1  Pamela M. Egan, WSBA No. 54736
   POTOMAC LAW GROUP PLLC
2  1905 7th Ave. W
   Seattle, WA 98119
3  Telephone: (415) 297-0132
   Email: pegan@potomaclaw.com
4    *Attorneys for Mark D. Waldron, Chapter 7 Trustee*

5

6            **UNITED STATES BANKRUPTCY COURT**
              **EASTERN DISTRICT OF WASHINGTON**
7

8  In re:                          | Case No. 18-03197 FPC 11

9  GIGA WATT, Inc., a Washington   | The Honorable Frederick P. Corbit
   corporation,
10                    Debtor.       | Chapter 7

11 MARK D. WALDRON, as Chapter 7   | Adv. Case No. 20-80031
   Trustee,
12                                  | **AMENDED VERIFIED**
                  Plaintiff,        | **COMPLAINT FOR (I) BREACH**
13        vs.                       | **OF FIDUCIARY DUTY TO GIGA**
                                    | **WATT, INC.,**
14 PERKINS COIE LLP, a Washington  | **(DEFENDANT PERKINS COIE**
   limited liability partnership,   | **LLP AND LOWELL NESS) (II)**
15 LOWELL NESS, individual and     | **AIDING AND ABETTING GIGA**
   California resident, GIGA WATT   | **WATT PTE. LTD.'S BREACH OF**
16 PTE., LTD., a Singapore corporation, | **FIDUCIARY DUTY TO GIGA**
   and ANDREY KUZENNY, a           | **WATT (DEFENDANTs PERKINS**
17 citizen of the Russian Federation, | **COIE LLP AND LOWELL NESS),**
                                    | **(III) BREACH OF FIDUCIARY**
18              Defendants,         | **DUTY TO GIGA WATT**
                                    | **(DEFENDANT GIGA WATT PTE.**
19             - and -              | **LTD. )AND (IV) AIDING AND**
                                    | **ABETTING BREACH OF**
20 THE GIGA WATT PROJECT, a        | **FIDUCIARY DUTY**
   partnership,                     | **(DEFENDANT ANDREY**
21                                  | **KUZENNY)**
               Nominal Defendant.
22

23 VERIFIED COMPLAINT – Page 1
24 REDACTED

25

Mark D. Waldron, in his capacity as the duly-appointed Chapter 7 Trustee, by and through his attorneys, the Potomac Law Group PLLC, for his Complaint against Perkins Coie LLP ("Perkins Coie") alleges as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This action is related to the bankruptcy case.

2. GW Singapore submitted to the personal jurisdiction of this Court by filing Claim No. 135 in the above-captioned bankruptcy case.

3. Kuzenny submitted to the personal jurisdiction of this Court by filing Claim Nos. 133, and 255.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## PARTIES

5. Plaintiff is the duly-appointed trustee in the above-captioned bankruptcy case pursuant to the *Appointment of Trustee*, dated September 30, 2020. [ECF No. 745.] Plaintiff also served as the Chapter 11 Trustee pursuant to the *Order Approving Appointment of Chapter 11 Trustee*, entered on June 24, 2019 [ECF No. 146] before the case converted to chapter 7 pursuant to the *Order Converting Case to Chapter 7*, entered on September 30, 2020. [ECF No. 744.]

6. Perkins Coie is a limited liability partnership formed under the laws of Washington State. It maintains offices in Seattle, Palo Alto, and numerous other cities worldwide. Perkins Coie is the 16th largest law firm in the United States. It was named one of the "Top Five Law Firms for Startups" in 2019

VERIFIED COMPLAINT – Page 2
REDACTED

(Kruze) and won the Technology/Telecom Deal of the Year" by The Deal Awards in 2019.

7. Upon information and belief, Lowell Ness resides in or around Palo Alto, California. He is a partner of Perkins Coie in the firm's Corporate practice, regularly acting as either company counsel or investors' counsel in venture capital financings. Perkins Coie's website adds that Ness is:

> a core member of the Blockchain Technology and Digital Currency industry group where he focuses part of his practice on assisting Blockchain, Bitcoin and other cryptocurrency clients raise money by maintaining relationships with key venture capital groups and other potential investors in the industry.

Ness earned a B.A. (*cum laude*) from the University of Pennsylvania in 1989. He earned a J.D. (*cum laude*) in 1994 from Georgetown University Law Center. He speaks French and Russian. Ness and Perkins Coie are referred to herein collectively as "Perkins Coie."

8. GW Singapore was incorporated under the laws of Singapore on December 28, 2016. As of March 2017, Sergey Pashentsev, a Russian citizen and, oddly, an auto mechanic in rural Russia, was GW Singapore's director, sole member, and sole shareholder. GW Singapore has failed to respond to correspondence sent to the email listed on its proof of claim filed in this case. Mail sent to the address listed on the proof of claim has been returned as undeliverable with no forwarding address. Perkins Coie is also unable to reach GW Singapore.

