Bradley S. Keller, WSBA #10665
Ralph E. Cromwell, Jr., WSBA #11784
Jofrey M. McWilliam, WSBA #28441
Byrnes Keller Cromwell LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
(206) 622-2000
Facsimile No.: (206) 622-2522

Attorneys for Perkins Coie LLP

The Honorable Frederick P. Corbit
Chapter: 7

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In Re:<br><br>GIGA WATT, INC., a Washington corporation,<br><br>　　　　　　　　　　Debtor. | No. 18-03197-FPC11<br><br>The Honorable Frederick P. Corbit<br><br>**CHAPTER 7** |
| MARK D. WALDRON, as Chapter 7 Trustee,<br><br>　　　　　　　　　　Plaintiff,<br><br>vs.<br><br>PERKINS COIE, LLP, a Washington limited liability partnership; LOWELL NESS, individual and California resident; GIGA WATT PTE., LTD. a Singapore corporation; and ANDREY KUZENNY, a citizen of the Russian Federation;<br><br>　　　　　　　　　　Defendants<br>　　and<br>THE GIGA WATT PROJECT, a partnership,<br>　　　　　　　　　　Nominal defendant. | Adv. Case No. 20-80031<br><br>**PERKINS' AND NESS' MOTION TO COMPEL ARBITRATION AND STAY** |

PERKINS' AND NESS' MOTION TO COMPEL ARBITRATION AND STAY- 1

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

20-80031-FPC    Doc 40    Filed 02/26/21    Entered 02/26/21 16:01:19    Pg 1 of 19

# I. INTRODUCTION AND RELIEF REQUESTED

Perkins Coie LLP and Lowell Ness (collectively "Perkins") move the Court to compel arbitration of this matter pursuant to the express terms of the WTT Token Purchase Agreements that the Trustee seeks to enforce against Perkins. The matter should be stayed pending the completion of the arbitration that is required by the Token Purchase Agreements upon which Debtor's claims here are premised.

The agreement to arbitrate in this case is governed by the Federal Arbitration Act, 9 U.S.C. § 206, because it involves international commerce—specifically the sale of digital tokens by a Singapore entity (Giga Watt Pte. Ltd.) to purchasers from around the world, for the purpose of "mining" cryptocurrencies on the world-wide web. The United States Supreme Court has made clear that the strong policy favoring arbitration "applies with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985). In particular, the Federal Arbitration Act "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

Here, the Trustee claims that discussion of an "escrow" arrangement—contained in marketing literature referred to as the "White Paper"—was incorporated by reference into Token Purchase Agreements between Giga Watt Pte. Ltd ("GW Singapore") and each token purchaser. The Trustee also claims that because the Debtor, Giga Watt Inc. ("GW Wenatchee"), was in a partnership with GW Singapore,

PERKINS' AND NESS' MOTION TO COMPEL ARBITRATION AND STAY- 2

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

20-80031-FPC    Doc 40    Filed 02/26/21    Entered 02/26/21 16:01:19    Pg 2 of 19

it can enforce this escrow arrangement even though it is not a signatory to the Token Purchase Agreements. Finally, the Trustee claims that, although Perkins was not a party to the Token Purchase Agreements, Perkins was aware of the terms of escrow as allegedly incorporated by reference into Token Purchase Agreements and therefore implicitly agreed to those terms and "entered into" the Agreement.

In short, under the Trustee's theory, he is stepping into the shoes of GW Singapore, a signatory to the Token Purchase Agreements, to assert those contractual rights against Perkins, who is allegedly bound by the Token Purchase Agreements to act as an escrow agent with regard to disbursement of token sale proceeds. Under the Trustee's allegations and theory of the case, the law is clear that the Debtor (and therefore the Trustee) cannot selectively choose which terms of the Token Purchase Agreements he will enforce, and thus is bound by all of its terms, including that all disputes "arising from or relating to" the Agreement be submitted to binding arbitration. *See GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, ___ U.S. ___, 140 S. Ct. 1637, 1644 (2020). Accordingly, this Court must compel arbitration under federal law and stay the case in the interim.

## II. BACKGROUND

The Court is familiar with the basic facts of this matter as currently known (recognizing that no discovery has yet taken place). The facts are summarized at length in Perkins' Opposition to the Trustee's Motion to Strike Jury Demand, and will not be repeated at length here. Perkins reiterates here only those facts relevant to this Motion to Compel Arbitration and Stay.

