1  Bradley S. Keller, WSBA #10665
2  Ralph E. Cromwell, Jr., WSBA #11784
   Jofrey M. McWilliam, WSBA #28441
3  Byrnes Keller Cromwell LLP
4  1000 Second Avenue, 38th Floor
   Seattle, WA  98104
5  (206) 622-2000
6  Facsimile No.: (206) 622-2522

7  Attorneys for Perkins Coie LLP

The Honorable Frederick P. Corbit
Chapter:  7

8

9

10             UNITED STATES BANKRUPTCY COURT
              EASTERN DISTRICT OF WASHINGTON

11
   In Re:
12
   GIGA WATT, INC., a Washington
13 corporation,
                                   Debtor.
14 ─────────────────────────────────
   MARK D. WALDRON, as Chapter 7
15 Trustee,

16                              Plaintiff,

17     vs.

18 PERKINS COIE, LLP, a Washington
   limited liability partnership; LOWELL
19 NESS, individual and California resident;
   GIGA WATT PTE., LTD. a Singapore
20 corporation; and ANDREY KUZENNY, a
   citizen of the Russian Federation;
21
                              Defendants
22     and
23
   THE GIGA WATT PROJECT, a
24 partnership,

25                      Nominal defendant.
   ─────────────────────────────────
26

No. 18-03197-FPC11

The Honorable Frederick P. Corbit

**CHAPTER 7**

Adv. Case No. 20-80031

**OPPOSITION OF PERKINS
AND NESS TO TRUSTEE'S
MOTION TO STRIKE JURY
DEMAND**

OPPOSITION OF PERKINS AND NESS TO TRUSTEE'S
MOTION TO STRIKE JURY DEMAND

Byrnes ♦ Keller ♦ Cromwell llp
38th Floor
1000 Second Avenue
Seattle, Washington  98104
(206) 622-2000

# I.     INTRODUCTION AND RELIEF REQUESTED

The Trustee's Motion to Strike Perkins Coie's and Lowell Ness' (collectively "Perkins") jury demand should be denied.  Perkins is constitutionally entitled to a jury trial because (1) the Trustee's claims are legal, not equitable, and, more importantly, (2) the Trustee seeks compensatory money damages, which is legal not equitable relief.  *See e.g.*, *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 44-45 (1989) (Seventh Amendment to U.S. Constitution guarantees right to jury trial where either claim asserted or, more importantly, relief sought is legal, not equitable); *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002) (same; money damages is "the classic form of *legal* relief").

Nor has Perkins waived that right.  Perkins has not asserted a creditor's claim in the bankruptcy, and, regardless of label, its defenses to the Trustee's claims arise from the same transaction that the Trustee is suing on, do not seek affirmative relief, but dispute only the existence and amount of the damages allegedly sustained by the Debtor—all of which occurred, if at all, pre-petition.

Perkins' defenses, while more properly characterized as "recoupment" rather than "setoff," in no way implicate the ratable distribution of assets among creditors of the estate, and therefore do not invoke the claims allowance process or the equitable jurisdiction of the bankruptcy court.  *See Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1398-1400 (9th Cir. 1996).  The Trustee's assertion that only a minority of district courts have so held is wrong.  Controlling Ninth Circuit precedent is fatal the Trustee's position.  *See id.* (defense arising from the same transaction as that sued

OPPOSITION OF PERKINS AND NESS TO TRUSTEE'S
MOTION TO STRIKE JURY DEMAND - 1

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

20-80031-FPC     Doc 41     Filed 02/26/21     Entered 02/26/21 16:05:09     Pg 2 of 22

upon by the trustee, and which seeks merely to reduce the trustee's recovery, "does not violate the bankruptcy principle of ratable distribution of assets among a bankrupt debtor's creditors").

Whether Perkins is constitutionally entitled to trial by jury has already been briefed and is pending before the District Court on Perkins' Motion to Withdraw the Reference. *See* ECF Nos. 18, 29, 30. Perkins will attempt not to repeat that briefing, and instead incorporates it herein by reference. *See* ECF Nos. 18, 30. The Trustee's Motion to Strike Perkins' Jury Demand appears to be an improper attempt to end-run the District Court's jurisdiction to decide the issue. Perkins therefore objects to it. In any event, the Motion lacks merit and must be denied.

