So Ordered.

Dated: April 22nd, 2021



Frederick P. Corbit
Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re:<br><br>GIGA WATT, INC., a Washington corporation,<br><br>                        Debtor. | Case No. 18-03197-FPC7 |
| MARK D. WALDRON, as Chapter 7 Trustee,<br><br>                        Plaintiff,<br><br>     v.<br><br>PERKINS COIE, LLP, a Washington limited liability partnership; LOWELL NESS, an individual and California resident; GIGA WATT PTE, LTD., a Singapore corporation; and ANDREY KUZENNY, a citizen of the Russian Federation;<br><br>                        Defendants,<br>     and<br><br>THE GIGA WATT PROJECT, a partnership,<br><br>                        Nominal Defendant. | Adversary No. 20-80031-FPC<br><br>**ORDER DENYING PERKINS' AND NESS' MOTION TO COMPEL ARBITRATION AND STAY**<br><br><br><br>**NOT FOR PUBLICATION** |

THIS MATTER came before the Court on Defendants Perkins Coie, LLP and Lowell Ness's Motion to Compel Arbitration and Stay in the adversary

ORDER DENYING ARBITRATION - Page 1

proceeding, Adversary Case No. 20-80031-FPC (the "Motion"). (Adv. ECF No. 40) On March 25, 2021, the Court held a hearing, reviewed the files and records herein, heard argument from Pamela Egan for the Plaintiff, Mark Waldron as the Chapter 7 Trustee for Giga Watt, Inc. (the "Trustee"), and from Ralph Cromwell for Defendants, Perkins Coie, LLP, a law firm, and for Lowell Ness, a partner at Perkins Coie, LLP (collectively referred to in the singular as "Perkins"). The Court finds, concludes and orders as follows:

## FINDINGS OF FACT[1]

1. Giga Watt, Inc. ("Giga Watt") and Giga Watt PTE, Ltd. ("Giga Watt Singapore") partnered to build and run a large-scale cryptocurrency mining operation, with investors who, after buying a token could install mining machines ("miners") in the building to generate cryptocurrency. Giga Watt offered "mining hosting services" that consisted of buildings designed to house miners along with the necessary electricity, and Giga Watt Singapore offered "turnkey mining services," that included selling miners and providing maintenance of the miners in the buildings. The project included an initial offering of WTT Tokens,[2] similar to

---

[1] Where a finding of fact is a conclusion of law, it shall be treated as such and vice versa.
[2] Giga Watt defined a WTT Token as "an Ethereum token representing the right to use the Giga Watt processing center's capacity, rent-free for 50 years, to accommodate 1 Watt's worth of mining equipment power consumption." (Adv. ECF No. 6, Ex. A., p.4)

ORDER DENYING ARBITRATION - Page 2

an initial public offering, called an Initial Coin Offering ("ICO") that was scheduled to begin August 7, 2017.

2. As part of the process of buying a WTT Token, each purchaser signed a Token Purchase Agreement that indicated it was an agreement with Giga Watt Singapore.[3] As a result of the ICO, Perkins received over $22 million in token sale proceeds and placed the funds in an Interest on Lawyers Trust Account ("IOLTA"). Subsequently, Perkins made refunds to various token holders, and then made four disbursements to Giga Watt Singapore that totaled $10.8 million and four disbursements to Giga Watt that totaled a little over $10.8 million. By February 22, 2108, the escrow account was depleted.

3. At issue are the Trustee's allegations that the bankruptcy estate was harmed when Perkins prematurely released funds from the IOLTA. Rather than resolve these allegations in this Court or in the District Court, Perkins seeks to compel arbitration in the Singapore International Arbitration Center pursuant to the Federal Arbitration Act. (Adv. ECF No. 40).

4. Perkins points to two documents—two versions of a Token Purchase Agreement—that contain arbitration provisions and argues that those provisions require this Court to order arbitration. Specifically, the two documents are: (i) a

---

[3] The procedural and factual background of the case is more fully set forth in the contemporaneous Order Granting Motion to Strike Jury Demand.

ORDER DENYING ARBITRATION - Page 3

seven-page document titled WTT Token Purchase Agreement[4] dated June 1, 2017, signed by Scott Glasscock as purchaser, and by Michael Savuskan, as CEO of Giga Watt Singapore ("Glasscock TPA"); and (ii) a document titled Token Purchase Agreement that was attached to an email dated May 17, 2017 from Katrina Grant to Lowell Ness ("Email TPA"). (Adv. ECF Nos. 43-2 and 43-3).

5. The Trustee objected to arbitration and argued that the lawsuit seeks enforcement of the unwritten escrow agreement between Perkins and Giga Watt Singapore, not the enforcement of Token Purchase Agreements.

6. The facts of the case, as introduced to the Court in the Complaint, Answers, Motion and related filings, suggests that Perkins and Giga Watt Singapore agreed that Perkins would hold money received from the WTT Token sales in an escrow or trust account. The agreement was not memorialized in writing as a traditional escrow agreement. In fact, the parties agree that a traditional escrow agreement document detailing the terms of the escrow account does not exist. (Adv. ECF No. 43, p. 1).

7. The existence of an escrow agreement is suggested by various pieces of evidence, including the Giga Watt Token Launch White Paper (the "White Paper");[5] statements made by David Carlson to the Trustee asserting that Perkins

---

[4] Adv. ECF No. 43-1.
[5] Adv. ECF No. 6, Exhibit A.

