1                 UNITED STATES BANKRUPTCY COURT
              FOR THE EASTERN DISTRICT OF WASHINGTON

2

| | |
|---|---|
| In re: | CASE NO. 18-03197-FPC7 |
| GIGA WATT INC, | United States Bankruptcy Court Eastern District of Washington ADV. PROC. NO. 20-80031-FPC |
| Debtor | |
| MARK D. WALDRON, | |
| Plaintiff, | |
| v. | |
| PERKINS COIE LLP, LOWELL NESS, *Perkins Coie LLP*, GIGA WATT PTE. LTD., ANDREY KUZENNY, GIGA WATT PROJECT, | |
| Defendants. | |

                    TRANSCRIPT OF HEARING ON
     DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY,
PLAINTIFF'S MOTION FOR DETERMINATION THAT PROCEEDING IS CORE,
         PLAINTIFF'S MOTION TO STRIKE JURY DEMAND,
           CONTINUED SCHEDULING CONFERENCE,
AND CONTINUED HEARING ON MOTION TO WITHDRAW THE REFERENCE
            IN THE ADVERSARY PROCEEDING
      BEFORE THE HONORABLE FREDERICK P. CORBIT
                MARCH 25, 2021

FOR THE PLAINTIFF:
      POTOMAC LAW GROUP PLLC
      By: Pamela Marie Egan
      1905 7th Ave. W
      Seattle, WA 98119

FOR THE DEFENDANT, PERKINS COIE LLP:
      BYRNES KELLER CROMWELL LLP
      By: Ralph E. Cromwell, Jr
      1000 Second Avenue, 38th Floor
      Seattle, WA 98104

      MUNDING, P.S.
      By: John D. Munding
      309 E Farwell Rd, Ste 310
      Spokane, WA 99218

1

1  FOR THE DEFENDANT, LOWELL NESS:
       BYRNES KELLER CROMWELL LLP
2      By:  Ralph E. Cromwell, Jr
       1000 Second Avenue, 38th Floor
3      Seattle, WA 98104

4      MUNDING, P.S.
       By:  John D. Munding
5      309 E Farwell Rd, Ste 310
       Spokane, WA 99218

6
   FOR THE DEFENDANT, GIGA WATT PTE. LTD.:
7      PRO SE

8  FOR THE DEFENDANT, ANDREY KUZENNY:
       HUMMER BOYD PLLC
9      By:  Donald A Boyd
       6 South 2nd Street, Ste 1016
10     Yakima, WA 98901

11 FOR THE DEFENDANT, GIGA WATT PROJECT:
       PRO SE

12
       Proceedings recorded by electronic sound recordings, transcript produced by
13 transcription service.

14                    GINA M. COZZA
                   APPROVED TRANSCRIBER
15                  518 E. NEBRASKA AVE.
                    SPOKANE, WA 99208
16                     509-482-0660

17

18

19

20

21

22

23

24

25

26

27

28

2

1  CLERK:  Good afternoon.  We have the Honorable Frederick P. Corbit presiding.  This is In

2  Re:  Waldron versus Perkins Coie et al, Adversary Number 20-80031.  What is before the

3  Court today is Defendant's Motion to Compel Arbitration and Stay, Plaintiff's Motion for

4  Determination that Proceeding is Core, Plaintiff's Motion to Strike Jury Demand, Continued

5  Scheduling Conference, and Continued Hearing on Motion to Withdraw the Reference.

6  Present, we have Pamela Egan, attorney for the Plaintiff.

7  PAMELA EGAN:  Good afternoon, Your Honor.

8  CLERK:  Thank you.  Mark Waldron, the Plaintiff.  Mr. Waldron is there.  Okay, and in

9  addition, we have Ralph Cromwell, attorney for Defendants Perkins Coie.

10  RALPH CROMWELL:  Good afternoon, Your Honor.

11  CLERK:  [inaudible] Mr. Cromwell, we have Jofrey McWilliam.

12  JOFREY MCWILLIAM:  Good afternoon, Your Honor.

13  CLERK:  And co-counsel, John Munding.

14  JOHN MUNDING:  Good afternoon, Your Honor.

15  CLERK:  And joining by phone, Judge, we have Don Boyd, attorney for Defendant Kuzenny.

16  DON BOYD:  Good afternoon, Your Honor.

17  CLERK:  Thank you.  This hearing is being recorded, and you may proceed.

18  JUDGE CORBIT:  Good afternoon, Counsel, this is Judge Corbit.  Conducting Zoom

19  hearings is a little bit new.  I teach classes by Zoom, and we've had some mediations by

20  Zoom, and this one should I be sitting in my courtroom, should I have my robe on?  I do have

21  my tie on, so hopefully, I'm showing you enough respect.  Good afternoon, everyone.  Mr.

22  Munding, I see you frequently in this Court.  Mr. Waldron, you've been here.  Mr. Egan,

23  you've been here.  And Mr. Cromwell, I believe I remember you from a case that you were

24  involved with…in connection with the…oh no sound from me?

25  UNKNOWN:  Yes, Your Honor.

26  JUDGE CORBIT:  Mr. Cromwell, can you hear me, okay?

27  RALPH CROMWELL:  Yes, I can, Your Honor.

28  JUDGE CORBIT:  Okay, Mr. Waldron…everybody else seems to be able to hear me.  I'm not

1    sure…we'll let Mr. Waldron work on his sound system here for a second.  Okay.  I'm

2    wondering, Madam Clerk, if you could shoot an email to Mr. Waldron, I'm wondering if he

3    called in on the AT&T line.

4    CLERK:  I'm going to send it right now.

5    JUDGE CORBIT:  Ms. Egan, do you have his cell number?  Would that be…

6    PAMELA EGAN:  Yes, would you like me to call him, Your Honor?

7    JUDGE CORBIT:  I think that would be good.

8    PAMELA EGAN:  Okay, fine.  Hold on please.  [pause]  Your Honor?

9    JUDGE CORBIT:  Yes.

10   PAMELA EGAN:  I reached Mr. Waldron, and he understands to call in on the AT&T line.

11   JUDGE CORBIT:  Okay.  Alright, thank you.  We were just talking a little…making a little

12   pleasantries.  I think most everyone here, Mr. McWilliam, I'm not sure that I met you before,

13   but everyone else has been in my courtroom before.  Mr. Cromwell, am I correct I think it was

14   in the Diocese, the malpractice case, that you represented the defendant law firm in that case?

15   RALPH CROMWELL:  Yes, Your Honor, you're correct.

16   JUDGE CORBIT:  Okay.  And I didn't get to…I didn't get to decide that case because you all

17   settled it, but it was certainly interesting, and I certainly did a lot of research beforehand.  So

18   I'll associate with you, Mr. Cromwell, complicated interesting cases.  This case certainly is

19   that.  There are four matters percolating, three of them are set for argument today, the three

20   that Madam Clerk called.  The Motion to Compel Arbitration, the Motion to Strike the Jury

21   Demand, and the Motion for Determination that the Proceeding is Core.  The fourth issue

22   percolating is the Motion to Withdraw the Reference, which this Court needs to respond on

23   and give the information to the District Court when it's decided.  But the first three of those

24   matters are scheduled for argument today.  I propose that we'll hear argument separately on

25   the motions.  So keep that mind and keep in mind that I've read all of your pleadings, all of

26   the declarations, and have done some research on my own, looking at some of the cases

27   dealing with the issues raised in your briefs.  But the reason why we'll start with the Motion

28   to Compel is that even though I may not rule on that motion today, I may take it under

1  advisement.  If I take it under advisement, I will issue an opinion in a matter of weeks, not a

2  matter of months.  I know it's important, and I will work diligently to get it done.  But if I

3  grant the motion to compel arbitration, it really eliminates lots of the other issues.  If it's

4  going to be arbitrated in Singapore, we're not gonna have a jury trial in Eastern Washington.

5  And the issue of whether or not the case is core is not an issue that may need to be decided,

6  and similarly whether or not the reference is going to be withdrawn may become moot.  So,

7  the Motion to Arbitrate is the one that I'd like to hear from you on first, and it's the one that I

8  intend to resolve first if I take matters under advisement.  Now after the arbitration motion, I

9  will hear from you on the Motion to Strike the Jury Demand.  On this one, the order will be

10 flipped, Ms. Egan will go first, that's her motion, and then I'll hear from Mr. Cromwell or his

11 colleague.  Again, you know, I don't plan to give you "x" number of minutes, but frankly I'm

12 thinking arguments of five minutes are probably enough.  Your briefing is…has all been

13 consumed by me.  And finally today, I would hear the argument on the Motion for the

14 Determination that the Proceeding is Core.  And the reason is if the Motion to Strike the Jury

15 Demand is denied and the Defendant choses…then has a right…the Court determines that the

16 Defendant has a right to a jury trial, and if the Defendant does not consent to this Court trying

17 that jury case, this Court can try…can handle a jury matter, but it has to…it needs the consent

18 of the parties.  So, if there is a right to a jury trial and the Defendant doesn't consent, then the

19 case it's going to go to the District Court, and that in essence probably renders moot the

20 Motion to Withdraw the Reference.  So that's the order I perceive this.  I'd be interested in

21 how I've set up this waterfall.  And on that issue only, Mr. Cromwell, do you…do you

22 concur?

23 RALPH CROMWELL:  I think it's a sensible, logical way to proceed.  I'm a little worried

24 about the five-minute limit.  I planned on saying a little bit more, but I will try to shorten up

25 what I had to say.

26 JUDGE CORBIT:  Well, Mr. Cromwell, if you don't repeat yourself and it's interesting and

27 on point, I'm not going to have my watch out, so.

28 RALPH CROMWELL:  Alright, well, you stop me…you stop me for sure if it's not

1    interesting or if it's not on point.

2    JUDGE CORBIT: Alright. Ms. Egan, let me hear from you about the order that I propose to

3    go through these matters.

4    PAMELA EGAN: Thank you, Your Honor. The Motion to Strike the Jury Demand and the

5    Motion to Determine Core are also integrally relevant to the Motion to Withdraw the

6    Reference. So if you don't mind, then I'll try…if I'm not interesting or on point, I expect to

7    be interrupted. But I think that those arguments dovetail closely with request for withdrawal.

8    And so I would expect that in my arguments on those points, I would be referring to the

9    Motion to Withdraw the Reference. I understand that's decided by the District Court, but this

10    Court can provide information, transmit information to the District Court on the motion so.

11    JUDGE CORBIT: I'll hear from you on that, that's fine. I understand that, and I don't mean

12    to cut you off. Before I hear from the two of you on…and I think, Mr. Cromwell, looking at

13    the emails, your co-counsel was going to handle one of the motions. Are you the one that will

14    handle the arbitration motion?

