1    Pamela M. Egan, WSBA No. 54736
     POTOMAC LAW GROUP PLLC
2    1905 7th Ave. W.
     Seattle, WA 98119
3    Telephone: (415) 297-0132
     Email: pegan@potomaclaw.com
4      *Attorneys for Mark D. Waldron, Chapter 7 Trustee*

5

6              **UNITED STATES BANKRUPTCY COURT**
                 **EASTERN DISTRICT OF WASHINGTON**
7

8    In re:                          | Case No. 18-03197 FPC 11

9    GIGA WATT, Inc., a Washington    | The Honorable Frederick P. Corbit
     corporation,
10                    Debtor.         | Chapter 7

11   MARK D. WALDRON, as Chapter 7    | Adv. Case No. 20-80031
     Trustee,
12                                    | **FIRST AMENDED COMPLAINT**
                     Plaintiff,
13          vs.

14   PERKINS COIE LLP, a Washington
     limited liability partnership,
15   LOWELL NESS, individual and
     California resident, GIGA WATT
16   PTE., LTD., a Singapore corporation,
     ANDREY KUZENNY, individual and
17   Russian citizen, TIMUR USMANOV,
     individual and Russian citizen,
18
                     Defendants,
19
                  - and -
20
     THE GIGA WATT PROJECT, a
21   partnership,

22                  Nominal Defendant.

23

24   FIRST AMENDED COMPLAINT – Page 1

25

Mark D. Waldron, in his capacity as the duly appointed Chapter 7 Trustee, by and through his attorneys, the Potomac Law Group PLLC, for his Complaint against Perkins Coie LLP ("Perkins Coie") alleges as follows:

## SUBJECT MATTER JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This action is related to the bankruptcy case.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## PARTIES

3. Plaintiff is the duly appointed Trustee in the above-captioned bankruptcy case pursuant to the *Appointment of Trustee*, dated September 30, 2020. Plaintiff also served as the Chapter 11 Trustee pursuant to the *Order Approving Appointment of Chapter 11 Trustee*, entered on June 24, 2019 before the case converted to chapter 7 pursuant to the *Order Converting Case to Chapter 7*, entered on September 30, 2020.

4. The above-captioned debtor, Giga Watt, Inc. ("Giga Watt") is a Washington corporation. On December 15, 2016, a Russian national named Katrina Kovalyeva a/k/a Katrina Grant, a/k/a Katrina Arden filed Giga Watt's Articles of Incorporation with the Washington Secretary of State.

5. Perkins Coie LLP ("Perkins") is a limited liability partnership formed under the laws of Washington State. It maintains offices in Seattle, Palo Alto, and numerous other cities worldwide. Perkins is the 16th largest law firm in the United States. It was named one of the "Top Five Law Firms for Startups" in 2019

FIRST AMENDED COMPLAINT – Page 2

(Kruze) and won the Technology/Telecom Deal of the Year" by The Deal Awards in 2019.

6.     Lowell Ness ("Ness") resides in or around Palo Alto, California. He is a partner of Perkins in the firm's Corporate practice, regularly acting as either company counsel or investors' counsel in venture capital financings. Perkins' website adds that Ness is:

> a core member of the Blockchain Technology and Digital Currency industry group where he focuses part of his practice on assisting Blockchain, Bitcoin and other cryptocurrency clients raise money by maintaining relationships with key venture capital groups and other potential investors in the industry.

Ness earned a B.A. (*cum laude*) from the University of Pennsylvania in 1989. He earned a J.D. (*cum laude*) in 1994 from Georgetown University Law Center. He speaks French and Russian. Ness and Perkins are referred to herein collectively as "Perkins."

7.     GigaWatt Pte. Ltd. ("GW Sg.") was incorporated under the laws of Singapore on December 28, 2016. As of March 2017, Sergey Pashentsev, an auto mechanic in rural Russia, was GW Sg.'s director, sole member, and sole shareholder. Andrey Kuzenny (discussed below) pretended to be Pashentsev when setting up a PayPal account that linked to GW Sg.'s bank account. The emails state that they are from Sergey Pashentsev. But when one clicks on the email address it reveals Andrey Kuzenny's address. Later, Pashenstev was replaced as director by a person named Marina Mikhaylyuta ("Mikhaylyuta"). Mikhaylyuta sent all her emails from an administrative account, admin@gigawatt.sg. Mail sent

FIRST AMENDED COMPLAINT – Page 3

to the address listed on GW Sg.'s proof of claim has been returned as undeliverable with no forwarding address. The email listed on GW Sg.'s proof of claim, with domain moon-mist.ru, remain unanswered. Perkins is also unable to reach GW Sg.

8.    Andrey Kuzenny ("Kuzenny") is a citizen of Russia. He was born in Kazakhstan during the Soviet Union. He signed the petition commencing this case on behalf of Giga Watt as its "Secretary." He has invoked his privilege against self-incrimination under the Fifth Amendment to the United States Constitution.

9.    As set forth more fully below, Kuzenny operating through GW Sg. withdrew funds prematurely from the Perkins IOLTA Trust Account. He has also admitted to embezzling funds from the accounts of WTT token holders.

10.    After signing Giga Watt's voluntary petition for relief commencing this case, Kuzenny or entities controlled by him, including Cryptonomos Pte. Ltd. ("Cryptonomos") and/or GW Sg., collected revenues generated by Giga Watt's post-petition operations and did not disclose these revenues. He also made post-distributions to WTT Token holders from the post-petition revenues, including to Jun Dam, John Winslow, and Scott Glasscock, who served on the Official Committee of Unsecured Creditors ("Committee"). Post-petition operations generated more than $100,000 in administrative expenses, including rent and electricity, which the Trustee has since paid.

11.    Kuzenny also told this Court that if the Court appointed a trustee, then "the Russian team" would not cooperate with the Trustee and Giga Watt

FIRST AMENDED COMPLAINT – Page 4

1 | would be destroyed. The Trustee was appointed and the Russian team has not only

2 | refused to cooperate, but has obstructed the Trustee's investigation. For example,

3 | in a tactic similar to one used by Elizabeth Theranos in her criminal fraud trial,

4 | Kuzenny provided the Trustee partial access to what seemed to be Giga Watt's

5 | electronic books and records. Then he filed a declaration with the Court falsely

6 | testifying that he had provided full access to the Debtor's electronic books and

7 | records and falsely alleging that the Trustee had either stolen funds or negligently

8 | allowed the funds to be stolen.

9 | 12. Kuzenny also wrested control of Giga Watt's revenues for his own

10 | benefit and that of the "Russian team" while saddling Giga Watt with crippling

11 | liabilities which rendered it insolvent.

12 | 13. Timur Usmanov ("Usmanov") is a Russian national who resides in

13 | Los Angeles, California. He is hoping to obtain a green card which would grant

14 | him permanent residency. He took nights classes in economics in Kazakhstan,

15 | which is a hydrocarbon kleptocracy. Despite his lack of substantive qualifications,

16 | Kuzenny installed Usmanov as the Chief Financial Officer ("CFO") of Giga Watt.

17 | Usmanov served as the CFO from approximately May 1, 2017 until September

18 | 2018.

19 | 14. Usmanov enforced Kuzenny's will. He wrested control of Giga

20 | Watt's revenue stream from Carlson and turned it over to Kuzenny and the

21 | Russian team. From May to November 2017, Kuzenny paid Usmanov's salary in a

22 | series of cash payments and wire transfers from Cryptonomos. The wire transfers

23 |

24 | FIRST AMENDED COMPLAINT – Page 5

25 |

1   went to Usmanov's bank in Latvia. Neither Kuzenny nor Cryptonomos provided

2   Usmanov with a W-2, 1099 or other form so that he could report this income and

3   he did not report this income to the IRS.

4       15.    The Giga Watt Project was an unregistered securities offering which

5   raised $50 million by soliciting investment in Giga Watt through the sale of WTT

6   Tokens and miners. Miners are computers that engage in cryptocurrency mining

7   by running a hash function to verify transactions recorded on the applicable

8   blockchain.

9       16.    According to the Giga Watt Token Launch White Paper ("White

10  Paper"), attached hereto as **Exhibit A**, which governed the terms of the GW ICO,

11  Cryptonomos (described below) would collect the WTT Token sales proceeds for

12  Giga Watt and place them in escrow ("Escrow") pending completion of Giga

13  Watt's facilities. Giga Watt's "Partner," GW Sg. would sell the miners. The White

14  Paper stated:

15      The Giga Watt Project is built in partnership between Giga Watt, Inc.
        a U.S. company ("GigaWatt" or "Company"), which offers mining
16      hosting service sat its Wenatchee, WA facilities, and GigaWattPte.
        Ltd., a Singapore company ("Partner"), which sells mining
17      equipment to customers worldwide.