9. Andrey Kuzenny is a citizen of the Russian Federation. Upon information and belief, he is a shareholder of Giga Watt. In August 2018, he acted

VERIFIED COMPLAINT – Page 3
REDACTED

as the Chief Operating Officer, Chief Coordinator or Secretary. He signed the petition commencing this case on behalf of Giga Watt as its Secretary. Upon information and belief, he and Nikolay Evdokimov founded Giga Watt and another company, Cryptonomos Pte. Ltd. ("Cryptonomos"). In the summer of 2018, David Carlson resigned as Giga Watt's Chief Executive Officer after discovering that Kuzenny was embezzling funds from the accounts of token holders. Kuzenny has not responded to the Trustee's inquiries.

10. The Giga Watt Project was a partnership between Giga Watt, Inc. ("Giga Watt") and Giga Watt Pte., Ltd. ("GW Singapore"). The Giga Watt Token Launch White Paper (the "White Paper"), which was incorporated by reference into the token purchase agreements, described the Giga Watt Project as:

> The Giga Watt Project is built in **partnership** between Giga Watt, Inc. a U.S. company ("GigaWatt" or "Company"), which offers mining hosting service sat its Wenatchee, WA facilities, and GigaWattPte. Ltd., a Singapore company ("**Partner**"), which sells mining equipment to customers worldwide.

Exhibit A attached to this Complaint, White Paper, p. 5. (Emphasis added.) "The **Partner** offers equipment sales through Giga Watt's web site. " Exhibit A, White Paper at p. 5. (Emphasis added.) It adds:

> Giga Watt's standard turnkey solution includes purchase and delivery of mining equipment through its **Partner** with its subsequent setup and hosting at Giga Watt's facilities in Wenatchee, WA, with hosting fees starting as low as 7.5 USD cents/kW/hour4

Exhibit A, White Paper, p. 5. (Emphasis added.) Further:

> Under the **existing partnership arrangements** between Giga Watt and its Partner, the Partner is offered access to Giga Watt's facility at

VERIFIED COMPLAINT – Page 4
REDACTED

an unprecedentedly low hosting rate, which significantly increases mining rewards.

Exhibit A, White Paper, p. 12. (Emphasis added.) The White Paper mentions Giga Watt's partner, GW Singapore, approximately 25 times.

## **NON-PARTY ACTORS**

11. Giga Watt was incorporated under the laws of Washington on December 15, 2016. Giga Watt agreed to build crypto-currency mining facilities and to maintain those facilities in partnership with GW Singapore as the Giga Watt Project.

12. David Carlson, a U.S. citizen, was Giga Watt's CEO from January 1, 2017 to August 12, 2018, when he resigned. He was Giga Watt's sole director. In 2019, the Trustee commenced an adversary proceeding against Carlson and related persons regarding the eve-of-bankruptcy transfer of the one Giga Watt cryptocurrency facility that was not tokenized and not part of the Giga Watt Project. The Court approved the Trustee's settlement with Carlson pursuant to an Order, dated March 10, 2020. [ECF No. 508.]

13. Evdokimov left the Giga Watt Project before the ICO ended and shortly thereafter began running another initial coin offering with a company named ICOBox, Inc. ("ICOBox"). The SEC obtained a default judgment against ICOBox and Evdokimov for failing to register this coin offering and for failing to register as a broker dealer. The default judgment required ICOBox and

VERIFIED COMPLAINT – Page 5
REDACTED

1  Evdokimov to pay $16,059,429.99 as "ill-gotten gains" and pre-judgment interest.

2  It also imposed a civil penalty against Evdokimov in the sum of $192,768.

3      14.    After Evdokimov left the Giga Watt Project in the summer of 2017,

4  Kuzenny continued to run Cryptonomos and the Giga Watt ICO.

5      15.    Cryptonomos worked extensively on the Giga Watt Project. Upon

6  information and belief, Cryptonomos was incorporated under the laws of

7  Singapore in December 2016. Cryptonomos structured the Giga Watt Project's

8  Initial Coin Offering ("ICO") and ran the marketing campaign for the entire Giga

9  Watt Project. It also managed the online platform for collecting ICO sales

10 proceeds and was authorized to collect those sale proceeds on behalf of GW

11 Singapore. Perkins Coie represented Cryptonomos with respect to the Giga Watt

12 Project and its ICO.

13     16.    Katrina Arden, a/k/a Katrina Grant, Katrina Kovaleva and Ekatarina

14 Kovaleva, provided legal advice to the Giga Watt Project, including how to

15 structure the ICO. She is a Russian and U.S. citizen. ████████████████

16 ████████████████████████████████████████████████████

17 ████████████████████████████████████████████████  She

18 was also Giga Watt's incorporator. Although she did not attend law school, she is

19 a member of the California State Bar.

20                    **PRELIMINARY STATEMENT**

21     17.    The claims in this Complaint arise from the misappropriation by GW

22 Singapore of $10.8 million that Perkins Coie was holding in escrow (the

23 VERIFIED COMPLAINT – Page 6

24 REDACTED

25

"Escrow") pursuant to the Giga Watt Project. The Giga Watt Project was a partnership in which Giga Watt agreed to build and manage cryptocurrency mining facilities, and GW Singapore agreed to "tokenize" those facilities, i.e., sell outstanding shares or interests in them, pursuant to an Initial Coin Offering ("ICO"). ICOs were popular in 2016 and 2017. They have died down since the Securities and Exchange Commission began enforcing the U.S. securities laws against them.