PERKINS' AND NESS' MOTION TO COMPEL ARBITRATION AND STAY- 3

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

20-80031-FPC    Doc 40    Filed 02/26/21    Entered 02/26/21 16:01:19    Pg 3 of 19

### A. The Trustee Seeks to Enforce the Token Purchase Agreement Against Perkins.

In its first claim for relief, the Trustee alleges that "GW Singapore entered into the Escrow agreement" with Perkins, and that GW Wenatchee (the Debtor), as the alleged partner of GW Singapore, is entitled to enforce the escrow terms because it "has privity with Perkins Coie with respect to the escrow agreement." Am. Compl. ¶ 68. One of the cases cited by the Debtor defines an escrow as follows:

> An excrow is a written instrument, which by its terms imparts a legal obligation, deposited by the grantor, promisor, or obligor, or his agent, with a stranger or a third person . . . to be kept by the depository until the performance of a condition or the happening of a certain event, and then to be delivered over to take effect.

*Lechner v. Halling*, 216 P.2d 179, 185 (Wash. 1950) (emphasis omitted). Thus, if there were a conventional escrow, one would expect to see a written agreement between Giga Watt Pte. Ltd., the various token purchasers, and Perkins, whereby the token purchasers agreed to deposit the proceeds of token purchases with Perkins, and whereby all parties agreed to specific directions to Perkins regarding release of the proceeds. No such agreement has been alleged, however, and Perkins has been unable to find any such escrow agreement in its files. *See* Am. Compl. 17:8-13; Declaration of Ralph E. Cromwell, Jr. ("Cromwell Decl."), ¶ 2. Accordingly, in the Amended Complaint, it is necessary for the Trustee to create the missing escrow agreement and then to devise a theory by which the Debtor has standing to enforce the escrow terms.

To do so, the Trustee relies on the "White Paper," which is attached to the Amended Complaint. The White Paper does mention an escrow arrangement, but

PERKINS' AND NESS' MOTION TO COMPEL ARBITRATION AND STAY- 4

BYRNES • KELLER • CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

20-80031-FPC    Doc 40    Filed 02/26/21    Entered 02/26/21 16:01:19    Pg 4 of 19

then explicitly states it is only an informational tool and disclaims that the White Paper gives rise to any contractual obligations:

> The purpose of this White Paper is to present the Giga Watt project to potential token holders in connection with the proposed Token Launch. The information set forth below may not be exhaustive and does not imply any elements of a contractual relationship.

Am. Compl., Ex. A at 3.

Because the White Paper does not give rise to any contractual obligation, the way in which token holders could actually purchase tokens was in a separate "WTT Token Purchase Agreement," which the Amended Complaint repeatedly references. *E.g.*, Am. Compl. at 4:11, 7:10, 10:9, 19:17. To access the Token Purchase Agreement, the purchaser had to go online, to insert information into the Token Purchase Agreement about how many tokens they wished to purchase, and to check "Accept." Am. Compl. 4:10, 7:9, 10:10, 19:18. This was explained to Perkins in a May 17, 2017, email whereby defendant Lowell Ness, a partner at Perkins, was asked to review the "final version" of the Token Purchase Agreement:

> Lowell, attached is the final version of the White Paper and a Token Purchase Agreement that would be incorporated into the web-site, so every purchaser would click "Accept" button before making payment.

*See* Cromwell Decl., Ex. 2.

In the Amended Complaint, it is the Trustee's theory that the Token Purchase Agreement incorporates the terms of the White Paper by reference and thus incorporates by reference the discussion in the White Paper of an escrow agreement.

PERKINS' AND NESS' MOTION TO COMPEL ARBITRATION AND STAY- 5

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

20-80031-FPC    Doc 40    Filed 02/26/21    Entered 02/26/21 16:01:19    Pg 5 of 19

*E.g.*, Am. Compl. 10:8-10, 7:9-11.  In other words, it is the Trustee's theory that the Token Purchase Agreement is the escrow agreement because it allegedly incorporates escrow terms from the White Paper by reference.