## II. BACKGROUND

### A. Overview

The Trustee claims that Perkins acted as an escrow agent with regard to proceeds from the sale of digital cryptocurrency mining "tokens." The tokens were sold by a Singapore company, Giga Watt Pte. Ltd ("GW Singapore"). The purchasers were individuals and entities from around the world. Cryptonymos Pte. Ltd. provided the marketing "platform" and conducted the token sale. Each token entitled the purchaser to place 1 watt of crypto-mining capacity in Giga Watt, Inc.'s ("GW Wenatchee" or "Debtor") facilities in Wenatchee for up to 50 years. The sale took place between May 19, 2017, through July 31, 2017, and raised approximately $22.4 million.

OPPOSITION OF PERKINS AND NESS TO TRUSTEE'S
MOTION TO STRIKE JURY DEMAND - 2

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

20-80031-FPC     Doc 41     Filed 02/26/21     Entered 02/26/21 16:05:09     Pg 3 of 22

**B.      The "White Paper" and WTT Token Purchase Agreement.**

As an informational tool to aid marketing efforts, Cryptonymos distributed a so-called "White Paper" that described cryptocurrency mining generally, the Giga Watt project, token launch details, a projected timeline, the "team" involved, and the "Risk Factors" of participation.  *See* Ex. A to Am. Compl.  There were, apparently, numerous versions of the White Paper—both an English version, as well as those translated in multiple foreign languages.  *Id.* at 3.

One version of the White Paper (attached as Exhibit A to the Trustee's Amended Verified Complaint), includes statements such as:  "New batches of tokens will be issued in step with the construction of new units"; "Cryptonymos will issue and distribute its initial batch of WTT tokens, with subsequent batch issues to follow upon the completion of new capacity construction"; "All funds collected through the pre-sale and Token Launch will be deposited in escrow"; "The funds will be released from escrow in step with the completion of facilities"; that if the token sale is over-subscribed, the "over-subscribed proceeds will be placed into escrow until the requisite processing center capacity has been built-out."  *See* Ex. A to Am. Verified Compl. at 15, 16, 18, 19, respectively.

Importantly, the first page of the White Paper includes a prominent "Legal Disclaimer" that, among other things, states that it "does not imply any elements of a contractual relationship" and its "sole purpose" is to provide "reasonable information" to allow interested purchasers "to undertake a thorough analysis of the company."  *Id.* at 3.  In other words, the White Paper was a marketing and informational piece.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

Because the White Paper did not create any contractual rights or obligations, the purchase of WTT tokens was accomplished through a purchase agreement titled "WTT Token Purchase Agreement" and was entered into between "Giga Watt Pte. Ltd., a Singapore company (the 'Company'), the issuer of the WTT Tokens," and each purchaser.  Am. Compl. ¶ 48.

## C.  Perkins' Setoff Defense:  The Debtor Received and Kept All of the Funds Which Allegedly Should Not Have Been Released and Therefore Has Not Been Damaged.

To understand the Trustee's mischaracterization of the "setoff" defense which figures prominently in the Trustee's Motion, it is necessary to start with some background.  Perkins' involvement in the current bankruptcy proceedings commenced last Summer with the Trustee's issuance of a Rule 2004 subpoena for documents related to the alleged "escrow."  Two things quickly became apparent:  (1) there was no "Escrow Agreement" of the type one would typically expect if a three-party escrow had been established, and (2) instead, at most, there was an understanding between Perkins and its client, GW Singapore, by which Perkins held proceeds from WTT token sales in an IOLTA account until instructed that the respective purchases had closed.  *See* Declaration of Ralph E. Cromwell, Jr. ("Cromwell Decl.") ¶ 2. Accordingly, in response to the Rule 2004 subpoena, Perkins produced to the Trustee an Excel spreadsheet showing all money in and out of its IOLTA Account and some 4,500 pages of emails largely relating to the administration of funds in the IOLTA account.  *Id.*

OPPOSITION OF PERKINS AND NESS TO TRUSTEE'S
MOTION TO STRIKE JURY DEMAND - 4

Byrnes ♦ Keller ♦ Cromwell LLP
38th FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

The Trustee's assertions that proceeds from the WTT token sales had inappropriately been released from an "escrow" are belied by his own allegations and statements of the Debtor. *See* Cromwell Decl. ¶ 8. In this regard, some rough order of magnitude calculations reveal that the greatest amount of money allegedly held in Perkins' IOLTA account was on August 4, 2017, when the account held $22,351,937.58. Am. Compl. 8:9. Subsequently, the Trustee alleges that Perkins distributed funds to GW Singapore from its IOLTA Account as follows:

| 8/8/17 | $5,400,000 |
|--------|-----------:|
| 8/19/17 | $900,000 |
| 9/25/17 | $1,200,000 |
| 11/7/17 | $3,300,000 |
| TOTAL | $10,800,000 |

Am. Compl. 9:11-15. The Trustee's position has always been that money should not have been released from the IOLTA account until there was sufficient hosting capacity at the Debtor's facilities to accommodate the token purchasers whose proceeds were being released. This position invites an inquiry as to how the $10.8 million disbursed to GW Singapore compared to the available hosting capacity.