ORDER DENYING ARBITRATION - Page 4

agreed to hold the token purchase proceeds in escrow until Giga Watt met certain milestones in the construction of its facilities;[6] writings from Katrina Arden, counsel to the Giga Watt Project, discussing a draft token purchase agreement;[7] the Glasscock TPA;[8] and statements made to the Securities and Exchange Commission that the release of the token purchase proceeds escrow were conditioned on Giga Watt's construction progress.[9]

8. The existence of an escrow agreement is also suggested by the Giga Watt Token Launch White Paper ("White Paper"). The White Paper sets forth a general description of how the proceeds from the WTT Token purchases would be treated. For example, the White Paper provides that funds collected through the pre-sale and the ICO would be deposited in escrow and would be released from escrow "in step with the completion of facilities." (Adv. ECF No. 6, Ex. A, p. 18). The White Paper also provides that in the event more demand existed for tokens than existing facility capacity, "[t]he over-subscribed proceeds will be placed into escrow until the requisite processing center capacity has been built out." *Id.* Finally, the White Paper provides that "[i]f the construction of the processing center capacity designed to accommodate additional WTT tokens is not completed

---

[6] Adv. ECF No. 44, page 3.
[7] Adv. ECF No. 43-2.
[8] *Id.*
[9] Adv. ECF No. 43-4, Response to Request No. 19.

ORDER DENYING ARBITRATION - Page 5

in a reasonable amount of time, the relevant portion of these proceeds will be refunded to the WTT token purchasers." *Id.* at n.21.

9. Perkins is not a party to the White Paper. Additionally, while an escrow account is mentioned in the White Paper, Perkins is not named.

10. Perkins admits in its Answer that the proceeds received from the WTT Token sale were held in the law firm's IOLTA for the benefit of its client, Giga Watt Singapore.

11. The Glasscock TPA, dated June 1, 2017, provides in paragraph 15 that the Purchaser and the Company, Giga Watt Singapore, will arbitrate all disputes in Singapore; however, Perkins is not a party to the Glasscock TPA. (Adv. ECF No. 43-1)

12. Similarly, the Email TPA has an arbitration clause but does not include Perkins as a party. (Adv. ECF No. 43-2) [10]

13. The evidence presented for the purposes of this Motion does not definitively establish the terms of the escrow agreement between Perkins and Giga Watt Singapore. If Perkins could produce a written escrow agreement with Giga Watt Singapore that contained an arbitration clause, the Court's conclusion might change. But as it stands, the evidence relied upon by Perkins consists of

---

[10] The Glasscock TPA was signed by Scott Glasscock and Michael Savuskan, CEO of Giga Watt Singapore, on June 1, 2017, but the Email TPA was neither signed nor dated.

ORDER DENYING ARBITRATION - Page 6

agreements that it was not a party to; instead, the agreements Perkins relies upon are between Giga Watt Singapore and WTT Token purchasers. In short, no escrow agreement between Perkins and Giga Watt Singapore that contains an arbitration clause has been produced.

14. Both the Email TPA and the Glasscock TPA serve as evidence that an escrow agreement existed between Giga Watt Singapore and Perkins. But neither document contains evidence that an arbitration clause existed within the escrow agreement between Giga Watt Singapore and Perkins.

15. Considering the evidence presented, the Court cannot find evidence of an express or an implied agreement to arbitrate within the escrow agreement between Perkins and Giga Watt Singapore. The Trustee alleges that Perkins promised to hold money in its IOLTA until certain construction milestones were met —a factual allegation for trial— but neither party has presented evidence demonstrating Giga Watt Singapore or Perkins' intent or agreement to arbitrate disputes that arose under that escrow agreement.

## CONCLUSIONS OF LAW

1. International arbitration agreements involving parties in the United States are governed by Chapter 2 of the Federal Arbitration Act ("FAA"), which codifies the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the so-called "New York Convention" or "Convention").

ORDER DENYING ARBITRATION - Page 7

*See* 9 U.S.C. §§ 201- 208. Under the terms of the Convention, as codified in the FAA, a district court must compel arbitration in a foreign location if the terms of arbitration so state, and if the arbitration agreement is governed by the Convention. *See* 9 U.S.C. § 206.

2. Courts may determine whether an arbitration agreement was actually formed, as the FAA "make[s] arbitration agreements as enforceable as other contracts, but not more so." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989) (internal quotation marks omitted). Additionally, courts decide issues pertaining to the formation of the arbitration agreement at issue, because "the FAA does not require parties to arbitrate when they have not agreed to do so." *Id. Accord Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 300 (2010). Finally, where the court finds evidence lacking that the parties expressly agreed to arbitrate a particular dispute and where an agreement to arbitrate a particular dispute was not validly formed, arbitration will not be compelled. *Id.*

3. The parties have not produced evidence of a contract or agreement indicating the parties' intent that disputes related to how proceeds received from the WTT Token sales were disbursed from Perkins' IOLTA would be subject to mandatory arbitration.

Therefore,

ORDER DENYING ARBITRATION - Page 8

IT IS ORDERED: Perkins' Motion to Compel Arbitration and Stay (Adv. ECF No. 40) **DENIED**.

///END OF ORDER///