15    RALPH CROMWELL: Yes, Your Honor.

16    JUDGE CORBIT: Okay. And before I hear from you and hear Ms. Egan's response to that,

17    there are a few issues that I want to raise with you to make sure that you address in your oral

18    argument. One of the issues that I'd like you to deal with is whether or not there's a

19    reasonable relation to Singapore. Now, I'm looking at Mr. Cromwell's document. It's the

20    Motion to Compel Arbitration at Docket Number 40 at Page 17, and I'm gonna quote Mr.

21    Cromwell here. He says, "The fourth element is met because a party to the transaction is not

22    a citizen of the United States, and there is a reasonable relation to Singapore." The question I

23    have is, is that what you're actually arguing Mr. Cromwell that it's an "and"? That both of

24    those elements have to be met? Or are you saying that if Giga Watt Singapore is not a citizen

25    of the United States, that's enough? But in your brief, you have the "and". The other issue

26    that I'd like both of you to address, and I'm going to quote now from the Perkins reply brief

27    in connection with their Motion to Compel Arbitration, that's at Docket 46. I'm looking at

28    Page 3 at Line 18. And I'm just going to read what you said Mr. Crowell. You said, "To

1   escape the consequences of his own allegations, much of the Trustee's oppositions suggest
2   that he will abandon his current complaint and pursue a new theory." Maybe this is more for
3   you to respond to Ms. Egan, but I would like you to address this. My concern is this, is that I
4   want this case to move efficiently forward. If I resolve the issue on the current complaint, am
5   I going to see a motion to amend the complaint and are we going to go through this again? I
6   would like to know if the Trustee is going to amend the complaint. And if so, in making my
7   decisions, I may want to get that done sooner rather than later, so then I can see what those
8   issues are. In particular, I go through and in reading Ms. Egan's pleadings, I'm not sure if she
9   used this word, but the impression I got was talking about Giga Watt Singapore being sort of
10  a sham entity. If it is a sham entity and has no assets, does it really need to be a party in this
11  lawsuit? We're talking about a escrow transaction as I understand this case, the white paper
12  which was Perkins Coie record I know had the white paper. And then I know that Perkins
13  Coie from the record did get money. And I know from an email that was submitted that
14  Perkins Coie was concerned about holding onto that money, and eventually that money was
15  released. And so if there was an escrow relationship and so forth and money…I know, Mr.
16  Cromwell, I'm not making any findings, I'm just talking about the allegations that Perkins
17  Coie should not have released that money when it did and as a consequence of that has some
18  liability. That's just the allegation. If that's the case and it's…this matter is dealing with
19  what Perkins Coie did and the money is gone and GW Singapore is not really there, do they
20  need to be a party to this action? If they're not a party, that may affect the arbitration
21  analysis. Now with respect to my questions, Mr. Cromwell, about the "and" and the other one
22  before you start, if I was not…I don't expect to be interesting, but if I wasn't articulate, Mr.
23  Cromwell, do you have any questions about my questions?
24  RALPH CROMWELL: I don't have any questions about your questions, Your Honor. I
25  think I've got them there, but if I'm not addressing what you want to know, I'm sure you're
26  gonna tell me.
27  JUDGE CORBIT: Well, is that my reputation? I am curious, and I do ask questions.
28  RALPH CROMWELL: No, that's not your reputation. I think that's my request because the

1    last thing I want to be doing is talking about something that is off-point from what you want

2    to hear.

3    JUDGE CORBIT: Okay, thank you, sir. I'm not bashful about asking questions. And while

4    I was Chief Judge of the 9th Circuit Bankruptcy Judges, this is something we had a roundtable

5    where we discussed with judges the appropriateness of asking questions and the different

6    styles of judges. I'm a…my style is to ask questions when I don't know. Ms. Egan, do you

7    have any questions about my questions?

8    PAMELA EGAN: No, Your Honor.

9    JUDGE CORBIT: Okay. Alright, well so, I set the table. Mr. Cromwell, it's your client's

10    motion. I'll hear from you first.

11    RALPH CROMWELL: Alright, Mr…alright, Your Honor, again for the record, I'm Ralph

12    Cromwell, and I'm representing the Defendants in this matter. I want to just step back for a

13    minute before I address your questions and provide a context that I think might be helpful the

14    rest of the discussion. The other day, I started hunting through your bankruptcy docket

15    looking for something, and I found it, I thought, in Document Number 753, Docket Number

16    753, it's a very short pleading, it's an objection. But what I was interested in was not the

17    pleading, I was interested in the signature block. It was signed by seventy-eight token

18    holders, and what it…and it had contact information for them. And what I was interested in

19    knowing is how many different countries are these people located in? And I quickly counted

20    up twenty-three different countries and the United States. That's a total of twenty-four

21    countries. Canada, the United Kingdom, Russia, Japan, Australia, Venezuela, Columbia,

22    Romania, Italy, Finland, South Africa, France, The Netherlands, Spain, Slovenia, Hungary,

23    Norway, Greece, Chile, Switzerland, Germany, Sweden, Brazil, and the United States. No

24    one from the Eastern District of Washington, one person from the State of Washington in

25    Bellingham, and people scattered all over the country and a handful of states, Florida, Texas,

26    California. What is the point of this or why would I want to know that? Well, when you first

27    hear about arbitration in Singapore, it seems a little startling like what? Arbitration where?

28    Why would you agree to arbitration in Singapore? I think if you go back to the spring of 2017

1    when Cryptonomos and Giga Watt Singapore were putting this transaction together, and they

2    were sitting there thinking about it, and they were going "you know we're gonna sell these

3    tokens to people literally all over the world.  If something goes wrong what's gonna happen?

4    Are we going to be hauled into court in twenty-four different countries under twenty-four

5    legal systems?  Do we have to hire twenty-four different lawyers if there's some sort of

6    problem?"  And what they eventually did is what a lot of people do in these international

7    transactions, they said, "No, if something goes wrong we need some sort of understanding

8    about how this is gonna get resolved in a somewhat hopefully efficient way."  And what they

9    provided for was arbitration in Singapore under Singapore law in front of the Singapore

10   International Arbitration Center.  I think that's a reasonable choice.  Why is it a reasonable

11   choice?  First of all, a lot of the people who are buying these tokens are not in North America,

12   they're in Europe, they're in Russia, they're in India, they're in Africa.  And if you have to fly

13   to some location for an arbitration, I would argue that Singapore, a major international city

14   with good air connections, is at least as convenient for a lot of these people as, you know,

15   somewhere in the United States.  Second of all, Singapore law is derived from English

16   Common Law just like U.S. law, some differences but many similarities, and the Singapore

17   International Arbitration Center is a very well-known arbitration organization, very reputable,

18   does these things day in and day out, you know, knows what they are doing.  And in

19   providing for arbitration in Singapore, I think these people made a reasonable choice, which if

20   you look at the context in which they were making it, clearly has connections to international

21   commerce, people all over the world.  What is the connection to Singapore?  Well, the

22   complaint says that both Cryptonomos, which structured and managed the sale of the tokens

23   was incorporated in Singapore.  There's a hyperlink to their incorporation documents.  Giga

24   Watt Singapore is allegedly incorporated in Singapore.  There is a hyperlink to their

25   documents.  There's a hyperlink to an email to Perkins Coie, where Perkins is given a street

26   address in Singapore to send correspondence.  There are wiring instructions to Perkins to a

27   bank in Singapore, where the money out of the alleged escrow was sent.  And I would argue

28   that in addition if you choosing Singapore law, it's reasonable to choose arbitration in

1  Singapore because presumably you're gonna get arbitrators who know Singapore law. So I

2  think my…you know, is there a connection…your exact question, "Does it have to be a

3  foreign citizen and a reasonable connection or is it just a foreign citizen?" My understanding

4  is that it's just a foreign citizen. Ms…Jofrey McWilliams, please correct me if you think

5  otherwise. But I think this is a transaction with strong international connections. These will

6  sold to people all over the world by an entity that was at least located and banking in

7  Singapore, incorporated in Singapore. I think that the prerequisites for application of the New

8  York Convention are met. But even if they weren't, all that would happen is you would

9  default to the Federal Arbitration Act, which is the body of law you're using under the New

10 York Convention anyhow. Okay, second point. When I first heard about this case, I don't

11 know a lot about escrow agreements. The only escrow agreement I've ever signed in my

12 whole life is when I bought a house, and I went to an escrow agent's office, and the buyer and

13 the seller sign a contract that appoints someone as an escrow agent and gives them directions.

14 Get the money from the buyer, get the title from the seller, when you got the title recorded,

15 give the seller the buyer's money. So when I heard this was an escrow case, the first thing I

16 said is "Okay where's the escrow agreement? Let's see the directions." If Perkins allegedly

17 breached this escrow, where's the escrow agreement? And the answer was there isn't one.

18 And I said, "Well, what do you mean there isn't one? How can there not be an escrow

19 agreement if this is an escrow case?" And the answer is there is no escrow agreement in the

20 sense one would traditionally expect to see. And so it's like, alright, well so why is the

21 Plaintiff saying there's…

22 JUDGE CORBIT: Okay, well let me ask a question here. An arbitration agreement is a

23 contact and here, you know, we have these various versions of the token agreement, purchase

24 agreements that I see that has the arbitration provision, but Perkins…okay whatever

25 this…whether there was an escrow or not, we look at what happens. And we…do you have

26 the white paper Perkins signed to announced that Perkins is going to hold money, and Perkins

27 did hold money. Okay, and then gave the money to someone else. We know those things

28 aren't disputed. So based on that, the point of saying there was an escrow agreement and

1  then…and that Perkins…and they say that Perkins didn't do what they were supposed to do,

2  they're going to have to prove the contract. But the arbitration contract that everybody's

3  looking at is the token agreement dealing with Giga Watt Singapore and what's happening

4  there and those agreements. But we're talking here only about what Perkins did and what

5  Perkins was supposed to do with holding those funds. Perkins didn't sign any arbitration

6  agreement, and I don't see in dealing with the so called escrow agreement, whether it's

7  unwritten or verbal or whatever it is, I don't see an agreement that those disputes are covered

8  by any arbitration contract or maybe you could point me to those.