18  **Exhibit A** at 5.

19      17.    The Russian team controlled all aspects of the GW ICO, down to the

20  logo. Another Russian, Daria Generalova, working with Grant and Perkins,

21  drafted the White Paper.

22

23

24  FIRST AMENDED COMPLAINT – Page 6

25

1    18.    The Russian team trampled over the GW ICO terms. GW Sg. took

2    control of the WTT Token sales proceeds, although the White Paper provided that

3    GW Sg. would sell miners  in partnership with Giga Watt, which was selling the

4    WTT Tokens. Later, Cryptonomos took control of Giga Watt's revenues, although

5    the White Paper provided that Cryptonomos was only providing marketing and

6    logistical support for Giga Watt's public offering.

7                                   **NON-PARTY ACTORS**

8    19.    Nikolay Evdokimov ("Evdokimov") is a Russian national. He signed

9    the agreement by which Giga Watt purchased the assets of David Carlson's

10   company, MegaBigPower, as described more fully below. Evdokimov left the

11   Giga Watt Project before the GW ICO ended. After leaving the Giga Watt Project,

12   he ran another unregistered cryptocurrency securities offering for which the

13   United States Securities and Exchange Commission ("SEC") sued him. The SEC

14   obtained a default judgment against him and his company, ICOBox, Inc. for

15   failing to register this coin offering and for failing to register as a broker dealer.

16   The default judgment required ICOBox and Evdokimov to pay $16,059,429.99 as

17   "ill-gotten gains" and pre-judgment interest. It also imposed a civil penalty against

18   Evdokimov in the sum of $192,768. *See ICOBox, Inc. SEC v. ICOBOX*, Case No.

19   2:19-cv-8066 DSF-E, U.S. District Court, Central District of California, filed

20   March 5, 2020, ECF No. 17.

21   20.    Upon information and belief, Cryptonomos was incorporated under

22   the laws of Singapore in December 2017. Kuzenny, Leonid Markin, and Eduard

23

24   FIRST AMENDED COMPLAINT – Page 7

25

1 Khaptakhaev conducted business through Cryptonomos. Mail sent to the address

2 listed on Cryptonomos' proof of claim has been returned as undeliverable with no

3 forwarding address. Perkins is also unable to reach Cryptonomos. According to

4 the White Paper, Cryptonomos served as a kind of investment banker to the GW

5 ICO. It provided marketing and logistical support, including collecting the WTT

6 Token sales proceeds on Giga Watt's behalf, depositing them into the Escrow, and

7 releasing WTT Tokens and Escrow funds in step with construction.

8      21.    Katrina Grant, a/k/a Katrina Arden, and Katrina Kovalyeva ("Grant")

9 provided legal advice to Cryptonomos, GW Sg., and Giga Watt. She also advised

10 Evdokimov on the corrupt ICOBox ICO. Upon information and belief, she has

11 dual Russian and U.S. citizenship. Although she did not attend law school, she is a

12 member of the California State Bar. She is based in Puerto Rico.

13      22.    David Carlson ("Carlson"), a U.S. citizen, was Giga Watt's CEO

14 from January 1, 2017 to on or about September 15, 2018. He had no managerial

15 authority over Giga Watt. He was Giga Watt's Chief Executive Offer ("CEO") in

16 name only. The Russian team controlled Giga Watt through Usmanov. In 2019,

17 the Trustee commenced an adversary proceeding against Carlson and related

18 persons regarding the eve-of-bankruptcy transfer of the one Giga Watt

19 cryptocurrency facility that was not tokenized and not part of the Giga Watt

20 Project. The Court approved the Trustee's settlement with Carlson pursuant to an

21 Order, dated March 10, 2020. ECF No. 508.

22

23

24 FIRST AMENDED COMPLAINT – Page 8

25

23. The Russian team carefully scripted Carlson, writing articles, drafting answers for reporters and interviewers, and reviewing and critiquing his public comments afterwards. In addition to marketing, Carlson was involved in constructing the facilities. In this regard he was not successful. He and the Russian team only managed to build 10.8 megawatts of capacity for WTT Token holders. However, according to Kuzenny, Giga Watt had sold more than 20 million WTT Tokens, leaving the GW ICO approximately 50% oversubscribed. Also, construction fell behind the schedule set forth in the White Paper triggering refund rights for oversubscribed WTT Token holders.

24. At all material times, Circle Internet Finance, Inc. ("Circle") was a Virtual Asset Service Provider which, among other things, exchanged U.S. dollars for cryptocurrency. The Russian team told the SEC that Circle converted cryptocurrency into U.S. dollars for the GW ICO.

25. Circle made the following deposits into Perkins IOLTA trust account:

| Date | Amount |
| --- | --- |
| 7/24/2017 | $2,575,000 |
| 8/4/2017 | $5,000,000 |
| 8/4/2017 | $6,598,900 |
| Total: | $14,173,900.00 |

26. Circle does not have in its possession, custody or control any records showing the origin of the funds that it deposited into the Perkins IOLTA trust account only days before Kuzenny began withdrawing those funds from that same

FIRST AMENDED COMPLAINT – Page 9

account. However, it converted cryptocurrency for GW Sg., Cryptonomos, and another company that Kuzenny controlled named Singtrade.

27.  In 2018, Circle purchased and began operating an unregistered securities exchange named Poloniex which dealt in digital assets, including tokens. In 2021, Circle agreed to pay more than $10 million to settle charges brought by the SEC for operating an unregistered online digital asset exchange and trading platform that facilitated the buying and selling of digital asset securities. The individuals from Circle who worked with Giga Watt are no longer with Circle.

28.  Singtrade Pte. Ltd. ("Singtrade") is a Singapore corporation through which Kuzenny sold miners in the GW ICO, despite the fact that the White Paper stated that GW Sg., as Giga Watt's "partner," would sell the miners. Singtrade's corporate filings disclose that its business purpose is "palmistry" and "astrology." Kuzenny provided these papers to Circle in a mockery of due diligence.

## PRELIMINARY STATEMENT

*"We are not gangsters. We are Russians*."[1]

29.  The GW ICO was an unregistered securities offering to raise money using digital assets and cryptocurrency as the lure. Ness brought Perkins into the center of the GW ICO by permitting Kuzenny to place, layer, and integrate

---

[1] In U.S. Trial Of Alleged Hacker, Signs Of Larger Russian Cybercrimes (rferl.org), https://www.rferl.org/a/methbot-russia-internet-fraud-state-sponsored-hacking-zhukov/31241417.html. Last accessed: September 8, 2022.

FIRST AMENDED COMPLAINT – Page 10

approximately $22 million – ostensibly derived from the GW ICO – through Perkins IOLTA trust account.

30.     When Ness' partners realized what he had done, i.e., when Perkins began receiving small cash deposits in hundreds of transactions, some without any identification, he tried to quit. But the Russian team threatened him by stressing that Perkins was absolutely critical to the success of the GW ICO and that they had already told the public that Perkins was part of the team.

31.     Kuzenny referred to the group of Russians who ran Giga Watt Project as "the Russian team." The Russian team routinely made fun of the Americans. One member of the Russian team masqueraded as a Russian Batman, calling himself Adam West. Another Russian called himself Al Mafia, writing to Perkins under this moniker. Usmanov, Giga Watt's Russian CFO, called his American colleagues "stupid" and fantasized about firing them so that they could lose their healthcare. For its part, Singtrade, which sold miners, listed its corporate business as "astrology and palmistry."

32.     The Russians, with Carlson's assistance, also abused the public municipalities that supported the Giga Watt Project. The Russian team left a large hole on land belonging to the Chelan Douglas Regional Port Authority ("Port") which is adjacent to the land that Giga Watt had leased from the Port, costing the Port more than $100,000 to fill. Giga Watt referred to the land leased from the Port as the Pangborn Site as it was next to the Pangborn Airport in East Wenatchee, Washington.

FIRST AMENDED COMPLAINT – Page 11

33.     Further, the Port was not simply Giga Watt's landlord. It had promoted the Giga Watt Project to the public. The Port also took out a loan in reliance on the Giga Watt Project and to help the Giga Watt Project, which the Port has had to repay out of its own funds. The Executive Director of the Port resigned after this bankruptcy case commenced.

34.     The Douglas County Public Utility District No. 1 ("District" or "PUD") may have fared worse. Like the Port, the District gave Giga Watt significant concessions, including allowing Giga Watt to build its own electrical substation on the Pangborn Site. The Russian team and Carlson also induced the District to spend $365,000 building poles and transmission wires which ultimately led to nowhere. The Pangborn Site was eventually reduced to a Potemkin Village on which stood powerless pods.