18.     GW Singapore opened the Escrow with Perkins Coie. According to the White Paper, which describes the Giga Watt Project in detail, and whose provisions were incorporated by reference into the token purchase agreements, all token sale proceeds would be held in escrow until Giga Watt met certain milestones in constructing the new facilities. The escrowed token sale proceeds would not be released before the earlier of (a) a refund request by the token holder or (b) construction by Giga Watt that could service the applicable tokens. The Giga Watt Project touted Perkins Coie's involvement as an advisor and escrow. Ness' photograph was on Cryptonomos' website.

19.     As partners, Giga Watt and GW Singapore were agents of each. They could enforce agreements entered into by the other in the course of the partnership and they could be liable on contracts entered into by the other. They could impose liability on the other by their conduct.

VERIFIED COMPLAINT – Page 7
REDACTED

1    20.    In the First Claim of Relief, the Trustee asserts that, standing in the

2  shoes of Giga Watt, he can enforce the Escrow against Perkins Coie because Giga

3  Watt and GW Singapore were partners, as alleged above.

4    21.    Perkins Coie breached the Escrow by disbursing funds to its client,

5  GW Singapore, without regard to Giga Watt's construction progress. It simply

6  disbursed funds to GW Singapore ███████████████████████████████

7  ████████████████████

8    22.    As of August 4, 2017, four days after the ICO closed, Perkins Coie

9  held $22,351,937.58 in token sale proceeds for the benefit of the Giga Watt

10  Project. After making certain refunds to various token holders, Perkins Coie

11  disbursed four payments to GW Singapore totaling $10.8 million and four

12  payments to Giga Watt totaling $10,865,757.31. The payments to Giga Watt were

13  ███████████████████████████ and as a loan pursuant to the Revolving Line of

14  Credit, discussed below.

15    23.    Each payment to GW Singapore exceeded the escrow draw down

16  amount that should have been made based on Giga Watt's construction progress to

17  which the Escrow was tied. In contrast, each payment to Giga Watt corresponded

18  to the escrow draw down based on construction progress. Moreover, ██████████

19  ████████████████████████████████████████████████████

20  ████████████████████████████████████████████████

21  ████████████████████████████████████████████

22  ████████████████████████████████████████████████

23
   VERIFIED COMPLAINT – Page 8
24  REDACTED

25

██████████████████████████████████ Perkins Coie violated the Escrow ████████████████████████████████████████ ████████████████.

24.    In stark contrast to the GW Singapore payments, ██████████ ████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████ Further, the amount of payments corresponded to the amount of capacity that Giga Watt had built. A summary of the transfers and the basis for the request – token release or finished construction – follows:

| Date | Amount | Paid To | |
|------|--------|---------|---|
| 8/8/2017 | ($5,400,000.00) | GW Singapore | ██████████ |
| 8/19/2017 | ($900,000.00) | GW Singapore | ██████████ |
| 9/25/2017 | ($1,200,000.00) | GW Singapore | ██████████ |
| 11/7/2017 | ($3,300,000.00) | GW Singapore | ██████████ |
| | | | ($10,800,000.00) |
| 12/19/2017 | ($2,000,000.00) | Giga Watt, Inc. | ██████████ |
| 12/26/2017 | ($4,500,000.00) | Giga Watt, Inc. | ██████████ |
| 2/9/2018 | ($1,148,057.58) | Giga Watt, Inc. | ██████████ |
| 2/22/2018 | ($3,217,699.73) | Giga Watt, Inc. | ██████████ |
| **TOTAL** | | | ($10,865,757.31) |

¹ ████████████████████████████████████.

VERIFIED COMPLAINT – Page 9
REDACTED

1    25.    Perkins Coie's breach of the Escrow damaged Giga Watt. RCW

2    25.05.120 states in pertinent part, "If, in the course of the partnership's business  .

3    . ., a partner receives or causes the partnership to receive money or property of a

4    person not a partner, and the money or property is misapplied by a partner, the

5    partnership is liable for the loss." Partners are liable for the partnership's debts.

6    RCW 25.05.125; Singapore Partnership Act § 5. In addition, the Escrow breach

7    caused lost profits by hastening, in fact, guaranteeing, Giga Watt's collapse.

8    26.    Perkins Coie's breach of fiduciary duty immediately put Giga Watt in

9    breach of the token purchase agreements which incorporated the terms of the

10   White Paper, including, in particular, the Escrow requirements. Additionally,

11   Perkins Coie's conduct increased Giga Watt's liability in putative class actions

12   suits that have been filed to rescind the token purchases as part of an unregistered

13   securities offering pursuant to section 12(a)(1) of the United States Securities Act

14   of 1933. 15 U.S.C. §§ 77(l) and (e). Giga Watt should have been in a position to

15   buy back $10.8 million in token sales out of the Escrow. Perkins Coie's breach of

16   the Escrow deprived Giga Watt of that recourse and increased Giga Watt's

17   rescission liability under the U.S. securities laws.