However, this is not quite as straightforward as it sounds.  For example, what was sent to Lowell Ness as the "final version" of the Token Purchase Agreement contained not only a general statement incorporating the terms of the White Paper, but also an actual, explicit escrow provision.  *See* Cromwell Decl. at 3 ¶ 3.  This provision stated that Perkins Coie would act as an escrow agent to hold the proceeds of token sales, but it also said that the trigger for the release of funds would be the issuance of tokens to the purchasers:

> 3.  <u>Escrow</u>.  Funds collected from the Purchaser will be deposited to the escrow account held in Trust by Perkins Coie <u>until the WTT Tokens are issued to the Purchaser</u>.  All funds paid in BTC or ETH will be converted to U.S. dollars based on the exchange rate at any time of conversion with 24 hours from the time of purchase.

*See id.* ¶ 3 (emphasis added).  Defining the release of tokens as the trigger authorizing the release of funds from escrow is a problem for the Trustee because it appears that tokens were, in fact, issued to all purchasers.  For example, in a letter to the SEC which is hyperlinked to the Complaint, the Debtor represents to the SEC that it sold 20,997,260 tokens and, that by February 28, 2018, it had issued 23,178,000 tokens.[1] *See* Cromwell Decl., Ex. 4 at 12-13.  In addition, the Amended Complaint alleges that

---

[1] The White Paper explains that for every 100 tokens sold, up to 15 additional tokens could be issued for the benefit of team members, Partners, and advisors.  Am. Compl. Ex. A at 19.

PERKINS' AND NESS' MOTION TO COMPEL ARBITRATION AND STAY- 6

BYRNES • KELLER • CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

20-80031-FPC    Doc 40    Filed 02/26/21    Entered 02/26/21 16:01:19    Pg 6 of 19

Perkins finished disbursing funds from its IOLTA account just six days earlier in February 22, 2018. *See* Am. Compl. 9:21. Accordingly, under the escrow provision provided to Ness as the "final version," Perkins would have substantially complied with its duties as an escrow agent by disbursing sales proceeds as tokens were issued, even if hosting capacity sufficient for all purchasers was not yet available.

For that reason, the Trustee's counsel has taken the position that the version of the Token Purchase Agreement emailed to Ness was in fact not used. Instead, Trustee's counsel has adopted a version of a Token Purchase Agreement filed in the underlying bankruptcy by Scott Glasscock as Docket No. 548. *See* Cromwell Decl., Ex. 1. In that version of the Token Purchase Agreement, paragraph 3 of the version sent to Ness addressing an escrow is removed. *Id.* There is no explicit mention of an escrow, no mention of Perkins, and no specification of when sales proceeds would be released. Instead, paragraph 6 says simply that "[t]he WTT Tokens terms and conditions are as set forth in the White Paper." *Id.* The Trustee alleges that this language means that the escrow discussion in the White Paper, under which token proceeds would be released "in step" with the construction of facilities in Wenatchee, is incorporated by reference into the Token Purchase Agreement and thus became a contractual term of all token purchases. Am. Compl. 7:14. This difference between the Token Purchase Agreement sent to Ness, and that filed as Docket No. 548, is also why the Amended Complaint repeatedly alleges that Perkins used the "wrong" escrow standard for the release of funds: issuance of the tokens, whereas the "correct" or

PERKINS' AND NESS' MOTION TO COMPEL ARBITRATION AND STAY- 7

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

"actual" standard was the Debtor's construction of facilities. Am. Compl. 8:6-7, 8:21, 9:6.

Regardless of these discrepancies, and most important to this motion, both the Token Purchase Agreement sent to Ness and the version filed as Docket No. 548, which the Trustee has adopted, contain arbitration clauses. In the version emailed to Ness, paragraph 8(a) provides that the parties "submit and consent to the exclusive jurisdiction of the [sic] Singapore"[2] with regard to any litigation "that may arise directly or indirectly from [the Token Purchase] Agreement." *See* Cromwell Decl., Ex. 3. The paragraph also contains a straightforward arbitration clause providing that "[a]ny dispute arising out of or in connection with this contract" shall be arbitrated in Singapore by the Singapore International Arbitration Centre, before a panel of three arbitrators, in English. *Id.*

The arbitration provision in the Token Purchase Agreement filed as Docket No. 548 in the bankruptcy is even more prominent and detailed. For example, the Token Purchase Agreement filed at Docket No. 548 starts at the top, in all capital letters, with a statement emphasizing that the agreement contains a binding arbitration clause and a waiver of the right to bring representative or class actions:

> WTT TOKEN PURCHASE AGREEMENT
>
> PLEASE READ THIS WTT TOKEN PURCHASE AGREEMENT CAREFULLY. NOTE THAT SECTION 15 CONTAINS A BINDING ARBITRATION CLAUSE AND

---

[2] As noted above, both Cryptonomos and Giga Watt Pte. Ltd. were organized in Singapore.