In this regard, the Trustee's Interim Report dated July 3, 2020 (ECF No. 631), states, in a table on page 4, that the Debtor built 9.75 megawatts of hosting capacity which were available to token purchasers. *See* Cromwell Decl., Ex. 6 at 4:17. Accepting these figures at face value, to calculate how much in token proceeds should be released to correspond with 9.75 megawatts of hosting capacity, one would need to

OPPOSITION OF PERKINS AND NESS TO TRUSTEE'S
MOTION TO STRIKE JURY DEMAND - 5

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

know the purchase price paid by these token holders who received access to the 9.75 megawatts of capacity. This is complicated because tokens were sold at a variety of prices, starting at a dollar a token for the earliest token sales and ending at $1.20 per token for the latest sales. Cromwell Decl., Ex. 6 at 2:10-11. However, as an approximation, the Trustee states in the Interim Report that a total of 20,154,783 tokens were issued. *Id.* at 4:3. This equates to an average purchase price of just under $1.11/token for the $22,353,137 placed in Perkins' IOLTA accounts, i.e., $22,353,137 ÷ 20,154,783 tokens = $1.11/token. Accordingly, if 9.75 megawatts of hosting capacity was available to token purchasers, this would equate to $10,810,000 being released from "escrow" using the average token price of $1.11 million, i.e., 9,750,000 watts x $1.11 = $10,810,000 in "escrow" proceeds.

In short, based on the above calculations, it appears that the funds allegedly disbursed to GW Singapore matched, fairly closely, what "should" have been disbursed assuming that the Trustee is correct about an escrow and correct that 9.75 megawatts of hosting capacity[1] was made available to token purchasers. If that is so, where did the rest of the money go?

The answer seems to be that the remaining proceeds went almost entirely to the Debtor. In particular, the balance of funds in Perkins' IOLTA account were, at the instructions of GW Singapore, disbursed to the Debtor as follows:

---

[1] In contrast to the Trustee's belief that 9.75 megawatts of capacity was available to token purchasers, the Debtor represented to the SEC, in August of 2018, that 18 megawatts of capacity was available to token purchasers. Cromwell Decl., Ex. 4 at 4.

OPPOSITION OF PERKINS AND NESS TO TRUSTEE'S
MOTION TO STRIKE JURY DEMAND - 6

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

| | |
|---|---|
| 12/19/17 | $2,000,000.00 |
| 12/26/17 | $4,500,000.00 |
| 2/9/18 | $1,148,057.58 |
| 2/22/18 | $3,217,699.73 |
| | $10,865,757.31 [2] |

Am. Compl. 9:17-21. In addition, taking August 7, 2017, as a starting point, Perkins was instructed to refund proceeds to 25 token purchasers. These refunds totaled $763,380.27.[3] Based on the above analysis, why would the Debtor sue Perkins to recover money that the Debtor received? In other words, if—using the Trustee's figures—GW Singapore received pretty much what it was supposed to receive, and the balance of funds—which allegedly should not have been disbursed—ended up at the Debtor, why was the Debtor entitled to receive from Perkins a second time money it was not supposed to have received the first time?

Indeed, it appears that perhaps **all of the proceeds of token sales** actually went to the Debtor. GW Singapore filed a proof of claim in the bankruptcy (Claim #365) stating that it had provided a $26,887,859.79 loan to the Debtor. *See* Cromwell Decl. at Ex. 5. In this regard, in an August 2, 2018, letter to the SEC, which is hyperlinked

---

[2] The total distributions after August 7, 2017, do not quite work out to the August 7, 2017, balance of $22,353,132 in that it appears that Perkins disbursed approximately $76,000 more from its IOLTA account than should be available based on that 8/7/17 balance. The explanation is that Perkins received approximately $77,000 in additional deposits after 8/7/17.

[3] It also appears that the Debtor refunded approximately $953,000 to StormMedia in January of 2018, further reducing the outstanding tokens that needed to be accommodated. Am. Compl. 22:9.