9  RALPH CROMWELL: Okay. I think I'm following you, and I'm not sure I can give you a

10 short answer, but I will answer you. Because there is no arbitration agreement in the sense

11 you would typically expect to see one, for example, if you bought a house. If you look at the

12 complaint, what the complaint says and this is just want it says, you could go read it, it says,

13 "the white paper referenced an escrow" but the white paper says that it creates no contractual

14 obligations and then the complaint says "the Token Purchase Agreement has a statement

15 something to effect that the terms and conditions of the tokens are as stated in the white paper

16 and the complaint alleges that is an incorporation by reference of the escrow provision into

17 the Token Purchase Agreements. There's no other escrow agreement but there is according to

18 the complaint an escrow provision incorporated by reference into the Token Purchase

19 Agreements." And then the complaint goes on to allege that the way that the Debtor was

20 damaged was that Perkins breached the escrow provision in the Token Purchase Agreement.

21 Perkins didn't sign the Token Purchase Agreement. The Debtor didn't sign the Token

22 Purchase Agreement. The Debtor says "I'm a parter…I'm a partner of Giga Watt Singapore

23 that is a signatory so I can assert their rights and I am liable for their misconduct and the harm

24 they cause" and they say "Perkins didn't sign it but Perkins knew what it said". So the theory

25 of the complaint is that the way that Perkins is liable to the Debtor is for Perkins' breach of an

26 escrow provision that was incorporated by reference into the Token Purchase Agreement.

27 You can look at Paragraph 26 of the complaint is one good place. So what Perkins is saying

28 is "Okay there's no classic escrow agreement here, but what you're saying is there was an

1  escrow provision in the Token Purchase Agreement and when we, Perkins, let money out of

2  our IOLTA trust account, you say that breached the escrow provision in the Token Purchase

3  Agreement and made you, the Debtor, liable to the token purchasers". That's an argument

4  that Perkins is liable for a breach of the Token Purchase Agreement. And our Motion to

5  Compel Arbitration is "okay, fine" if you are saying "We, Perkins, are liable to you, the

6  Debtor, for a breach of the Token Purchase Agreement". Then guess what else in the Token

7  Purchase Agreement? An arbitration provision that your partner, Giga Watt Singapore, put

8  there because they didn't want to be sued in twenty-four different countries. And you don't

9  get…if you're suing us for a breach of the Token Purchase Agreement, you don't get to pick

10 and choose which provisions get enforced. You can't just say "I want to enforce this one but

11 not that one". It's equitable estoppel. If you are suing us for a breach of the Token Purchase

12 Agreement, then you are equitably estopped to deny that we are entitled to demand

13 arbitration. I hope I'm addressing what you were getting at there.

14 JUDGE CORBIT: You did.

15 RALPH CROMWELL: So that's it in a nutshell. In a nutshell, we are saying there's no

16 toke…there's no escrow agreement here. But Debtor, we understand your theory. Your

17 theory is there was an escrow provision in the Token Purchase Agreement. You claim it was

18 breached. You claim that we breached it by letting money out when we shouldn't have.

19 Okay, we let money out when we shouldn't have, and you became liable for it. You are suing

20 us for a breach of the Token Purchase Agreement, so equitable estoppel we want to arbitrate

21 that…under that provision which says, "Any dispute arising from or relating to the Token

22 Purchase Agreement" which you say contains this escrow clause, you know, that's right down

23 the middle of what would fall in an arbitration clause like that. You're suing us for a breach

24 of the Token Purchase Agreement. We want to arbitrate. And then you know, what is their

25 response? Their response is "well there's no proof that the Token Purchase Agreements were

26 signed". Well okay, if there's no purchase…proof that the Token Purchase Agreements were

27 signed, we can all go home right now. Because if they weren't signed, you didn't occur any

28 liability for a breach of an escrow provision in there. There's an argument this is absur…you

1   know, this is so broad, it could be applied in an absurd fashion.  There's nothing absurd about

2   saying, "if you claim we breached an escrow provision in the Token Purchase Agreement, we

3   want to arbitration under an arbitration clause in the Token Purchase Agreement that covers

4   any disputes regarding that agreement".  There is a claim that there's no reasonable relation to

5   Singapore, but you claim they're incorporated there.  You claim that Cryptonomos is

6   incorporated there.  You hyperlinked to emails giving us a street address there and wiring

7   instructions to a bank there, and the Token Purchase Agreement provides for application of

8   Singapore law.  Sounds like a connection to me.  And then the last argument you get, which in

9   some ways I think gets, you know, on a page count basis the most attention, is the idea that

10  because we are in bankruptcy, you have discretion not to enforce arbitration.  Even if there is

11  a Token Purchase Agreement, and even if we are claiming a breach of it, and even if it does

12  have an arbitration clause, and even if it's otherwise enforceable, you have discretion not to

13  enforce the arbitration clause if that would under…you know, inherently undermine one of

14  the fundamental purposes of the bankruptcy code.  And the first step of the analysis…as I

15  understand that argument, it's Congress passed the Arbitration Act, Congress passed the

16  Bankruptcy Code, we have to assume that Congress doesn't want the Arbitration Act applied

17  in a way that fundamentally undercuts the Bankruptcy Code.  And we don't want the

18  Bankruptcy Code applied in a way that fundamentally Arbitration Act.  So is there something

19  about arbitration of this particular case that is fundamentally inconsistent with the purposes of

20  the Bankruptcy Code?  And that analysis, developed through case law, is the first thing you

21  ask is well okay is this adversary proceeding core or non-core?  Which, you know, you want

22  to address serially.  But the analysis is is if it is non-code…excuse me, non-core, almost by

23  definition application of enforcement of an arbitration clause could not be fundamentally

24  inconsistent with the purposes of the bankruptcy act if we're not even talking about a core

25  issue.  And then the 9th Circuit goes on and says, "But even if it is core, the party resisting

26  arbitration still has the burden of showing that enforcement of arbitration would be

27  fundamentally inconsistent with the purposes of the Bankruptcy Code".  And this is you know

28  this whole non-core, core, non-core thing is complicated.  But, you know, as I understand the

1   argument to shorten…I mean look, all of the conduct at issue is pre-petition.  We are talking

2   about sales of tokens in 2017 and an alleged escrow that was funded in the summer of 2017

3   and money that was disbursed from escrow by Perkins Coie in the fall of 2017 or maybe in

4   January or February of 2018.  It's all pre-petition conduct.  If a cause of action for breach of

5   escrow rose, it arose at the very latest by February of 2018.  Perkins Coie has not submitted a

6   proof of claim.  There is no counter-claim in our answer, and if you read our request for relief,

7   we have not asked for any affirmative relief from the Debtor.  So what is the argument that

8   this is a core proceeding?  It turns on the allegation that by asserting setoff as an affirmative

9   defense, we transformed what was otherwise a non-core proceeding into a core proceeding.

10  And my understanding of the law there, and I'm not a bankruptcy attorney, is is that

11  bankruptcy…but I'll take a shot at it, bankruptcy has a very special definition of "setoff" and

12  they distinguish "setoff" from "recoupment".  "Setoff" is where the claim that the Defendant

13  is setting off against the Debtor arose in a transaction that is different than the transaction the

14  Debtor is suing on.  Whereas, "recoupment" is a claim that the Defendant is asserting against

15  the Debtor in the same transaction that the Debtor is suing.  And the important distinction is is

16  that if the transaction is different, if the setoff is from a transaction that is different, it is

17  treated as an independent claim against the Debtor subject to allowance or disallowance

18  which makes it a core issue.  In contrast, if the setoff defense arises from the same transaction

19  that the Debtor is suing on, it is not treated as an independent claim.  It is simply treated as an

20  attempt to reduce the Debtor's damages, and there is no automatic stay, there is no application

21  of 553, there is no transformation of the setoff defense into an independent claim, which is a

22  core proceeding.  And so, what are our setoff defenses here?  We have two of them.  One, it

23  seems to be undisputed that this money that was wrongfully released from the escrow ended

24  up from the Debtor.  And so one of our setoff defenses is if you got the money, why are you

25  suing us?

26  JUDGE CORBIT:  Isn't…isn't that…as for that, isn't that about the half the money, not all

27  the money?

28  RALPH CROMWELL:  My understanding…so this is a…it is at least half the money.  But

1   the Trustee's complaint at Page 9, like Line 11, don't hold me to that but we cite it in our

2   brief, the Trustee's complaint contains a hyperlink to a letter that the Debtor wrote to the FCC

3   in August of 2018.  The FCC had a whole bunch of questions for the Debtor.  And one of the

4   questions was "Where'd the money go?  All this money you got from selling tokens where

5   did it go?"  And what the Debtor's answer to the FCC is "It was used for construction."  Well

6   the only…the only person doing any construction was the Debtor.  And then if you look at the

7   complaint, the complaint says that Giga Watt Singapore filed a claim in the bankruptcy,

8   claiming $26 million loan to the Debtors.  So it appears to me that what happened is that all of

9   the money went to the Debtor, perhaps some of it as a loan, but a loan that hasn't been repaid.

10  And so whether we're right or wrong about the facts, I mean, if we litigate this lawsuit, I

11  guess we'll find out if we're right or wrong about the facts.  But in theory, what's our setoff

12  defense?  Our theory in setoff defense is "Why are you suing us if you got the money and kept

13  it and used it for construction?"  Or said differently, "Why does Perkins have to give you

14  money a second time that you say you weren't supposed to get a first time?"  Or said

15  differently "If you have to give back money that you weren't supposed to get, why were you

16  damaged?"  But the important issue for this core, non-core, do you have discretion to deny

17  arbitration is is that defense arising from the same transaction or a different transaction than is

18  the subject of the Trustee's action?  And we would say it's clearly the same transaction.  The

19  transaction involved in the Trustee's claim is that there was money in escrow and "Perkins

20  you let it out before you were supposed to" and our defense is "yeah but we let it out to you".

21  That's the same transaction.  So under this distinction between setoff and recoupment that the

22  9th Circuit follows, where if it's the same transaction, it's recoupment.  And if it's

23  recoupment, it's not treated as an independent claim subject to the claims allowance process.

24  It's just a defense, it's just an effort to reduce the Trustee's damages.  We would say that by

25  asserting that as a setoff, we're State Court lawyers, you know, we shouldn't have called it a

26  "setoff," we should have called it "recoupment" but we did not transform this case into a core

27  proceeding.  So I've kind of gone down this rabbit hole of core, non-core that you wanted to

28  address separately, and I've only done it in the context of demotion to compel arbitration.

1  One of the responses is "well even if it's true that there's an arbitration clause and even if it's

2  true that it would otherwise apply" you have discretion not to apply it here under this line of

3  cases that you can't fundament…order arbitration in a way that would be inconsistent with the

4  fundamental purposes of the Bankruptcy Code. And the first step in that analysis is "is it core

5  or non-core?" and if it's non-core, the law in the 9th Circuit is there is no discretion not to

6  order bank…arbitration. So our position is, this is not a core proceeding, it's clearly a non-

7  core proceeding. There is…it's State Law claims pre-petition conduct, we are not asserting a

8  claim against you. We are not asserting a setoff from a different transaction than you are

9  suing on. We are simply defending ourselves and saying "If you got the money, it's not fair

10 that we give it to you a second time." I've gone well beyond your five minutes, Your Honor.