35.     After commencing this bankruptcy case, Kuzenny accused the District of "reiderstvo," which is a Russian form of corruption in which a government entity or municipality, like the District, raids and takes over a legitimate private business. The Committee then obtained an order requiring the Trustee to hire counsel to evaluate these accusations and provide a "second opinion" regarding Kuzenny's allegations. The District incurred more than $30,000 in attorney's fees producing tens of thousands of documents to the estate's special counsel regarding Kuzenny's untrue allegations.

36.     The Russian team has consistently shown no appreciation for or understanding of the Rule of Law. For example, Kuzenny caused Giga Watt to

FIRST AMENDED COMPLAINT – Page 12

1  object to the appointment of a trustee. In that objection, he threatened to destroy

2  Giga Watt's business, bluntly stating that the "Russian team" would not cooperate

3  with any trustee and that such cooperation was essential to Giga Watt's health.

4      37.    In another example, Usmanov "assured" the payroll department at

5  Giga Watt that Kuzenny's appointment as Chief Operating Office was simply a

6  ruse designed for the American authorities so that Kuzenny could obtain a work

7  visa as an exceptional individual. Usmanov assured them that Kuzenny would not

8  actually do anything at Giga Watt. However, he would expect to be paid his

9  $180,000 annual salary.

10     38.    The Russian team also encouraged Giga Watt investors to buy WTT

11 Tokens and miners with cryptocurrency that could be purchased on an exchange

12 known as BTC-e. However, at the time, BTC-e's operator, Russian national,

13 Alexander Vinnick, was under indictment for money laundering and fraud. Mr.

14 Vinnick was extradited to the United States from Greece in August 2022.

15     39.    By some measures, the Giga Watt Project was big. According to Giga

16 Watt's controller, Heather Mulhall, $30 million was spent on construction.

17 Further, Giga Watt built 10.8 megawatts of cryptocurrency facilities in Moses

18 Lake, Washington. However, it is not unusual for Russian fraudsters to invest

19 heavily in their projects. A Russian was behind what one cybercrime researcher

20 called "the most costly botnet fraud in history." In U.S. Trial Of Alleged Hacker,

21 Signs Of Larger Russian Cybercrimes (rferl.org). Nor is it unusual for Russian

22 fraudsters to blend illegitimate activities with a legitimate business. "Russians also

23

24 FIRST AMENDED COMPLAINT – Page 13

25

commit other sophisticated types of fraud that blend legal and illegal operations, as often happened in the former Soviet Union. This blend maximizes the impact of the illegal activity and makes it hard to detect."[2]

40.      Perkins helped the Giga Watt Project in a variety of ways. According to Carlson, it offered what the Department of Justice calls jurisdictional arbitrage, advising the Russian team to collect the WTT Token and miner sales proceeds through an offshore company. Jurisdictional arbitrage makes it more difficult to issue service of process and conduct investigations. Perkins also advised regarding the U.S. securities laws and reviewed the White Paper. It lent credibility to the GW ICO by serving as a credit enhancement mechanism. Perkins even opened its IOLTA trust account to Russians who were running an unregistered securities offering. And it granted them free access to these funds contrary to the terms of the White Paper.

41.      Perkins claims that Giga Watt is a mere stranger. Giga Who? However, on the very day that Perkins released $5.4 million of the GW ICO proceeds to GW Sg., Perkins told the United States Security Service ("USSS"),

---

[2] Finckenauer and Waring, *Challenging the Russian Mafia Myth*, U.S. Department of Justice website, https://www.google.com/url?client=internal-element-cse&cx=015849196504226064512:uyit-fm6gna&q=https://www.ojp.gov/pdffiles1/jr000247b.pdf&sa=U&ved=2ahUKEwjldSSoPf5AhU0FjQIHSVmApIQFnoECAAQAQ&usg=AOvVaw3g1F65lEPAdoCy6REb94yF. Last accessed on September 5, 2022.

FIRST AMENDED COMPLAINT – Page 14

"We represent Giga Watt." Indeed, Usmanov believed that Ness was Giga Watt's point person "on all legal matters." Furthermore, anyone reading the White Paper, especially the attorneys responsible for its "final review," understood that the GW ICO solicited investments in Giga Watt.

42.     Ness appears to share the Russians' penchant for obfuscation. Although the engagement letter with GW Sg. states that Perkins would provide general corporate advice to GW Sg., Perkins did not provide any such advice to GW Sg. And, although Perkins had no engagement letter with Giga Watt, it provided general corporate advice to Giga Watt.

43.     Usmanov enforced the Russian team's will. He forced Carlson to turn over to the Russian team the keys to the wallets which collected and accounted for Giga Watt's cryptocurrency revenues. By having Carlson turn over the keys, the Russian team effected an off-chain transaction, which involves the transfer of private keys from one person to another without recording the transaction on the blockchain. It maintains opacity.

44.     Creditors and interest holders have filed more than $100 million in claims in the bankruptcy case. WTT Token holders and miners have asserted approximately $70 million in claims, of which $30 million is asserted by the class of WTT Token holders and miners in a class action pending in the U.S. District Court, for the Eastern District of Washington, seeking rescission and restitution under section 12 of the U.S. Securities Act of 1993. Regarding insider claims, Cryptonomos has filed a claim for approximately $2.8 million, GW Sg. has

FIRST AMENDED COMPLAINT – Page 15

asserted a claim for approximately $27 million, and Kuzenny, through Singtrade, has asserted a claim for approximately $2 million. Non-insider general unsecured claims are approximately $4.5 million.

## GENERAL ALLEGATIONS[3]

45.     In 2016, Carlson, Rob Taves ("Taves"), and Jeffrey Field ("Field") operated a cryptocurrency mining facility through their entity, Enterprise Focus, Inc., doing business as MegaBigPower. According to the White Paper, MegaBigPower re-branded itself as Giga Watt by selling all or substantially all its assets to Giga Watt pursuant to a *Bill of Sale and Assignment and Assumption Agreement* ("Sale Agreement"), dated January 1, 2017. The purchase price was $3 million payable in installments: (1) January 15, 2017, $21,000; (2) February 15, 2017, $21,000; (3) March 15, 2017, $958,000; (4) September 15, 2017, $1,000,000; and (5) March 15, 2018, $1 million.

46.     On March 2, 2017, Ness wrote to Grant that for a fixed fee of $10,000 per month from March 1, 2017 through February 28, 2018, Perkins would provide "day-to-day support, including counseling on securities regulations, corporate structure, tax laws ***as well as final document review with respect to digital currency style token sales***" to Cryptonomos. (Emphasis added.)

47.     That same day, March 2, 2017, Carlson signed the power contract ("Pangborn Power Contract") with the District. On March 7, 2017, the District

---

[3] This pleading contains multiple excerpts of emails. This pleading does not correct typographical errors contained in these excerpts. However, it attempts to clarify where necessary.

FIRST AMENDED COMPLAINT – Page 16

signed the Pangborn Power Contract. The District would provide up to 30 MW of "maximum connected Load" to the Pangborn Site. The price for electricity was the rate set forth in Rate Schedule 1 plus 6.013% of the monthly bill. At the time Rate Schedule 1 provided for a price of 2.8 cents per kw/h. However, this rate was subject to change at any time.

48. On March 9, 2017, Carlson wrote to Taves and Field:

> Guys, we've had some delays getting the token launched, mainly due to the legal process required to allow us to sell our tokens to non accredited investors in the US and Europe. In order to avoid the Great Eye of SECron, we have to productize the offer, and this has taken time. Buyer proposes to delay payments[.]

Carlson is equating the SEC to the Great Eye of Sauron, the embodiment of evil in The Lord of the Rings.

49. That same day, March 9, 2017, Carlson signed the lease with the Port for the Pangborn Site. The Port granted Giga Watt a concession providing Giga Watt's rent would be deferred for six months, during the deferment period would have to pay $923.75 a month in rent for the first six months of the lease which began on March 1, 2017. Thus, it would not have to pay rent until September 2017. After September 2017, Giga Watt would pay $15,312.33. Starting in March 2018, rent would be $8,239.81 per month.

50. On March 11, 2017, Evdokimov signed the Perkins-Cryptonomos engagement letter described in paragraph 46 hereof.

51. On March 13, 2017, Carlson followed up with Taves and Field:

> We've signed a deal with the PUD for 30MW, and another deal with the Port for 8 acres to build the pod farm. Investor feedback on the

FIRST AMENDED COMPLAINT – Page 17

token is very positive, ***but continue to wait for Perkins Coie*** to finish their opinion letter so that we can launch the PR campaign

(Emphasis added.) Carlson was exaggerating. Perkins was not retained to issue an opinion letter, but instead to be available for day-to-day support, advice, and final document review of any white papers, including the White Paper.