18   27.    Giga Watt, which was a start-up could not endure the loss of $10.8

19   million in investors' funds (approximately half the total token proceeds). Within a

20   year of the ICO's close, Giga Watt was a defendant in multiple cases, described

21   below, in which the plaintiffs alleged, *inter alia,* that their tokens were never

22   activated, yet the money was dissipated from the Escrow.  Token holders have

23   VERIFIED COMPLAINT – Page 10
24   REDACTED

25

filed approximately $69 million in damages claims against Giga Watt arising from the Giga Watt Project. Non-insider trade creditors have filed $4.5 million in pre-petition claims.

28. The Trustee's Second Claim for Relief seeks damages against Perkins Coie for aiding and abetting GW Singapore's breach of fiduciary duty to Giga Watt. GW Singapore and Giga Watt were partners in the GW Project. Therefore, GW Singapore owed Giga Watt a fiduciary duty. In breach of its fiduciary duty to Giga Watt, GW Singapore withdrew $10.8 million in escrowed token sale proceeds from the Escrow before Giga Watt had built the requisite facilities putting Giga Watt in breach of the WTT Token Sales Agreements and leading to Giga Watt's collapse.

29. Perkins Coie knew that GW Singapore and Giga Watt were partners.

30. In addition, Perkins Coie had an independent duty to Giga Watt because Giga Watt was GW Singapore's partner and principal with respect to all

1    aspects of the Giga Watt Project, including the most critical component of the

2    Project – the Escrow.

3        31.     By disbursing money to GW Singapore in violation of the Escrow

4    terms, Perkins Coie substantially assisted GW Singapore's breach of its fiduciary

5    duty to Giga Watt. The breach of fiduciary duty caused the same damages as

6    Perkins' Coie breach as alleged in the First Claim for Relief.

7        32.     Therefore, Giga Watt seeks damages from Perkins Coie on the

8    Second Claim for Relief in an amount not less than $10.8 million.

9        33.     The Trustee's Third Claim for Relief is against GW Singapore for

10    breach of fiduciary duty. ███████████████████

11    ████████████████████████████████ GW

12    Singapore breached its fiduciary duty to Giga Watt. That breach of fiduciary duty

13    caused the same damages that Perkins Coie's breach of fiduciary duty caused, as

14    alleged in the First Claim for Relief.

15        34.     The Fourth Claim for Relief is against Kuzenny for aiding and

16    abetting GW's Singapore's breach of fiduciary duty. Kuzenny knew that GW

17    Singapore owed a fiduciary duty to Giga Watt and that withdrawing funds from

18    the Escrow before the construction was finished would breach that fiduciary duty.

19    With this knowledge, ████████████████████████

20    ████████████ thus substantially assisting GW Singapore's breach of fiduciary

21    duty. Kuzenny's aiding and abetting of GW Singapore's breach of fiduciary duty

22

23

   VERIFIED COMPLAINT – Page 12
24    REDACTED

25

1 to Giga Watt proximately caused the same damages as alleged in the First Claim
2 of Relief.

3 **GENERAL ALLEGATIONS**

4     35.    In March 2017, ████████████████████████████
5 ████████████████████████████████████████
6 ██████████████████████████████████████████
7 ██████████████████████████████████████████
8 ████████████████████████████████████████
9 ████████████████████████████████████████████
10 ████████████████████████████████████████
11 ██████████████████████████████████

12     36.    On a whirlwind of conferences, interviews and articles, during the
13 Spring and Summer of 2017, Carlson  described the Giga Watt Project's mission
14 as making large-scale cryptocurrency mining available to the "the small miner."
15 Carlson wrote, "The Giga Watt Project is a move to decentralize the global
16 balance of mining power and put it back in the hands of the little guy.".

17     37.    A blockchain, on which cryptocurrency depends, is decentralized. It
18 is a public distributed ledger that has no centralized manager. The back office
19 functions are performed by cryptocurrency miners who are scattered throughout
20 the world. They are rewarded for their services with coins, which they receive as
21 an "award" when they perform the back office function of verifying a transaction
22 for entry onto the blockchain. Blockchain is considered very reliable in this regard

23
VERIFIED COMPLAINT – Page 13
24 REDACTED

25

1  because no one has the computing power necessary to cheat. Changing one block

2  would require changing every other block. Until quantum computing becomes

3  available, no one has the computer power necessary to penetrate this defense.

4      38.     In contrast to the decentralization of the blockchain, cryptocurrency

5  mining is dominated by a few big companies. There are high barriers to mining.

6  The machines are noisy, dusty, smelly, and hot. They consume an enormous

7  amount of power. And miners or "rigs" are cranky, requiring attention to

8  maximize their efficiency. The Giga Watt Project offered Carlson an opportunity

9  to scale up and at the same time broaden (decentralize) cryptocurrency mining.