PERKINS' AND NESS' MOTION TO COMPEL ARBITRATION AND STAY- 8

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

20-80031-FPC    Doc 40    Filed 02/26/21    Entered 02/26/21 16:01:19    Pg 8 of 19

REPRESENTATIVE ACTION WAIVER, WHICH AFFECT YOUR LEGAL RIGHTS. IF YOU DO NOT AGREE TO THE TERMS OF THIS WTT TOKEN PURCHASE AGREEMENT, DO NOT PURCHASE TOKENS.

*See* Cromwell Decl., Ex. 1. The arbitration clause referenced is then found in paragraphs 15(a), (c), and (d). *Id.* Like the version of the Token Purchase Agreement sent to Ness as "final," paragraph 15(d) provides for arbitration in Singapore before the Singapore International Arbitration Centre. *Id.*

However, creating an escrow agreement via the Token Purchase Agreement does not completely solve the Trustee's problems in that the Debtor is not a party to any version of the Token Purchase Agreement and thus is not in a position to enforce any escrow agreement contained therein. The Trustee attempts to address this problem by alleging that the Debtor was a "partner" of Giga Watt Pte. Ltd. and can thus enforce any agreement that Giga Watt Pte. Ltd. entered into as a party of the "Giga Watt Project." *E.g.*, Am. Compl. 7:17-19 ("As partners, Giga Watt and Giga Watt Singapore were agents of each. They could enforce agreements entered into by the other in the course of the partnership . . . ."). Indeed, the Debtor goes so far as to say it was in "privity" with Perkins "with respect to the Escrow agreement" by virtue of being the partner of Giga Watt Pte. Ltd. Am. Compl. 26:5. In short, it is the Trustee's theory in the Amended Complaint that the Token Purchase Agreement contained an escrow provision to which the Debtor is a *de facto* a party.

Finally, the Trustee needs a way to create a duty for Perkins to perform the escrow provision incorporated into the Token Purchase Agreements, given that

PERKINS' AND NESS' MOTION TO COMPEL ARBITRATION AND STAY- 9

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

20-80031-FPC    Doc 40    Filed 02/26/21    Entered 02/26/21 16:01:19    Pg 9 of 19

Perkins was also not a party to the Token Purchase Agreements. The Trustee does this by alleging that Perkins knew of the escrow provision in the White Paper and its incorporation in the Token Purchase Agreement and thus, agreed to perform and be bound by the escrow provisions when it accepted wire transfer payments from the various token purchasers. Am. Compl. 11:13-19, 28:18-20.

In short, the Trustee's theory is that the Token Purchase Agreements may be enforced by the Trustee against Perkins, including, specifically, the escrow provision of the Token Purchase Agreement which is incorporated by reference from the White Paper. However, if the Trustee can enforce the escrow provisions of the Token Purchase Agreements against Perkins, then the law is clear that Perkins can likewise enforce the arbitration provisions of the Token Purchase Agreements against the Trustee.

### III. ARGUMENT

**A. Under the Terms of the Token Purchase Agreements, This Dispute Must Be Referred to Arbitration.**

**1. The FAA Controls and Imposes a Strong Policy in Favor of Arbitration.**

Because the Token Purchase Agreements involve both foreign and U.S. parties, and call for arbitration in Singapore, they are international arbitration agreements. International arbitration agreements involving parties in the United States are governed by Chapter 2 of the Federal Arbitration Act ("FAA"), which codifies the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the so-called "New York Convention" or "Convention"). *See* 9 U.S.C.

PERKINS' AND NESS' MOTION TO COMPEL ARBITRATION AND STAY- 10

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

20-80031-FPC    Doc 40    Filed 02/26/21    Entered 02/26/21 16:01:19    Pg 10 of 19

§§ 201- 208. Under the terms of the Convention, as codified in the FAA, a district court must compel arbitration in a foreign location if the terms of arbitration so state, and if the arbitration agreement is governed by the Convention. *See* 9 U.S.C. § 206.