OPPOSITION OF PERKINS AND NESS TO TRUSTEE'S
MOTION TO STRIKE JURY DEMAND - 7

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

to the Amended Complaint in this matter, the Debtor represented that all of the proceeds of the token sales went to fund construction at the Debtor's facilities:

> Request No. 20
>
> Documents sufficient to show the use of the proceeds of the Giga Watt pre-sale and ICO.
>
> Response to Request No. 20.
>
> As stated in our July 13, 2018, email, all funds raised through the ICO were ultimately spent on construction.

Cromwell Decl., Ex. 4 at 12. Because the Debtor was the only one doing any "construction" in connection with the "Giga Watt Project," this response seems to represent that all of the proceeds of the digital tokens went to and were used by the Debtor. In other words, not only did $10.8 million go directly to the Debtor from Perkins, but the additional $10.8 million which GW Singapore allegedly "misappropriated" from the escrow apparently also went to the Debtor as an unrepaid "loan" from GW Singapore.

That the Debtor apparently received all of the token sale proceeds that allegedly should not have been disbursed is one prong of Perkins' "setoff" defense—namely, that the Debtor has not been damaged by any alleged wrongful disbursement and cannot recover from Perkins—a second time—money the Debtor previously received and used to construct its hosting facilities.

The other prong of Perkins' "setoff" defense relates to the Trustee's theory of why he can sue to enforce an escrow agreement to which the Trustee is not a party. The Amended Complaint does not allege that there is a conventional escrow

OPPOSITION OF PERKINS AND NESS TO TRUSTEE'S
MOTION TO STRIKE JURY DEMAND - 8

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

20-80031-FPC    Doc 41    Filed 02/26/21    Entered 02/26/21 16:05:09    Pg 9 of 22

agreement. *See* Am. Compl. 17:8-13. Instead, the Trustee alleges that the White Paper described the conditions of the sale and "was incorporated by reference into the token purchase agreements." *Id.* ¶ 10. Recognizing that the Debtor is not a party to the Token Purchase Agreements, and thus is in no position to enforce the alleged "escrow," the Trustee claims that the Debtor was nevertheless a "partner" of GW Singapore, and that GW Wenatchee and GW Singapore were therefore "agents of each [other]," and "could enforce agreements entered into by the other." *Id.* ¶ 19. In this manner, the Trustee claims that, the Debtor (and thus the Trustee), "can enforce the Escrow against Perkins." *Id.* ¶ 20. In fact, the Trustee claims that GW Wenatchee (the Debtor), as the alleged partner of GW Singapore, "has privity with Perkins Coie with respect to the Escrow agreement." *Id.* ¶ 68. Moreover, the Trustee claims that, as an alleged partner of GW Singapore, the Debtor became vicariously liable for GW Singapore's liability to token purchasers, and "Perkins Coie's breach of the Escrow proximately caused that liability." *Id.* ¶ 72. Finally, with regard to GW Singapore, for whose conduct the Trustee claims to be vicariously liable, the Trustee claims that GW Singapore breached its duties to the Debtor by withdrawing proceeds of sale "from the escrow in violation of its terms." *Id.* ¶ 85. Perkins allegedly aided this breach by "disbursing funds from the Escrow based on the wrong standard." *Id.* ¶ 81.

With regard to this second prong of Perkins' setoff defense, even if the Trustee's reasoning is valid, then it is also (a) circular, in that GW Singapore's wrongful disbursement instructions would likewise be imputed to the Debtor as its

OPPOSITION OF PERKINS AND NESS TO TRUSTEE'S
MOTION TO STRIKE JURY DEMAND - 9

Byrnes ◆ Keller ◆ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

20-80031-FPC    Doc 41    Filed 02/26/21    Entered 02/26/21 16:05:09    Pg 10 of 22

"partner," and the Debtor would not be able to recover the same losses it is also deemed to have caused; and (b) mutual, in that the Debtor would not only be charged with the burden of GW Singapore's alleged wrongful instructions, but would also be charged with the benefits—i.e., the Debtor would be deemed to have received the money that was wrongfully disbursed and would not be able to recover, for a second time, money it is deemed to have already received.

## III.   ARGUMENT

### A.   Perkins Is Constitutionally Entitled to a Jury Trial.

With this factual background, Perkins incorporates by reference its argument and authorities with respect to its right to trial by jury, as set forth in its Motion and Reply in Support of Withdrawal of the Reference. *See* ECF Nos. 18, 30. Suffice it to say that nothing the Trustee argues in this, his now third bite at the apple, alters the outcome. Perkins is entitled to trial by jury under the Seventh Amendment because: (1) the Trustee's claims are legal, not equitable; and (2) the Trustee seeks compensatory damages, which is a legal and not an equitable remedy.