11 JUDGE CORBIT: I hate to say.

12 RALPH CROMWELL: But if I've answered your questions, maybe this is the place to wrap

13 it up. For better or for worse, the Debtor's partner put an arbitration clause in these Token

14 Purchase Agreements, providing for arbitration in Singapore in what clearly was going to be

15 an international transaction, where they are selling tokens to people all over the world. And

16 the theory in the complaint is we, Perkins Coie, are liable to the Debtor because we breached

17 the Token Purchase Agreement, we breached the escrow provision in the Token Purchase

18 Agreement, and all we are saying is, fine, if that's your theory, then we are entitled to avail

19 ourselves of that arbitration provision in that same Token Purchase Agreement. Thank you.

20 JUDGE CORBIT: Thank you. Ms. Egan.

21 PAMELA EGAN: Thank you, Your Honor.

22 JUDGE CORBIT: And let me say, I will let you…you know, the…you have your motions

23 coming up, too. I'm going to hear from you on those. If, as with Mr. Cromwell, these various

24 motions your arguments bleed together, I understand that. But what I'd like to hear from you

25 at this point is not your motion to strike or not your motion to determine that it's core, but

26 dealing with the motion to arbitrate.

27 PAMELA EGAN: Thank you, Your Honor. One of the things that I admire about Mr.

28 Cromwell is his ability to draw a picture very vividly, whether it's the correct picture or not, I

1    don't agree that he has the correct picture. We're not suing on the Token Purchase

2    Agreement. Katrina Arden asked Lowell Ness if he…if Perkins Coie could serve as the

3    escrow for the ICL. He said "yes". He issued what he called a "vanilla retainer letter" for

4    Giga Watt Singapore in order to access the IOLTA trust account, which is where attorneys

5    who serve as escrow are supposed to the put the escrow money. And there's a lot of evidence

6    of the escrow agreement and the terms of the escrow agreement, including the website where

7    Lowell Ness and Perkins Coie are saying "We're going to hold this money in escrow". And

8    statements of the token holders and the Token Purchase Agreement is evidence of the…

9    JUDGE CORBIT: You mentioned something…

10    PAMELA EGAN: [inaudible]

11    JUDGE CORBIT: And I've read the Token Purchase Agreements, I've read the white paper,

12    I've read the complaint, I've read the answer. You're talking about, was an engagement letter

13    or something that Perkins issued?

14    PAMELA EGAN: Yes. Yes.

15    JUDGE CORBIT: Where is that in the record?

16    PAMELA EGAN: Where is the…well, it's alleged in the complaint.

17    JUDGE CORBIT: Okay.

18    PAMELA EGAN: I don't…it's not attached to any of the pleadings. It's alleged and

19    described in the complaint.

20    JUDGE CORBIT: Okay. And give me your shorthand description of what that is. You say

21    this is the engagement letter. Is that what you describe this as?

22    PAMELA EGAN: Yes. Well, yes, it's a very short engagement letter that does not have an

23    arbitration clause that states untruthfully that Perkins Coie will provide corporate advice to

24    Giga Watt Singapore. And there's an email from Lowell Ness where he says "I'll open or I'll

25    issue a vanilla retainer letter in order to access the account at Perkins Coie." That's the

26    writing that we have. And Katrina Arden, this is all in the complaint, Katrina Arden followed

27    up to Mr. Ness' assistant, saying "Is there going to be any writing about the terms of the

28    withdrawal?" and there's just no answer. Mr. Ness shows he wanted a vanilla retainer letter.

1    We don't know why, but that's why we don't have a written agreement, but we have a lot of

2    evidence.  And with respect to damages, Giga Watt's damages are not simply that there was a

3    promise to the token purchase agree…holders that the money would be held in escrow.  When

4    that money…that…well it destroyed all…it destroyed the enhan…it destroyed Giga Watt

5    when the escrow agreement was completely hollowed out, and Giga Watt had not built the

6    construction that it had said it would try to, but it has a lot of hedges about the scheduling.

7    And Giga Watt didn't want to be on the hook if it didn't finish the construction.  David

8    Carlson took care of that, that money would have to stay in escrow and the token holders

9    would get power or a refund.  And by feeding the money as if it were not held in escrow, that

10   money was not available.  And Giga Watt was making promises, we'll have…what they

11   wanted to make sure that if they can't finish the construction, they won't have token holders

12   coming at them for the money and…because the money had been siphoned out.  And with

13   respect to all the money went to Giga Watt, when the money…when the first…the first half of

14   the money was siphoned off to Giga Watt Singapore.  Now if that money…if Giga Watt

15   received any money before it had finished the construction from Giga Watt Singapore, that

16   money could have come from all this other money that Giga Watt Singapore was making

17   selling miners.  You know, we have add those in.  This is a $50 million dollar capital raise

18   that they made, only half of which went through the escrow.  So if Giga Watt was being lent

19   money in order to do the building, and it was…and they were getting money than they had

20   megawatts, that wasn't the tell to Giga Watt that the money was coming from escrow.

21   That…it could have been something from the miner money.  So anyway, I just wanted to kind

22   of…I wanted to reset that table.  We're not suing on the Token Purchase Agreement.  The

23   Token Purchase Agreement is evidence of the terms of the escrow and also…well, that's what

24   it is.  And with respect to arbitration, the Motion to Compel Arbitration stumbles on the

25   threshold of contract formation.  There is a fatal contract formation defect under either the…I

26   call it the email Token Purchase Agreement, the one where Katrina Arden sent it and said

27   "Here is an agreement that would be put on the website".  There are more than three

28   hundred…less than three hundred and fifty claims filed by token holders in this case.  Twelve

1  of them have Token Purchase Agreements attached, but they're not the email Token Purchase

2  Agreement, it's the…what I call the Glasscock Token Purchase Agreement. No one has

3  presented to us the…an email Token Purchase Agreement that has been signed, executed,

4  entered into, performed. Even if the email from Katrina Arden to Lowell Ness said, which it

5  doesn't, "this is the final Token Purchase Agreement that will be entered into by the parties".

6  Even that, and it doesn't say that, even that doesn't show it was ever entered into. We have

7  no evidence that that agreement was ever entered into. And a threshold question under all

8  arbitration is that there is an enforceable arbitration agreement. And the email TPA does not

9  meet that requirement. That's the end of that issue.

10  JUDGE CORBIT: Okay, let me ask you…

11  PAMELA EGAN: [inaudible] doesn't…yeah.

12  JUDGE CORBIT: Okay, there's one token person…purchase agreement. I think it's the

13  Glasscock one.

14  PAMELA EGAN: Yes.

15  JUDGE CORBIT: That shows electronic signatures on both sides.

16  PAMELA EGAN: That's right.

17  JUDGE CORBIT: So…

18  PAMELA EGAN: That's right.

19  JUDGE CORBIT: So why don't we have…I mean, you say…you said there was none. But

20  is there one? I mean…

21  PAMELA EGAN: Well, there's twelve. There's twelve of the Glasscock Token Purchase

22  Agreements, and those are different, Your Honor. They have different language. They have

23  different arbitration clauses. And that's very important. The email TPA has a pretty standard

24  one that looks like a good lawyer went…it looks like a good lawyer went over the Glasscock

25  TPA and fixed the arbitration clause, so that it wasn't infinite. But we have no evidence that

26  anyone ever entered into that agreement, and therefore, there's no basis for enforcing that

27  arbitration clause. And the e…and the Glasscock TPA, which is attached as Exhibit 1 to Mr.

28  Cromwell's Declaration, which is ECF 43, that provision provides for arbitration of any

1    disputes.  And "disputes" as defined in the agreement as "any demand, any claim for relief

2    between those two parties".  That is a classic infinite arbitration clause because any disputes,

3    so one party to the agreement runs over the other party sixty years after the agreement is

4    entered into, after the tokens have already expired, the survivors of the victim sue, and the

5    Giga Watt Singapore responds it has to be arbitrated because it says "any dispute" between

6    the parties.  The 9th Circuit has already addressed this issue.  And there's a split in the Circuit

7    on how this infinite clause analysis is conducted.  Mr. Cromwell with Perkins Coie wrote in

8    its brief that "well, yeah, sure if you draw it out hypothetically that far, that could be…that's

9    absurd that, you know, sixty-five years there's a car accident, and that has to be arbitrated in

10   Singapore.  That's absurd.  But under these facts, it's not absurd.  In the 4th Circuit, Mr.

11   Cromwell might have won that point.  But the 9th Circuit has rejected that approach, and the

12   9th Circuit says, "look if there's an agreement that you're reading and it leads to absurd

13   results, no one has entered into that agreement, that is not an enforceable agreement in the 9th

14   Circuit" and therefore, under the Glasscock TPA, which has been entered into, the clause is

15   not enforceable.  And the very first element of compelling arbitration is to have an

16   enforceable agreement.  Now in their brief, Perkins Coie argues that "well there's some

17   limiting language elsewhere in the agreement…elsewhere in that paragraph, it's Paragraph

18   15a".  And for example, they waive the right to go to court with respect to any disputes,

19   capital "D" relating to or arising from the agreement.  Well that language is missing from the

20   sentence regarding arbitration.  And Mr. Cromwell would have the Court copy the limiting

21   language from one sentence and paste it into this section.  But courts don't rewrite

22   agreements, they interpret them.  And when parties use language in one place, limiting

23   language, and then they don't use it in another place, the Court is entitled, it's reasonable to

24   infer because they didn't want it there.  And that is…and it's not there because somebody got

25   kind of clever by half and thought "well we're just going to make it as broad as possible" and

26   in some circuits maybe that would have worked like in the 4th Circuit, but not in the 9th

27   Circuit.  And so that's why there is no enforceable agreement, a necessary element of the

28   motion to compel arbitration has not been met.  And with respect to the fourth element, which

1  is whether or not Giga Watt Singapore is a sham or not, I think there's a lot of evidence

2  that…there's something very wrong with Giga Watt Singapore in that there's not a mechanic

3  in rural Russia who's listed in the paperwork that was sent to the FCC. And so as of 2018 a

4  guy named Sergey Pushencha up on the Dawn River is the director and member of Giga Watt

5  Singapore, but we've never heard from him. I don't think we have to spend a lot of time on

6  whether or not Giga Watt is a…I mean, I don't know if it's…you know, it incorporated in

7  Singapore. But where is Mr. Pushencha? And who is Marina Mehaluta who was presented as

8  the director and now her email says "Munez"? And they've fled, they've vanished, showing

9  that they…I think we can draw the [inaudible] that they never intended to keep their promises,

10  otherwise, they'd be here. Now Mr. Kuzenny pops in and pops out and files things like if a

11  trustee is appointed the Russian team, which is what Giga Watt Singapore is. You know, we

12  called it Giga Watt Singapore as a label. We've heard the Russian team mentioned many

13  times, that's the Russian team. So, but the first element is the key there, and it has not been

14  met. Now then, we also go to the alternative analysis at the Court's discretion. Now our

15  position is that there's no authority to compel arbitration because there's no arbitration clause.