52.     In March, 2017, Leonid Markin, a Russian national who is a member of the Russian team, acting on behalf of Giga Watt, and Carlson, Taves and Field, on behalf of MegaBigPower, signed a modification ("<u>Modification</u>") to the Sale Agreement pursuant to which Giga Watt would pay MegaBigPower $3 million in three installments: (1) $1 million when the first $1 million was withdrawn from the GW ICO escrow; (2) $1 million six months after the first payment; and (3) $1 million twelve months after the first payment.

53.     Giga Watt never paid Carlson any portion of this purchase price and indeed never had the funds to do so. Instead, the Russian team controlled the WTT Token sales proceeds through the Escrow and took all of Giga Watt's operating revenues. GW Sg. paid $2 million to David Carlson in cryptocurrency leaving a total unpaid of $1 million.

54.     The White Paper, which set forth the terms of the GW ICO, provided for the Escrow:

> All funds collected through the pre-sale and Token Launch will be deposited in escrow. Original payments made in BTC and ETH will be converted to USD at the rate effective at the time when the rights to WTT Tokens were reserved. The funds will be released from escrow in step with the completion of facilities.

**Exhibit A** at 18.

FIRST AMENDED COMPLAINT – Page 18

If the token sale is over-subscribed, meaning that there is more demand for WTT tokens than there is existing facility capacity, the capacity will be allocated to the WTT tokens in the order in which the WTT tokens were purchased. The over-subscribed proceeds will be placed into escrow until the requisite processing center capacity has been built out. [footnote 21]

Fn. 21: If the construction of the processing center capacity designed to accommodate additional WTT tokens is not completed in a reasonable amount of time, the relevant portion of these proceeds will be refunded to the WTT token purchasers. However, if Giga Watt [has] discharged all its obligations in full, no refunds will be due to the WTT token purchasers.

**Exhibit A** at 19.

Construction timeline specified in this White Paper is based on the reasonable estimates but is not guaranteed. This timeline may change, and the construction may be delayed because of many factors, including those beyond Giga Watt's control, such as the actions of third-parties (contractors, suppliers, etc.). If the completion of the capacities is delayed by more than 3 months from the projected date, and, consequently, the relevant WTT tokens are not issued, the escrow agent may issue a refund at the request of the WTT token purchasers. The refund will be issued in the original form of payment at the exchange rate on the date of the refund.

**Exhibit A** at 26-27.

55.     The GW ICO launched on or about May 1, 2017 with a multi-channel marketing campaign. Giga Watt produced to the SEC thousands of pages of marketing materials that appeared on Twitter, Facebook, Reddit, and other media. The Russian team even paid for a billboard on a highway leading to LAX

FIRST AMENDED COMPLAINT – Page 19

1      56.     from Los Angeles where Usmanov, Evdokimov, Kuzenny and

2 Markin were based:



13      57.     No one had actually bought pizza for 5K bitcoins in 2010. The

14 Russians were generating buzz about Giga Watt.

15      58.     In May 2017, Grant asked Ness if Perkins would agree to be the

16 escrow for the GW ICO. Perkins agreed. Grant wrote to Ness, "remember, GW

17 Sg. is issuing the tokens." However, the White Paper provided that Giga Watt –

18 not GW Sg. – was selling the WTT Tokens. GW Sg. was only selling the miners.

19      59.     On May 12, 2017, Perkins finalized its agreement to hold the Escrow.

20      60.     In June 2017, less than a month after the GW ICO began, Ness wrote

21 to Arden:

22         My escrow guys are asking how long this is going to go on.
23         Normally, we do closing escrows as an accommodation for clients

24 FIRST AMENDED COMPLAINT – Page 20

25

that take a week or two for a transaction to close and involve 10 or 20 wires to manage. This one has gone way beyond the norm for us. Are we close to the closing when no more wires will come in? If not, let's see what other escrow providers can handle this. We are not set up to manage long term escrow accounts.

Arden responded, in pertinent part:

We have the date for the end of sales set on July 31, unless we reach the cap of 30,000,000 sold earlier. This date was indicated on every single document you reviewed prior to agreeing to provide the escrow services to Giga Watt. We have publicly announced that Perkins Coie performs the escrow for the sale of tokens. It is listed on the web-site, in publications and reports made on WTT by independent media. ***Switching this service to another company now would be detrimental for the entire token launch process and would jeopardize not just the future sales but also existing purchases once the buyers learn that Perkins Coie no longer escrows their funds.*** I do understand your concern and I feel sorry that it causes your firm a great deal of inconvenience; however, due to the extend [sic] of possible damage, switching the escrow at this point does not seem to be a solution. Let's figure something out to make the process easier for you, instead.

Ness replied, "Understood. Don't want to cause trouble. Just looking for a way to explain this novel stuff internally. Let's hope you get to the cap first!"

61. Indeed, Cryptonomos carried Perkin's name and Lowell Ness' photograph on its website with the caption, "Legal Consulting and Escrow. Internationally acclaimed law firm with vast experience in the field of blockchain and cryptocurrencies." The website states under Ness' photograph and next to the picture of a safe:

All funds raised through the WTT Token Launch are put in fiat escrow (funds received in cryptocurrencies are first converted into USD). Funds are released from escrow in batches ***only after the underlying capacities are built*** and relevant tokens are issued and distributed.

(Emphasis added.)

FIRST AMENDED COMPLAINT – Page 21

62.     In July 2017, Arden wrote to Ness:

Giga Watt [is] trying to get a loan to build the additional facilities secured by the funds in the escrow so it can build more and ahead of construction schedule. The lender wants to make sure that he would get paid from the escrow. If we ask PC to keep certain balance (we are talking about $3,000,000) and make payment at Giga's request to a specific third party, you should be able to do so, right? The loan would be for three months but Giga is planning to repay it in one month.

Ness responded:

I'm getting a ton of push back internally for ***"abusing" our closing escrow.*** They definitely aren't going to let me do something really unusual like paying a third party. I know we set this up at the last minute, but we're just using our standard client closing account that normally gets 10 or 11 wires into it and pays out to our client a week or two later.

(Emphasis added.)

63.     On July 25, 2017, the SEC issued its Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO explaining its analysis that blockchain digital asset tokens were securities subject to the U.S. securities laws. Therefore, at least as of this date, Perkins was on notice that WTT Tokens were likely securities.

64.     In the summer and early fall of 2017, when Usmanov was pressuring Carlson to hand over the keys to Giga Watt's wallets, Carlson approached Perkins for advice, asking among other things how the revenue stream should be handled both internally and for tax purposes. He met with Martha Sandoval ("Sandoval"), a Perkins corporate attorney on July 27, 2017. Before, during, and after this meeting, Usmanov, Kuzenny, and Leonid Markin pressured Carlson to back

FIRST AMENDED COMPLAINT – Page 22

down. They told him to accept Usmanov's authority, "change his attitude," and turn over the keys to the wallet(s). Meanwhile, Sandoval advised Giga Watt that its corporate documents were in disarray and she prepared a list of action items for the client, Giga Watt, which Usmanov ignored.

65. On August 1, 2017, GW Sg. deposited $1.95 million into the Escrow. This deposit contradicted the White Paper which stated that Cryptonomos – not GW Sg. – would collect the WTT Token sales proceeds and place them in the Escrow.

66. On August 7, 2017, Mikhaylyuta asked Perkins to release $5.4 million from the Escrow, writing, "Now that we've launched the first batch of tokens I would like to ask you to release the equivalent amount of USD 5 400 000." No new construction had been completed.

67. That same day, August 7, 2017, Sandoval wrote to Michael Olmstead, Giga Watt's sole in-house accountant, that Perkins had not worked on Giga Watt's incorporation and that she was not familiar with Giga Watt. That same day, she also wrote to Carlson:

> It was a pleasure meeting the two of you the week before last. I followed up with my colleagues who have worked on Giga Watt / Cryptonomos matters prior to my involvement and can confirm that we were not involved in the incorporation of Giga Watt, Inc. or [GigaWatt] Pte. Ltd nor in organizational structure conversations/decisions. As I mentioned in our meeting, our involvement began with questions regarding separation of liability between the entities.

Sandoval is referring to Perkins' non-involvement in incorporating Giga Watt and GW Sg. It went without saying that Perkins' involvement with the GW ICO

FIRST AMENDED COMPLAINT – Page 23

started at least in March 2017 when Carlson wrote to his MegaBigPower

shareholders that he and the Russian controlling shareholders of Giga Watt were

waiting on Perkins to launch the GW ICO and Perkins signed the retainer letter

with Cryptonomos in early March.