10     39.     Through Carlson's efforts and local relationships, Giga Watt obtained

11  a power contract with the Douglas County Public Utility District (the "District")

12  for 30 MW of power, a lease for land to which the power could be delivered

13  ("Pangborn"), and the funds to begin construction. In May 2017, Giga Watt sold a

14  small crypto-mining facilities ("Giga Pod") to Allrise IP Holding, Inc. ("Allrise"),

15  a Cayman corporation, for $1.2 million. In June 2017, it sold a Giga Pod to

16  EcoDiversified Holding, Inc. ("EcoDiversified"), a Nevada Corporation, for $1.5

17  million.

18     40.     Giga Watt also had access to a $27 million revolving line of credit

19  with GW Singapore. As of June 30, 2017, Giga Watt's balance sheet showed that

20  Giga Watt had drawn $2,409,500 on its "construction progress loan." Carlson had

21  relationships within the community and was reasonably confident he could

22  negotiate leases for additional land. Indeed, he succeeded in leasing four

23
    VERIFIED COMPLAINT – Page 14
24  REDACTED

25

1  additional parcels from Giga Watt's landlord at its preexisting facility in Moses

2  Lake, Washington. These parcels were known as the Expansion Area, Parcel C,

3  Parcel D, and Parcel E. On these four parcels, Giga Watt built six pods for

4  tokenization in addition to the two pods that Giga Watt sold to Allrise and

5  EcoDiversified, respectively.

6       41.    The ICO offered access to Giga Watt's future facilities and to Giga

7  Watt's current capacity of 2.25 MW through tokens. One token entitled the holder

8  to crypto-mine at Giga Watt at the rate of one (1) "Watt" for fifty years, which

9  was the estimated life span of the hard asset infrastructure that Giga Watt was

10  building. A token cost $1.00 at the ICO's onset, with the price rising throughout

11  the ICO by $.05 until the price reached $1.20.

12       42.    The White Paper, which set forth the terms of the ICO, provided for

13  the Escrow:

14      All funds collected through the pre-sale and Token Launch will be
deposited in escrow. Original payments made in BTC and ETH will
15      be converted to USD at the rate effective at the time when the rights
to WTT Tokens were reserved. The funds will be released from
16      escrow in step with the completion of facilities.

17
Exhibit A, White Paper, p. 18.
18

19      If the token sale is over-subscribed, meaning that there is more
demand for WTT tokens than there is existing facility capacity, the
capacity will be allocated to the WTT tokens in the order in which
20      the WTT tokens were purchased. The over-subscribed proceeds will

21

22

23  VERIFIED COMPLAINT – Page 15
REDACTED
24

25

be placed into escrow until the requisite processing center capacity has been built out. [footnote 21]

Fn. 21: If the construction of the processing center capacity designed to accommodate additional WTT tokens is not completed in a reasonable amount of time, the relevant portion of these proceeds will be refunded to the WTT token purchasers. However, if Giga Watt [has] discharged all its obligations in full, no refunds will be due to the WTT token purchasers.

Exhibit A, White Paper, p. 19.

Construction timeline specified in this White Paper is based on the reasonable estimates but is not guaranteed. This timeline may change, and the construction may be delayed because of many factors, including those beyond Giga Watt's control, such as the actions of third-parties (contractors, suppliers, etc.). If the completion of the capacities is delayed by more than 3 months from the projected date, and, consequently, the relevant WTT tokens are not issued, the escrow agent may issue a refund at the request of the WTT token purchasers. The refund will be issued in the original form of payment at the exchange rate on the date of the refund.

Exhibit A, White Paper, pp. 26-27.

43.     In the months leading up to the ICO, which began on May 19, 2017,

44.

VERIFIED COMPLAINT – Page 16
REDACTED



45.     The ICO ran from May 19, 2017 to July 31, 2017. It included a pre-sale that ran from May 19, 2017 to June 2, 2017, offering tokens for $1 but requiring a minimum of $10,000. Early purchase was advantageous because tokens would be served on a first come basis. As of August 4, 2017, Perkins Coie confirmed by letter that it held $22,351,937.58. In this letter, Perkins Coie stated that it held funds in its client account for GW Singapore, omitting any reference to the fact that Perkins Coie held these funds as escrow for the Giga Watt Project's ICO.

VERIFIED COMPLAINT – Page 17
REDACTED

1    46. 

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16           [This Complaint continues on the next page.]

17

18

19

20

21

22

23   VERIFIED COMPLAINT – Page 18
24   REDACTED

25

1 ████████████████████████████████████████████

2 ██████████

3 ████████████████████████████████████████████████

4 ████████████████████████████████████████████████

5 █████████████████████████

6       47.     Indeed, Cryptonomos carried Perkin Coie's name and Lowell Ness'

7 photograph on its website with the caption, "Legal Consulting and Escrow.

8 Internationally acclaimed law firm with vast experience in the field of blockchain

9 and cryptocurrencies." The website states under Ness' photograph and next to the

10 picture of a safe:

11     All funds raised through the WTT Token Launch are put in fiat
    escrow (funds received in cryptocurrencies are first converted into

12     USD). Funds are released from escrow in batches ***only after the***
    ***underlying capacities are built*** and relevant tokens are issued and

13     distributed.