Arbitration agreements governed by the Convention are also governed by Chapter 1 of the FAA to the extent that the FAA and the Convention are not in conflict. 9 U.S.C. § 208. Here, therefore, both Chapter 1 and Chapter 2 of the FAA apply.

The FAA espouses a strong policy favoring arbitration agreements. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25 (1983); *see also Hall St. Assocs., L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 581 (2008). Federal courts are required to rigorously enforce agreements to arbitrate. *Hall St. Assocs.,* 552 U.S. at 582. Courts are also directed to resolve any "ambiguities as to the scope of the arbitration clause itself ... in favor of arbitration." *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.,* 489 U.S. 468, 476 (1989). The federal policy favoring enforcement of arbitration agreements "applies with special force in the field of international commerce." *Mitsubishi Motors,* 473 U.S. at 631.

Pursuant to the FAA, a written arbitration provision in a "contract evidencing a transaction involving commerce" is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. §§ 2, 206. By its terms, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to

PERKINS' AND NESS' MOTION TO COMPEL ARBITRATION AND STAY- 11

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

20-80031-FPC    Doc 40    Filed 02/26/21    Entered 02/26/21 16:01:19    Pg 11 of 19

proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds*, 470 U.S. at 218.

### 2. All of the Elements Requiring Referral to Arbitration Are Met.

Under the Convention, as codified in the FAA, the District Court must conduct a "very limited inquiry" in determining whether to enforce an international agreement to arbitrate. *Bautista v. Star Cruises*, 396 F.3d 1289, 1294 (11th Cir. 2005) (quoting *Francisco v. Stolt Achievement MT*, 293 F.3d 270, 273 (5th Cir. 2002)). A court may not review the merits of the dispute but must limit its inquiry to determining whether the four elements that require arbitration under the Convention are met. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C10-5458 SI, 2011 WL 5325589 at * 2 (N.D. Cal. Sept. 19, 2011). In determining whether arbitration must be compelled under the Convention, the court reviews only the following four elements:

> (1) there is an agreement in writing within the meaning of the Convention; (2) the agreement provides for arbitration in the territory of a signatory of the Convention; (3) the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial; and (4) a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states.

*Balen v. Holland Am. Line Inc.*, 583 F.3d 647, 654-55 (9th Cir. 2009) (quoting *Bautista*, 396 F.3d at 1294 n.7). *See also* 9 U.S.C. § 202. If these questions are answered in the affirmative, the "Convention requires that courts must enforce an agreement to arbitrate unless the agreement is null and void, inoperative or incapable of being performed." *Id.* at 654 (internal quotation marks omitted). "[T]he party

PERKINS' AND NESS' MOTION TO COMPEL ARBITRATION AND STAY- 12

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

20-80031-FPC    Doc 40    Filed 02/26/21    Entered 02/26/21 16:01:19    Pg 12 of 19

resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000).

Here, all of the elements of the Convention are met. Therefore, this Court "must enforce" the agreements and compel arbitration. *Balen*, 583 F.3d at 654.

### a. The Agreement to Arbitrate Is in Writing.

Perkins is not a signatory to the written arbitration provision contained in the Token Purchase Agreements. However, in *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009), the Supreme Court considered whether Chapter 1 of the FAA prohibited "those who are not parties to a written arbitration agreement" from invoking the FAA's provisions under contract law principles entitling a nonsignatory to enforce such agreements. *Id.* at 629. The Supreme Court then held that Chapter 1's provisions concerning the validity and enforcement of arbitration agreements did not "alter background principles of state contract law regarding the scope of agreements (including the question of who is bound by them)." *Id.* at 630. Accordingly, the Supreme Court held that "a litigant who was not a party to the relevant arbitration agreement" may nevertheless invoke the FAA's provisions if the relevant contract law allows him to enforce the agreement through doctrines such as "assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." *Id.* at 631, 632.