#### 1.   The Trustee's Claims Are Legal, Not Equitable.

Because an escrow agent has certain fiduciary obligations and holds escrowed property "in trust" for its principals, the Trustee argues that a "trust" was formed and that its claim is for breach of trust, which, the Trustee argues, sounds exclusively in equity, and does not provide any right to trial by jury. However, many agency relationships impose fiduciary obligations, and in that sense create a "trust relationship," but this does not mean that an actual "trust" has been created.

OPPOSITION OF PERKINS AND NESS TO TRUSTEE'S
MOTION TO STRIKE JURY DEMAND - 10

Byrnes ♦ Keller ♦ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

A trust is formed when a trustor *conveys* title and/or ownership of property to a trustee to manage and hold for the benefit of specific beneficiaries. *See e.g., Dixon v. Nw. Nat'l Bank of Minneapolis*, 297 F. Supp. 485, 488 (D. Minn. 1969) (creation of trust is "a conveyance of the beneficial interest in the trust property rather than as a contract"). As such, the trustee owns, invests, and manages the property, in the trustee's discretion, for the benefit of the beneficiaries.

In contrast, an escrow is a contractual, agency arrangement, not a conveyance of ownership. "The relationship between the escrow agent and the principal is contractual . . . ." *St. Paul Title Co. v. Meier*, 226 Cal. Rptr. 538, 540 (1986). A deposit into escrow does not convey ownership to the escrow agent, but is nothing more than a "conditional delivery" to the other principal party to the transaction that the escrow agent holds as a "depositary" until the conditions of the escrow have been met. *Lechner v. Halling*, 216 P.2d 179, 185 (1950). As to the items deposited into escrow, the escrow holder is an agent of the parties to the transaction of the items each deposited, and those parties are the escrow principals. *Radach v. Prior*, 297 P.2d 605, 608 (Wash. 1956).

Because the escrow relationship is contractual, an escrow agent's duties are exclusively defined and limited by the escrow contract. *Denaxas v. Sandstone Court of Bellevue, LLC*, 63 P.3d 125, 129 (Wash. 2003). As such, the law "does not impose a duty on escrow agents independent of the parties' instructions." *Proterra Dev. Ventures LLC v. First Am. Title Ins. Co.,* No. 47567-7-II, 2016 WL 3866099, at \*4

OPPOSITION OF PERKINS AND NESS TO TRUSTEE'S
MOTION TO STRIKE JURY DEMAND - 11

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

20-80031-FPC    Doc 41    Filed 02/26/21    Entered 02/26/21 16:05:09    Pg 12 of 22

(Wash. Ct. App. July 12, 2016) (citing *Denaxas*). Thus, while an escrow agent may have fiduciary obligations, they are strictly tied to the contract and where there is no breach of the escrow agreement, there is also no breach of the standard of care or fiduciary duty. *Denaxas*, 63 P.3d at 130 (no breach of duty of care or fiduciary duty because plaintiff "cannot show that the Title Company breached a duty express or implied in the escrow instructions").

Notably, here, the Trustee does not and cannot claim that either the Debtor or its alleged "partner" GW Singapore, is in effect a "trustor" who conveyed ownership of funds to Perkins as "trustee" to manage and hold for some "beneficiary." Rather, the funds at issue were deposited by token purchasers and (if in fact an escrow existed), unless and until the conditions for disbursement were met, those funds remained the property of the token purchasers. Perkins (if indeed it was an escrow agent) would have been the agent of those purchasers with respect to those funds and owed no duty to GW Singapore or the Debtor with regard to them. *See Radach,* 297 P.2d at 608.

Nor does the Trustee assert that either the Debtor or its "partner" GW Singapore had any beneficial interest in the funds that were allegedly wrongfully disbursed so as to be the rightful "beneficiary" of those funds. Indeed, the Trustee's claim is the opposite: that the token purchasers at all times remained entitled to the funds and the funds should not have been disbursed. As such, the Debtor was neither a trustor nor a beneficiary under any machination of the facts or the law. The notion, therefore, that

OPPOSITION OF PERKINS AND NESS TO TRUSTEE'S
MOTION TO STRIKE JURY DEMAND - 12

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

the Trustee is properly asserting a claim for breach of trust, as a trustor or beneficiary, is factually and legally baseless.