16  One was not executed, and the other is infinite. But putting that aside, if the matter is core

17  and if the Court finds an inherent conflict between arbitration and the purposes of the

18  Bankruptcy Code, then the Court has discretion on whether or not to compel arbitration. The

19  core analysis, and this is where I think we can talk about the core analysis, is…it's…all you

20  have to find is that it's statutorily core, not constitutionally core. In the withdrawal analysis, a

21  matter has to be constitutionally core to count because withdrawal deals with finality. It's…if

22  the issue is constitutionally core, then there's no de novo review, the Court can enter final

23  judgment. If it's not constitutionally core, then the Court's decision is subject to de novo

24  review and therefore, that creates another layer. And how does that effect the efficiency

25  analysis? And because the efficiencies are so overwhelmingly in favor of the case being here,

26  that's not sufficient. But the…for arbitration purposes, it only matters whether or not it's

27  statutorily core. And they're…Mr. Cromwell is not accurately describing Perkins Coie's

28  affirmative defenses. And it's Affirmative Defense Number 12, as Mr. Waldron is trumping

1  up liability against his own debtor in order to line his own pockets and that the attorneys are

2  working with him in order to line their own pockets.  Well, that allegation arises in

3  bankruptcy.  That's both statutorily and constitutionally core.  It's statutorily core under

4  157(b)(2)(A) the very first one because it's the administration of the bankruptcy estate.  And

5  the offset claim is not simply "you got the money"…I…that's fine that would be fine if that's

6  what they said.  But what they really say…they did say that.  But they also said, Perkins Coie

7  also said that Plaintiff is liable to Perkins Coie for quote "any damages caused to Perkins

8  Coie…any damages caused to Perkins Coie by Giga Watt Singapore in the course of the Giga

9  Watt project" and that's adver…that's Affirmative Defense Number 2.  And there is

10  what…what Perkins Coie is saying is "We have done nothing wrong, we have not acted

11  unreasonably.  You have acted unreasonably.  You, Mr. Waldron, you didn't do well with the

12  case and now you're trying to shake down the deep pocket and you're trying to enrich

13  yourself at the detriment of the Debtor, unjust enrichment and that's improper, and we acted

14  reasonably in following the directions of our client.  And if those directions were wrong,

15  that's your fault because it came from your partner in the Giga Watt project.  And so this isn't

16  about our wrongful conduct.  This is about your wrongful conduct."  That is a global descent

17  to seize the ground, to seize the narrative of what happened.  That's what…that's what Mr.

18  Cromwell is skillfully doing with his associate and his partners.  And that makes the matter

19  core because the Court has to find out…has to discern which is it?  Is it Mr. Waldron and his

20  professionals who were gold bricking through the case and now are gold digging? Or…and

21  Perkins Coie acted reasonably and followed the directions and if Giga Watt Singapore was

22  engage…if Andrey Kuzenny was engaging in fraud, again, and giving us wrongful, that's on

23  you and you owe us.  That's core.  And so then the question becomes, now that we've decided

24  that its core, whether or not there is an inherent conflict.  And so, please excuse me

25  [inaudible], whether there's an inherent conflict.  And there…let's go back to the

26  introductions by Perkins Coie's counsel, which is we've got parties from twenty-four

27  countries, I think there's twenty-four, from all over the world.  And what we have in the

28  Bankruptcy Court, key purposes of the bankruptcy court is to avoid piecemeal litigation and

1  to centralize disputes regarding the Debtor's obligations and it's rights in one setting.  That's

2  the superpower of bankruptcy.  That is unique of a bankruptcy court and that's one of the

3  purposes of the bankruptcy court.  And we have token holders who have filed claims against

4  Giga Watt, and those claims are well, you know, are, you know, "we never got…we never got

5  power and we never got money" by some of the token holders.  Other token holders like Jun

6  Dam, he says that his tokens worked great.  He made $140,000 on his tokens.  He put a

7  million dollars in, he got a $140,000 out, and then in mid-January of 2019, I think people

8  might forget that the Debtor was operating when it filed, and it continued to operate.  It filed

9  in…on November 19th…November, December, half of January it was operating.  Mr. Dam

10  was damaged when Giga Watt crashed.  Now, some of those…those token holders' claims

11  against Giga Watt are always going to be here, they're always going to be in this Court

12  because they're core, they're constitutionally core, and that's what this Court does.  There

13  findings that this Court can make on those…on those…on those claims.  What were the terms

14  of the escrow?  What was the promise to you?  Were you supposed to get…was it power

15  refunds or is it as Perkins Coie says, "no Giga Watt Singapore was allowed to access the

16  money right away"?  Well, those issue will be decided in the claims allowance process, and

17  they would be decided in an arbitration between Giga Watt and Perkins Coie.  We could have

18  inconsistent results on facts.  We could have different legal conclusions, and that inherently

19  conflicts with the whole point of bankruptcy, which to centralize these disputes and avoid

20  piecemeal litigation.  And if this case is sent to arbitration, then I think that we can be fairly

21  confident that the token holders claims once they get the right plaintiff, I think it's important

22  to note, Your Honor, that Jun Dam is the lead plaintiff in the case that's pending in the

23  District Court, his tokens worked, he got the power, he wasn't directly affected by the escrow.

24  Mr. Waldron and I are finalizing our analysis of our entitlements, the Trustee's entitlements,

25  in order to show cause why that action doesn't violate the automatic stay.  It's a copycat

26  lawsuit.  But if…but there are token holders out there who will have direct claims against

27  Perkins Coie.  And there's a class action waiver in the…at least in the Glasscock…the twelve

28  Glasscock TPAs.  So what are we going to have all three hundred and forty in different

1    arbitrations?  That inherently conflicts with bankruptcy.  Bankruptcy is particularly well-

2    suited in the like the mass tort type scenario.  We saw that in the Catholic Diocese cases.  I

3    represented a committee of tenant claimants in another case down in Oakland where

4    everybody gets to come into one forum as opposed to different panels of arbitrators in

5    Singapore.  So there's an inherent conflict there.  So in…and finally, so what we have is on

6    the Motion to Arbitrate, an essential element is missing, there is not an enforceable

7    agreement.  And then on discretion, we have the statutory coreness, we have the inherent

8    conflict.  Now in one of the papers, I think it was in the reply to the opposition to the Motion

9    to Compel Arbitration, Perkins Coie asked for a stay while they went and looked for an

10   agreement, an agreement that they…that had an enforceable…but under the Federal

11   Arbitration Act, in order to get a stay under Section 3, there has to first be an enforceable

12   agreement.  They can't get a stay in order go look for it.  Then outside of the FAA, in order to

13   get a stay, one has to show a probability of success on the merit.  One doesn't get a stay so

14   that they can go fish for evidence to give them that probability.  So they're not entitled to a

15   stay.  And on all of those grounds, Your Honor, arbitration is not appropriate.

16   JUDGE CORBIT:  Ms. Egan, one of my questions at the outset was whether or not you might

17   be amending the complaint.

18   CLERK:  Judge, are you on mute?

19   JUDGE CORBIT:  I don't think so.  Ms. Egan, can you hear me?

20   PAMELA EGAN:  Yes, I can, Your Honor.

21   JUDGE CORBIT:  Okay.  Madam Clerk, for recording, is it better if I get a little closer to the

22   machine?  Is that better?

23   CLERK:  Yeah, that's better. Thank you.

24   JUDGE CORBIT:  So Ms. Egan, the question is while I have to be reviewing this arbitration

25   motion twice, once with respect to the complaint that's been drafted and possibly with an

26   amended complaint that might be filed.  You know, again, I was wondering why is Giga Watt

27   Singapore even a defendant?  I mean is…are you going to be amending the complaint as Mr.

28   Cromwell guessed?

1    PAMELA EGAN:  I don't think so, Your Honor.  I read the complaint, which Mr. Waldron

2    and I wrote, differently than Mr. Cromwell reads it.  Mr. Cromwell reads it as we're suing on

3    the Token Purchase Agreement, but we're not.  We're suing on the escrow agreement.

4    There's a lot of evidence of the escrow agreement, some of which is the Glasscock TPA, but I

5    don't…and then with respect to Giga Watt Singapore as a sham.  Why are we suing a sham?

6    I don't know the…I…we've come close to alleging it as a sham.  There's a…there's just a lot

7    of questions about it, and that's what I said.  It's not prima facie…prima facie invalid.  And so

8    at this time, Your Honor, we're not inclined to amend the complaint.

9    JUDGE CORBIT:  Okay.  That…you know, I'm not…I'm just trying to get a handle on

10    where this case is going so that I can decide the issues and not be aiming at a moving target.

11    So Ms. Egan, you answered my question.  Mr. Cromwell, it's your motion you get the last

12    word.

13    RALPH CROMWELL:  Thank you, Your Honor.  I'll be…I'll be very, very brief.  Rather

14    than painting a vivid picture, I would like to just read two paragraphs from the complaint on

15    this issue of are they alleging a breach of Token Purchase Agreement.  First, Paragraph 48 on

16    Page 19, this is the amended complaint.  "Tokens were purchased through a module on Giga

17    Watt's website, which Cryptonomos created and controlled.  Using smart contracts, Giga

18    Watt Singapore and the token holders entered into the token sales agreements, which

19    incorporated by reference the terms of the white paper including its escrow terms."  So the

20    complaint specifically alleges that Giga Watt Singapore and the token holders entered into the

21    token sales agreement, which is otherwise referred to as the Token Purchase Agreement.