68.    The same day, August 7, 2017, Usmanov sent an email to Ness with

the subject line, "need your advice." The body of the email stated:

> Hi Lowell [Ness], My name is Tim, I'm the CFO at Giga Watt, Inc.
> **Katrina referred to you as a main contact person who I could speak
> with on all our legal matters.** Several days ago we received an email
> supposedly sent by the U.S. Secret Service, asking us to share some
> sensitive information. Please find below a copy of this email.

(Emphasis added.) Ness promptly directed Usmanov to Jean-Jacques Cabou

("Cabou"), Ness' partner, who responded:

> I share your skepticism but it also bears some indicia of legitimacy to
> me. I'd be happy to return the call if you'd like; otherwise there's no
> harm in returning the call and saying you are trying to confirm the
> legitimacy of the request before consulting with counsel about
> providing any information. Don't give anything up yet; see what the
> guy says

69.    Usmanov responded:

> Agree with you. Would be great if you gave them a call on our
> behalf. Your voice will sound more persuasive. At least you will find
> the right questions to ask.

FIRST AMENDED COMPLAINT – Page 24

1    70.    On August 8, 2017, Perkins made the first premature escrow release.

2  That same day, August 8, 2017, at 8:19 a.m., Ronan McGee of the USSS wrote to

3  Ness:

4        Good morning Lowell,

5        The U.S. Secret Service has an ongoing investigation in which a
       suspect's phone received a confirmation code from Cryptonomos.
6        We believe the confirmation code to be related to the mining
       operations of the Cryptonomos / Giga Watt venture. We are
7        interested in obtaining any and all information Cryptonomos / Giga
       Watt maintains on file for this specific phone number, particularly
8        any bitcoin addresses.

9        We have attempted to contacted Cryptonomos directly multiple
       times, but they have thus far failed to respond to our inquiries. Our
10       understanding is that you are the legal representative of Giga Watt.

11       As a result, could you please provide the appropriate Grand Jury
       subpoena contact information (e.g. physical address to include on the
12       subpoena, email to which subpoena can be served, etc) for
       Cryptonomos / Giga Watt so that we may subpoena the information
13       in question?

14       71.    Less than an hour later, on August 8, 2017, Cabou responded:

15       Ronan and Team,

16       It was a pleasure to speak with Ronan briefly just now regarding this
       email that was directed to my partner, Lowell Ness, who is also
17       copied here. As I explained to Ronan, **our firm represents Giga
       Watt** and I can accept service of a subpoena by email on its behalf.
18       Please just send that to me.

19       We understand that the USSS and state authorities have reason to
       believe Giga Watt may hold certain records relevant to your
20       investigation. Once we get the subpoena, we will work with the client
       to determine what if any responsive records we have and to produce
21       them to you in a timely and convenient way.

22       Please let me know if you have any questions.

23

24  FIRST AMENDED COMPLAINT – Page 25

25

We look forward to working with you.

72.    Cabou forwarded the email to Ness and Usmanov adding the following:

Lowell and Tim,

I spoke just now with Ronan McGee, an intelligence analyst for the USSS. He confirmed this was a legit request and will be sending a subpoena from the US District Court in Kentucky for the records they want. I have asked that the subpoena be directed to me, as you can see below. McGee confirmed that GW is just a holder of information here, not a target or subject of the investigation.

So the play here is for us to be cooperative as long as possible, see what they want, and then get it to them if we have it. One thing I'd like to do is to review whatever agreement(s) or terms we would have with the individual in question to ensure that we have no self-imposed obligation to notify them of the subpoena.

Obviously I'd be happy to talk about any of this at your convenience.

73.    Thus, on the day that Perkins made the first premature escrow release, Perkins represented Giga Watt "on all legal matters," told the USSS that Perkins represented Giga Watt, and advised Giga Watt on how to respond to the subpoena.

74.    On August 9, 2017, the day after Perkins made the first premature escrow release to GW Sg., "Al Mafia" wrote to Perkins' accounting department asking for the "general ledger regarding the GigaWatt Pte. Ltd. escrow." That same day, August 9, 2017, Kuzenny wrote to Al Mafia, "Our lawyers are in a panic at your letter that you addressed. Honestly. You know how they relate to the word mafia here in America (( [.] Let me better send you dox from them." Kuzenny was trying to get "Al Mafia" to invest in Giga Watt and Usmanov was

FIRST AMENDED COMPLAINT – Page 26

working on Giga Watt's financial statements for Al Mafia. Thus, when Kuzenny

wrote that "*our* lawyers" were in a "panic," he was referring to Giga Watt's

lawyers, Perkins.

75. On August 9, 2017, Carlson wrote to Sandoval regarding the "project

orientation checkup," which was code for whether Giga Watt could fend off the

Russian team's efforts to grab Giga Watt's revenues. He copied Khaptakhaev,

Markin, Kuzenny, and Usmanov:

> Thanks for the clarity[,] Martha.
>
> Ed - we met with Perkins week before last and did a project
> orientation checkup with Martha. I wasn't clear what Perkins had
> been involved with versus the guidance given by Katrina.
>
> Its clear that at this point that the corp[.] structure (Giga.sg and
> Giga.us) and their relationship were defined by Katrina with perhaps
> some input by Perkins, but not at their specific direction.
>
> I think we need to determine if we are comfortable with our current
> arrangement, or do we want Perkins to dig into how we are doing
> business and what the entity structure consists of. Further, we may
> need Perkins to evaluate whether the legal protection and tax/revenue
> strategies implied by this corp structure are effective and achieve our
> goals.
>
> We've built a lot of business based on the structure Katrina defined,
> and perhaps you guys are familiar and comfortable with it - I'm
> asking you for your feedback on whether to engage Perkins to audit
> our structure and build us a robust plan going forward. At this point I
> think its fair to say that Perkins knows *very little* about our
> business, with the exception of the two entities and a proposed third
> entity (Hosting).
>
> Your thoughts? Thanks! Dave

FIRST AMENDED COMPLAINT – Page 27

76. On August 9, 2017, Usmanov wrote to Sandoval:

I totally agree with Dave. We would need to ask Perkins Coie to audit our structure and provide advice and assistance.

Martha didn't mention GW One LLC as a company that is also under our umbrella. Apparently, we would have to set up a call and talk through the entire group and bring Martha up to speed on our M&A plans. We definitely need a legal advice on the upcoming merger with Hashplex as there are few things I'm not clear about.

As for the constitutional dox requested by Martha - please find attached some of the documents on Giga Watt, Inc that I've got as of today. As you can see the Articles of Incorp doesn't contain articles per se, but only a title page. In view of the above, I suggest that Perkins Coie also reach out to Washington Secretary of State to check with them whether or not the initial filing was complete. Same goes for our Singapore entities. Someone would probably need to request the full batch of documents via the registered agent. As far as SHA [Shareholder Agreement] is concerned - I believe this is still being drafted and discussed amongst the shareholders.

77. On or about August 11, 2017, OSBC asked Kuzenny to explain the $1.95 million transfer from GW Sg.'s account at OSBC to Perkins' IOLTA Trust Account that GW Sg. had made earlier on August 1, 2017. It also asked Kuzenny to explain the $5.4 million deposit into GW Sg.'s account from Perkins' IOLTA Trust Account one week later on August 8, 2017. Kuzenny responded by dissembling, with Usmanov's help. He and Usmanov said that the $1.95 million transfer was an "inter-company transfer" and that the $5.4 million transfer was for "completed construction." In fact, no new construction had been completed. They also said that the funds were for a "pre-sale," although this was unsubstantiated and irrelevant.

FIRST AMENDED COMPLAINT – Page 28

78.     On August 14, 2017, Usmanov followed up with Cabou regarding the grand jury subpoena. He included a message that the USSS had sent to Evdokimov previously on August 7, 2017. Usmanov asked him:

> Could you provide some more information of what you are discussing with them? Would you also share that subpoena with us, please? Any steps from our end required?

79.     Cabou responded:

> Tim, Thanks for your note. To be clear, I have an open line of communication with the USSS but I have NOT shared or discussed any substance at all with them. I have simply said we want to assist and will accept service of a subpoena to me by email.
>
> They have confirmed they are still obtaining the subpoena and will be in further touch.
>
> Nothing to do for now at all. Best J

80.     On August 15, 2017, Mikhaylyuta asked to withdraw $900,000 from the Escrow, "We ve [sic] released the second batch of tokens I would like to ask you to release the equivalent amount of USD 900 000 nine hundred thousand in favor of GIGAWATT PTE LTD." [Punctuation from original not corrected.]

81.     On August 17, 2017, Cabou forwarded the grand jury subpoena to Usmanov with Ness in copy, "Attached is the subpoena I just received. We need to have a call to discuss next steps. When can you and/or your team have that call with me."