14 (Emphasis added.)

15       48.     Tokens were purchased through a "module" on Giga Watt's website

16 which Cryptonomos created and controlled. Using "Smart Contracts," GW

17 Singapore and the token holders entered into the WTT Token Sales Agreements

18 which incorporated by reference the terms of the White Paper, including its

19 escrow terms.

20       49.     In July 2017, ████████████████████

21 ████████████████████████████████████████████

22 ████████████████████████████████████████████

23 ████████████████████████████████████████████

VERIFIED COMPLAINT – Page 19
REDACTED

1
2
3


4
5
6
7
8

9      50.     The chart below shows the escrow disbursements to GW Singapore.

10   The blue bars show the maximum amount of money that could have been

11   disbursed to GW Singapore, based on Giga Watt's power capacity at the time of

12   the disbursement. The orange bars show the actual amount disbursed to GW

13   Singapore.

14
15
16   
17
18
19
20
21
22

23   VERIFIED COMPLAINT – Page 20
24   REDACTED

25

1    51. The amount of capacity constructed by Giga Watt and the dates of

2    construction are based on representations made by Giga Watt to the Securities and

3    Exchange Commission in its letter dated August 2, 2017. ███████████████

4    ████████████████████████████████████

5    52. Giga Watt had no access to the Escrow. Perkins Coie has not

6    acknowledged Giga Watt as its client and would not provide documents to the

7    Trustee without the Trustee formally moving for and obtaining a Rule 2004 Order

8    and Perkins Coie moving for and obtaining a Protective Order in order to preserve

9    its attorney-client privilege with GW Singapore and Cryptonomos.

10    53. Further, distributions from the Escrow to Giga Watt correlated to

11    Giga Watt's completed construction. They were also transferred as loans from

12    GW Singapore pursuant to the Revolving Line of Credit.

13    54. The chart below compares these disbursements to Giga Watt's power

14    capacity at the time of the disbursement to Giga Watt:



VERIFIED COMPLAINT – Page 21
REDACTED

55.     In December 2017, StormsMedia LLC ("StormsMedia") commenced a complaint against all the principals in the Giga Watt Project, asserting a private right of action for rescission under section 12(a)(1) of the US Securities Act of 1933 for failing to register the sale of the tokens and miners. StormsMedia also inquired regarding the Escrow. Perkins Coie and/or the law firm that represented Giga Watt in the StormsMedia action, Wilson Sonsini Goodrich and Rosati ("WSGR") informed StormsMedia that there were sufficient funds in the Escrow to rescind and buy back StormsMedia's tokens. In January 2018, Giga Watt paid $953,319.55 to StormsMedia out of funds on hand.

56.     After this settlement, the lawyer for StormsMedia approached Perkins Coie on behalf of a group of other token and miner owners asking that remaining Escrow funds be frozen. There should have been approximately $10.8 million in the Escrow. He was informed that Perkins Coie was not holding any funds in Escrow.

57.     Shortly thereafter, on March 19, 2018, the lawyer filed a securities action against Giga Watt and GW Singapore under the caption, *Moss v. Giga Watt, Inc., et al.*, No. 2:18-cv-0010-SMJ (E.D. Wash.). The complaint alleged individual claims of an unregistered offering of securities under the Securities Act of 1933 and the Washington Securities Act and a claim for rescission of the token purchases. In his complaint, Moss alleged:

> Moreover, contrary to the terms of the GIGA WATT White Paper – which stated that all invested cryptocurrency would be held in escrow and would only "be released from escrow in step with the completion of facilities" – Defendants have represented to Plaintiff that, *without*

VERIFIED COMPLAINT – Page 22
REDACTED

1
2
3
4
5

*regard to GIGA WATT's failure to have completed its facilities,* virtually all of the cryptocurrency raised from investors in the ICO has been liquidated into U.S. Dollars and has been transferred from the escrow account to an operating account; and Plaintiff reasonably *believes the funds raised have been dissipated, or will be dissipated, before all ICO investors receive their Giga Watt tokens/mining equipment or any opportunity to receive a return on their investments.*

6   Moss Complaint, pp. 32-33, ¶ 105. (Emphasis added.)

7   58.   On March 20, 2018, a separately represented token purchaser named

8   Raymond Balestra filed an action against Giga Watt, GW Singapore,

9   Cryptonomos, and Giga Watt CEO, Carlson, under the caption *Balestra v. Giga*

10  *Watt, Inc., et al.,* No. 2:18-cv-00103-SMJ (E.D. Wash.). The complaint alleges a

11  claim of unregistered offering of securities against all defendants under section

12  12(a)(1) and a control person claim against Dave Carlson under section 15(a) of

13  the Securities Act of 1933 on behalf of a putative class of plaintiffs who purchased

14  tokens during the Giga Watt ICO. On June 28, 2018, the court appointed Alex

15  McVicker as lead plaintiff in the *Balestra* case.

16  59.   In his complaint, *Balestra, inter alia*, sought a preliminary injunction

17  enjoining any further disbursement of escrow funds (although by then it was

18  empty), an accounting, imposition of a constructive trust, and rescission. Balestra

19  Complaint, pp. 21-22. By stipulation of the parties, on July 3, 2018, the Court

20  consolidated this case with the action titled *Moss v. Giga Watt, Inc., et al.*

21  described above.