In *GE Energy Power Conversion France SAS v. Outokumpu Stainless USA LLC*, ___ U.S. ___, 140 S. Ct. 1637, 1644 (2020), the United States Supreme Court

PERKINS' AND NESS' MOTION TO COMPEL ARBITRATION AND STAY- 13

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

20-80031-FPC   Doc 40   Filed 02/26/21   Entered 02/26/21 16:01:19   Pg 13 of 19

resolved whether a nonsignatory to an international arbitration agreement may enforce an arbitration agreement under the Convention, using the doctrine of equitable estoppel, notwithstanding the Convention's requirement that there be an "agreement in writing." In a unanimous decision, authored by Justice Thomas, the United States Supreme Court held that the Convention—as implemented in the United States via Chapter 2 of the FAA, 9 U.S.C. § 201, *et seq.*—permits nonsignatories to international arbitration agreements to compel arbitration based on domestic-law equitable estoppel doctrines. 140 S. Ct. at 1645.

Here, Perkins is entitled to enforce the arbitration provision in the Token Purchase Agreements under the doctrine of equitable estoppel. Equitable estoppel applies because the Trustee is suing Perkins based on his assertion that he may exercise the rights of a signatory to the Token Purchase Agreements against Perkins. A party who asserts the rights of a signatory to an agreement containing an arbitration agreement is equitably estopped to deny they are bound to arbitrate. *Quackenbush v. Allstate Ins. Co.*, 121 F.3d 1372, 1380-82 (9th Cir. 1997); *Bennet v. Liberty Nat'l Fire Ins. Co.*, 968 F.2d 969, 972 (9th Cir. 1992); *David Terry Invs., LLC-PRC v. Headwaters, Dev. Group Ltd.*, 463 P.3d 117, 171 (Wash. Ct. App. 2020); *Goldman v. KPMG LLP*, 92 Cal. Rptr. 3d 534, 543 (Cal. Ct. App. 2009). Specifically, equitable estoppel "precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that [the] contract imposes." *Comer v. Micor, Inc.* 436 F.3d 1098, 1101 (9th Cir. 2006). Under that doctrine, where "a

PERKINS' AND NESS' MOTION TO COMPEL ARBITRATION AND STAY- 14

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

20-80031-FPC    Doc 40    Filed 02/26/21    Entered 02/26/21 16:01:19    Pg 14 of 19

signatory to the written agreement must rely on the terms of that agreement in asserting its claims against the nonsignatory," the signatory may be estopped from "cherry-pick[ing] beneficial contract terms while ignoring other provisions that do not benefit it or that it would prefer not to be governed by such as an arbitration clause." 21 Richard A. Lord, Williston on Contracts, § 57:19, at 200, 202 (4th ed. 2017). In short, the Trustee may not selectively assert the escrow terms of the Token Purchase Agreements against Perkins to its benefit, while at the same time disavowing, and attempting to avoid, its arbitration terms. Accordingly, the Trustee is bound to arbitrate his claims against Perkins.

In addition, and alternatively, Perkins may enforce the arbitration terms of the Token Purchase Agreements as a nonsignatory under ordinary principles of agency. *See Comer*, 436 F.3d at 1101. Here, as the alleged "escrow" agent in the transaction, under the Trustee's theory of liability, Perkins was acting as the agent of both GW Singapore and the token purchasers with respect to performance under the Agreements and, specifically, the terms under which proceeds of sale would be disbursed. *See Radach v. Prior*, 297 P.2d 605 (Wash. 1956) (escrow is agent of both parties to the transaction and, upon performance of conditions, agent of one or the other). In this regard, Perkins was acting on the instructions of its alleged principal, GW Singapore, in the disbursement of sale proceeds. The Trustee's allegation is that the instruction was improper, and that Perkins breached the escrow terms that were alleged incorporated into the Agreements. Where, as here, the claim is against a

PERKINS' AND NESS' MOTION TO COMPEL ARBITRATION AND STAY- 15

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

20-80031-FPC   Doc 40   Filed 02/26/21   Entered 02/26/21 16:01:19   Pg 15 of 19

nonsignatory agent of the principals who signed the arbitration agreement, and the claims arise out of the performance of the agreements, the nonsignatory agent may enforce the agreement. *See Letizia v. Prudential Bache Secs., Inc.*, 802 F.2d 1185, 1188 (9th Cir. 1986) (nonsignatory agents (employees) of securities broker entitled to enforce arbitration agreement arising from their alleged wrongdoing in performing under brokerage account contract). *Accord e.g., Amisil Holdings, Ltd. v. Clarion Capital Mgmt.,* 622 F. Supp. 2d 825, 840-41 (N.D. Cal 2007) (nonsignatories, as agents of signatory, may enforce agreement to arbitrate, where alleged wrongful conduct of nonsignatories relates to performance of agreement and claims are "intertwined" with agreement).