Moreover, the Trustee's attempts to wordsmith its way into "equity" is unavailing. "[T]he constitutional right to trial by jury cannot be made to depend upon the choice of words used in the pleadings." *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477 (1962). Instead, the Seventh Amendment analysis "depends on the nature of the issue to be tried rather than the character of the overall action." *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry,* 494 U.S. 558, 569 (1990). Here, the Trustee does not claim the Debtor had any interest in the alleged wrongfully disbursed funds. Rather, the Trustee claims that it may be liable to token purchasers for those funds, and if so, then it ought to be able to recover that liability as damages from Perkins. That is a claim for damages, plain and simple, and is an action at law that entitles Perkins to a jury.

In any event, characterizing the claim as one in that "sounds in equity" does not answer whether there is a right to trial by jury. The Supreme Court's decision in *Dairy Queen* is instructive on this point. There, the plaintiff asserted a claim for an "accounting," which is an equitable remedy. *See* 369 U.S. at 477. Moreover, the defendant interposed a defense of "reformation," also an equitable remedy. *See id.* at 479. Nevertheless, the court held that a right to jury trial existed. Specifically, the court noted that both the claim and the remedy turned on the question of whether a contract existed, and what its terms were, which entitled the defendant to trial by jury:

OPPOSITION OF PERKINS AND NESS TO TRUSTEE'S
MOTION TO STRIKE JURY DEMAND - 13

Byrnes ♦ Keller ♦ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

> Such a defense [reformation] goes to the question of just what, under the law, the contract between the respondents and the petitioner is and, in an action to collect a debt for breach of a contract between these parties, petitioner has a right to have the jury determine not only whether the contract has been breached and the extent of the damages if any but also just what the contract is.

*Id.* at 479. Here, likewise, the Trustee's claims against Perkins—whether under a theory of "trust" or "escrow"—turns entirely on the existence, terms, enforceability, and breach of the alleged escrow agreement. Under *Dairy Queen*, it is improper to assume the existence of an escrow agreement, and from that derive "trust" obligations and equitable claims. Rather, the existence, terms, enforceability, and breach of the alleged escrow have not yet been determined. As in *Dairy Queen*, Perkins "has a right to have the jury determine not only whether the contract has been breached and the extent of the damages if any but also just what the contract is." *Id.* at 479.

Likewise, as explained by the Ninth Circuit, even where a claim might otherwise be equitable in nature, if the claim is predicated on underlying conduct that is actionable at law, the claim must be submitted to a jury. *DePinto v. Provident Sec. Life Ins. Co.*, 323 F.2d 826, 837 (9th Cir. 1963). In *DePinto*, the Ninth Circuit held that "where a claim of breach of fiduciary duty is predicated upon underlying conduct, such as negligence, which is actionable in a direct suit at common law, the issue of whether there has been such a breach is . . . a jury question." *Id.* The court therefore concluded that "the question concerning breach of fiduciary duty, as well as negligence, should have been submitted to the jury." *Id.* In short, whether an escrow agreements exists, what its terms are, whether it is enforceable against Perkins,

OPPOSITION OF PERKINS AND NESS TO TRUSTEE'S
MOTION TO STRIKE JURY DEMAND - 14

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

whether it was breached by Perkins, whether Perkins acted negligently in carrying out any duties that it may have had, or breached any fiduciary obligations, and whether the Debtor suffered any damages—are all clearly jury questions. *See id.; Dairy Queen*, 369 U.S. at 479.

Finally, and consistent with the jurisprudence of 18th Century England, before a claim in equity can proceed, the plaintiff must show that it does not have an adequate remedy at law. Thus, "in [the] absence of a clear showing that a court of law lacks capacity to give the relief which the allegations show plaintiff entitled to have, a suit in equity cannot be maintained." *Schoenthal v. Irving Trust Co.*, 287 U.S. 92, 95 (1932). Here, the Trustee has not argued and cannot show that the relief it seeks—money damages—is unavailable "at law." For example, common law actions for "trover and money had and received" were often resorted to for the recovery of wrongfully transferred money, including by bankruptcy trustees. *See id.* at 94. Indeed, as the Supreme Court made abundantly clear in *Granfinanciera*, where a claim involved cash, as opposed to real estate, the action was at law "for money had and received," a legal action "as available to the trustee to-day as they were in the English courts of long ago." *Granfinanciera*, 492 U.S.at 44. Here, likewise, the Trustee is seeking nothing more than the recovery of funds allegedly "had and received" by Perkins—which is a legal, not equitable, claim.

Thus, under controlling Supreme Court and Ninth Circuit precedent, the Trustee's claim is legal, not equitable, in nature.