22    Paragraph 48 and then Paragraph 25 and 26, Paragraph 25:  "Perkins Coie's breach of the

23    escrow damaged Giga Watt."  How?  Paragraph 26:  "Perkins Coie's breach of fiduciary duty

24    immediately put Giga Watt in breach of the Token Purchase Agreements, which incorporated

25    the terms of the white paper including in particular the escrow requirements."  I can only take

26    the complaint at face value, which says there were Token Purchase Agreements which were

27    signed and that when Perkins Coie let this money out of escrow, it put the Debtor in breach of

28    the Token Purchase Agreement, and we'd like to recover damages for that.  That is suing

1  Perkins Coie for an alleged breach of the Token Purchase Agreement. And that entitles

2  Perkins Coie to go fine if that's your theory then guess what else is in the Token Purchase

3  Agreement, we want to arbitrate. So it's Paragraph 25 and 26, Paragraph 48. Thank you,

4  Your Honor.

5  JUDGE CORBIT: Thank you. And Ms. Egan, you know, no further reply from you on that

6  motion, but I do understand your argument that the Token Purchase Agreements are evidence

7  of the escrow, but it's that the escrow…and I'm not saying that I accept that argument. I

8  understand Mr. Cromwell's, as well, but I think you both have done a good job in explaining

9  to me your positions and what the issue are. So now let's move to the second of the three

10  motions. Let's deal with the Motion to Strike the Jury Demand. Ms. Egan…

11  RALPH CROMWELL: Your Honor…Your Honor, this is Ralph Cromwell. May I just

12  interrupt to a minute to say I'm going to ask my partner, Jofrey McWilliam, to argue this. I'm

13  just giving him a brief heads up. I'm sorry to interrupt.

14  JUDGE CORBIT: Okay, and…get my glasses on again, it's McWilliam?

15  JOFREY MCWILLIAM: Yes, Your Honor.

16  RALPH CROMWELL: McWilliam. Yes, Your Honor.

17  JUDGE CORBIT: Okay. Alright, so with respect to the Debtor's…or the Trustee's Motion

18  to Strike the Jury Demand, I'll hear from you first, Ms. Egan, and then I'll hear from Mr.

19  McWilliam.

20  PAMELA EGAN: Thank you, Your Honor. The Motion to Strike the Jury Demand is very

21  much related to the Motion to Withdraw. Whether or not there's a right to a jury trial is

22  relevant, not dispositive. If there is a right to a jury trial, withdrawal does have to occur at

23  some point, but it effects the…but it doesn't have to happen right away. Otherwise, we would

24  lose all of the efficiencies and all of the efficiencies of being here in the Bankruptcy Court

25  with the Court has been exposed to the context and the facts since November of 2017. So

26  that's the relevance. Also…

27  JUDGE CORBIT: And Ms. Egan, I think I'm recognizing that in the sense that I'm going to

28  decide the arbitration motion first, even if later I decide that there's a right to a jury trial, and

1    it's not going to be before me, and it has to go before the District Court.

2    PAMELA EGAN:  Right.  So, you know, it's so intertwined with the Motion to Withdraw the

3    Reference.  I have a question, Your Honor, if you'd bear with me, please.  Are we going to

4    argue the Motion to Withdraw the Reference today in order to facilitate the Court's

5    transmittal of information to the District Court regarding it?

6    JUDGE CORBIT:  No, not today.

7    PAMELA EGAN:  Oh okay.  Alright.  Alright, well there is no right to a jury trial in this case.

8    The…we're suing on an escrow.  An escrow is a trust, and we have the authorities in the

9    briefs.  I know the Court is always diligent and reading the briefs, so I won't belabor that

10   point.  It's a trust.  Under the common law back in the courts of Westminster in 1791 when

11   there was a breach of fiduciary duty claim against a trustee, the surcharge for damages which

12   is perfectly entitled to exclusive…that went into the exclusive jurisdiction of the equity court,

13   which did not have damages.  And a majority of the courts back then held that you don't even

14   have…show a lack of inadequate remedy at law.  It's a trust, it's exclusive jurisdiction of the

15   courts.  The adequate remedies at law that Perkins Coie has pointed out to us are not adequate

16   remedies at law.  Money had and received is when the Defendant is holding the money, and

17   the Defendant is not holding the money.  So we would not have a money had and received.

18   Trover is for chattels, which is, you know, it's cattle, it's stuff, and not about money,

19   unless…unless there was specific money entrusted to somebody like spec…like that money

20   like, you know, these euros.  Not here where we're surcharging the Trustee for breach of

21   fiduciary duty.  And I pretty thoroughly I think outlined how that was in 1791 treated solely in

22   escrow, which is why there is no right to a jury trial in this case.  And I would like to point out

23   that there's a disingenuity…disingenuousness about the…Perkins Coie's demand for a jury

24   trial.  On the one hand, they ask for arbitration, no jury trial.  But on the other hand they

25   ask…you know, they demand a jury trial.  But on the other hand, they ask for arbitration.  On

26   the one hand, they demand arbitration, but on the other hand they would rely on the Glasscock

27   TPA, which has a waiver of jury trial.  And so they're going back and forth on this, and the

28   single thread between all of that is they demand a jury trial when they want to withdraw the

1  reference, and then, you know, they don't care about the jury trial when they want to go to

2  arbitration, which smacks of an "anywhere but here" campaign. Its smacks of forum

3  shopping. That's our…and if there is a right to a jury trial with respect to the withdrawal, all

4  that that means is that there would be de novo review because the efficiencies, I call them

5  the…the four elements are EFUD, EDUF, efficiency, delay, uniformity, and forum shopping.

6  It just means that there would be a de novo review, which in light of the efficiencies and the

7  forum shopping is insufficient to outweigh. So that's all I have, Your Honor, on the jury trial

8  issue.

9  JUDGE CORBIT: I do have a question for you, Ms. Egan. In connection with the de novo

10 review, okay, if this case is not core and there is no right to a jury trial, the trial takes place

11 before me, and then I make a report and recommendation up to the District Court. That's a

12 process that everybody's familiar with. However, if there's a right to a jury trial, this Court

13 can conduct a jury trial if the parties consent. But if Perkins Coie doesn't consent, doesn't

14 that mean that I should just send it upstairs? Now, I have to tell you this, varying levels of

15 concern that I have in this. You know, there is with all the faces I see here and all the people

16 that have been in my court trying disputes, there is some sort of locus of interest in Eastern

17 Washington or in the United States. People knew that they were investing in Wenatchee.

18 They knew this was there. People have all been here in this court, and all the attorneys are

19 already here. Perkins Coie is in this state. You know, there's all of that. That deals with the

20 arbitration clause. As for whether there's a right to a jury trial and whether I should try this

21 case or not, I'm not so worried about this case going to Judge Rice or Judge…you know, one

22 of the other district judges here and they conduct a jury trial because, you know, it's…they're

23 about a hundred yards away from me. You know the forum is not that far off, and they're all

24 excellent judges. I guess I do wonder why the Plaint…or the Defendant in this case would

25 want a jury. I would think that they would rather try this case before a federal district judge

26 or a bankruptcy judge. But I'm rambling and if you were the judge, Ms. Egan, you could tell

27 me to wrap it up. What I'm trying to get to here is that if there is a right to a jury trial, I don't

28 see this going as a report and recommendation. If it's going to be a judge trial, you know, the

1   report and recommendation is…you have the trial you have all the…then there's a de novo

2   review, but there's not a new trial. But if at some point during the process there has to be a

3   jury trial, the party has a right to a jury trial, it seems to me if it's not going to be conducted

4   here because people don't consent, then it needs to go to the District Court.

5   PAMELA EGAN: Your Honor, may I say something on that?

6   JUDGE CORBIT: Yes.

7   PAMELA EGAN: Thank you. I…yes, of course. But then the question becomes one of

8   timing. Of when does it go over, when does it go upstairs to the request [inaudible] a hundred

9   yards away to the District Court? There's a lot of water that can flow under the bridge

10   between now and when this case is ready for trial. Maybe they'll be a 12(b)(6), he's raised it

11   as an affirmative defense. Maybe we'll be moving for summary judgment. There were will a

12   lot of discovery issues. I hope that we can work them out and all of that can be decided here

13   without the delay and the inefficiency. So I think that if there is a right to a jury trial, that

14   then becomes a question of timing.

15   JUDGE CORBIT: And I understand that, and I think that that's the best analogy would be at

16   that point, you know, the Bankruptcy Court is a separate court, and we have core jurisdiction

17   to do many things. And frankly the withdrawal of the reference issue and what's not core

18   happens maybe one out of five thousand cases. It's very small, but it can happen. But when

19   it does happen, it's…I think the situation is more analogous to a magistrate judge and a

20   district court judge. A magistrate judge does decide a lot of issues, discovery issues, may

21   decide arbitration issues and so forth, even though the magistrate judge may not ultimately, if

22   people don't consent, the magistrate judge may not conduct the jury trial. I think that's…it

23   would be somewhat similar here. So Ms. Egan, the short answer is I understand your timing

24   question, and if I didn't think that was an issue, I wouldn't be hearing the arbitration issue

25   first.

26   PAMELA EGAN: Understood.

27   JUDGE CORBIT: Okay. Mr. McWilliam, it's your turn to respond to the Motion…

28   JOFREY MCWILLIAM: Thank you, Your Honor. Thank you, Your Honor. I'll try to be

1  brief. First of all, I just wanted to address very briefly this question of disingenuity. There is

2  no disingenuity. Parties are allowed to plead and argue any alternative.

3  JUDGE CORBIT: I understand that.

4  JOFREY MCWILLIAM: Okay. I just wanted to address that very briefly. So the right to

5  jury trial is a two pronged analysis. First prong, the question is is the claim legal or equitable?

6  The second prong is is the relief requested legal or equitable? And that's an either/or analysis.

7  If either one of those is answered that the claim is legal or the relief is legal, then there's a

8  right to a jury trial. And the Supreme Court's been very, very clear that this is a substance

9  over semantics in that you have to very carefully review this issue because it is a

10  constitutional right. And if there's one thing addressing this first element, is the claim legal?

11  If there's one thing that the argument this afternoon has made clear, it is that the existence of

12  an escrow agreement, what it's terms are, whether it is enforceable against Perkins Coie, and

13  whether performance under it, under those terms were breached is at the core of this case.

14  This case turns on that issue in large part. That is the first and foremost issue and that issue,

15  it…does a contract exist, what are the terms of the contract, who are the parties to the

16  contract, who can enforce that contract, did a party to the contract breach it's terms? That is a

17  classic legal issue. And we've cited the case law for that, Your Honor, but it is clear under

18  U.S. Supreme Court precedent that when you're talking about whether a contract exists and

19  what its terms are, that's a legal issue, that entitles you to a jury trial, and that's what we have

20  here. And I was…in terms of this issue about whether an escrow is a trust, does it have

21  fiduciary duties, there are many agency relationships that give rise to fiduciary obligations

22  that are…that give rise to trust obligations. That doesn't mean a trust has been created and a

23  trust…an escrow is not a trust. Even though an escrow may have fiduciary obligations, even

24  though there may be trust obligations, it is not a trust, and we do not fall under trust law. And

25  I can…I can go into that distinction between an escrow and a trust a little bit if that would be

26  helpful. But I also want to point the Court to the *Dairy Queen* case that we cited in our

27  briefings, as well as the *DePinto* case. The *Dairy Queen* case is the U.S. Supreme Court case.