82.     Usmanov responded, "I'm ready to talk whenever you are." Shortly thereafter, Cabou wrote to Usmanov with a copy to Ness:

> Tim, Good to speak with you just now. As we discussed, you and your team will conduct a diligent search for all records responsive to

FIRST AMENDED COMPLAINT – Page 29

the subpoena and will get any such records to me for review. Once that's done, we will work with you to complete the waiver and declaration forms and we will get those to the USSS for you.

Look forward to hearing from you[.]

83. On August 18, 2017, Usmanov described the steps that the Romanian suspect had taken on Cryptonomos' website.

84. On August 19, 2017, Perkins released $900,000 to GW Sg. No construction had been completed. On August 22, 2017, Usmanov wrote to Cabou again, "Hi J, Here is the name that this guy used when creating a profile on the website. Popescu Bogdan Stefan[.]"

85. On August 22, 2017, Sandoval wrote to Usmanov that Giga Watt lacked signed bylaws and that she needed more information regarding "the Singapore entity." Usmanov responded, "I'll try to find that out later on [re the Singapore entity]. Meanwhile, *let's focus on our U.S. entities*." (Emphasis added.)

86. Over the next few days, Cabou nagged, cajoled, and guided Usmanov and Giga Watt's Chief Operating Officer, Anton Orlov (who, like Usmanov received his salary from the Russian team), through the steps necessary to comply with the USSS subpoena. For example, on September 4, 2017, Cabou wrote to Usmanov and Orlov with a copy to Ness:

Guys,

This is urgent and frustrating. I have gotten no response to the below.

Our deadline to provide documents is September 7. I MUST, WITHOUT EXCEPTION, have all documents to be produced by

FIRST AMENDED COMPLAINT – Page 30

tomorrow. So far, I have only one file to produce. That clearly isn't enough, as explained below.

I also need the waiver and certification attached completed and returned to me tomorrow. We are under court order here. We cannot miss this deadline. Please let me know what is happening.

87. On September 5, 2017, Usmanov asked Cabou to confirm that what he and Orlov had cobbled together "is enough." Cabou responded, "Yes. Thank you. I will look forward to getting the waiver and certification."

88. On September 5, 2017, Usmanov wrote to Carlson regarding the USSS subpoena, "You, as the CEO, just need ot [sic] sign the waiver and the certification." That same day, September 5, 2017, Kirsh wrote to Usmanov with a copy to Carlson regarding the waiver and certification for the grand jury subpoena responses, "i filled out the form stuff on pages 5 and 7. Dave, all you need ot [sic] do isput [sic] down 2 signatures one at the bottom of each page. This needs to be sent out within 2 days by Perkins." Carlson signed the waiver and certification as the CEO of Giga Watt. Neither GW Sg. nor Cryptonomos signed the waiver and certification.

89. On September 5, 2017, Michael Olmstead, the sole accountant at Giga Watt, learned that Giga Watt no longer had control of or even access to Giga Watt's cryptocurrency revenue wallets. A wall was put between the Giga Watt accounting team and revenues. Kuzenny through Cryptonomos controlled Giga Watt's revenues from this point forward. According to Usmanov's emails, Olesia Egozina, the Chief Product Officer of Cryptonomos, controlled information regarding the wallet. Although Giga Watt reported approximately $1 million in

FIRST AMENDED COMPLAINT – Page 31

revenue in its 2017 federal tax return, that number was provided by Cryptonomos. Usmanov simply repeated what he had been told and had no means to verify the number.

90.     While stripping Giga Watt of its revenues, the Russian Team also burdened Giga Watt with all the liabilities of the Giga Watt Project, from big ticket items such as construction costs to various other expenses, such as Uber rides in Moscow, office space in Beverly Hills, first-class airline tickets between Los Angeles and Moscow, and costs incurred by Cryptonomos in other ventures, including a project called Rentberry.

91.     Throughout its existence, Giga Watt was unable to pay its debts as they came due and was never balance-sheet solvent.

92.     On September 12, 2017, Sandoval wrote to Usmanov, in his capacity as an officer of Giga Watt, pointing out a series of inadequacies in Giga Watt's incorporation:

o Bylaws and other Incorporation Steps

☐ You passed along an action by the incorporator dated 12/16/16.

In this action, the incorporator:

• adopted the bylaws;

• stated that the company would have 1 director; and

 • appointed Nikolay Evdokimov as the sole director •

Of these 3 acts taken by the incorporator, the incorporator only has statutory authority to adopt the bylaws and set the number of directors.

FIRST AMENDED COMPLAINT – Page 32

☐ Inconsistent with the 12/16/16 incorporator action, in the 1/1/2017 Minutes of the Special Meeting of the Board of Directors, Adam West is identified as (and acted as) the sole director.

In this meeting, the following officers were appointed:

• CEO: David M. Carlson

• President: Nikolay Evdokimov

• CFO: Leonid Markin

• Secretary: Adam West

o Steps to be taken are

• Client: Provide the identity (identities) of the company's board of directors

 • Client: Provide the identity of the company's officer (are those listed above correct?; are there other officers?)

• Client: Provide capitalization table (or breakdown of share ownership)

• Client: Provide input on desired number of authorized shares (post stock split)

• Perkins: Prepare a shareholder action in which the director(s) are appointed (and other incorporator actions)

• Perkins: Prepare the organizational actions to be approved by a company's board of directors

• Perkins: Order governing documents from WA Secretary of State's Office and amend and restate articles of incorporation

93.    By "client," Sandoval meant Giga Watt.

94.    On a similar topic, on September 22, 2017, Kirsh wrote to Carlson, "you are very right, we have serious problems in gW inc , gw singapore and even

FIRST AMENDED COMPLAINT – Page 33

1   in cryptonomos. all these companies need shareholder agreements." (Punctuation

2   in original.)

3      95.   Carlson wrote back to Kirsh:

4      Not surprising honestly.

5      In any case I don't see why we can't execute a shareholders
       agreement to at least nail it down legally. It's a lot to ask for us to
6      continue operating as if it is in place, when technically it's never been
       executed.
7
       We can amend later if needs be...
8
       Cheers, and thanks for the copy of the bylaws. I'll get them to the
9      PUD.

10  There were no signed bylaws and they never nailed down a shareholders

11  agreement, legally or otherwise.

12     96.   On September 22, 2017, Mikhaylyuta (or Kuzenny using her name)

13  asked Perkins to release $1.2 million from the escrow. On September 25, 2017,

14  Perkins complied. As of September 25, 2017, no new construction had been

15  finished.

16     97.   On September 26, 2017, Cabou confirmed with respect to the grand

17  jury subpoena, "This has been taken care of. Please do not contact USSS further.

18  They will let us know if they have questions." Again, Cabou was advising Giga

19  Watt.

20     98.   On October 6, 2017, Usmanov wrote to Sandoval:

21     Sorry for the delay. Our colleagues has been traaveling [sic] a lot
       lately, so it was hard to get all together.
22

23

24  FIRST AMENDED COMPLAINT – Page 34

25

Regarding GW Management, LLC, Giga Pod 1-100, LLC, and Mine Building, LLC - actually

I've never heard these entities were duly established. Let me ask you where you heard of them .

Anyways, like I mentioned earlier in our previous correspondences, **let's focus first on Giga Watt, Inc. as this is our main operating vehicle.**

(Emphasis added.)

99.    On December 4, 2017, GW Sg. lost its OCBC banking privileges.

100.    On December 5, 2017, Usmanov wrote to AA1 Solutions, "Most probably we will have to release some funds from escrow later this week. So we'd definitely need a USD [U.S. dollar denominated] account ***to land the money***."

(Emphasis added.)

101.    After his misrepresentations to OCBC proved ineffectual and OCBC terminated GW Sg.'s banking privileges, Kuzenny began directing Perkins to deliver the escrow releases to Giga Watt. However, Giga Watt was having its own banking problems. From August 2017 to January 2018, Wells Fargo, Numerica Credit Union, and Umpqua Bank each informed Giga Watt that it was no longer welcome. Giga Watt bounced from bank to bank.

102.    Perkins saw this hopscotch, transferring money to Numerica Credit Union, then to Umpqua Bank, and then to Bank of America. No questions asked.

103.    On December 18, 2017, Usmanov drafted what would become the text of an email request to Perkins, ostensibly from Mikhaylyuta, to release $2

FIRST AMENDED COMPLAINT – Page 35

million from the escrow to Giga Watt. On December 19, 2017, Perkins transferred $2 million from the escrow to Giga Watt.

104.    On December 22, 2017, Usmanov ghost wrote another escrow release request to Perkins, this time requesting that $4.5 million be sent to Giga Watt. Perkins transferred this amount to Giga Watt on December 26, 2017.