22
23
24

VERIFIED COMPLAINT – Page 23
REDACTED

25

1     60.     On or about April 2018, the U.S. Securities and Exchange

2    Commission commenced a formal investigation of Giga Watt and the Giga Watt

3    Project ICO. In this investigation, Arden wrote an opinion letter on behalf of Giga

4    Watt in which she stated that the tokens were "utility tokens" and not securities.

5    Under this theory, the Escrow was the linchpin: if the sale token proceeds were

6    held in Escrow and tokens not issued until Giga Watt built out the capacity, then

7    the token would be a "functional product" – not a security. The key to Arden's

8    utility token theory was that the token sale proceeds would not be disbursed from

9    Escrow and the tokens would not be "issued" until Giga Watt had built the

10   underlying capacity. In Arden's opinion, the token would be a "functional

11   product" not a security. Opinion Letter, p. 5.

12     61.     Paragraph 15 of the Opinion Letter confirms that, "The Company

13   [GW Singapore] contracted Perkins Coie LLP, a leading U.S. law firm to escrow

14   the WTT Token sale proceeds." ████████████████████████████

15   ████████████████████████████████████████████

16   ████████████    it agreed to serve as the Escrow holder for the Giga Watt Project

17   ICO.

18     62.     In July 2018, Carlson informed WSGR that Giga Watt did not have

19   access to any information regarding the token sale proceeds and the Escrow. GW

20   Singapore and Cryptonomos had that information. Giga Watt had no ability to sell

21   tokens or miners or to see revenues from the sale of tokens or miners. Purchases

22   of tokens and miners were directed to a "module" on Giga Watt's website that

23
   VERIFIED COMPLAINT – Page 24
24   REDACTED

25

Cryptonomos created and controlled. All proceeds went to GW Singapore. Arden, rather than Carlson or Giga Watt, produced the information regarding the escrow and token sale proceeds.

63. In July 2018, Carlson discovered that Kuzenny was embezzling funds from the wallets of token holders whose tokens Giga Watt was servicing with built-out capacity. When Carlson confronted Kuzenny, Kuzenny did not deny the embezzlement. Instead, he asked for more time to replenish the funds, pleading, "Please don't break the balls." Carlson resigned immediately thereafter as of August 12, 2018. Kuzenny first appears on Giga Watt's filings with the Washington Secretary of State that month.

64. In October 2018, Raphael Sofair commenced a RICO action against Giga Watt, GW Singapore, and Carlson for claims arising from GW Singapore's sale of miners after the ICO ended. According to the allegations, after the ICO ended, GW Singapore sold miners without regard to Giga Watt's capacity to host miners. When Giga Watt informed these miner purchasers that their miners would be deployed after token holders' miners were deployed, they sued.

65. That same month, October 2018, the DC PUD provided one-year's notice of intent to terminate the Pangborn power contract and the landlord for the Pangborn site commenced eviction proceedings.

66. Giga Watt commenced the above-captioned bankruptcy case on November 19, 2018 (the "Petition Date"). Kuzenny signed the petition commencing this bankruptcy case.

VERIFIED COMPLAINT – Page 25
REDACTED

## FIRST CLAIM FOR RELIEF
### (Breach of Fiduciary Duty – Perkins Coie)

67.  Plaintiff incorporates all prior allegations by reference as if set forth fully herein.

68.  Giga Watt has privity with Perkins Coie with respect to the Escrow agreement because its partner, GW Singapore entered into the Escrow agreement pursuant to the Giga Watt Project. Perkins Coie owed Giga Watt a fiduciary duty as GW Singapore's partner with respect to the Escrow.

69.  Perkins Coie's role in the ICO was prominent and crucial. █████

70.

VERIFIED COMPLAINT – Page 26
REDACTED

1    71.    Perkins Coie failed to act strictly in accordance with the provisions of

2    the Escrow and failed to disburse the Escrow proceeds with scrupulous honesty,

3    skill, and diligence. As set forth above, Perkins Coie disbursed funds to GW

4    Singapore, contrary to the Escrow condition to disburse funds only when Giga

5    Watt had completed the facilities to service the tokens. ███████████████

6    ████████████████████████████████████████████████ This was a

7    breach of fiduciary duty to Giga Watt.

8    72.    The partnership is liable when a partner misappropriates funds

9    received from a non-partner. RCW 25.05.120. ███████████████

10   ████████████████████████████████████████████████████

11   ██████ Therefore, when Perkins Coie violated the Escrow and disbursed Escrow

12   funds before capacity was built out, Giga Watt immediately became liable ██████

13   █████████████ Perkins Coie's breach of the Escrow proximately caused that

14   liability.