For all of these reasons, an enforceable arbitration agreement in writing exists, and the first element for compelling arbitration under the Convention is satisfied.

### b. **Singapore Is a Member Nation of the Convention**

The second element is met because arbitration is required to take place in Singapore, and Singapore is a signatory, member nation of the Convention. *See* http://www.newyorkconvention.org/countries (listing member nations).

### c. **The Transaction Involves Commerce**

The third element is met because the agreement to arbitrate relates to a transaction that involves commerce. Specifically, token purchasers from around the world purchased tokens from an entity in Singapore for the purpose of obtaining up to 50 years of power capacity in Wenatchee that would allow them to engage in cryptocurrency "mining" on the internet (which includes mining on servers located

PERKINS' AND NESS' MOTION TO COMPEL ARBITRATION AND STAY- 16

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

20-80031-FPC   Doc 40   Filed 02/26/21   Entered 02/26/21 16:01:19   Pg 16 of 19

around the world). The transaction is commercial in nature. The third element for application of the Convention is present.

### d. There Is a Reasonable Relation to Singapore

The fourth element is met because a party to the transaction is not a citizen of the United States, and there is a reasonable relation to Singapore. As noted in the Amended Complaint, both the seller of the tokens, GW Singapore, and the marketer of the tokens, Cryptonomos, were incorporated in Singapore. Am. Compl. 3:14 & 6:6-7. The purchasers included hundreds of individuals from around the world. Accordingly, the transaction involved non-U.S. parties and has a reasonable relationship to arbitration in Singapore. The fourth and final element for application of the Convention is also met.

In short, because all four elements of the Convention are met, this Court "must enforce" the agreements and compel arbitration. *Balen*, 583 F.3d at 654.

### B. A Stay Should Be Entered Pending Completion of Arbitration.

Under 9 U.S.C. § 3, courts are required to stay proceedings pending completion of arbitrate. Accordingly, a stay of this matter must be entered pending completion of arbitration.

PERKINS' AND NESS' MOTION TO COMPEL ARBITRATION AND STAY- 17

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

20-80031-FPC    Doc 40    Filed 02/26/21    Entered 02/26/21 16:01:19    Pg 17 of 19

DATED this 26th day of February, 2021.

                              BYRNES KELLER CROMWELL LLP

                              By /s/ Bradley S. Keller
                                 Bradley S. Keller, WSBA #10665
                              By /s/ Ralph E. Cromwell, Jr.
                                 Ralph E. Cromwell, Jr., WSBA #11784
                              By /s/ Jofrey M. McWilliam
                                 Jofrey M. McWilliam, WSBA #28441
                              1000 Second Avenue, 38th Floor
                              Seattle, Washington 98104
                              206-622-2000
                              Fax: 206-622-2522
                              Email: bkeller@byrneskeller.com
                                             rcromwell@byrneskeller.com
                                             jmcwilliam@byrneskeller.com

                              MUNDING, P.S.

                              By /s/ John Munding
                                 John Munding, WSBA #21734
                              9425 N. Nevada St. Suite 212
                              Spokane, Washington 99218
                              509-624-6464
                              Fax: (509) 624-6155
                              Email: john@mundinglaw.com
                              *Attorneys for Perkins Coie LLP and Lowell Ness*

PERKINS' AND NESS' MOTION TO COMPEL ARBITRATION AND STAY- 18

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

20-80031-FPC    Doc 40    Filed 02/26/21    Entered 02/26/21 16:01:19    Pg 18 of 19

# CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of February, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system. The NEF for the foregoing specifically identifies recipients of electronic notice.

By /s/ Ralph E. Cromwell, Jr.
Ralph E. Cromwell, Jr.
*Attorneys for Plaintiffs*
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
206-622-2000
Fax: 206-622-2522
Email: rcromwell@byrneskeller.com

PERKINS' AND NESS' MOTION TO COMPEL ARBITRATION AND STAY- 19

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

20-80031-FPC   Doc 40   Filed 02/26/21   Entered 02/26/21 16:01:19   Pg 19 of 19