OPPOSITION OF PERKINS AND NESS TO TRUSTEE'S
MOTION TO STRIKE JURY DEMAND - 15

Byrnes ♦ Keller ♦ Cromwell LLP
38th Floor
1000 Second Avenue
Seattle, Washington 98104
(206) 622-2000

20-80031-FPC    Doc 41    Filed 02/26/21    Entered 02/26/21 16:05:09    Pg 16 of 22

**2.** **The Relief Sought Is Legal, Not Equitable.**

Similarly, the relief sought by the Trustee is compensatory damages, the quintessential remedy at law. *Great-West Life*, 534 U.S. at 210. The Trustee's attempt to characterize the remedy sought as "surcharging" a trustee fails for the same reason its "trust" argument fails: namely, as discussed above, the Debtor was not a beneficiary of the funds at issue which, according to the Debtor's own theory, were being held for, and should have been returned to, the token purchasers. Even assuming a trust existed (it did not), since the Debtor was neither a trustor nor beneficiary of the funds at issue, its surcharging argument falls flat.

Instead, as noted above, the Trustee claims that it may be liable to token purchasers for the funds that were allegedly wrongfully disbursed, and if so, then it ought to be able to recover that liability in the form of money damages from Perkins. Again, that is a claim for compensatory money damages, which is classically legal, not equitable relief. *Id.* Put differently, and as *Granfinanciera* makes abundantly clear, an "action for *monetary* relief would not have sounded in equity 200 years ago in England." 492 U.S. at 43.

**B.** **Perkins Has Not Waived Its Constitutional Right to Trial by Jury.**

The Trustee's argument regarding waiver depends completely on its incorrect assertion that Perkins' assertion of a "setoff" defense constitutes an "informal" creditor's claim, and thus invokes the claims allowance process and the equitable jurisdiction of the Court. The Trustee's argument is incorrect and has already been

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

briefed at length in Perkins' Reply in Support of Motion to Withdraw the Reference. *See* ECF No. 30 at 6-10.

Briefly, as described above, the evidence suggests that the Debtor received at least $10.8 million of the token sale proceeds, and possibly received the *entirety* of the proceeds. Perkins' setoff defense is merely that the Trustee cannot recover for a second time money that the Debtor already received. This is not a claim against the Debtor as much as an assertion that, if the Debtor received and chose to keep all of the token proceeds, it has not been damaged if forced to return the proceeds as wrongfully disbursed. The Debtor would simply be returning what it was not entitled to receive. Similarly, under the Trustee's "partnership" theory, the Debtor is charged with having received the proceeds of sale to the same extent as its "partner," GW Singapore. Thus, Perkins' defense arises from the same transaction as the Trustee is suing upon and seeks to reduce or eliminate the Trustee's recovery.

Controlling Ninth Circuit authority unequivocally holds that such a defense does *not* invoke the claims allowance process. *See Newbery Corp.,* 95 F.3d 1398-1400 (defense arising from the same transaction as that sued upon by the trustee, and which seeks merely to reduce the trustee's recovery, "does not violate the bankruptcy principle of ratable distribution of assets among a bankrupt debtor's creditors"). *Accord e.g., In re Canopy Fin., Inc.,* 471 B.R. 218, 223 (N.D. Ill. 2012); *In re M & L Bus. Mach. Co.,* 178 B.R. 270, 272 (Bankr. D. Colo. 1995). *See also* ECF No. 30 at 6-10 (discussing authorities); *Reiter v. Cooper*, 507 U.S. 258, 265 n.2 (1993)

OPPOSITION OF PERKINS AND NESS TO TRUSTEE'S
MOTION TO STRIKE JURY DEMAND - 17

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

20-80031-FPC    Doc 41    Filed 02/26/21    Entered 02/26/21 16:05:09    Pg 18 of 22

(Recoupment permits a determination of the "just and proper liability on the main issue," and involves "no element of preference.").  In *Newbery*, contrary to the Trustee's argument, the Ninth Circuit also explicitly held that 11 U.S.C. § 553 did <u>not</u> apply to a defense arising from the same transaction as that sued upon by the Trustee. 95 F.3d at 1400.

The cases cited by the Trustee are inapposite for two reasons.  First, the Ninth Circuit's decision in *Newbery* controls.  Second, the Trustee does exactly what the cases admonish not to do—elevates semantics (use of the term "setoff") over the actual nature of the defense.  The cases the Trustee relies on are distinguishable in that they deal with claims that arise from a *different* transaction than that sued upon, and therefore involve affirmative relief as opposed to reducing or eliminating the claim asserted by the Trustee.  The cases the Trustee relies on, therefore, are distinguishable on precisely the grounds discussed by *Newbery*—and *Newbery* controls.