28  The *DePinto* case is a 9th Circuit case, and those cases are really instructive here. In the

1   *Dairy Queen* case, the plaintiff asserted a claim for an accounting.  That is classically an

2   equitable claim, but it turned on the existence of the contract and what the terms of the

3   contract were.  And the Court said doesn't matter that you're deriving or bringing an

4   accounting claim derived from a contract, you first have to determine is there a contract, what

5   it's terms are, whether they were breached.  That's a…that is a legal issue.  It's a jury

6   question.  That's what the *Dairy Queen* court holds.  So, regardless of whether there may be

7   fiduciary obligations as part of an escrow agent's duties, regardless of whether they may have

8   trust obligations, the first and foremost question is what is the contract, what are its terms?

9   And that is a legal issue.  And the case law and this gets into the distinction a little bit between

10  escrow and trust, the case law on escrow is very, very clear that your fiduciary obligations,

11  your trust obligations, whatever they may be, they are limited and defined by the contract

12  terms.  So the contract is core.  And if you look at the case law we cite, an escrow relationship

13  is an agency relationship.  It is a contractual agency relationship, and it is very distinct from a

14  trust or being a trustee.  When you get into the trust law, you have essentially a trustor gifting

15  money or property to a beneficiary, and title or ownership is conveyed to a trustee who then

16  has a lot of discretion to manage it, to invest it, and to then give the proceeds to the

17  beneficiary.  And that is the trust relationship.  The beneficiary at all times has a beneficial

18  interest in the property that is owned by the trustee, and that is not what an escrow is.  An

19  escrow merely facilitates a commercial transaction, it's contractual, the two principals…the

20  two parties that are doing the transaction principals.  The escrow is an agent, the escrow

21  agent's…the escrow agent's obligations change over time, depending on what is happening

22  with the transaction and whether conditions of escrow have been met.  And that is another

23  point to be made here, which is the Trustee is not arguing that it ever had a beneficial interest

24  in the funds that were allegedly improperly disbursed.  The Trustee is arguing that the token

25  purchasers at all times had that beneficial interest.  Why?  Because the Trustee alleges the

26  contractual terms of the escrow had not yet been met and so there was no right or obligation

27  to transfer that money or disburse it to Giga Watt Singapore.  And so at all times, we're

28  talking about funds that according to the Trustee's allegations belong to the token purchasers.

1   So the Trustee is not a beneficiary of those funds and cannot sue in trust for a breach of trust

2   to funds in which it never had a beneficial interest, and that's the Trustees whole theory. So

3   those are the distinctions between escrow and trust. Escrow is a contractual relationship. The

4   fundamental issue here is a contractual issue, and that is a legal issue that is a jury question.

5   And the Supreme Court in *Dairy Queen* and the 9th Circuit in *DePinto* really illustrate that

6   point. So this…so the first prong is met here. The legal issue, the jury question, that alone

7   entitled Perkins Coie and Mr. Ness to a jury trial. Secondly, and somewhat connected to this

8   issue of who had the beneficial interest in the funds that were allegedly improperly disbursed

9   is the second prong of the analysis which is is the relief sought legal or equitable? And the

10   Trustee, again, is not claiming that it ever…that the Debtor ever had a beneficial interest in

11   the funds that were allegedly improperly disbursed. It's quite the opposite. The Trustee is

12   saying those funds should never have been disbursed. They should go back to the token

13   purchasers who never got power. And if that is the case, then what the Trustee is really

14   alleging, and I think this is what the complaint says, is if we are liable to the token purchasers

15   for damages caused by this arrangement, this escrow, however their liability might occur if

16   the Debtor is liable to the token purchasers, then that liability is compensable in money

17   damages by Perkins. We should be able to sue Perkins for money damages if we are liable to

18   token purchasers. That's what the claim is here. It is a claim…classic claim for

19   compensatory damages. It's almost like the contribution claim. If we're liable to the token

20   purchasers, then you're liable to us. Pay us damages. So the second prong is also met. And

21   if you look at the Supreme Court analysis, the second prong is more important. You can call

22   you claim whatever you want it. If you're looking for compensatory damages, there's a jury

23   trial right. Does Your Honor have any questions?

24   JUDGE CORBIT: No, thank you. I'll read those cases, again. Ms. Egan, this is your motion,

25   you can have the last word.

26   PAMELA EGAN: Thank you, Your Honor. The Washington Supreme Court in the *Estate of*

27   *Jordan* said quote "We emphasize that our holding is based on the special trust relationship

28   that exists between an escrow company and its trust beneficiaries. The escrow agent held the

1  escrow funds in trust for the benefit of its clients.  The Trustee owes undivided loyalties.  And

2  then we have the *Radich* case referring to an escrow agent as a trustee for the parties, and

3  that's alleged in the complaint.  Andrey Kuzenny would refer to Perkins Coie as the trustee.

4  So an escrow is a trust.  Back in 1791, you couldn't sue on an escrow for money because it

5  didn't exist.  You would have to sue under a trust theory.  The fact that an escrow agent only

6  has to follow the directions just means that that's the duty of the escrow is to follow the

7  directions…the escrow agent, the escrow hold 'em, the escrow trustee, they're called all of

8  those things under the case law.  That they have to follow those directions.  Well that's the

9  same with every trust.  Every trust starts with an agreement.  Hey, will you hold this for me?

10  And some trustees have broad discretion, some trustees have very narrow discretion.  And

11  it's…I respectfully disagree with my colleague, Mr. McWilliam, that it's either the legal…the

12  claim is legal or the remedy is legal.  That's incorrect.  The…there are cases where the court

13  is looking at something like a statutory right that, like under Arisa for example this comes up,

14  and they don't know if there's a right to a jury trial or not.  The statutory right, of course, did

15  not exist in the courts of Westminster in 1791.  So the court backed in, they tried to back in to

16  what it is.  And when they're backing into what it is, they look at the claim and they look at

17  the remedy, and in that scenario, the remedy has more weight than the remedy.  But this is a

18  different situation.  This is a classic trust theory.  You know, Black's Law Dictionary, "an

19  escrow is an account held on trust".  I don't think that can be seriously argued.  And surcharge

20  is…we didn't call it surcharge.  That's a…you know, damages…if the trustee dissipates the

21  funds, the beneficiary has a right against that trustee for breach of fiduciary duty, and there is

22  no jury right for that.  The court of equity had the power, it's called "make whole relief".

23  They had those rights.  Justice Storey talks about that quite a bit in a briefed oral of that.  So

24  that is what we used to call in law school "lack letter law" where it was just those are the

25  rules.  And so, this is an action on a trust, and there is no right to a jury trial.

26  JUDGE CORBIT:  Thank you.  Again, the Court is new to having Zoom hearings.  After

27  arguing almost two hours, I would give everybody a little bit of a break, and I think I'm going

28  to do that, too.  But as opposed to logging in and logging out, I have on my screen it says

1  3:11, let's come back at 3:15, just four minutes. Go stretch your legs, and then we'll hear,

2  Ms. Egan, your motion to determine that this matter is core. But again, just a four-minute

3  break to stretch our legs, get a drink of water if you want one.

4  CLERK: Okay, we're off the record.

5  [break 3:13:25pm to 3:20:28pm]

6  CLERK: We're back on the record.

7  JUDGE CORBIT: Ms. Egan?

8  PAMELA EGAN: Thank you, Your Honor.

9  JUDGE CORBIT: I'll hear from you with respect to Motion for Determination that the

10 proceeding is core.

11 PAMELA EGAN: Thank you, Your Honor. In Affirmative Defense Number 12, Perkins

12 Coie makes the allegation that we've mentioned before that the Trustee is just…didn't do well

13 in the bankruptcy case and is now improperly contriving liability against the Debtor so that he

14 can grab his three percent of distributions and make sure that his attorneys are paid. That's an

15 effort by very skilled lawyers to seize the grounds, to seize the battle grounds, set the

16 narrative. And the other affirmative defense is also…it's to seize the grounds, set the

17 narrative, be in control of the field on which we're all talking, which is that Perkins Coie

18 didn't do anything wrong, Perkins Coie acted reasonably, it received instructions from its

19 client with what to do with respect to this money, and if Giga Watt Singapore did anything

20 "wrongful" was the term used, then you're the ones liable. So those aren't the kinds of

21 defenses that can just be disaggregated and set off to the side, that's the gestalt as it were, it's

22 the entire case. We didn't do anything wrong. You had an unsuccessful case. You're doing

23 something improper. Your partner may have done something improper. If we're damaged by

24 this, you're going to be reimburse us. The claim against the Trustee and his professionals is

25 constitutionally core. It arises in the bankruptcy case. No other court can decide those issues,

26 and that's not just a throw away. Maya Angelou once said, "When people show you who they

27 are, believe them". They've made this aggressive, assertive, affirmative defense. You're the

28 bad guy, we're not the bad guys. It's constitutionally core. It makes the entire case. It can't

1     be that both are true. It's an either/or. And if we know that the…that there was a trust, and it

2     was breached, or if we know that Mr…you know, we would never this, but just hypothetically

3     [inaudible] that the Trustee is just contriving things to unjustly enrich himself, then it's not

4     that Perkins Coie assumed an obligation, which would have benefited Giga Watt by making

5     sure that if it didn't meet its construction schedule like it didn't, then they could just pay the

6     token holders instead of being caught with people with no power and no tokens. So those

7     defenses, that aggressiveness, that seizing the ground as it were, well okay, if that's the

8     ground that we're going to be on, that's core. And that's why this case is core and the courts

9     recognize that. And so that's why this case is now core. The offset claim, which is if Giga

10     Watt Singapore did something wrong and you know we…you know and we're

11     [inaudible]…and we, Perkins Coie, are harmed by that, that's a claim, which is core. And it's

12     a secured claim because it brought the offset. And these aren't just like these little one offs.

13     It's either/or. And the courts recognize that when that happens the whole case becomes core.

14     Thank you, Your Honor.

15     JUDGE CORBIT: Thank you. Mr. Cromwell, Mr. McWilliam, whichever one of you wants

16     to argue, the floor is yours.