105.    In late December 2017, Stormsmedia LLC, a WTT Token and miner purchaser, sued Giga Watt under section 12 of the U.S. Securities Act of 1933 seeking rescission and restitution of its WTT Token and miner purchases on behalf of all WTT Token and Miner investors. Stormsmedia alleged that Giga Watt had not completed construction. Perkins received actual notice of this complaint.

106.    In January 2018, Giga Watt settled this lawsuit by paying Stormsmedia LLC $953,319.55 out of funds that Perkins transferred to Giga Watt from the escrow on instructions from Usmanov, Kuzenny, and/or Mikhaylyuta. The settlement released both Giga Watt and GW Sg. from Stormsmedia only. No settlement class had been certified.

107.    In February 2018, Perkins made the last two escrow releases, notwithstanding actual and inquiry notice that construction was not completed.

108.    After the Stormsmedia settlement, the lawyer for StormsMedia approached Perkins on behalf of a group of other token and miner owners asking that remaining Escrow funds be frozen. There should have been approximately

FIRST AMENDED COMPLAINT – Page 36

1    $10.8 million in the Escrow. He was informed that Perkins was not holding any

2    funds in Escrow.

3          109.   Shortly thereafter, on March 19, 2018, the lawyer filed a securities

4    action against Giga Watt and GW Sg. under the caption, *Moss v. Giga Watt, Inc.,*

5    *et al.*, No. 2:18-cv-0010-SMJ (E.D. Wash.). The complaint alleged individual

6    claims of an unregistered offering of securities under the Securities Act

7    of 1933 and the Washington Securities Act and a claim for rescission of the token

8    purchases. In his complaint, Moss alleged:

> Moreover, contrary to the terms of the GIGA WATT White Paper –
> which stated that all invested cryptocurrency would be held in escrow
> and would only "be released from escrow in step with the completion
> of facilities" – Defendants have represented to Plaintiff that, ***without
> regard to GIGA WATT's failure to have completed its facilities***,
> virtually all of the cryptocurrency raised from investors in the ICO
> has been liquidated into U.S. Dollars and ***has been transferred from
> the escrow account to an operating account;*** and Plaintiff
> reasonably believes the funds raised have been dissipated, or will be
> dissipated, before all ICO investors receive their Giga Watt
> tokens/mining equipment or any opportunity to receive a return on
> their investments.

16    Moss Complaint, pp. 32-33, ¶ 105. (Emphasis added.)

17          110.   On March 20, 2018, a separately represented token purchaser named

18    Raymond Balestra filed an action against Giga Watt, GW Sg., Cryptonomos, and

19    Giga Watt CEO, Carlson, under the caption *Balestra v. Giga Watt, Inc., et al.*, No.

20    2:18-cv-00103-SMJ (E.D. Wash.). The complaint alleges a claim of unregistered

21    offering of securities against all defendants under section 12(a)(1) and a control

22    person claim against Carlson under section 15(a) of the Securities Act of 1933 on

23

24    FIRST AMENDED COMPLAINT – Page 37

25

behalf of a putative class of plaintiffs who purchased tokens during the GW ICO. On June 28, 2018, the Court appointed Alex McVicker as lead plaintiff in the *Balestra* case.

111.   In his complaint, *Balestra, inter alia*, sought a preliminary injunction enjoining any further disbursement of escrow funds, although by then it was already empty. Balestra Complaint, pp. 21-22. By stipulation of the parties, on July 3, 2018, the Court consolidated this case with the action titled *Moss v. Giga Watt, Inc., et al.* described above.

112.   On or about April 2018, the SEC commenced a formal investigation of the GW ICO. Giga Watt retained Wilson Sonsini Rosati & Goodrich ("Wilson Sonsini") to represent it. Zeev Kirsh, who was providing general counsel services to Cryptonomos, GW Sg. and Giga Watt, advised Carlson and the Russian team to choose Wilson Sonsini over Perkins.

113.   In July 2018, Carlson informed Wilson Sonsini that Giga Watt did not have access to any information regarding the WTT token sale proceeds, including the Perkins IOLTA trust account. GW Sg. and Cryptonomos had that information. Thus, Grant and Kuzenny, rather than Carlson or Giga Watt, produced the information regarding the escrow and token sale proceeds.

114.   In July 2018, Carlson discovered that Kuzenny was embezzling funds from the wallets of WTT token holders. When Carlson confronted Kuzenny, Kuzenny did not deny the embezzlement. Instead, he asked for more time to

FIRST AMENDED COMPLAINT – Page 38

1  replenish the funds, pleading, "Please don't break the balls." Carlson resigned. His
2  last paycheck was in September 2018.

3      115.   In August 2018, Kuzenny falsely told the SEC through counsel that
4  all funds had been withdrawn from the GW ICO escrow in step with construction.

5      116.   During this period, the SEC asked why the last four escrow payments
6  had been made to Giga Watt and not to GW Sg., like the first four payments.
7  Kuzenny stated that it was for administrative convenience in light of urgent
8  invoices that needed to be paid. He did not mention that GW Sg. had lost its
9  banking privileges and that they started using Giga Watt's multiple bank accounts
10 "to land the money."

11     117.   In October 2018, Raphael Sofair commenced a RICO action against
12 Giga Watt, GW Sg., and Carlson for claims arising from GW Sg.'s sale of miners
13 after the GW ICO ended. According to the allegations, after the GW ICO ended,
14 GW Sg. sold miners without regard to Giga Watt's capacity to host miners. When
15 Giga Watt informed these miner purchasers that their miners would be deployed
16 after WTT Token holders' miners were deployed, they sued. Sofair's attorney is
17 currently also representing Jun Dam in litigation pending in the U.S. District
18 Court, E.D. Washington against Perkins, Case No. 20-264.

19     118.   That same month, October 2018, the DC PUD provided one-year's
20 notice of intent to terminate the Pangborn Power Contract and the Port
21 commenced eviction proceedings.

22

23

24 FIRST AMENDED COMPLAINT – Page 39

25

119. On November 19, 2018, Kuzenny signed Giga Watt's petition for voluntary relief under chapter 11 of the Bankruptcy Code.

**FIRST CLAIM FOR RELIEF**
*(Breach of Fiduciary Duty – Perkins)*

120. Plaintiff incorporates all prior allegations by reference as if set forth fully herein.

121. Perkins owed Giga Watt a fiduciary duty. It was Giga Watt's attorney.

122. Perkins knew the terms of the White Paper given that it had agreed to provide final review of the White Paper.

123. Perkins failed to act strictly in accordance with the provisions of the Escrow and failed to disburse the Escrow proceeds with scrupulous honesty, skill, and diligence.

124. Perkins breached its fiduciary duty by disbursing funds from the Escrow to GW Sg. contrary to the Escrow terms, which required that funds be released only in step with the construction of Giga Watt's facilities.

125. Perkins further breached its fiduciary duty by acquiescing to Grant's fraudulent proposal that GW Sg. would "issue" the WTT Tokens and therefore, implicitly, collect the WTT Token sales proceeds. This arrangement violated the terms of the White Paper, which provided that WTT Token holders and miner purchasers were investing in Giga Watt's future facilities based on Giga Watt's purported skill and experience in cryptocurrency mining. GW Sg. had been pitched as Giga Watt's partner which supplied the miners that WTT Token

FIRST AMENDED COMPLAINT – Page 40

1  holders would use in Giga Watt's future facilities. The White Paper did not

2  provide that GW Sg. would collect the WTT Token sales proceeds.

3

4  126.   A summary of the Escrow withdrawals follows:

| Date | Amount | Paid To |
|------|--------|---------|
| 8/8/2017 | ($5,400,000.00) | GW Sg. |
| 8/19/2017 | ($900,000.00) | GW Sg. |
| 9/25/2017 | ($1,200,000.00) | GW Sg. |
| 11/7/2017 | ($3,300,000.00) | GW Sg. |
| 12/19/2017 | ($2,000,000.00) | Giga Watt |
| 12/26/2017 | ($4,500,000.00) | Giga Watt |
| 2/9/2018 | ($1,148,057.58) | Giga Watt |
| 2/22/2018 | ($3,217,700.00) | Giga Watt |
|  | ($21,665,757.58) |  |

127.   The following chart below compares the amount of power that Giga

Watt was operating with the amount disbursed from Escrow:



FIRST AMENDED COMPLAINT – Page 41

128.    The amount of capacity constructed by Giga Watt and the dates of construction are based on representations made by Giga Watt to the Securities and Exchange Commission in its letter dated August 2, 2017 and on power summaries from the Grant County Public Utility District.