15   73.    In addition, Perkins Coie's breach of fiduciary duty increased Giga

16   Watt's liability for not registering the ICO as required by the U.S. securities laws.

17   Perkins Coie had in fact advised the Giga Watt Project of the risk that the ICO

18   would be required to register with the Securities and Exchange Commission.

19   74.    Giga Watt is a named defendant in two putative class actions under

20   the Securities Act of 1933 seeking rescission under section 12(a)(1) thereof. But

21   for Perkins Coie's failure ██████████████████████████████████████

22   ████████████████████████████████████████████████

23   VERIFIED COMPLAINT – Page 27
24   REDACTED

25

1 ███████ Giga Watt's rescission liability has increased by $10.8 million plus

2 interest. Furthermore, allowing $10.8 million to be misappropriated is a

3 significant blow to any company, let alone a start-up such as Giga Watt. The

4 Escrow breach guaranteed Giga Watt's collapse and this bankruptcy case in which

5 creditors have filed approximately $73 million in claims.

6    75.    Based on the foregoing, Perkins Coie is jointly and severally liable

7 with the other Defendants to Giga Watt for not less than $10.8 million plus

8 interest, and lost profits.

9 ## SECOND CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty – Perkins Coie)

11    76.    Plaintiff incorporates all prior allegations by reference as if set forth

12 fully herein.

13    77.    GW Singapore was Giga Watt's partner in the Giga Watt Project and

14 thus owed Giga Watt a fiduciary duty.

15    78.  ████████████████████████████

16 ████████████████████████████████████

17 ████████████

18    79.  ████████████████████████████

19 ████████████████████████████████████

20 ████████████████████████████████████

21 ████████████████████████████████████

22 ████████████████████████████

VERIFIED COMPLAINT – Page 28
REDACTED

1      80.     Perkins Coie also separately owed Giga Watt a fiduciary duty as set

2 forth in the First Claim of Relief, herein, which allegations are incorporated herein

3 by reference as if set forth fully herein.

4      81.     Perkins Coie substantially assisted GW Singapore's breach of

5 fiduciary duty to Giga Watt by disbursing funds from the Escrow ████████

6 ████████████████████████████████████████████████████

7 ████████████

8      82.     Perkins Coie's conduct proximately caused damage to Giga Watt as

9 set forth in the First Claim of Relief herein, which allegations are incorporated

10 herein by reference as if set forth fully herein.

**THIRD CLAIM FOR RELIEF**
**(Breach of Fiduciary Duty – GW Singapore)**

13      83.     Plaintiff incorporates all prior allegations by reference as if set forth

14 fully herein.

15      84.     GW Singapore owed a fiduciary duty to Giga Watt as Giga Watt's

16 partners in the Giga Watt Project.

17      85.     GW Singapore breached its fiduciary duty to Giga Watt by

18 withdrawing $10.8 million from the escrow in violation of its terms.

19      86.     GW Singapore's conduct and Cryptonomos' conduct proximately

20 caused damage to Giga Watt as set forth in the First Claim of Relief herein, which

21 allegations are incorporated herein by reference as if set forth fully herein.

VERIFIED COMPLAINT – Page 29
REDACTED

### FOURTH CLAIM OF RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty – Kuzenny)

87. Plaintiff incorporates all prior allegations by reference as if set forth fully herein.

88. Kuzenny knew that GW Singapore and Giga Watt were partners in the Giga Watt Project and that the Escrow required Giga Watt to complete the requisite construction before funds could be released.

89. Despite this knowledge, ██████████████████ ████████████████████████████ ██████████████████████████████ ██████████████████████████████ ████████

90. Singapore's breach of fiduciary duty and Kuzenny's aiding and abetting that breach proximately caused damage to Giga Watt as alleged in the First Claim of Relief which allegations are incorporated herein by reference.

### PRAYER

Wherefore, the Plaintiff respectfully requests that the Court:

1. Enter judgment in Plaintiff's favor and against the Defendants for joint and several liability in an amount to be proved at trial, plus prejudgment and post-judgment interest, costs and attorneys' fees; and

VERIFIED COMPLAINT – Page 30
REDACTED

1    2.    Grant such other and further relief as the Court deems necessary and

2    just.

3    Dated: November 19, 2020                    POTOMAC LAW GROUP PLLC

4
                                        By:    _/s/ Pamela M. Egan_____
5                                              Pamela M. Egan (WSBA No. 54736)
                                               *Attorneys for Mark D. Waldron, Chapter 7*
6                                              *Trustee, Plaintiff*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
     VERIFIED COMPLAINT – Page 31
24   REDACTED

25

# **VERIFICATION**

I, Mark D. Waldron, am the duly-appointed Chapter 7 Trustee in the above-captioned bankruptcy case. I have reviewed the Complaint. I believe the allegations set forth therein are true based upon my personal knowledge and where applicable based on my investigation and review of documents in this case.

I declare under penalty of perjury that the foregoing is true.

Signed this 19th day of November 2020 in Tacoma, Washington.


_____
Mark D. Waldron, in his capacity as
the Chapter 7 Trustee

– Page 1