Finally, the Trustee makes too much of Perkins' failure to mitigate defense, which asserts that it is "improper" to embrace liability for GW Singapore's alleged misconduct.  The Trustee claims this language implicates the administration of the estate.  It does no such thing.  It merely points out that, under the same state law principles by which the Trustee would impose liability on Perkins, the Trustee also is obliged to mitigate the Debtor's alleged damages, and contriving liability to create such damages constitutes a failure to mitigate.  This defense also merely seeks to

OPPOSITION OF PERKINS AND NESS TO TRUSTEE'S
MOTION TO STRIKE JURY DEMAND - 18

Byrnes ♦ Keller ♦ Cromwell LLP
38th Floor
1000 Second Avenue
Seattle, Washington 98104
(206) 622-2000

20-80031-FPC    Doc 41    Filed 02/26/21    Entered 02/26/21 16:05:09    Pg 19 of 22

reduce or eliminate the Trustee's recovery.  Accordingly, the equity jurisdiction of the bankruptcy court has not been invoked, and the right to jury trial has not been waived.

## C.    The Trustee's Other Arguments Are Irrelevant.

The Trustee makes two other arguments.  Both are irrelevant.  First, the Trustee argues that it was in "partnership" with GW Singapore, and partnership claims are equitable.  However, whatever claims the Trustee might assert against GW Singapore are irrelevant to Perkin's right to trial by jury on the claims asserted against Perkins. Perkins is not alleged to be a part of any partnership involving the Debtor, and this is not an action for a partnership accounting or dissolution.  Moreover, a partnership has not been proven.  For the same reasons as discussed above, a jury will need to determine the nature and extent of the agreements actually entered into between the Debtor and GW Singapore, and whether a partnership was created or not.

Second, the fact that certain defenses asserted by Perkins may be equitable in nature is irrelevant to the right to a jury trial on the Trustee's claims against Perkins. "When legal and equitable claims are joined in the same action, 'the right to jury trial on the legal claim, including all issues common to both claims, remains intact.'"  *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 550 (1990) (quoting *Curtis v. Loether*, 415 U.S. 189, 196 n.11 (1974)).  Accordingly, "facts common to legal and equitable claims must be adjudicated by a jury," and "[t]he right to a trial by jury must be preserved even if the legal claims are characterized as incidental to the equitable claims."  *In re Basile*, 472 B.R. 147, 152 (Bankr. D. Mass. 2012).

The Motion to Strike Jury Demand should be denied.

OPPOSITION OF PERKINS AND NESS TO TRUSTEE'S
MOTION TO STRIKE JURY DEMAND - 19

DATED this 26th day of February, 2021.

BYRNES KELLER CROMWELL LLP

By /s/ Bradley S. Keller
    Bradley S. Keller, WSBA #10665
By /s/ Ralph E. Cromwell, Jr.
    Ralph E. Cromwell, Jr., WSBA #11784
By /s/ Jofrey M. McWilliam
    Jofrey M. McWilliam, WSBA #28441
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
206-622-2000
Fax: 206-622-2522
Email: bkeller@byrneskeller.com
       rcromwell@byrneskeller.com
       jmcwilliam@byrneskeller.com


MUNDING, P.S.

By /s/ John Munding
    John Munding, WSBA #21734
9425 N. Nevada St. Suite 212
Spokane, Washington 99218
509-624-6464
Fax: (509) 624-6155
Email: john@mundinglaw.com
*Attorneys for Perkins Coie LLP and Lowell Ness*

OPPOSITION OF PERKINS AND NESS TO TRUSTEE'S
MOTION TO STRIKE JURY DEMAND - 20

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

20-80031-FPC   Doc 41   Filed 02/26/21   Entered 02/26/21 16:05:09   Pg 21 of 22

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of February, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system. The NEF for the foregoing specifically identifies recipients of electronic notice.

By /s/ Ralph E. Cromwell, Jr.
Ralph E. Cromwell, Jr.
*Attorneys for Plaintiffs*
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
206-622-2000
Fax: 206-622-2522
Email: rcromwell@byrneskeller.com

OPPOSITION OF PERKINS AND NESS TO TRUSTEE'S
MOTION TO STRIKE JURY DEMAND - 21

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

20-80031-FPC    Doc 41    Filed 02/26/21    Entered 02/26/21 16:05:09    Pg 22 of 22