17     JOFREY MCWILLIAM: It's going to be Mr. McWilliam. Thank you, Your Honor. I think

18     I'd like start by just emphasizing that the Defendants have not filed a proof of claim. The

19     Defendants have not counterclaimed. The Defendants have not requested affirmative relief of

20     any kind. Rather, they had simply said that whatever moneys you got, you cannot recover

21     twice from Perkins Coie. And by the way under the same state law that governs your claim

22     against Perkins Coie, you have a duty to mitigate. Those are the two defenses. You can't

23     recover twice. We've called it setoff, it's really recoupment in this situation and failure to

24     mitigate. Those are state law defenses that do not seek affirmative relief of any kind, that

25     merely seek to reduce or abate the damages that are sought from Perkins by the Trustee and

26     that arise out of the exact same circumstances on which the Trustee is suing Perkins Coie.

27     And this issue is directly controlled by the 9th Circuit's decision in *Newberry*. And Mr.

28     Cromwell talked about it a fair amount already, but basically, and I'll just reiterate very

1  briefly, if the defense arises out of the same transaction, it is not…it does not invoke the

2  claims allowance process, it does not invoke the Bankruptcy Court's equitable jurisdiction, it

3  is not a preference, it is not a setoff under Subsection 5553 of Title 11, there is no automatic

4  stay applicable here.  I mean, that is…that is if you read *Newberry*, that is the precise holding

5  on all of those issues, and that is all that has been done here.  If this matter is tried in the

6  District Court or jury, if this matter is tried to arbitration, there's no bankruptcy issue that is

7  going to be decided by any of these decision makers or these fact finders.  The issue is going

8  to be under state law principles, are you seeking to recover money that you already got?

9  Under state law principles, did you meet your duty to mitigate your damages?  That's all that

10 is being…

11 JUDGE CORBIT:  Yeah, let me ask you a question.  This one…this issue, the consequences

12 of this motion the three…well that may have the least amount of consequences in the sense is

13 that if I determine that there was no right to arbitrate and there was no right to a jury trial, the

14 dif…what happens is if this is not core, I try the case, and I give a report to the District Court.

15 The District Court's not likely to conduct another trial, they do a de novo review and look at

16 it.  On the other hand, if I determine that it's core, I conduct the case.  And if you don't like it,

17 you appeal to the District Court.  So you know, the procedure that will be followed, it's

18 probably, do you agree with me it's probably not going to be all that much different?

19 JOFREY MCWILLIAM:  Your Honor, if you are asking for me to…if I understand the issue,

20 I think you're asking me a question of bankruptcy law?  And I perhaps would ask Mr.

21 Munding to weigh in because I'm not a bankruptcy lawyer.

22 JUDGE CORBIT:  Treat that as a comment because this motion, whether it's core or not,

23 does have consequence.  Whether the consequence is as big as some of the other motions, it

24 doesn't matter.  This motion does have consequence, so you can just treat what I stated as a

25 comment.  Go ahead, Mr. McWilliam.

26 JOFREY MCWILLIAM:  Well, I think I've really covered what I wanted to say, which really

27 is that 9th Circuit law is very, very clear that if all you're trying to do is to reduce or abate the

28 damages that the Trustee is asserting against you or seeking to recover against you, then this

1    is a true defense, it does not invoke the claims allowance process.  I mean, we are not asking

2    for any relief.  We are not asking for a finding that somehow there was…there has been

3    something done in the bankruptcy that shouldn't have been done.  We're not asking for any of

4    that.  The point merely with all of this, both with the setoff/recoupment defense and with the

5    failure to mitigate defense, and I…we've tried to explain this in our briefing is the…for

6    example, the point that you're liable to us, it was a rhetorical point.  If…if…if you are

7    claiming through your partner GW Singapore, it then…you have to take the burden of that

8    relationship along with the benefits.  So if you were liable for GW Singapore's conduct, then

9    you…then…and that conduct is imputed to you as your partner, which is what the allegation

10    is, well so is the benefit of that arrangement.  So is the benefit of the fact that they got

11    some…either the Debtor or GW Singapore got the money.  Well, the benefit of that is

12    imputed to you, as well.  And by the way, so is the burden of GW Singapore's conduct.  So

13    it's an offsetting claim and liability, and that's all the point was.  It was not asking for

14    affirmative relief, and it's the same thing with the failure to mitigate.  It's just that there is a

15    duty under…under state law that governs these claims, potentially, we'll have to see what…I

16    mean, depending on rulings on is their token purchase agreement enforceable and does it have

17    a choice of law?  But the issue here is can you claim or recover damages that weren't

18    mitigated?  Did you meet that duty?  And that, again, is simply an effort to reduce or abate the

19    claim damages.  And under *Newberry*, that is not a core claim and does not invoke the

20    allowance process…or, disallowance process and does not invoke equitable jurisdiction of

21    bankruptcy.  So thank you, Your Honor.

22    JUDGE CORBIT:  Thank you.  Ms. Egan, final remark.

23    PAMELA EGAN:  Thank you, Your Honor.  For my final remarks, I'd like to go back to

24    Maya Angelou "When people show you who they are, believe them".  Affirmative defenses

25    are much broader than what's being portrayed right now.  [inaudible] I expect that we go to

26    trial, whether it be before Your Honor, whether it be in the District Court, whether it be in an

27    arbitration, Mr. Waldron is going to be put on trial, the professionals are going to be put on

28    trial.  You're making this up, you're contriving this theory, this creative theory in order to

1   compensate for your lack of success in the case at…to the detriment of the Debtor.  They

2   don't just say…tell you to make a case, they said "contriving liability", they said "improper",

3   and so that's seizing the ground.  We're not at fault, you're at fault.  And with respect to the

4   offset and the recoupment, you know, in my…when I go for walks, I listen to lectures that I

5   barely understand by physics professors, and they talk a lot about, oh, there's all kinds, but at

6   a certain level the universe is homogeneous, like actually like everything in the universe is

7   exactly the same.  And so at some level, you can say "oh well it rises out of the same

8   transaction", that doesn't make it recoupment.  Recoupment it has to be like the same goods,

9   or in *Newberry*, the facts are very convoluted.  I think I laid them out pretty clearly in the

10  brief.  The plaintiff was actually suing the debtor for…the credit…was suing a party…the

11  defendants for a claim that the plaintiff actually owed.  The plaintiff owed it and yet they had

12  the chutzpah to sue the defendant.  This isn't *Newberry* recoupment.  *California Canners* is a

13  case that's really only shapes recoupment is.  It's that the same goods being back and forth.

14  This is "yeah, you think that we're liable to you, well, we didn't do anything wrong and it was

15  your partner who did something wrong".  That's a claim, and that's core, and I won't belabor

16  the point.  But I'll just finish on the point that it's seizing the ground, it's seizing the narrative,

17  it's what happened, and it's…the offset makes the entire…the offset is not just "we gave you

18  money, and therefore, you know, we want to have an offset for the money that we gave you".

19  It's much broader than that as written.  And so it's…and the case laws say that when you

20  bring an offset claim that's entangled with the entire fees, then you're here, and we're going

21  to decide it because you're asserting a secured claim against the estate.  It doesn't matter that

22  it's only going to come out of liability.  It doesn't matter that they're not, you know, that they

23  didn't, you know, file a proof a claim.  It's core and, you know, where the coreness…I want

24  to make one final distinction because it's important.  For the withdrawal purposes, one looks

25  at constitutional coreness because it deals with finality.  But for triggering this Court's

26  discretion in arbitration, it's only statutory coreness that matters, and an offset is statutorily

27  core because it asserts a claim.  It doesn't matter that a proof of claim hasn't been filed,

28  101(5) of 11 U.S.C. 101(5) describes a claim as "any right to payment, whether fixed,

1  contingent, reduced to judgment, disputed, undisputed, matured, unmatured," any claim.  And

2  then certainly, you know, saying that the Trustee has contrived liability at the expense of the

3  Debtor improperly is constitutionally core, but the…and statutorily core.  And that's an

4  important distinction for the arbitration in terms of the Court using its discretion.  And that's

5  all that, on behalf of the Trustee, I have to say on the issue of coreness, Your Honor.

6  JUDGE CORBIT:  Okay, thank you, Ms. Egan.  We started off saying that I would cut

7  you…any of you off if I thought you were repeating yourself, you didn't.  Mr. Cromwell, Mr.

8  McWilliam, Ms. Egan, your arguments were clear and cogent.  I appreciate it.  One thing I

9  would like to do, though, with everybody on the screen is that not only do we have this

10  litigation, but we have this case to administer.  You know bankruptcies have…bankruptcy

11  judges preside over adversary actions, and they preside over the main case.  I'm not going to

12  rule from the bench, and I don't think you expected me to.  I want to write a reasoned opinion

13  on this, on these three issues that were raised, and I want to do so quickly, but I don't know in

14  the administration of this case, Mr. Waldron, Ms. Egan, if there is something, that you need

15  this by "x" date or if there's something that's happening.  So I'm opening it up for status

16  conference.  I would hope that I could get the arbitration motion written and decided in a

17  couple of weeks and that maybe the other two will follow in similar timeframes.  Maybe I can

18  be a little faster than that, maybe it will take a little bit longer than that.  Ms. Egan, do you

19  think that that creates any difficulty, the Court's suggested timing?

20  PAMELA EGAN:  I don't, Your Honor.  I would like…I would like…

21  JUDGE CORBIT:  I saw Mr. Waldron shake his head, no, so unless…

22  PAMELA EGAN:  Okay.  Okay.  Okay.

23  JUDGE CORBIT:  So I think there's agreement.

24  PAMELA EGAN:  [inaudible]

25  JUDGE CORBIT:  Mr. Cromwell, is there any deadlines that you're aware of that you'd like

26  me to burn the midnight oil?

27  RALPH CROMWELL:  No, Your Honor.

28  JUDGE CORBIT:  Okay.  I will probably burn a little bit of midnight oil anyway because I'm

1 a night owl, but I will move briskly.  Mr. Munding can probably…he's had some complicated

2 cases before me.  I'm…we talked about reputations.  I hope that my reputation is is that we

3 move promptly, but in a case like this, promptly is not overnight.  This is an interesting case,

4 and you presented interesting legal issues, and you deserve a reasoned response.

5 UNKNOWN:  Thank you, Your Honor.

6 JUDGE CORBIT:  With that comment, Counsel, thank you for your good briefs, thank you

7 for your clear arguments.  We're adjourned.

8

9 Signed under penalty of perjury on May 10, 2021

10

11 _____

12 Signature

13

14 Gina M. Cozza_____

15 Print/Type Name

16

17 518 East Nebraska, Spokane, WA 99208_____

18 Address

19

20

21

22

23

24

25

26

27

28