129.    Perkins' conduct increased Giga Watt's liability in putative class actions suits that have been filed to rescind the WTT token purchases as part of an unregistered securities offering pursuant to section 12(a)(1) of the United States Securities Act of 1933. 15 U.S.C. §§ 77(l) and (e). Giga Watt should have been in a position to buy back approximately $10.8 million in WTT Tokens out of the Escrow. Perkins' breach of the Escrow deprived Giga Watt of that recourse and increased Giga Watt's rescission liability under the U.S. securities laws.

130.    Further, a partnership is liable when a partner misappropriates funds received from a non-partner. RCW 25.05.120. Here, GW Sg., which the White Paper described as Giga Watt's partner, misappropriated approximately $22 million held in Escrow by Perkins. Therefore, when Perkins violated the Escrow and disbursed Escrow funds before capacity was built out, Giga Watt immediately became liable for that misappropriation. Perkins' breach of the Escrow proximately caused that liability.

131.    Giga Watt, which was a start-up could not endure the loss of $10.8 million in investors' funds (approximately half the total WTT Token sales proceeds). Within a year of the GW ICO's close, Giga Watt was a defendant in multiple federal securities class actions  in which the plaintiffs alleged, *inter alia,*

FIRST AMENDED COMPLAINT – Page 42

1  that their WTT Tokens were never backed by power at Giga Watt, yet the money
2  was dissipated from the Escrow.

3      132.   Perkins' failure to rebuff GW Sg.'s raid on the Escrow – which
4  would have required no more than saying no and asking about the construction
5  schedule – increased Giga Watt's rescission liability by $10.8 million plus
6  interest. Furthermore, allowing the approximately $22 million in escrow proceeds
7  to be misappropriated is a significant blow to any company, let alone a start-up
8  such as Giga Watt. The Escrow breach guaranteed Giga Watt's collapse and this
9  bankruptcy case in which non-insider creditors have filed approximately $75
10  million in claims.

11      133.   Based on the foregoing, Perkins is jointly and severally liable with
12  the other Defendants to Giga Watt for not less than $22 million plus interest, and
13  lost profits.

14  **SECOND CLAIM FOR RELIEF**
*(Aiding and Abetting Breach of Fiduciary Duty – Perkins)*
15

16      134.   Plaintiff incorporates all prior allegations by reference as if set forth
17  fully herein.

18      135.   GW Sg. was Giga Watt's partner in the Giga Watt Project and thus
19  owed Giga Watt a fiduciary duty.

20      136.   Perkins knew of GW Sg.'s fiduciary duty because the relationship
21  was described in the White Paper and Perkins was responsible for providing final
22  review of the White Paper.

23

24  FIRST AMENDED COMPLAINT – Page 43

25

137. Perkins knew the Escrow terms as set forth in the White Paper.

138. Perkins separately owed Giga Watt a fiduciary duty as set forth in the First Claim of Relief, herein, which allegations are incorporated herein by reference as if set forth fully herein.

139. Perkins substantially assisted GW Sg.'s breach of fiduciary duty by acquiescing to GW Sg.'s usurpation of the WTT Token sales proceeds and by disbursing funds from the Escrow regardless of Giga Watt's operating capacity.

140. Perkins' conduct proximately caused damage to Giga Watt as set forth in the First Claim of Relief herein, which allegations are incorporated herein by reference as if set forth fully herein.

### THIRD CLAIM FOR RELIEF
*(Breach of Trust – RCW 11.98.085 – Perkins)*

141. Plaintiff incorporates all prior allegations by reference as if set forth fully herein.

142. The Escrow was a trust. Perkins held the WTT Token sales proceeds in the Escrow for Giga Watt's benefit.

143. Perkins breached the Escrow by disbursing funds regardless of the stage of construction of Giga Watt's cryptocurrency mining facilities.

144. Perkins is liable for the amount required to restore the value of the trust property and trust distributions to what they would have been had the breach not occurred. That amount is $10.8 million.

FIRST AMENDED COMPLAINT – Page 44

## FOURTH CLAIM FOR RELIEF
*(Breach of Fiduciary Duty – GW Sg.)*

145.   Plaintiff incorporates all prior allegations by reference as if set forth fully herein.

146.   GW Sg. owed a fiduciary duty to Giga Watt as Giga Watt's partner in the Giga Watt Project.

147.   GW Sg. breached its fiduciary duty to Giga Watt by withdrawing approximately $22 million from the escrow out of step with construction.

148.   GW Sg.'s conduct and Cryptonomos' conduct proximately caused damage to Giga Watt as set forth in the First Claim of Relief herein, which allegations are incorporated herein by reference as if set forth fully herein.

## FIFTH CLAIM FOR RELIEF
*(Breach of Fiduciary Duty – Usmanov)*

149.   Plaintiff incorporates all prior allegations by reference as if set forth fully herein.

150.   As the Chief Financial Officer of Giga Watt from May 2017 to September 2018, Usmanov was an officer with discretionary authority.

151.   Usmanov failed to exercise his duties under that authority: (a) in good faith, (b) in a manner that Usmanov reasonably believed to be in the best interests of Giga Watt and (c) with the care an ordinarily prudent person in a like position would exercise under similar circumstances.

152.   Furthermore, Usmanov's conduct constitutes a reckless, willful, and knowing breach of fiduciary duty and therefore constitutes fraud or defalcation.

FIRST AMENDED COMPLAINT – Page 45

153.   Usmanov executed the Russian team's plan to strip Giga Watt of its revenues by forcing Carlson to turn over the keys to the Giga Watt cryptocurrency wallet.

154.   Usmanov caused Giga Watt to pay a $180,000 annual salary to Kuzenny although Kuzenny had "no actual duties" and was only being called the Chief Operating Officer so that he could obtain a work visa under false pretenses. Relatedly, Usmanov reduced Giga Watt to an instrument of immigration fraud.

155.   Usmanov facilitated premature releases from the Escrow by ghost-writing letters to Perkins to release Escrow funds when he knew the Escrow had already been improperly depleted and no further releases should be made.

156.   He helped Kuzenny cover up the impropriety of GW Sg.'s: (a) possession and transfer of $1.95 million in WTT Token sales proceeds; (b) receipt of $5.4 million from the Escrow; and (c) receipt of $3.3 million from the Escrow.

157.   Usmanov's conduct proximately caused damage to Giga Watt as set forth in the First Claim of Relief herein, which allegations are incorporated herein by reference as if set forth fully herein.

158.   Kuzenny actively worked to obstruct the Trustee's investigation of Giga Watt's affairs, as alleged herein.

159.   Perkins representation to the Trustee that it had not represented Giga Watt further prevented the Trustee from piecing together Usmanov's role.

160.   The Trustee discovered Usmanov's role in July 2022 when pursuant to a subpoena and turnover demand it obtained documents that a third-party

FIRST AMENDED COMPLAINT – Page 46

vendor for Giga Watt had imaged in 2018. These documents are voluminous – more than 220 gigabytes.

## SIXTH CLAIM OF RELIEF
### *(Aiding and Abetting Breach of Fiduciary Duty – Kuzenny & Usmanov)*

161.   Plaintiff incorporates all prior allegations by reference as if set forth fully herein.

162.   Kuzenny and Usmanov both knew that GW Sg. and Giga Watt were partners in the Giga Watt Project and that the White Paper required Giga Watt to complete the requisite construction before WTT Token sales proceeds could be released.

163.   Despite this knowledge, Kuzenny requested disbursements of Escrow proceeds to GW Sg. before Giga Watt had completed the requisite construction, contrary to the terms of the Escrow. These approvals substantially assisted GW Sg.'s effort to raid the Escrow in breach of its fiduciary duty to Giga Watt.

164.   Despite this knowledge, Usmanov ghost wrote letters pretending to be Mikhaylyuta asking for releases before the requisite construction had been built, contrary to the terms of the Escrow. These letters substantially assisted GW Sg.'s effort to raid the Escrow in breach of its fiduciary duty to Giga Watt.

165.   GW Sg.'s breach of fiduciary duty, and Kuzenny and Usmanov's aiding and abetting that breach, proximately caused damage to Giga Watt as alleged in the First Claim of Relief which allegations are incorporated herein by reference.

FIRST AMENDED COMPLAINT – Page 47

## PRAYER

Wherefore, the Plaintiff respectfully requests that the Court:

1.      Enter judgment in Plaintiff's favor and against the Defendants for joint and several liability in an amount to be proved at trial, plus prejudgment and post-judgment interest, costs and attorneys' fees; and

2.      Grant such other and further relief as the Court deems necessary and just.

Dated: September 8, 2022         POTOMAC LAW GROUP PLLC

By:       s/ Pamela M. Egan
         Pamela M. Egan (WSBA No. 54736)
         *Attorneys for Mark D. Waldron, Chapter 7 Trustee, Plaintiff*

FIRST AMENDED COMPLAINT – Page 48