EXHIBIT 2

1   Pamela M. Egan, WSBA No. 54736
    POTOMAC LAW GROUP PLLC
2   1905 7th Ave. W.
    Seattle, WA 98119
3   Telephone: (415) 297-0132
    Email: pegan@potomaclaw.com
4    *Attorneys for Mark D. Waldron, Chapter 7 Trustee*

5

6               **UNITED STATES BANKRUPTCY COURT**
                **EASTERN DISTRICT OF WASHINGTON**
7

8   In re:                          | Case No. 18-03197 FPC 11

9   GIGA WATT, Inc., a Washington   | The Honorable Frederick P. Corbit
    corporation,
10                    Debtor.        | Chapter 7

11  MARK D. WALDRON, as Chapter 7   | Adv. Case No. 20-80031
    Trustee,
12                                  | **FIRST AMENDED COMPLAINT**
13                  Plaintiff,
              vs.
14
    PERKINS COIE LLP, a Washington
15  limited liability partnership,
    LOWELL NESS, individual and
16  California resident, and TIMUR
    USMANOV, individual and Russian
17  citizen,

18                  Defendants.

19          Mark D. Waldron, in his capacity as the duly appointed Chapter 7 Trustee,

20  by and through his attorneys, the Potomac Law Group PLLC, for his First

21  Amended Complaint against Perkins Coie LLP ("Perkins Coie") alleges as

22  follows:

23

24  FIRST AMENDED COMPLAINT – Page 1

25

## SUBJECT MATTER JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This action is related to the bankruptcy case.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## PARTIES

3. Plaintiff is the duly appointed Trustee in the above-captioned bankruptcy case of Giga Watt, Inc. ("Giga Watt"), which was filed on November 19, 2018 ("Petition Date")

4. Defendant Perkins Coie LLP ("Perkins") is a limited liability partnership formed under the laws of Washington State. It maintains offices in Seattle, Palo Alto, and numerous other cities worldwide. Perkins is the 16th largest law firm in the United States. It was named one of the "Top Five Law Firms for Startups" in 2019 (Kruze) and won the Technology/Telecom Deal of the Year" by The Deal Awards in 2019.

5. Defendant Lowell Ness ("Ness") resides in or around Palo Alto, California. He is a partner of Perkins in the firm's Corporate practice, regularly acting as either company counsel or investors' counsel in venture capital financings. Perkins' website adds that Ness is:

> a core member of the Blockchain Technology and Digital Currency industry group where he focuses part of his practice on assisting Blockchain, Bitcoin and other cryptocurrency clients raise money by maintaining relationships with key venture capital groups and other potential investors in the industry.

Ness earned a B.A. (*cum laude*) from the University of Pennsylvania in 1989. He earned a J.D. (*cum laude*) in 1994 from Georgetown University Law Center. He

FIRST AMENDED COMPLAINT – Page 2

speaks French and Russian. Ness and Perkins are referred to herein collectively as "Perkins."

6.    Defendant Timur Usmanov ("Usmanov") is a Russian national who resides in Los Angeles, California. He was Giga Watt's Chief Financial Officer ("CFO") from on or about May 3, 2017 to on or about September 15, 2018.

## PRELIMINARY STATEMENT

7.    The First Claim of Relief alleges that Perkins owed Giga Watt a fiduciary duty. The duty arises from two roles that it played as the Giga Watt Initial Coin Offering ("GW ICO") escrow holder and as Giga Watt' s attorneys. Perkins breached its fiduciary duty to Giga Watt by allowing a Singapore corporation, GigaWatt Pte. Ltd. ("GW Sg."), to control the WTT Token sales proceeds and by releasing those proceeds, for a total of $22.3 million, out of step with the completion of Giga Watt's cryptocurrency facilities. WTT Tokens are described below.

8.    The Second Claim of Relief alleges that Perkins is also liable pursuant to RCW 11.98.085 as a trustee. Perkins breached the trust by treating the WTT Token sales proceeds as if they belonged to GW Sg. and by disbursing the WTT Token sales proceeds regardless of the completion of Giga Watt cryptocurrency mining facilities. Perkins is liable for the amount required to restore the value of the trust property to what it would have been had the breach not occurred. That amount is $22.3 million

9.    The Third Claim of Relief alleges that Usmanov owed Giga Watt a fiduciary duty as its Chief Financial Officer. Usmanov breached this duty by

FIRST AMENDED COMPLAINT – Page 3

1   enabling, executing, and covering up (a) GW Sg.'s misappropriation of the $22.3

2   million that Perkins held in trust, (b) Cryptonomos Pte. Ltd.'s ("Cryptonomos")

3   misappropriation of Giga Watt's operating revenues in the estimated amount of $5

4   million, (c) the disappearance of approximately $1.2 million, and (d) the

5   fraudulent transfer of $180,000 to Andrey Kuzenny ("Kuzenny") pursuant to a

6   fraudulent scheme to obtain for him a U.S. work visa. Usmanov implemented

7   Kuzenny's plan to strip Giga Watt of all capital contributions and revenues and to

8   saddle it with liabilities.

## GENERAL ALLEGATIONS

10  10.   In January 2017, David Carlson ("Carlson"), Rob Taves ("Taves")

11  and Jeff Field ("Field") sold all or substantially all the assets of their company,

12  MegaBigPower, to Giga Watt for a purchase price of $3 million.

13  11.   Giga Watt had only been incorporated in Washington the month

14  before in December 2016 by Nikolay Evdokimov ("Evdokimov"), a Russian

15  national. It never had signed bylaws or a signed shareholders agreement. There are

16  no minutes or record of a shareholders meeting by which directors could be

17  appointed. Relatedly, there are no minutes or record of a directors' meeting or

18  appointment by directors of officers. Instead, four Russian nationals ran Giga

19  Watt as if it were their non-corporate enterprise. These nationals are Evdokimov,

20  Kuzenny, Leonid Markin ("Markin"), and Eduard Khaptakhaev ("Khaptakhaev").

21  These four, whom Carlson called "the Russian partners" and Kuzenny called "the

22  Russian team," ran Giga Watt. At some point during the GW ICO, Evdokimov

23  was squeezed out. But the other three remained.

24

FIRST AMENDED COMPLAINT – Page 4

25

1     12.    MegaBigPower was the business name of Enterprise Focus, Inc., a

2  Washington corporation. It was a cryptocurrency mining operation located in

3  Moses Lake and East Wenatchee, Washington.

4     13.    Evdokimov signed the purchase and sale agreement on behalf of

5  Giga Watt. Carlson signed on behalf of MegaBigPower.

6     14.    In January 2017, Carlson became the Chief Executive Officer

7  ("CEO") of Giga Watt.

8     15.    On March 3, 2017 Perkins signed an engagement letter with

9  Cryptonomos, a Singapore corporation. Evdokimov signed this engagement letter

10  on Cryptonomos' behalf. The engagement letter provided that Perkins would

11  provide "final document review with respect to digital currency style token sales."

12  A copy of the foregoing engagement letter is attached hereto as **Exhibit A**.

13     16.    On March 13, 2017, Carlson wrote to Taves and Field that there

14  would be a delay in payment of the purchase price of the sale to Giga Watt,

15  writing, "Investor feedback on the token is very positive, ***but continue to wait for***

16  ***Perkins Coie*** to finish their opinion letter so that we can launch the PR

17  campaign[.]" (Emphasis added.)

18     17.    Upon information and belief, Perkins did not issue an opinion letter.

19  But it advised Giga Watt regarding "the PR campaign."

20     18.    By PR campaign, Carlson meant the GW ICO.

21     19.    A document entitled the Giga Watt Token Launch White Paper

22  ("White Paper"), attached hereto as **Exhibit B**, set forth the terms of the GW ICO.

23  Daria Generalova, authored the White Paper.

24
FIRST AMENDED COMPLAINT – Page 5

25

20. The GW ICO was an investment scheme that leveraged the novelty of digital assets, cryptocurrency, and the blockchain to attract investors. It ran from approximately May 2017 to approximately August 2017. Pursuant to the GW ICO, Giga Watt sold WTT Tokens and GW Sg. sold miners, as described more fully below.

21. The White Paper styled Cryptonomos as an ersatz investment banker for the GW ICO, providing marketing services and logistical support in storing the WTT Tokens on the Ethereum blockchain.

22. Carlson did not want to register the GW ICO with the SEC, which he referred to as "the eye of SECron" in an allusion to the embodiment of evil in *The Lord of the Rings*.

23. He reasonably believed that Perkins was advising Giga Watt, through its engagement by Cryptonomos. At one point, he referred to their legal work as an effort to "productize" the WTT Token, by which he meant it would not be considered a security subject to the registration and other requirements of U.S. securities laws.

24. Cryptocurrency mining is power intensive and the GW ICO tied its sales pitch to power. One WTT Token entitled the holder to the net revenues generated by Giga Watt's use of one watt of power in its mining operation, assuming the WTT Token holder also purchased a miner running one watt of power. Thus, if Giga Watt's mining operation was using 10 megawatts of power and there were holders of 10 million WTT Tokens with miners using those 10 megawatts of power, then the WTT Token holders would be entitled to 100% of

FIRST AMENDED COMPLAINT – Page 6

Giga Watt's revenues, less a maintenance fee and the proportionate cost of electricity. In the same vein, someone holding one million WTT Tokens and owning miners using one million watts of power would be entitled to 10% of Giga Watt's mining revenues less a maintenance fee and the proportionate cost of electricity.

25. Giga Watt pooled its miners and the revenues they earned. Thus, if one miner did not earn any cryptocurrency, the miner would nonetheless be credited with revenue if the pool as a whole had earned revenue. Revenues were not tied to individual miners. Giga Watt built the facilities and maintained the miners.

26. For every 100 WTT Tokens sold, fifteen (15) were to be distributed to the Giga Watt insiders.

27. According to the White Paper, if Giga Watt failed to build out cryptocurrency facilities within three months of the schedule set forth in the White Paper, and sold more WTT Tokens than it could accommodate, then the oversubscribed WTT Token holders would be entitled to a refund.

28. The White Paper further provided, "All funds collected through the pre-sale and Token Launch will be deposited in escrow. . . . The funds will be released from escrow in step with the completion of facilities." **Exhibit B**, White Paper at 18.

29. The White Paper further provided:

> . . . . If the completion of the capacities is delayed by more than 3 months from the projected date, and, consequently, the relevant WTT tokens are not issued, the escrow agent may issue a refund at the

FIRST AMENDED COMPLAINT – Page 7

request of the WTT token purchasers. The refund will be issued in the original form of payment at the exchange rate on the date of the refund.

**Exhibit B**, White Paper at 26-27.

30.     Further pursuant to the White Paper, Cryptonomos would collect the WTT Token sales proceeds on Giga Watt's behalf and release the WTT tokens upon Giga Watt's completion of the requisite facilities. GW Sg. was selling the miners. Miner sales proceeds were not placed in trust.

31.     The GW ICO was preceded by months of multi-channel marketing involving social media, conferences, interviews, videos, press releases, and one billboard.

32.     The Russians prominently featured the two American participants in their PR campaign, Carlson, and Perkins. Giga Watt produced to the SEC thousands of pages of social media posts and numerous videos about Carlson and Giga Watt. Further, Carlson spent a significant amount of his time otherwise networking and promoting Giga Watt. As set forth below, Carlson did not run Giga Watt, despite his title as Chief Executive Officer.

33.     Cryptonomos carried Perkin's name and Lowell Ness' photograph on its website with the caption, "Legal Consulting and Escrow. Internationally acclaimed law firm with vast experience in the field of blockchain and cryptocurrencies." The website stated under Ness' photograph and next to the picture of a safe:

> All funds raised through the WTT Token Launch are put in fiat escrow (funds received in cryptocurrencies are first converted into USD). Funds are released from escrow in batches ***only after the***

FIRST AMENDED COMPLAINT – Page 8

***underlying capacities are built*** and relevant tokens are issued and distributed.

(Emphasis added.)

34.     In addition, the local government supported Giga Watt. The Chelan Douglas Port Authority gave Giga Watt a lease for 13 acres of land in a business park near the Pangborn Airport (the "Pangborn Site"). The terms were favorable. For example, Giga Watt would pay less than $1,000 a month in rent for the six months of the lease. This was intended to allow Giga Watt six months to get the Pangborn Site up and running.

35.     Further, the Douglas County Public Utility District No. 1 gave Giga Watt a 30-megawatt power contract at exceptionally low electrical rates, although the rates were subject to change at any time, and Giga Watt had to pay for and build a substation capable of handling 30 megawatts of power.

[*This First Amended Complaint continues on the next page.*]

FIRST AMENDED COMPLAINT – Page 9

36.     The Pangborn Site featured heavily in the GW ICO, but it was just a Potemkin Village. In April 2018, Wilson Sonsini Goodrich & Rosati ("Wilson Sonsini") sent the following picture to the SEC in an effort to show that the WTT Token and miner proceeds had been used to build out a real project:



37.     As the picture shows, Giga Watt had erected buildings on the Pangborn Site. But none of them were powered, except for one "show pod" which only used .75 megawatts. Further, the "show pod" was not "tokenized," but instead operated for the benefit of Red Team Investments, Inc., whose principal was Trevin Vaughn.

38.     Despite the failure to develop the Pangborn Site, Carlson and the Russians succeeded in building approximately 10.8 MW of "tokenized" facilities in Moses Lake, Washington, albeit at less favorable lease and power rates.

39.     Giga Watt also ran a non-tokenized facility in East Wenatchee, Washington on Highline Drive known as the Highline or TNT Facility.

40.     In May 2017, shortly after the GW ICO had started, Katrina Grant, a/k/a Katrina Arden a/k/a Ekatarina Kovalyova ("Grant"), who is a Russian national with a California law license and who worked for Cryptonomos, GW Sg., and Giga Watt, asked Ness if Perkins would be willing to serve as the GW ICO escrow.

41.     Ness agreed saying that he would issue a "vanilla" engagement letter in order to get access to Perkins' IOLTA trust account, which would hold the WTT Token sales proceeds.

42.     Grant followed up with Ness, "Remember, GW Sg. is selling the tokens." However, the White Paper said that GW Sg. was selling the miners – not the WTT Tokens.

43.     GW Sg. was a paper façade. It was registered as a corporation in Singapore. Its first director, Sergey Pashentsev, was an auto mechanic living in rural Russia. Andrey Kuzenny authored emails pretending to be Pashentsev. GW Sg.'s second director, Marina Mikhaylyuta, may have lived in Moscow. Usmanov ghostwrote at least some of her letters. GW Sg. had no shareholders agreement. Kuzenny controlled GW Sg. After December 2017, GW Sg. had no stable, reliable banking relationship anywhere.

FIRST AMENDED COMPLAINT – Page 11

1        44.     On or about May 12, 2017, Perkins and GW Sg. signed the "vanilla"

2    engagement letter providing that Perkins would give GW Sg. "general corporate

3    advice." However, Perkins did not provide "general corporate advice" to GW Sg.

4    It provided general corporate advice to Giga Watt, as set forth below. A copy of

5    the foregoing engagement letter is attached hereto as **Exhibit C**.

6        45.     Shortly afterward, Grant sent an email to Ness' assistant asking if

7    they should write down the terms regarding Perkins' holding of the WTT Token

8    sales proceeds. Ness did not respond, at least not in writing, and thus chose not to

9    put any terms in writing separate from the White Paper.

10       46.     Further, pursuant to the engagement letter with Cryptonomos,

11   Perkins was responsible for "final review" of the White Paper. Therefore, Ness

12   knew the terms by which he would be holding the WTT Token sales proceeds.

13       47.     After May 12, 2017, Perkins IOLTA trust account began receiving

14   hundreds of small-dollar payments relating to the GW ICO.

15       48.     Just as the GW ICO started, Andrey Kuzenny, Leonid Markin, and

16   Eduard Khaptakhaev installed Usmanov at Giga Watt as its Chief Financial

17   Officer ("CFO"). From May 2017 until November or December 2017 when Giga

18   Watt began paying his salary, Usmanov received his compensation in the form of

19   wire transfers to his bank account in Latvia and cash payments. Kuzenny and

20   Cryptonomos made these payments. He has not reported them to the United States

21   Internal Revenue Service.

22

23

24   FIRST AMENDED COMPLAINT – Page 12

25

1

49.     In June 2017, less than a month after the GW ICO began, Ness wrote

2    to Arden:

3        My escrow guys are asking how long this is going to go on.
         Normally, we do closing escrows as an accommodation for clients
4        that take a week or two for a transaction to close and involve 10 or 20
         wires to manage. This one has gone way beyond the norm for us. Are
5        we close to the closing when no more wires will come in? If not, let's
         see what other escrow providers can handle this. We are not set up to
6        manage long term escrow accounts.

7        50.     Arden responded, in pertinent part:

8        We have the date for the end of sales set on July 31, unless we reach
         the cap of 30,000,000 [WTT Tokens] sold earlier. This date was
9        indicated on every single document you reviewed prior to agreeing to
         provide the escrow services to Giga Watt. We have publicly
10       announced that Perkins Coie performs the escrow for the sale of
         tokens. It is listed on the web-site, in publications and reports made
11       on WTT by independent media. *Switching this service to another
         company now would be detrimental for the entire token launch*
12       *process and would jeopardize not just the future sales but also*
         *existing purchases once the buyers learn that Perkins Coie no*
13       *longer escrows their funds.* I do understand your concern and I feel
         sorry that it causes your firm a great deal of inconvenience; however,
14       due to the extend [sic] of possible damage, switching the escrow at
         this point does not seem to be a solution. Let's figure something out
15       to make the process easier for you, instead.

16       51.     Ness replied, "Understood. Don't want to cause trouble. Just looking

17   for a way to explain this novel stuff internally. Let's hope you get to the cap first!"

18       52.     By "novel stuff," Ness was referring to the fact that the GW ICO, like

19   all initial coin offerings, used the blockchain to record the interests, called WTT

20   Tokens, that Giga Watt was selling. Ownership and transfers of the WTT Tokens

21   were stored on the Ethereum blockchain, which is a ledger that is located on the

22   cloud. Because they are stored on a blockchain, tokens are considered "digital

23   assets."

24   FIRST AMENDED COMPLAINT – Page 13

25

53. In July 2017, Arden wrote to Ness:

Giga Watt [is] trying to get a loan to build the additional facilities secured by the funds in the escrow so it can build more and ahead of construction schedule. The lender wants to make sure that he would get paid from the escrow. If we ask PC to keep certain balance (we are talking about $3,000,000) and make payment at Giga's request to a specific third party, you should be able to do so, right? The loan would be for three months but Giga is planning to repay it in one month.

54. Ness did not ask whether she meant Giga Watt or GW Sg. He had more pressing concerns, responding:

I'm getting a ton of push back internally for "abusing" our closing escrow. They definitely aren't going to let me do something really unusual like paying a third party. I know we set this up at the last minute, but we're just using our standard client closing account that normally gets 10 or 11 wires into it and pays out to our client a week or two later.

55. On July 25, 2017, the SEC issued its *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* in which it explained its analysis that blockchain digital asset tokens were securities subject to the U.S. securities laws.

56. On July 27, 2017, Carlson met with a corporate attorney at Perkins, Martha Sandoval ("Sandoval"), seeking advice regarding Giga Watt and its relationship with GW Sg. By this point, GW Sg. had already usurped the WTT Token sales proceeds, substituting itself as the seller at the last minute, contrary to the White Paper terms.

57. In preparation for that meeting, Michael Olmstead ("Olmstead"), Giga Watt's accountant, wrote to Sandoval that they needed advice regarding the treatment of Giga Watt's revenues "both internally and for tax purposes."

FIRST AMENDED COMPLAINT – Page 14

58.    This meeting upset Usmanov. He wrote multiple drafts of a letter to Carlson for Leonid Markin's signature. Markin is a Russian national who worked with Kuzenny. On July 28, 2017, Leonid Markin, sent an email to Carlson telling him to accept Usmanov's authority and "change [his] attitude." After this point, Usmanov took over the relationship with Perkins.

59.    The GW ICO ended on or about July 31, 2017. Kuzenny told the SEC that they had sold approximately 22 million WTT Tokens for approximately $22 million. However, as of July 31, 2017, Perkins was only holding $8,621,218.58 in WTT Token sales proceeds.

60.    On August 1, 2017, GW Sg. deposited $1.95 million into the Perkins IOLTA trust account. This deposit contradicted the White Paper which stated that Cryptonomos – not GW Sg. – would collect the WTT Token sales proceeds and place them in the escrow. Further, Giga Watt – not GW Sg. – should have been selling the WTT Tokens. GW Sg. was only selling the miners.

61.    On August 4, 2017, Circle Internet Finance, Ltd. ("Circle") made two deposits into Perkins' IOLTA Trust account, one in the amount of $5 million and another in the amount of $6,598,900.

62.    Circle's records do not show the source of these funds.

63.    Only three days later, on August 7, 2017, Mikhaylyuta asked Perkins to release to GW Sg. $5.4 million, writing, "Now that we've launched the first batch of tokens[,] I would like to ask you to release the equivalent amount of USD 5 400 000."

FIRST AMENDED COMPLAINT – Page 15

1    64.    That same day, August 7, 2017, Sandoval wrote to Olmstead, Giga

2    Watt's sole in-house accountant, that Perkins had not worked on

3    Giga Watt's incorporation, and that before the July 2017 meeting, she had not

4    been familiar with Giga Watt. It was not listed in Perkins' database as a client.

5    65.    The same day, August 7, 2017, Usmanov sent an email to Ness with

6    the subject line, "need your advice." The body of the email stated:

7    Hi Lowell [Ness], My name is Tim, I'm the CFO at Giga Watt, Inc.
     **_Katrina referred to you as a main contact person who I could speak
8    with on all our legal matters._** Several days ago we received an email
     supposedly sent by the U.S. Secret Service, asking us to share some
9    sensitive information. Please find below a copy of this email.

10   (Emphasis added.) Ness promptly directed Usmanov to Jean-Jacques Cabou

11   ("Cabou"), Ness' partner, who responded:

12   I share your skepticism but it also bears some indicia of legitimacy to
     me. I'd be happy to return the call if you'd like; otherwise there's no
13   harm in returning the call and saying you are trying to confirm the
     legitimacy of the request before consulting with counsel about
14   providing any information. Don't give anything up yet; see what the
     guy says
15
     66.    Usmanov responded:
16
     Agree with you. Would be great if you gave them a call on our
17   behalf. Your voice will sound more persuasive. At least you will find
     the right questions to ask.
18
     67.    On August 8, 2017, Perkins made the first premature escrow release
19
     in the amount of $5.4 million. No new construction had been completed. This
20
     payment violated the White Paper terms.
21
     68.    That same day, August 8, 2017, at 8:19 a.m., Ronan McGee of the
22
     USSS wrote to Ness:
23

24   FIRST AMENDED COMPLAINT – Page 16
25

Good morning Lowell,

The U.S. Secret Service has an ongoing investigation in which a suspect's phone received a confirmation code from Cryptonomos. We believe the confirmation code to be related to the mining operations of the Cryptonomos / Giga Watt venture. We are interested in obtaining any and all information Cryptonomos / Giga Watt maintains on file for this specific phone number, particularly any bitcoin addresses.

We have attempted to contacted [sic] Cryptonomos directly multiple times, but they have thus far failed to respond to our inquiries. ***Our understanding is that you are the legal representative of Giga Watt***.

As a result, could you please provide the appropriate Grand Jury subpoena contact information (e.g. physical address to include on the subpoena, email to which subpoena can be served, etc) for Cryptonomos / Giga Watt so that we may subpoena the information in question?

(Emphasis added.) (Punctuation in the original.)

69. Less than an hour later, on August 8, 2017, Cabou responded:

Ronan and Team,

It was a pleasure to speak with Ronan briefly just now regarding this email that was directed to my partner, Lowell Ness, who is also copied here. As I explained to Ronan, ***our firm represents Giga Watt*** and I can accept service of a subpoena by email on its behalf. Please just send that to me.

We understand that the USSS and state authorities have reason to believe Giga Watt may hold certain records relevant to your investigation. Once we get the subpoena, we will work with the client to determine what if any responsive records we have and to produce them to you in a timely and convenient way.

Please let me know if you have any questions.

We look forward to working with you.

(Emphasis added.).

FIRST AMENDED COMPLAINT – Page 17

70.     Cabou forwarded the email to Ness and Usmanov adding the following:

> Lowell and Tim,
>
> I spoke just now with Ronan McGee, an intelligence analyst for the USSS. He confirmed this was a legit request and will be sending a subpoena from the US District Court in Kentucky for the records they want. I have asked that the subpoena be directed to me, as you can see below. McGee confirmed that GW is just a holder of information here, not a target or subject of the investigation.
>
> So the play here is for us to be cooperative as long as possible, see what they want, and then get it to them if we have it. One thing I'd like to do is to review whatever agreement(s) or terms we would have with the individual in question to ensure that we have no self-imposed obligation to notify them of the subpoena.
>
> Obviously[,] I'd be happy to talk about any of this at your convenience.

71.     Thus, on the day that Perkins made the first premature escrow release, Perkins represented Giga Watt "on all legal matters," confirmed to the USSS that Perkins represented Giga Watt, and provided legal advice to Giga Watt.

72.     In August 2017, Kuzenny was seeking an investment from a Russian who used the moniker, Al Mafia. On August 9, 2017, the day after Perkins made the first premature escrow release to GW Sg., "Al Mafia" wrote to Perkins' accounting department asking for the "general ledger regarding the GigaWatt Pte. Ltd. escrow."

73.     That same day, August 9, 2017, Kuzenny wrote to Al Mafia, "***Our lawyers*** are in a panic at your letter that you addressed. Honestly. You know how they relate to the word mafia here in America (( Let me better send you dox from them." (Emphasis added.) (Punctuation and parentheses in original.)

FIRST AMENDED COMPLAINT – Page 18

74. On August 9, 2017, Carlson followed up with Sandoval regarding their July meeting, referring to the issues they discussed as the "project orientation checkup." In this email he wrote that Perkins should scrutinize Giga Watt and GW Sg.'s relationship, analyze whether it makes sense, and familiarize itself with Giga Watt's business. Addressing Sandoval and Khaptakhaev, he wrote:

> Thanks for the clarity[,] Martha.
>
> Ed - we met with Perkins week before last and did a project orientation checkup with Martha. I wasn't clear what Perkins had been involved with versus the guidance given by Katrina [Grant].
>
> Its clear that at this point that the corp[.] structure (Giga.sg and Giga.us) and their relationship were [sic] defined by Katrina with perhaps some input by Perkins, but not at their specific direction.
>
> I think we need to determine if we are comfortable with our current arrangement, or do we want Perkins to dig into how we are doing business and what the entity structure consists of. Further, we may need Perkins to evaluate whether the legal protection and tax/revenue strategies implied by this corp structure are effective and achieve our goals.
>
> We've built a lot of business based on the structure Katrina defined, and perhaps you guys are familiar and comfortable with it - I'm asking you for your feedback on whether to engage Perkins to audit our structure and build us a robust plan going forward. At this point I think its [sic] fair to say that Perkins knows *very little* about our business, with the exception of the two entities and a proposed third entity (Hosting).
>
> Your thoughts? Thanks! Dave

75. Carlson copied Markin, Kuzenny, and Usmanov on the foregoing email.

76. On August 9, 2017, Usmanov wrote to Sandoval:

> I totally agree with Dave. We would need to ask Perkins Coie to audit our structure and provide advice and assistance.

FIRST AMENDED COMPLAINT – Page 19

Martha didn't mention GW One LLC as a company that is also under our umbrella. Apparently, we would have to set up a call and talk through the entire group and bring Martha up to speed on our M&A plans. We definitely need a legal advice on the upcoming merger with Hashplex as there are few things I'm not clear about.

As for the constitutional dox requested by Martha - please find attached some of the documents on Giga Watt, Inc that I've got as of today. As you can see the Articles of Incorp doesn't contain articles per se, but only a title page. In view of the above, I suggest that Perkins Coie also reach out to Washington Secretary of State to check with them whether or not the initial filing was complete. Same goes for our Singapore entities. Someone would probably need to request the full batch of documents via the registered agent. As far as SHA [Shareholder Agreement] is concerned - I believe this is still being drafted and discussed amongst the shareholders.

77.     On or about August 11, 2017, Kuzenny received unwelcome news. GW Sg.'s bank, the Overseas Chinese Banking Corporation ("OCBC") asked him to explain the $1.95 million that GW Sg. had deposited into the Perkins IOLTA Trust Account and about which Perkins had asked no questions. As alleged earlier, GW Sg. had no business selling the WTT Tokens in the first place.

78.     On or about the same day, OCBC also asked Kuzenny to explain the $5.4 million that Perkins had transferred to GW Sg. from the Perkins IOLTA trust account. As alleged earlier, this transfer violated the terms of the GW ICO because it was made before Giga Watt had finished the requisite construction.

79.     Unable to tell the truth without risking losing the account, Kuzenny and Usmanov dissembled, stating falsely that the $1.95 million transfer was akin to an "inter-company transfer" between GW Sg. and Perkins, and that the $5.4 million transfer was for "completed construction." They also said that the funds were for a "pre-sale," although this was unsubstantiated and irrelevant.

FIRST AMENDED COMPLAINT – Page 20

80.     On August 14, 2017, Usmanov followed up with Cabou, regarding the grand jury subpoena. He included a message that the USSS had sent to Nikolay Evdokimov on August 7, 2017. As alleged above, Evdokimov had signed Giga Watt's incorporation papers. However, sometime in 2017, he parted ways with Giga Watt and conducted a different unregistered securities offering which resulted in a default judgment against him by the SEC for more than $16 million.

81.     In the foregoing email, dated August 14, 2017, Usmanov asked Cabou:

> Could you provide some more information of what you are discussing with them? Would you also share that subpoena with us, please? Any steps from our end required?

82.     Cabou responded:

> Tim, Thanks for your note. To be clear, I have an open line of communication with the USSS but I have NOT shared or discussed any substance at all with them. I have simply said we want to assist and will accept service of a subpoena to me by email.
>
> They have confirmed they are still obtaining the subpoena and will be in further touch.
>
> Nothing to do for now at all. Best J

83.     On August 15, 2017, Mikhaylyuta asked to withdraw $900,000 from Perkins' IOLTA trust account, "We ve [sic] released the second batch of tokens[.] I would like to ask you to release the equivalent amount of USD 900 000 nine hundred thousand in favor of GIGAWATT PTE LTD [GW Sg.]." (All caps in original.)

84.     On August 17, 2017, Cabou forwarded the grand jury subpoena to Usmanov with Ness copied, "Attached is the subpoena I just received. We need to

FIRST AMENDED COMPLAINT – Page 21

1    have a call to discuss next steps. When can you and/or your team have that call

2    with me." The subpoena was addressed to Cryptonomos/Giga Watt.

3         85.    Usmanov responded, "I'm ready to talk whenever you are." Shortly

4    thereafter, Cabou wrote to Usmanov with a copy to Ness:

5         Tim, Good to speak with you just now. As we discussed, you and
         your team will conduct a diligent search for all records responsive to
6         the subpoena and will get any such records to me for review. Once
         that's done, we will work with you to complete the waiver and
7         declaration forms and we will get those to the USSS for you.

8         Look forward to hearing from you[.]

9         86.    On August 18, 2017, Usmanov described to Perkins the steps that the

10   Romanian suspect had taken on Cryptonomos' website.

11        87.    On August 19, 2017, Perkins released $900,000 to GW Sg. No

12   construction had been completed.

13        88.    On August 22, 2017, Usmanov wrote to Cabou again, "Hi J, Here is

14   the name that this guy used when creating a profile on the website. Popescu

15   Bogdan Stefan[.]"

16        89.    On August 22, 2017, Sandoval wrote to Usmanov that Giga Watt

17   lacked signed bylaws and that she needed more information regarding "the

18   Singapore entity." Usmanov responded, "I'll try to find that out later on [re the

19   Singapore entity]. Meanwhile, *let's focus on our U.S. entities*." (Emphasis

20   added.) He thus drew attention away from the Singapore paper façade.

21        90.    Over the next few days, Cabou nagged, cajoled, and guided Usmanov

22   through the steps necessary to comply with the USSS subpoena. For example, on

23

24   FIRST AMENDED COMPLAINT – Page 22

25

September 4, 2017, Cabou wrote to Usmanov and Giga Watt's Chief Operating

Officer, Anton Orlov ("Orlov"), with a copy to Ness:

> Guys,
>
> This is urgent and frustrating. I have gotten no response to the below.
>
> Our deadline to provide documents is September 7. I MUST, WITHOUT EXCEPTION, have all documents to be produced by tomorrow. So far, I have only one file to produce. That clearly isn't enough, as explained below.
>
> I also need the waiver and certification attached completed and returned to me tomorrow. We are under court order here. We cannot miss this deadline. Please let me know what is happening.

91.     Orlov is a Russian national. He did not receive his salary from Giga

Watt. Carlson told Wilson Sonsini that he "was on loan" from another company.

92.     On September 5, 2017, Usmanov asked Cabou to confirm that what

he and Orlov had cobbled together "is enough." Cabou responded, "Yes. Thank

you. I will look forward to getting the waiver and certification."

93.     On September 5, 2017, Usmanov wrote to Carlson regarding the

USSS subpoena, "You, as the CEO, just need ot [sic] sign the waiver and the

certification." That same day, September 5, 2017, Zeev Kirsh ("Kirsh"), a New

York-licensed lawyer who advised Giga Watt, Gw. Sg., and Cryptonomos, wrote

to Usmanov with a copy to Carlson regarding the waiver and certification for the

grand jury subpoena responses, "i filled out the form stuff on pages 5 and 7. Dave,

all you need ot [sic] do isput [sic] down 2 signatures one at the bottom of each

page. This needs to be sent out within 2 days by Perkins." Carlson signed the

waiver and certification as the CEO of Giga Watt.

FIRST AMENDED COMPLAINT – Page 23

1    94.    On September 5, 2017, Olmstead, the sole accountant at Giga Watt,

2    learned that Giga Watt no longer had control of or even access to Giga Watt's

3    cryptocurrency revenue wallets. A wall had been erected between Giga Watt and

4    its revenues. Cryptonomos controlled Giga Watt's revenues from this point

5    forward. According to Usmanov's emails, Olesia Egozina, the Chief Product

6    Officer of Cryptonomos, controlled information regarding the wallet. Although

7    Giga Watt reported approximately $1 million in revenue in its 2017 federal tax

8    return, that number was provided to Usmanov by Cryptonomos and by his own

9    admission, Usmanov did not verify the number.

10    95.    On September 12, 2017, Sandoval wrote to Usmanov regarding Giga

11    Watt's formation documents:

12    o Bylaws and other Incorporation Steps

13    ☐ You passed along an action by the incorporator dated
      12/16/16.
14
      In this action, the incorporator:
15
      • adopted the bylaws;
16
      • stated that the company would have 1 director; and
17
      • appointed Nikolay Evdokimov as the sole director •
18
      Of these 3 acts taken by the incorporator, the incorporator only has
19    statutory authority to adopt the bylaws and set the number of
      directors.
20
      ☐ Inconsistent with the 12/16/16 incorporator action, in the
21    1/1/2017 Minutes of the Special Meeting of the Board of Directors,
      Adam West is identified as (and acted as) the sole director.
22
      In this meeting, the following officers were appointed:
23

24    FIRST AMENDED COMPLAINT – Page 24

25

• CEO: David M. Carlson

• President: Nikolay Evdokimov

• CFO: Leonid Markin

• Secretary: Adam West

o Steps to be taken are

• Client: Provide the identity (identities) of the company's board of directors

 • Client: Provide the identity of the company's officer (are those listed above, correct?; are there other officers?)

• Client: Provide capitalization table (or breakdown of share ownership)

• Client: Provide input on desired number of authorized shares (post stock split)

• Perkins: Prepare a shareholder action in which the director(s) are appointed (and other incorporator actions)

• Perkins: Prepare the organizational actions to be approved by a company's board of directors

• Perkins: Order governing documents from WA Secretary of State's Office and amend and restate articles of incorporation

96. By "client," Sandoval meant Giga Watt.

97. On a similar topic, on September 22, 2017, Kirsh wrote to Carlson, "you are very right, we have serious problems in gW inc, gw singapore and even in Cryptonomos. all these companies need shareholder agreements." (Punctuation and typographical errors in original.)

98. Carlson wrote back to Kirsh:

Not surprising honestly.

FIRST AMENDED COMPLAINT – Page 25

In any case I don't see why we can't execute a shareholders agreement to at least nail it down legally. It's a lot to ask for us to continue operating as if it is in place, when technically it's never been executed.

We can amend later if needs be...

Cheers, and thanks for the copy of the bylaws. I'll get them to the PUD.

There were never signed bylaws and they never nailed down the shareholders agreement.

99.     On September 22, 2017, Mikhaylyuta (or Kuzenny using her name) asked Perkins to release $1.2 million from the escrow. On September 25, 2017, Perkins complied. As of September 25, 2017, no new construction had been finished.

100.    On September 26, 2017, Cabou continued to advise Giga Watt with respect to the grand jury subpoena, "This has been taken care of. Please do not contact USSS further. They will let us know if they have questions."

101.    On October 6, 2017, Usmanov wrote to Sandoval:

Sorry for the delay. Our colleagues has [sic] been traaveling [sic] a lot lately, so it was hard to get all together.

Regarding GW Management, LLC, Giga Pod 1-100, LLC, and Mine Building, LLC - actually

I've never heard these entities were duly established. Let me ask you where you heard of them .

Anyways, like I mentioned earlier in our previous correspondences, let's focus first on Giga Watt, Inc. as this is our main operating vehicle.

102.    On November 7, 2017, Perkins released $3.3 million to GW Sg. from its IOLTA trust account. No new construction had been completed. The OCBC

FIRST AMENDED COMPLAINT – Page 26

asked GW Sg. to explain this payment. Usmanov and Kuzenny used the exact same language as before stating that the funds were proceeds from the GW ICO "pre-sale," a statement that was both unsubstantiated and irrelevant. OCBC was asking about the source of these funds. If Usmanov and Kuzenny had told the truth, they would have had to admit that the funds were withdrawn contrary to the terms of the GW ICO White Paper.

103.   On December 4, 2017, GW Sg. lost its OCBC banking privileges.

104.   On December 5, 2017, Usmanov wrote to AA1 Solutions, "Most probably we will have to release some funds from escrow later this week. So we'd definitely need a USD [U.S. dollar denominated] account *to land the money*." (Emphasis added.)

105.   After OCBC terminated GW Sg.'s banking privileges, Kuzenny began directing Perkins to deliver the escrow releases to Giga Watt. However, Giga Watt was having its own banking problems. From August 2017 to January 2018, Wells Fargo, Numerica Credit Union, and Umpqua Bank each informed Giga Watt that it was no longer welcome. Giga Watt bounced from bank to bank.

106.   Perkins played along with this financial hopscotch, transferring money to Numerica Credit Union, then to Umpqua Bank, and then to Bank of America, no questions asked.

107.   On December 18, 2017, Usmanov drafted what would become the text of an email request to Perkins, ostensibly from Mikhaylyuta, to release $2 million from the escrow to Giga Watt.

FIRST AMENDED COMPLAINT – Page 27

108. On December 19, 2017, Perkins transferred $2 million from the escrow to Giga Watt. Giga Watt had built 2 megawatts of new cryptocurrency mining capacity. However, Giga Watt was more than three months behind the construction schedule set forth in the White Paper and, therefore, by its terms, WTT Token holders, other than those who had received the 2 megawatts of cryptocurrency capacity, were entitled to refunds. The prior $10.8 million should not have been released.

109. On December 22, 2017, Usmanov ghost wrote another escrow release request to Perkins, this time requesting that $4.5 million be sent to Giga Watt.

110. Perkins transferred the $4.5 million to Giga Watt on December 26, 2017. GW Sg. treated this transfer to Giga Watt and all escrow transfers to Giga Watt as a loan. By this date, Giga Watt had built 4.5 megawatts of new cryptocurrency mining capacity. However, the WTT Token holders remained oversubscribed and the escrow had already been improperly and severely depleted.

111. In late December 2017, Stormsmedia LLC, a WTT Token and miner purchaser, sued Giga Watt, GW Sg., and others under section 12 of the U.S. Securities Act of 1933, seeking rescission and restitution of its WTT Token and miner purchases on behalf of all WTT Token and Miner investors. Stormsmedia alleged that Giga Watt had not completed construction.

112. Perkins received actual notice of the Stormsmedia complaint and the allegation that Giga Watt was behind in its construction schedule by more than

FIRST AMENDED COMPLAINT – Page 28

1  three months and that there were oversubscribed WTT Token holders entitled to
2  refunds from the IOLTA trust account.

3      113.   In January 2018, Giga Watt settled the Stormsmedia lawsuit by

4  paying Stormsmedia LLC $953,319.55 out of funds that Perkins transferred to

5  Giga Watt from its IOLTA trust account on instructions from Usmanov, Kuzenny,

6  and/or Mikhaylyuta. GW Sg. treated that transfer as a loan.

7      114.   The Stormsmedia settlement released both Giga Watt and GW Sg.

8  from claims brought by Stormsmedia. No settlement class had been certified.

9      115.   In February 2018, Perkins made the last two escrow releases,

10 notwithstanding its knowledge of Stormsmedia's allegations that construction was

11 delayed. Giga Watt had completed sufficient new cryptocurrency facilities to

12 service some additional WTT Tokens. However, the WTT Token holders

13 remained significantly oversubscribed. To service all the sold WTT Tokens, Giga

14 Watt would have had to be running approximately 22 megawatts of power.

15 Instead, it was only running approximately 11 megawatts of power for WTT

16 Tokens.

17     116.   A summary of the Escrow withdrawals follows:

| Date | Amount | Paid To |
|---|---|---|
| 8/8/2017 | ($5,400,000.00) | GW Sg. |
| 8/19/2017 | ($900,000.00) | GW Sg. |
| 9/25/2017 | ($1,200,000.00) | GW Sg. |
| 11/7/2017 | ($3,300,000.00) | GW Sg. |

FIRST AMENDED COMPLAINT – Page 29

| Date | Amount | Paid To |
|------|--------|---------|
| 12/19/2017 | ($2,000,000.00) | Giga Watt |
| 12/26/2017 | ($4,500,000.00) | Giga Watt |
| 2/9/2018 | ($1,148,057.58) | Giga Watt |
| 2/22/2018 | ($3,217,700.00) | Giga Watt |
| | ($21,665,757.58) | |

117.   As the foregoing shows, from August 2017 to November 2017, GW Sg. received $10,800,000 ("Released Escrow Proceeds") from Perkins IOLTA trust account.

118.   During this same August to November period, GW Sg. paid to Giga Watt $9,050,000, which it treated as loans to Giga Watt. GW Sg. commingled the Released Escrow Proceeds with other funds before transferring any funds to Giga Watt.

119.   GW Sg. had other funds to commingle. From June 2017 to December 2017, GW Sg. received $14,309,605.00 ("Circle Proceeds") from Circle, which exchanged cryptocurrency for U.S. dollars, among other things. GW Sg. also received revenues from the sale of miners. The Circle Proceeds alone were

[*This First Amended Complaint continues on the next page.*]

FIRST AMENDED COMPLAINT – Page 30

sufficient to cover all payments by GW Sg. to Giga Watt without recourse to the WTT Token sales proceeds:



120. GW Sg. began directing payments to Giga Watt after GW Sg. lost independent access to a bank. GW Sg. was unbankable. During the period, December 2017 to February 2018, as set forth above, Perkins transferred to Giga Watt from the IOLTA trust account, the aggregate sum of $10,865,757.31. If GW Sg. had not previously depleted the escrow, these payments would have been made in step with construction.

121. The chart below compares the disbursements to Giga Watt in relation to Giga Watt's power capacity at the time of the transfer:



122. Further, Giga Watt did not retain all the proceeds that Perkins distributed directly to Giga Watt as set forth below:

| When | Escrow Transfers to Giga Watt | GW Bank Withdrawals (Not Ordinary) | Giga Watt Bank | Bank Records' Transfer Description |
|---|---|---|---|---|
| 12/19/2017 | $ 2,000,000.00 | | Numerica Credit Union | Incoming Wire |
| 12/26/2017 | $ 4,500,000.00 | | Umpqua Bank | Incoming Wire |
| 12/26/2017 | | $ (294,000.00) | Umpqua Bank | INTL Wire Xfer Debit Business Singtrade Kr Pte Ltd Overseas-Chinese Banking Corp Payment Under Gw Sgt |
| 1/8/2018 | | $ (3,450,340.00) | Umpqua Bank | OTC [Over the Counter] Withdrawal |
| 1/17/2018 | | $ (953,320.00) | Bank of America | BNF:SILVER MILLER FBO STORMSME SETTLEMENT AGREEMENT DD 01.15.20 |

FIRST AMENDED COMPLAINT – Page 32

| When | Escrow Transfers to Giga Watt | GW Bank Withdrawals (Not Ordinary) | Giga Watt Bank | Bank Records' Transfer Description |
|---|---|---|---|---|
| 1/19/2018 | | $ (47,250.00) | Bank of America | BNF:GIGWATT PTE. LTD BNF BK:E UROSTANDARD BK 60 LOAN AGREEMENT |
| 2/9/2018 | $ 1,148,057.58 | | Bank of America | Incoming Wire |
| 2/22/2018 | $ 3,217,699.73 | | Bank of America | Incoming Wire |
| | $10,865,757.31 | $ (4,744,910.00) | | |
| | | $ 2,258,078.00 | Bank of America & Washington Trust Bank | Deposits partially reimbursing the $3,450,340 withdrawal. |
| | $ (2,486,832.00) | $ (2,486,832.00) | | |
| | $ 8,378,925.31 | | | |

123.   The foregoing also shows that $3,450,340 was withdrawn in an over-the-counter transaction from Umpqua Bank. Umpqua, like Wells Fargo and Numerica Credit Union, had closed Giga Watt's account for suspicious activity. Only $2,258,078 was deposited into Bank of America and Giga Watt's other account at Washington Trust Bank, leaving a missing amount of $1,192,262.

[*This First Amended Complaint continues on the next page.*]

FIRST AMENDED COMPLAINT – Page 33

1  124. The money flows between Perkins and the Giga Watt entities are

2  illustrated as follows:



13  125. The foregoing also illustrates how Giga Watt's revenues were re-

14  directed to Cryptonomos. Cryptonomos paid some funds to Giga Watt, but only as

15  loans.

16  126. After the Stormsmedia settlement, the lawyer for Stormsmedia

17  approached Perkins on behalf of another WTT Token holder, Mark Moss, asking

18  that any WTT Tokens sales proceeds remaining in Perkins IOLTA Trust account

19  be frozen. At the time, there should have been approximately $10.8 million in the

20  Escrow. Perkins informed him that it was no longer holding any WTT Token sales

21  proceeds in its IOLTA trust account.

22  127. Shortly thereafter, on March 19, 2018, the lawyer filed a securities

23  action against Giga Watt and GW Sg. under the caption, *Moss v. Giga Watt, Inc.,*

24  FIRST AMENDED COMPLAINT – Page 34

25

*et al.*, No. 2:18-cv-0010-SMJ (E.D. Wash.). The complaint alleged individual claims of an unregistered offering of securities under the Securities Act of 1933 and the Washington Securities Act and a claim for rescission of the token purchases. In his complaint, Moss alleged:

> Moreover, contrary to the terms of the GIGA WATT White Paper – which stated that all invested cryptocurrency would be held in escrow and would only "be released from escrow in step with the completion of facilities" – Defendants have represented to Plaintiff that, ***without regard to GIGA WATT's failure to have completed its facilities***, virtually all of the cryptocurrency raised from investors in the ICO has been liquidated into U.S. Dollars and has been transferred from the escrow account to an operating account; and Plaintiff reasonably believes the funds raised have been dissipated, or will be dissipated, before all ICO investors receive their Giga Watt tokens/mining equipment or any opportunity to receive a return on their investments.

Moss Complaint, pp. 32-33, ¶ 105. (Emphasis added.)

128.   On March 20, 2018, a separately represented token purchaser named Raymond Balestra filed an action against Giga Watt, GW Sg., Cryptonomos, and Carlson, under the caption *Balestra v. Giga Watt, Inc., et al.*, No. 2:18-cv-00103-SMJ (E.D. Wash.). The complaint alleges a claim of unregistered offering of securities against all defendants under section 12(a)(1) and a control person claim against Carlson under section 15(a) of the Securities Act of 1933 on behalf of a putative class of plaintiffs who purchased tokens during the GW ICO.

129.   In his complaint, *Balestra, inter alia*, sought a preliminary injunction enjoining any further disbursement of WTT Token sales proceeds, although by then Perkins had already released all the WTT Token sales proceeds. (Balestra Complaint, pp. 21-22.) By stipulation of the parties, on July 3, 2018, the Court

FIRST AMENDED COMPLAINT – Page 35

consolidated this case with the action titled *Moss v. Giga Watt, Inc., et al.* described above, and a new named plaintiff appeared, Alex McVicker.

130. On or about April 19, 2018, the SEC commenced a formal investigation of the GW ICO. On the advice of Kirsh, Giga Watt retained Wilson Sonsini.

131. That same month Usmanov and Carlson decided to "destroy" the Giga Watt-MegaBigPower purchase and sale agreement, pursuant to which Giga Watt had promised to pay MegaBigPower $3 million for all or substantially all its assets, and replace it with what Carlson called a "note" for $1 million.

132. In the above-captioned bankruptcy case, Carlson used this "note" to pretend that he had only sold some of MegaBigPower's assets to Giga Watt and that he had retained ownership of the TNT Facility. In fact, though, in August 2018, GW Sg. had paid Carlson $2 million of the $3 million purchase price in cryptocurrency. GW Sg. then treated the $2 million payment as a loan to Giga Watt.

133. Usmanov said that destroying the purchase and sale agreement would help Carlson save on his taxes. Carlson said, "that would be excellent." It is not known whether Carlson reported the $2 million to the IRS or otherwise used Usmanov's ruse to save on his taxes.

134. During the SEC investigation, Carlson informed Wilson Sonsini that he did not have access to any information regarding the WTT token sale proceeds, including the Perkins IOLTA trust account. Cryptonomos had that information.

FIRST AMENDED COMPLAINT – Page 36

1  Thus, Kuzenny produced the information regarding the escrow and token sale
2  proceeds.

3      135.   Kuzenny falsely misrepresented to Wilson Sonsini and the SEC that
4  all WTT Token sales proceeds had been released from the Perkins IOLTA trust
5  account in step with construction. He also pretended that GW Sg. had enjoyed the
6  right to the WTT Token sales proceeds in the first place.

7      136.   In July 2018, Usmanov told Carlson that Kuzenny was embezzling
8  funds from WTT token holders who stored their share of Giga Watt's revenues in
9  wallets controlled by Cryptonomos. When Carlson confronted Kuzenny, Kuzenny
10  did not deny the embezzlement. Instead, he asked for more time to replenish the
11  funds, writing, "Please don't break the balls."

12      137.   In August 2018 Carlson resigned. His last paycheck was in
13  September 2018.

14      138.   In October 2018, Raphael Sofair commenced a RICO action against
15  Giga Watt, GW Sg., and Carlson for claims arising from GW Sg.'s sale of miners
16  after the GW ICO ended. According to the allegations, after the GW ICO ended,
17  GW Sg. sold miners without regard to Giga Watt's capacity to run them. When
18  Giga Watt informed these miner purchasers that their miners would be deployed
19  after WTT Token holders' miners were deployed, they sued. Sofair's attorney is
20  currently also representing Jun Dam in litigation pending in the U.S. District
21  Court, E.D. Washington against Perkins, Case No. 20-264.

22

23

24  FIRST AMENDED COMPLAINT – Page 37
25

## FIRST CLAIM FOR RELIEF
### *(Breach of Fiduciary Duty – Perkins)*

139. Plaintiff incorporates all prior allegations by reference as if set forth fully herein.

140. Perkins owed Giga Watt a fiduciary duty as the trustee of the GW ICO escrow.

141. Perkins also owed Giga Watt a fiduciary duty as its attorney.

142. Perkins provided legal advice to Giga Watt as described herein and Grant, Carlson, and Usmanov reasonably believed that Perkins was Giga Watt's attorney.

143. Ness knew the White Paper's terms when he agreed to hold the WTT Token sales proceeds.

144. Perkins failed to act strictly in accordance with the provisions of the White Paper and failed to disburse the WTT Token sales proceeds with scrupulous honesty, skill, and diligence.

145. Perkins breached its fiduciary duty by:

    a. Allowing GW Sg. to control and direct disbursements of the WTT Token sales proceeds from Perkins IOLTA trust account; and

    b. Disbursing funds from its IOLTA trust account contrary to the White Paper's terms.

146. Each of these payments violated the escrow terms.

147. Perkins conduct deprived Giga Watt of its right to control the WTT Token sales proceeds disbursements.

FIRST AMENDED COMPLAINT – Page 38

148.   It deprived Giga Watt of the ability to pay refunds after falling behind in its construction schedule. The plaintiffs in the consolidated McVicker class action have filed a proof of claim for rescission and $30 million in restitution. Giga Watt was left with no funds in the IOLTA trust account to pay any restitution. With knowledge of the allegations that construction had not been completed, Perkins emptied its IOLTA trust account of WTT Token sales proceeds.

149.   Perkins' dissipation of the WTT Token sales proceeds kept Giga Watt out of the capital markets, prevented it from attracting new investors or lenders, destroyed Giga Watt's relationship with WTT Token and miner owners who had invested in Giga Watt and led to this bankruptcy case.

150.   Based on the foregoing, Perkins is jointly and severally liable with the other Defendants to Giga Watt for not less than $22.3 million plus interest, and lost profits.

### SECOND CLAIM FOR RELIEF
*(Breach of Trust – RCW 11.98.085 – Perkins)*

151.   Plaintiff incorporates all prior allegations by reference as if set forth fully herein.

152.   Perkins held the WTT Token sales proceeds in trust for the benefit of Giga Watt.

153.   Perkins breached the trust by treating the WTT Token sales proceeds as if they belonged to GW Sg. and by disbursing the WTT Token sales proceeds without regard to the completion of Giga Watt's cryptocurrency mining facilities.

FIRST AMENDED COMPLAINT – Page 39

154. Perkins is liable for the amount required to restore the value of the trust property to what it would have been had the breach not occurred. That amount is $22.3 million.

### THIRD CLAIM FOR RELIEF
*(Breach of Fiduciary Duty – Usmanov)*

155. Plaintiff incorporates all prior allegations by reference as if set forth fully herein.

156. As the Chief Financial Officer of Giga Watt from May 2017 to September 2018, Usmanov was an officer with discretionary authority.

157. Usmanov failed to exercise his duties under that authority: (a) in good faith, (b) in a manner that Usmanov reasonably believed to be in the best interests of Giga Watt and (c) with the care an ordinarily prudent person in a like position would exercise under similar circumstances.

158. Furthermore, Usmanov's conduct constitutes a reckless, willful, and knowing breach of fiduciary duty amounting to fraud or defalcation.

159. Usmanov breached his fiduciary duty to Giga Watt by:

    a. Enabling Cryptonomos to strip Giga Watt of all its revenues starting in September 2017 until September 2018 when he left Giga Watt in the estimated amount of $5 million;

    b. Helping Kuzenny to misappropriate funds from the WTT Token sales proceeds;

    c. Helping Kuzenny to cover up GW Sg.'s misappropriation of the WTT Token sales proceeds;

FIRST AMENDED COMPLAINT – Page 40

d. Allowing approximately $1.2 million to vanish from Giga Watt's bank accounts through an over-the-counter withdrawal from Umpqua Bank; and

e. Causing Giga Watt to pay a $180,000 annual salary to Kuzenny although Kuzenny had "no actual duties" and was being called the Chief Operating Officer only so that he could obtain a work visa under false pretenses.

160. Usmanov's conduct caused damages to Giga Watt in an amount not less than $28 million.

161. The Trustee did not discover and could not reasonably have discovered the facts of Usmanov's conduct until the summer of 2022 when the Trustee obtained more than 220 gigabytes of documents relating to Giga Watt.

162. Usmanov's boss, Kuzenny, obstructed the Trustee's investigation of Giga Watt's affairs. In fact, he told the Court in advance that the "Russian team" would not cooperate with any trustee who was appointed. He falsely told the Court that he had provided the Trustee access to Giga Watt's books and records, and he falsely accused the Trustee of stealing or losing post-petition revenues. In fact, the Trustee had no access to the books and records and no access to post-petition revenues generated before his appointment.

163. Perkins also hindered and delayed the Trustee's discovery of the facts underlying the claim against Usmanov. In response to the Trustee's queries, Perkins mischaracterized its relationship with Giga Watt, stating falsely that it had

FIRST AMENDED COMPLAINT – Page 41

not represented Giga Watt. And it withheld correspondence in its possession that would have shown Usmanov's significant role in Giga Watt's affairs.

164.   Carlson also hindered and delayed the Trustee's investigation by misrepresenting which assets even belonged to Giga Watt. Further, he claimed to have no Giga Watt records and no knowledge of how to obtain them.

165.   GW Sg. has vanished.

166.   Cryptonomos has vanished.

167.   Kuzenny has vanished.

168.   Markin has claimed that he has no records and has vanished.

169.   Grant has cooperated but has no access to Giga Watt's records, including emails.

## PRAYER

Wherefore, the Plaintiff respectfully requests that the Court:

1.     Enter judgment in Plaintiff's favor and against the Defendants for joint and several liability in an amount to be proved at trial, plus prejudgment and post-judgment interest, costs, and attorneys' fees; and

2.     Grant such other and further relief as the Court deems necessary and just.

Dated: September 26, 2022            POTOMAC LAW GROUP PLLC


                                     By:     s/ Pamela M. Egan
                                     Pamela M. Egan (WSBA No. 54736)
                                     *Attorneys for Mark D. Waldron, Chapter 7*
                                     *Trustee, Plaintiff*

FIRST AMENDED COMPLAINT – Page 42

# EXHIBIT A

**PERKINS**COIE

3150 Porter Drive
Palo Alto, CA 94304-1212

☎ +1.650.838.4300
🖷 +1.650.838.4350
perkinscoie.com

March 3, 2017

VIA E-MAIL

Lowell D. Ness
LNess@perkinscoie.com
D. (650) 838-4317
F. (650) 838-4517

Cryptonomos PTE. Ltd.
5002 Beach Road
#08-08 Golden Mile Complex
Singapore 199588
Attention: Katarina Grant

**Re:     Legal Representation**

Dear Katarina:

Thank you for selecting Perkins Coie LLP to represent Cryptonomos PTE. Ltd., a company formed under the laws of Singapore (the "Client", "you" or "your"), in connection with U.S. securities law, tax and regulatory advice. This letter will also apply to any additional matters that we undertake at the Client's request, unless otherwise specified in a separate engagement letter addressing that matter.

**Fees/Costs/Billing**

As agreed, effective March 1, 2017, Cryptonomos will pay our firm a monthly fixed fee of $10,000 plus disbursements through February 28, 2018. As provided in my email correspondence dated March 2, 2017, the monthly fixed fee will cover all day-to-day support, including counseling on securities regulations, corporate structure, tax laws as well as final document review with respect to digital currency style token sales.

The fixed fee will not cover costs and disbursement, one-time projects, such as patent and/or trademark applications, litigation (if any), or our support as you negotiate and codify substantive partnerships.

For those projects outside of the scope of the monthly retainer, we will utilize our current hourly billing rates and will provide fee estimates at the onset of each project, and keep Cryptonomos apprised of material deviations from such budgets (if any) as the projects unfold.

In addition, we will cooperatively revisit the monthly fixed fee during within six months of the inception of our engagement to ensure the current pricing structure is operating as anticipated relative to providing of legal services. We believe that this arrangement will assist in providing Cryptonomos with a higher degree of predictability for this operational expense.

134650702.1

All other matters we handle on behalf of Cryptonomos will be subject to our standard terms of engagement as described below or otherwise agreed to in writing.

Aside from the fixed fee arrangement described above, the principal factors in determining our fees will be the time and effort devoted to the matter and the hourly rates of the lawyers and paralegals involved.  I will have primary oversight for Perkins' representation of the Client, but we assign other firm lawyers and paralegals when necessary, beneficial or cost-effective and when desirable to meet the time constraints of the matter.  The hourly billing rates of the persons whom we anticipate assigning to the Matter currently range from $350 to $1,150.  These rates are adjusted at least annually, usually on January 1.  Services performed after the effective date of the new rates will be charged at the new applicable rates.  We try to issue invoices for our fees and disbursements on a monthly basis.  These invoices include detail that most of our clients find sufficient, but please let me know at any time if more detailed information is needed on our invoices.  Please also refer to the enclosed Information for Clients for specifics regarding fees, disbursements, billing, payment, and termination of our representation should payment not be made or other circumstances warrant.

## Conflicts of Interest

Our representation of the Client does not include acting as counsel for any entity in which the Client holds equity or any subsidiary, affiliate, equityholder, employee, family member or other person (collectively, "Affiliates"), unless such additional representation is separately and clearly undertaken by us.  If in the future we and the Client mutually agree to expand our representation of the Client to include any of the Client's Affiliates, it is agreed that the terms, conditions and consents contained herein will apply to such representation(s).

Perkins Coie represents many other companies, individuals and government agencies ("clients"). During the time we are representing the Client we may be asked to represent:

(1)     other present or future clients in transactions, litigation or other disputes directly adverse to the Client that are not substantially related to our representation of the Client;

(2)     parties who are considered directly adverse parties in matters we handle for the Client. Our work for these directly adverse parties would be in matters that are not substantially related to our work for the Client; and/or

134650702.1

Cryptonomos PTE. Ltd.
March 3, 2017
Page 3

(3)     you in future transactions, litigation or other disputes directly adverse to other firm clients in matters not substantially related to our work for the other firm clients.

We request the Client's consent to allow Perkins to undertake such future representations without the need to obtain any further or separate approval from the Client, as long as those representations described in (1) and (2) above are not substantially related to work Perkins has done, or is doing, for the Client.  Your signature below constitutes the Client's consent to such representation(s).  We agree not to use any proprietary or other confidential nonpublic information concerning the Client acquired by us as a result of our representation of the Client in connection with any litigation or other matter in which we represent a party directly adverse to the Client.

Perkins Coie may need to consult with or secure consent from its other current or prospective clients who are or may become adverse to you in order to clear or address actual or potential conflicts of interest.  You agree and consent that to the extent it is reasonably necessary in such communications, Perkins Coie may disclose to each such current or prospective client the fact that Perkins Coie has or has had an attorney-client relationship with you.

During our representation of the Client, there may be issues that raise questions about our duties under the rules of professional conduct that apply to lawyers.  These might include, *e.g.,* conflict of interest issues, and could even include issues raised because of a dispute between us and a client over the handling of a matter.  Normally when such issues arise we would seek the advice of our Professional Standards Counsel, Loss Prevention partners or Professional Standards Conflicts Attorneys who are experts in such matters.  Consistent with the rulings of courts in many jurisdictions, we consider such consultations to be attorney-client privileged conversations between firm personnel and counsel for the firm.  However, there have been judicial decisions indicating that under some circumstances such conversations involve a conflict of interest between the client and Perkins Coie and that our consultation with Perkins Coie's counsel may not be privileged, unless we either withdraw from the representation of the client or obtain the client's consent to consult on a privileged basis with Perkins Coie's counsel.

We believe that it is in our clients' interests, as well as ours, that in the event legal ethics or professional responsibility issues arise during a representation, we receive expert analysis.  Accordingly, as part of our agreement concerning our representation of the Client, you agree that if we determine in our own discretion during the representation that it is appropriate to consult with our firm counsel (either Perkins Coie's internal counsel or, if we choose, outside counsel) we have your consent to do so on a privileged basis despite any alleged conflict of interest.  You further agree that our continuing to represent you at the time of such consultation shall not

134650702.1

thereby waive or otherwise limit any attorney-client privilege that Perkins Coie has regarding the confidentiality of our communications with our own in-firm or outside counsel. The costs associated with such legal counsel for Perkins Coie will be paid solely by Perkins Coie and will not be charged to you in any way.

## Marketing Materials

The Client agrees that, following public release of information regarding any acquisition, disposition, joint venture, financing, fundraising or other project, transaction, lawsuit or proceeding in which we are involved (a "Project"), we may place a tombstone-style advertisement in newspapers, publications or marketing materials (including our website), in each case at our own expense, which may include the Client's logo and a reference to our representation of the Client in the Project. Such announcements would not disclose dollar amounts or other information about the Client or the Project that the Client had not already publicly released or was otherwise publicly available. The Client further agrees that, subject to the preceding sentence, we may disclose the fact that the Client is a client of the firm, as well as our involvement in any Project, on our web site and marketing materials, provided we do not disclose any confidential information regarding our representation or the Project.

## Conclusion

This letter, along with the enclosed Information for Clients, confirms the terms and conditions on which Perkins Coie LLP will provide legal services to the Client. Unless otherwise agreed in writing, the terms of this letter and the enclosed Information for Clients will also apply to any additional matters that we undertake at the Client's request. If this letter correctly sets forth our understanding, please sign and date a copy of this letter and promptly return it to me. If you have any questions about this letter or generally about our services or bills, please call me at any time. We look forward to working with you and thank you for placing your confidence in Perkins.

Sincerely,

DocuSigned by:

*Lowell Ness*

—77D4623009374B8...

Lowell D. Ness

Enclosure:     Information for Clients

134650702.1

Cryptonomos PTE. Ltd.
March 3, 2017
Page 5


ACCEPTED AND AGREED:

CRYPTONOMOS PTE. LTD.

By: <u>                                              </u>

     DocuSigned by:

     738DD6D6D3234C6...

    Nikolay Evdokimov
    Chief Executive Officer

Date: <u>марта 11, 2017               </u>

134650702.1

# Information for Clients

Perkins Coie LLP is pleased to serve you. The following information explains the terms that apply to our engagements (except to the extent that you have reached a different written understanding with us about particular terms) for legal services provided by Perkins Coie LLP. No changes or additions to these terms will be binding unless confirmed in writing sent by us or signed by us. We encourage you to discuss this information with our lawyers at the inception of a matter and whenever you have questions during the course of that matter. Section headings are for convenience of reference only and not intended to affect the interpretation of the provisions of such sections.

**Personnel.** We generally assign one lawyer primary responsibility for seeing that your requests for legal services are met, but additional lawyers, paralegals and technology professionals may assist in rendering the most appropriate and efficient legal services. We attempt to assign personnel to each matter based on the nature and scope of the issues raised by the matter and our lawyers' experience and expertise.

**Basis for Fees.** We charge for legal services rendered by our firm at applicable hourly rates. Each attorney, paralegal, and other timekeeper records time at assigned billing rates. Because hourly rates vary among personnel, each statement typically reflects a composite of several hourly rates. Those rates are reviewed periodically and change at least annually (usually on January 1) based on economic factors and the changing experience levels of our personnel. Services performed after the effective date of the new rates will be charged at the new rates.

**Disbursements and Other Charges.** In the course of performing legal services for you, various services may be provided by third parties. Examples include messenger and courier charges, filing and recording fees, foreign agent fees, court reporters and transcript costs, expert and other witness fees, discovery vendor costs, charges for outside consultants and research services, and travel expenses. You are responsible for these third-party charges, and we reserve the right to forward their invoices directly to you for payment. For administrative ease, however, we may advance payment to the third-party provider and include the charge on our invoice to you, with no markup for handling. We will retain and not allocate to clients relatively insignificant discounts we receive for prompt payment or volume usage. For patent, trademark and other matters that may involve significant third-party payments, you may be required to maintain a minimum balance in a trust account to fund such payments. You will be advised of any such requirements, and we will not be obligated to request or pay for third-party services not fully covered by such deposits.

We will also charge you for certain internal services we provide in connection with our legal services. As noted below, because we both invest in specialized equipment and commit to long-term contracts with computer research vendors (such as Westlaw) and other vendors, we achieve savings in exchange for guaranteed payment, usage or other obligations undertaken at our risk. This allows us to charge our clients for certain services at rates discounted below standard rates. However, the payments we receive from clients for these services may exceed our total payments to the vendors. This excess is used to partially offset the costs we incur for related equipment and personnel and the risks we assume in entering these contracts.

We currently charge specific internal costs in the following manner:

      1. **Photocopying, Printing, and Facsimile.** In our U.S. offices, clients are charged ten cents per page for photocopying. These charges are higher in our non-U.S. offices. We do not charge for facsimiles sent or received.

      2. **Computer Research.** There is no extra charge to clients for our use of the firm's internal work product retrieval system. Clients are charged for computer-assisted research from outside services, other than many Westlaw Services, at the vendors' standard rates. For many services from Westlaw, our primary outside computer-research source, we are able to charge clients just 37% of Westlaw's standard rates as of 2016 because we committed to a long-term contract with monthly minimum payments. We may occasionally be able to pass along other discounted rates for computer-assisted research from outside sources when we can negotiate volume discounts.

-1-

**3. Telecommunications.** We do not charge for local or long-distance calls or for any email communications. Credit card and cell phone calls necessitated by work on your matters are charged at our actual cost.

**4. Mail/Messengers.** In our larger offices, we may use firm messengers whenever appropriate to shorten delivery times and offer greater flexibility. Charges for such internal messengers are equal to or below rates charged by outside messengers for similar services. We do not charge for regular mail. Bulk mailings, packages, overnight deliveries, and special postal services are charged at our actual cost.

**5. Overtime.** Clients are charged for staff overtime, meals, and transportation only when (a) the client specifically requests after-hours effort or (b) the nature of the work necessitates overtime and such work could not have been done during normal work hours.

**6. Discovery Services and Database Hosting.** Certain matters, particularly large-scale litigation, may require certain discovery and ancillary support services such as data processing, data hosting and certain software solutions that you instruct us to use. In some instances we may be able to reduce costs by contracting with vendors, including discovery and data storage vendors on whose servers and other media your information may be stored, to purchase a quantity of service over time that is beyond the needs of a single client. Because these services require us to incur management and other overhead expenses, we may bill you at a reduced per-unit rate that does not fully reflect the quantity of discounts we ultimately obtain.

**Invoices and Payment.** We typically bill monthly, and payment is due upon receipt of the invoice. Payment of an invoice will reflect your agreement to the amount charged on that invoice, and you must bring any misbilling or other charge that you believe is inappropriate to our attention within 45 days of presentation of the invoice. To the fullest extent permitted by law, you agree that we have an attorneys' lien (including, without limitation, in the results of our services) to secure payment of the obligations owed us and that we may take steps to inform others of any attorneys' lien rights we might have. For accounts not paid within 30 days of the invoice date, we add a late payment charge of 1% per month (or such lower rate as required by applicable law) on unpaid balances from the invoice date. Unless otherwise agreed upon, we may apply payments first to our own attorneys' fees and costs of collection, second to our late charges, third to our invoiced fees, and finally to our invoiced disbursement charges. Our election not to exercise any rights or not to require punctual performance of each provision of this agreement will not be construed as a waiver or relinquishment of our rights. We do not and cannot guarantee the outcome of any matter or particular results, and payment of our fees and disbursements is not conditioned on any particular outcome. If we are required to bring an action or proceeding to collect fees or disbursements due us, we will also be entitled to recover certain fees and costs. These include, but are not limited to, our own outside attorneys' fees, expert witness fees, other costs of collection billed to us, and the value of legal services Perkins Coie's own attorneys perform in analyzing or prosecuting a collection action if such circumstances arise on your account. You consent to venue and jurisdiction wherever we have an office with attorneys who worked on your behalf. Also, if we are required to testify, produce documents, or respond to other requests in connection with litigation or other proceedings commenced by third parties that relate to our representation of you, you will pay us our reasonable fees and costs incurred in connection with such activities. For matters handled by our New York lawyers, the client may have a right to arbitrate fee disputes under Part 137 of the Rules of the Chief Administrator of the New York Supreme Court, Appellate Division.

**Insurance Coverage.** You may have insurance policies relating to a matter for which you engage us that might cover, among other things, reimbursement of attorneys' fees and costs. If coverage is potentially available, including coverage for our fees and costs, your appropriate insurance company must be notified as soon as possible. We can advise you on the availability of insurance coverage only if you expressly and timely request that we do so, we do not have a conflict of interest, and we agree to undertake such additional work. You would then need to furnish us copies of all relevant insurance policies and related documents. Regardless whether, when, and to what the extent insurance coverage might be available to reimburse all or a portion of our fees and costs, you nevertheless remain primarily obligated for amounts owed us, including any late charges that accrue during any delay in payment by others.

**Advance Payments and Estimates.** We may require advance payments before working or continuing work on a matter. Of course, the amount of work we are called upon to perform may subsequently exceed our prior

134650702.1

expectations. Regardless of whether you make an advance payment, you agree that any budget, estimate, or similar range for potential charges is nothing more than a forecast based on then-current assumptions, and any such forecast may be high or low due to changed or unforeseen circumstances. We reserve the right, as a condition of providing additional services, to require an increase in any advance payment.

**Legal Service Provider.** We provide strictly legal services to you in connection with this agreement. You are not relying on us for any services other than legal services, and we are specifically not providing any business, investment, insurance, or accounting advice or any investigation of the character or credit of persons with whom you may be dealing.

**Identity of Client.** You confirm that we are being engaged by you and not any of your subsidiaries, affiliates, equityholders, employees, members of your family, or other persons (collectively, "Affiliates"), unless we separately and explicitly undertake such representation. You also expressly confirm that, as our representation is limited to you and does not include acting as counsel for your Affiliates, we may represent other clients adverse to your Affiliates without disclosing those matters to you or obtaining your consent. If in the future we agreed to expand our representation of you to include one or more of your Affiliates, you, and Affiliate(s), agree that the terms, conditions and consents contained in our engagement letter with you will apply to such representation(s).

**Conflicts of Interest.** We have performed a search of our other clients to determine whether representing you might create a potential conflict of interest with any other clients. That check was done using your name and any other names you gave us. Please inform us immediately if you use other names or have affiliated companies that we should enter into our conflicts system.

**Cooperation/Reliance on Accurate Information.** To enable us to represent you effectively, you will cooperate fully with us in your matter(s). You and your agents will fully and accurately disclose to us all facts and documents that may be relevant to a matter we undertake or which we may otherwise request. This information will form the basis of our legal advice.

**Email Communication Disclaimer.** Many of our legal professionals receive hundreds of email messages per day (in addition to spam). Although email is an efficient method for many communications, it can also be delayed in transit or otherwise missed (e.g., blocked by our anti-spam software). If you have not received a response or acknowledgement of receipt of an email, please notify the intended recipient.

**Termination of Services.** We retain the right to cease performing legal services and to terminate our legal representation for any reason consistent with ethical rules, including conflicts of interest or your failure to pay our legal fees and expenses when due. Our representation in any matter will also cease on completion of our work on that matter unless you ask us to perform additional work that we agree to undertake. Performing additional services for you on the same or any other matter is subject to these terms and conditions, our mutual concurrence and clearance of conflicts, if any. We are unable to assure you that matters for other clients will not conflict us out of additional matters you might later ask us to undertake. On completion of a matter, we may close our files and, absent a specific written undertaking to do so, will not thereafter be obligated to docket milestones, make additional or continuation filings, pursue appeals, take other steps on your behalf on the matter, or monitor or advise you with respect to changes in the law or circumstances that might bear upon or adversely affect the completed matter. If you wish to have us return material from your files after the conclusion of a particular matter, we will provide you such material at your request and expense. Some of our practice groups consider our electronic records to be the official client file. Thus, requests for copies of client files may be provided in electronic form only. We will have no obligation to retain client files more than one year after the conclusion of a particular matter or our representation. Our representation of you will be deemed concluded at the time that we have rendered our final bill for services on the matter described in our engagement letter or any such additional matters that are clearly undertaken by us. Whether we will undertake any further matters and form an attorney-client relationship again will depend upon your request, our performance of a conflicts check and our expression to you of our willingness to accept any further matters.

**Alliances/Other Counsel.** Many of our clients also have international or other legal needs we cannot fulfill. This causes us from time to time to establish ongoing working relationships or strategic alliances with law firms in other jurisdictions. While our close relationships with our legal colleagues at these firms have helped us provide

134650702.1

coordinated representation for many of our clients, these firms (and other firms we may recommend to our clients) are separate from and independent of Perkins Coie. We do not share personnel or fees, do not have common operations beyond occasional joint seminars and presentations, and must check any other firm's conflicts of interest before that firm's lawyers may jointly represent any of our clients. Under rules in certain jurisdictions where we practice, we must advise you that you may consult independent counsel to advise you regarding these documents governing our relationship, and we encourage you to do so if you like. Also, you retain the right to consult with independent counsel at any time while we represent you. However, we are not responsible for any advice an independent counsel may give you, and such consultation will be entirely at your expense.

**Questions.** We endeavor to deliver legal services effectively and efficiently and to render accurate and understandable billings. Please direct any questions about services or billing practices to your client service lawyer. Questions regarding the billing or payment status of your account may also be directed to the Client Accounting Department in our Seattle office at 1-800-261-3143 (206-359-3143 in the Seattle area).

# EXHIBIT B



Giga Watt

Token Launch White Paper

May 2017

134834324.1

# Table of Contents

Legal Disclaimer.................................................................. 3
Token Launch Summary...................................................... 4
Overview of the Giga Watt Project..................................... 5
    Substance of the Giga Watt Project............................... 5
    Project History................................................................ 6
    Giga Watt's Pricing....................................................... 6
    Market Overview........................................................... 8
    Giga Watt Technology.................................................... 9
Token Launch Details............................................................ 12
    Token Launch Overview................................................ 12
    Token Launch Platform.................................................. 16
    WTT Smart Contract..................................................... 16
    Payment Terms............................................................. 17
    Distribution and Rates.................................................. 19
Projected Timeline................................................................ 20
Team....................................................................................... 22
    Giga Watt Project Team................................................ 22
    Cryptonomos Token Launch Team.............................. 23
Risk Factors........................................................................... 25

134834324.1

Exhibit B, Page 2 of 29
20-80031-FPC    Doc 115-2    Filed 09/26/22    Entered 09/26/22 19:23:41    Pg 56 of 92
GWSEC00000004

# Legal Disclaimer

The purpose of this White Paper is to present the Giga Watt project to potential token holders in connection with the proposed Token Launch. The information set forth below may not be exhaustive and does not imply any elements of a contractual relationship. Its sole purpose is to provide relevant and reasonable information to potential token holders in order for them to determine whether to undertake a thorough analysis of the company with the intent of acquiring WTT tokens.

Nothing in this White Paper shall be deemed to constitute a prospectus of any sort or a solicitation for investment, nor does it in any way pertain to an offering or a solicitation of an offer to buy any securities in any jurisdiction. This document is not composed in accordance with, and is not subject to, laws or regulations of any jurisdiction which are designed to protect investors.

Certain statements, estimates and financial information contained in this White Paper constitute forward-looking statements or information. Such forward-looking statements or information involve known and unknown risks and uncertainties which may cause actual events or results to differ materially from the estimates or the results implied or expressed in such forward-looking statements.

This English language White Paper is the primary official source of information about the WTT Token Launch. The information contained herein may from time to time be translated into other languages or used in the course of written or verbal communications with existing and prospective customers, partners etc. In the course of such translation or communication some of the information contained herein may be lost, corrupted, or misrepresented. The accuracy of such alternative communications cannot be guaranteed. In the event of any conflicts or inconsistencies between such translations and communications and this official English language White Paper, the provisions of this English language original document shall prevail.

134834324.1

3

# Token Launch Summary

**WTT token** is an Ethereum token representing the right to use the Giga Watt processing center's capacity, rent-free for 50 years, to accommodate 1 Watt's worth of mining equipment power consumption.

**Token Launch** means the initial sale to the public of WTT tokens.

**Token Issue** means a release of a specific batch of WTT tokens.

Tokens will be offered for 60 days starting on June 2, 2017 and ending on July 31, 2017.

The offering will be open to the public globally.

| | |
|---|---|
| Token Sale Volume: | 30 million WTT |
| Token Issue Volume: | 34.5 million WTT [1] |
| Distribution of Tokens: | For every 100 tokens sold in this offering 15 additional tokens will be issued and retained for the team members, partners and advisors [2] |
| Token Price at Issue: | Equivalent of USD 1-1.2, depending on the date of the acquisition |
| Website link: | https://cryptonomos.com/wtt/ |
| Accepted forms of payment: | Bitcoin ("BTC"), Ether ("ETH"), wire transfer |
| Presale Start Date: Presale End Date: | May 19, 2017, 12:00 PM PDT June 2, 2017, 12:00 PM PDT |
| Token Launch Start Date: Token Launch End Date: | June 2, 2017, 12:00 PM PDT July 31, 2017, 12:00 PM PDT |
| Initial Token Issue Date: | August 7, 2017, 12:00PM PDT |

---

[1] The WTT tokens will only be issued based on actual existing facility capacity. More WTT tokens will be issued as the facility capacity is increased through future build outs.

[2] See Section 'Distribution and Rates' for details.

4

134834324.1

GWSEC00000006

# Overview of the Giga Watt Project

## Substance of the Giga Watt Project

The Giga Watt Project is built in partnership between Giga Watt, Inc. a U.S. company ("Giga Watt" or "Company"), which offers mining hosting services at its Wenatchee, WA facilities, and GigaWatt Pte. Ltd., a Singapore company ("Partner"), which sells mining equipment to customers worldwide.

Giga Watt is a full-service mining solution provider. Giga Watt offers turnkey mining services or custom packages tailored to clients' needs: full range of mining services from hosting, maintenance and repair to private blockchain servicing. The Partner offers equipment sales through Giga Watt's web site[3].

Giga Watt's standard turnkey solution includes purchase and delivery of mining equipment through its Partner with its subsequent setup and hosting at Giga Watt's facilities in Wenatchee, WA, with hosting fees starting as low as 7.5 USD cents/kW/hour[4], zero setup fees (for equipment purchased through its Partner) and uniquely low minimum facility entrance threshold of 1 miner of any model.

Giga Watt can host a wide range of mining equipment models commonly used by miners; many popular models are offered for sale by its Partner.

Giga Watt also offers a variety of custom packages and services, so that clients who own their mining equipment, including the models not distributed by Giga Watt's Partner, can still host it at Giga Watt's facility: Giga Watt can accommodate any ASIC or GPU-based miners[5].

Giga Watt mines all scalable cryptocurrencies. The decision on what currency to mine is made by the customers who own the mining equipment. However, at this stage it is technically impossible for Giga Watt to offer all available options to retail customers. Currently, retail customers can mine only BTC, ETH, and LTC[6].

Your choice of equipment also determines which mining pool you can use. The following three pools are available to Giga Watt's clients: Slush Pool to mine bitcoins, NanoPool for Ethereum and LitecoinPool for LTC[7].

---

[3] The sales and delivery of equipment is offered through the Partner's sales module on Giga Watt's web site .

[4] See details in Giga Watt's Pricing section below.

[5] ASIC-based miners are used to mine bitcoin or litecoin, GPU-based equipment is used to mine other altcoins.

[6] Giga Watt is working on expanding this list of currencies in the future.

[7] List of mining pools may be revised in the future.

5

134834324.1

A miner is a piece of equipment operating 24/7 under extremely high load, so failures and breakdowns are quite common. Miners have to be shipped to service centers for repairs, which takes time, especially if a service center is located abroad, and every day of downtime means a loss of mining profit. Giga Watt's on-site service center minimizes the downtime (93.5% minimum uptime), thereby achieving more efficient mining.

Although it is common practice in the industry not to disclose the details of mining facilities, including their locations, in order to preserve trade secrets and shut competitors out of inexpensive power locations, Giga Watt believes in complete transparency. Years of experience in the mining business demonstrate that running a competitive company takes more than the ability to copy. This is why every two weeks Giga Watt welcomes visitors to its Open House in Wenatchee to personally tour the mining facility.


## Project History

In 2010, a software engineer and 10-year veteran startup entrepreneur Dave Carlson first came across Bitcoin. He's been innovating in the space ever since. In 2012 he founded MegaBigPower with the goal of building the world's first megawatt-scale Bitcoin mining center and identifying the key design parameters required to successfully scale up the business of Blockchain transaction processing. Soon it became one of the largest single-operator mines in the world.

Now, MegaBigPower has re-branded as Giga Watt, which completed the construction of 3 mining facilities designed by the original MegaBigPower team and built under their supervision (250kW, 1MW and 1MW). The opportunity to use these facilities is now being offered for tokenization. All three facilities are in operation and mostly rented out (actual numbers are placed and updated regularly here - https://cryptonomos.com/wtt/#/capacity). Giga Watt continues to build new units with its own resources[8].


## Giga Watt's Pricing

Giga Watt's pricing structure for standard turnkey solution consists of a one-time charge for the purchase of miners and daily charges for hosting services, which include:
- effective electricity cost;
- maintenance fee; and

---

[8] See details in the Timeline Section. Tokens are issued only when new processing center capacity becomes available for the use of the token holders.

6

134834324.1

- facility rental fee.

**Miners Purchase:**

Four models of mining equipment[9] are currently available for purchase through Giga-Watt.com:

|  | ASIC miner S9 (PSU included) | ASIC miner T9 (PSU included) | ASIC miner L3+ (PSU included) | PandaMiner B3 Plus (PSU included) |
|---|---|---|---|---|
| Cryptocurrency mined | Bitcoin | Bitcoin | Litecoin | Ethereum |
| Hash Rate | 13,5TH/s | 12.5 TH/s | 504 MH/s | 237 MH/s |
| Power Consumption | 1,323W +10% | 1,576W +7% | 800W +10% | 1,250W + 10% |
| Chip | 16nm | 16nm | BM1485 | RX470 |

Current prices and specifications are regularly published and updated at https://giga-watt.com/promo/prices.

**Hosting fees[10]:**

|  | Small Starter up to 9 miners | Medium Self-Miner 10-49 miners | Large Small Facility 50-99 miners | X-Large Mining Farm 100 miners and more |
|---|---|---|---|---|
| **Hosting fee, hour** | ¢9.75 kW/h | ¢9 kW/h | ¢8.25 kW/h | ¢7.5 kW/h |
| Electricity | 2.80 | 2.80 | 2.80 | 2.80 |
| Maintenance | 0.50 | 0.50 | 0.50 | 0.50 |
| Facility rent | 6.45 | 5.70 | 4.95 | 4.20 |
| **Hosting fee, day** | ¢0.23 W/day | ¢0.22 W/day | ¢0.2 W/day | ¢0.18 W/day |
| Electricity | 0.067 | 0.067 | 0.067 | 0.067 |
| Maintenance | 0.012 | 0.012 | 0.012 | 0.012 |
| Facility rent | 0.155 | 0.137 | 0.119 | 0.101 |

---

[9] The list of models may be revised in the future. Equipment's description may be revised at any time to reflect the manufacturer's specifications.
[10] Hosting fees may be revised in the future.

7

134834324.1

Payments for hosting services (electricity, maintenance, rental fees) are deducted daily from the mining rewards. Giga Watt does not charge any fees for transfers and withdrawals of funds; however, third parties may charge fees to transfer funds or withdraw them from the account on Giga Watt's platform).

Clients who have their own mining equipment can host it at Giga Watt at the same hosting prices, with the only difference of paying the following setup fees: USD 20 per ASIC-based miner, USD 40 per GPU-based miner[11].

Giga Watt's service center also provides an add-on paid option of emergency equipment repairs. The cost of service depends on the nature of performed repairs.

## Market Overview

Generally, only four options exist on the market for cryptomining. These are: (i) to operate miners from home; (ii) to use cloud mining; (iii) to host your own miners at third-party hosting facilities; or (iiii) to build proprietary mining facilities. The first two options are intended for private party mining, and the latter two are designed for businesses. Now, however, through its low fees and extremely low minimum entrance threshold, Giga Watt is able to offer a fifth option: competitive services which could be used not only by the clients of hosting companies but also serve as an alternative to home mining, cloud mining and self-built facilities.

| | Min number of miners | Max number of miners | Electricity cost | Maintenance + rental fee | Min setup costs |
|---|---|---|---|---|---|
| Home mining | 1 | 5 | 9.4 ¢/kW on average | 0 ¢/kW | $ 0 |
| Cloud mining | 0.015 | 10,000 | 9.9 ¢/kW and up | | 30% |
| 3rd party hosting | 100 | 250 | 3.0 ¢/kW and up | 6.0 ¢/kW and up | $ 2,000 |
| Self-built farm | 5,000 | ∞ | 2.8 ¢/kW and up | 2.0 ¢/kW and up | $ 3,000,000 |
| Giga Watt | 1 | 70,000 | 2.8 ¢/kW | 4.7 ¢/kW and up | $ 0 |

---

[11] Setup fees may be revised in the future.

8

134834324.1

Aside from the numbers, home mining is both expensive and demanding: it requires the owner's constant attention, and miners are quite noisy, which many find objectionable. Cloud mining is extremely opaque: As a rule, users have no knowledge of their equipment's brand name, model number, serial number, power efficiency and consumption, breakdown of costs, mining pool name or even the location of the facility. Self-built farms require experts and full-fledged business operations, which is risky: any mistake may cost millions. Third-party hosting provides a viable alternative but there is currently a dire shortage of these services: the demand greatly exceeds the supply.

What's more, effective electricity cost offered by Giga Watt is currently among the lowest feasible, and even taken together with other fees it is still comparable to average electricity rates worldwide.



*Electricity rates worldwide (USD cents per kW/h)*

All of this makes Giga Watt's expansion extremely timely and relevant.

## Giga Watt Technology

In the past 4 years, Giga Watt's team built 5 air-cooled mining facilities. This experience gave them the expertise to select, build and employ the best technologies for mining. From their experience Dave Carlson and his team discovered that large monolithic processing centers are not optimal for mining.

9

134834324.1

## ⊟ Large monolithic facility

– Active cooling uses up to 33% of a facility's available power

– Demands immense mechanical equipment

– Cooling, backup power and switchgear systems increase project costs fivefold

## ⊕ Compact high-density facilities

+ Shortest air flow distance saves power and cools efficiently

+ Utilizes readily available electrical transformers and switchgear

+ Minimum costs and progressive revenue earning during construction

The latest technology embodying this knowledge at Giga Watt's facility in Wenatchee, WA is the proprietary Giga Pods solution which takes advantage of the mining hardware's extremely high power density, avoids active cooling consumption, and saves power for high-efficiency mining, thus minimizing costs in every aspect of mining operations. Giga Pods can accommodate any type of miners. This model will be the cornerstone of Giga Watt's expansion[12].

Giga Watt's distinctive infrastructure consists of numerous autonomous units. This approach offers flexibility in the processing center's design and record-fast expansion of its capacity. It also minimizes construction costs and allows to utilize first units while new units are being built.

The final Giga Pod model will be completed before the end of the Token Launch. Status of the construction can be checked here - https://cryptonomos.com/wtt/#/capacity.



---

[12] Actual dimensions, processing power and other characteristics may vary slightly.

134834324.1

10



*Size: 12'x48'*
*Independent fiber-optic Internet connection*

High-pressure fans constantly circulate fresh air through the pod. Filtered air intakes are positioned on one side, with exhaust fans on the other. Rain and snow "fallout area" provides cool shade at intake. Shade placement of transformers ensures higher efficiency and better longevity.

Single "mining wall" inside the pod ensures cool air circulation around miners. All heat-producing equipment is arranged next to exhaust fans.

Grass-covered campus reduces dust, cutting down on intake filters maintenance costs. Arrangement of Pods with exhaust fans facing each other ("hot aisle-cold aisle"), in-line with prevailing wind air currents, clears warm air efficiently. Network autonomy minimizes outage risks for the entire operation.

Minimum processing power of each Giga Pod is 750 kW. Processing power depends on the equipment each Pod is designed to accommodate. A Pod designed to accommodate bitcoin miners and GPUs[13] or only GPUs can have minimum processing power. A Pod designed to accommodate only bitcoin miners can house up to 1.75 MW, but requires more vents and heavier-duty inside wiring and equipment, which will proportionally increase the construction costs.

The choice of the required processing power is determined by the market demand. Giga Watt's team chooses the most suitable Pod outfit option based on the agreements with its current and potential customers and their equipment hosting needs.

---

[13] GPU is a graphics processing unit which can be used to mine Ethereum and certain other cryptocurrencies.

134834324.1

GWSEC00000013

# Token Launch Details

## Token Launch Overview

Our goal is to offer the token holders access to both an exciting new world of technology and the cryptocurrency mining business. Generally, mining turnover is comprised of three components: (i) electricity cost; (ii) mining hosting cost; and (iii) mining net profits. Net profits can vary greatly depending on mining equipment, while costs are constant and predictable and consume the lion's share of the potential profits.



*This infographic is an example based on the calculations from April 28, 2017. The numbers may vary significantly due to the rate fluctuations, mining difficulty increase, and other factors.*

Under the existing partnership arrangements between Giga Watt and its Partner, the Partner is offered access to Giga Watt's facility at an unprecedentedly low hosting rate, which significantly increases mining rewards. Now, through the tokenization process, this low hosting rate can be passed to all token holders.

**Each Giga Watt Project Token (WTT)** represents the right to use the Giga Watt processing center's capacity, rent-free for 50 years, to accommodate 1 Watt's worth of mining equipment power consumption. So to provision and use your mining equipment rent-free, you will need to purchase the number of tokens equal to your equipment's power consumption:

|  | ASIC miner S9 (PSU included) | ASIC miner T9 (PSU included) | ASIC miner L3+ (PSU included) | PandaMiner B3 Plus (PSU included) |
|---|---|---|---|---|
| Power Consumption | 1,323W +10% | 1,576W +7% | 800W +10% | 1,250W + 10% |

Token owners can use this capacity to accommodate their own miners or to rent it out to other users. Essentially, this is access to professional mining – with an extraordinarily low

134834324.1

12

entrance threshold. In fact, it could be compared to membership in an elite private mining club.



1 token is 1 Watt is 1 USD

Giga Watt's hosting fee typically consists of effective electricity cost, maintenance fee and rental fee. Token owners pay zero rent, which drastically reduces their ongoing costs: their hosting fee is comprised only of effective electricity cost and maintenance fee.

| Miners | Hosting Fee, cents/kW/h | | Saving |
|---|---|---|---|
| | Standard | For WTT Holder | |
| 100+ | 7.50 | 3.30 | 56.00% |
| 50-99 | 8.25 | 3.30 | 60.00% |
| 10-49 | 9.00 | 3.30 | 63.33% |
| 1-9 | 9.75 | 3.30 | 66.15% |

To be used, tokens should be deposited in the token holder's account with Partner placed on Giga Watt's website[14]. When token holders buy miners from the Partner through Giga Watt's website, miners available to them will be automatically displayed in their accounts and matched with their tokens. If at the time of token purchase a token holder already owns miners, they can be matched with tokens manually[15].

Token holders can also rent out their extra tokens if they have more tokens than they need to accommodate their miners.

---

[14] Token holders manage their tokens through the Partner's token holder account module on Giga Watt's web site.

[15] Please contact the support team for manual matching.

13

134834324.1

**Renting Tokens**

Token holders who are not personally interested in mining or have spare tokens can rent them out via the Partner's rental module on Giga Watt's web-site[16], choosing one of the rental fees set by Giga Watt. Token rental fees are the same as the Giga Watt's facility rental fees, which are 4.20, 4.95, 5.7 and 6.45 US cents/kW/h, depending on the number of miners hosted (see Section "Giga Watt's pricing"). It translates into daily rental income of ¢0.1-0.15 per token (¢37-57 per year).

To take advantage of this option, Giga Watt's clients who do not have their own tokens and token holders who need additional tokens or have spare tokens, place orders seeking or offering tokens for rent on the Partner's rental module on Giga Watt's website. Each order specifies the number of tokens, the rental fee which the token holder is looking to receive or which the client has to pay according to the applicable pricing plan. Token holders and clients can view the lists of these orders, sorted by their value to the viewer, and choose a suitable option or place their own order.

After the completion of the Token Launch, hosting of miners will only be available to retail clients through tokens. Consequently, the clients who do not own tokens will have to rent them from their owners. Customers who had their miners hosted with Giga Watt before the start of the Token Launch will continue to be served. Their hosting fees will cover the rental fees for token holders who rent out their tokens. However, after the end of their miners' lifecycle they will be able to host their new miners with Giga Watt only if at that time there are token holders willing to rent out sufficient number of tokens.

Rental fees are deducted from their mining rewards daily and paid to the token holder via a third party splitter. Giga Watt and Partner do not charge any fees for the use of the rental module; however, third parties may charge fees to transfer funds or to withdraw them from the token holder's account on Giga Watt's web-site.

There is currently a dire shortage of mining hosting services: the demand greatly exceeds the supply. Furthermore Giga Watt's pricing packages are suitable for technology companies,

---

[16] The matching of token holders' and Giga Watt's clients' orders for tokens offered or sought for rent is offered through the Partner's token rental module on Giga Watt's website.

14

134834324.1

mining farms, cloud-mining projects, and even individual miners. All of this makes Giga Watt extremely timely, relevant, and attractive to potential renters of tokens.

**Access to capacities**

WTT can be used **from the very first date of issue**. Giga Watt facility's unique design allows for record-fast expansion, and the first units can be operated while the new ones are still being built.

Each Watt of capacity of each unit in operation is an opportunity to accommodate miners of token holders. Each Watt of capacity which is already rented out to the client who has no tokens of his own is an opportunity to rent tokens out.

Currently, all three existing facilities are in operation and mostly rented out. Status of the construction and the capacity utilization can be checked here - https://cryptonomos.com/wtt/#/capacity.

First batch of tokens of 5,400,000 WTT (which represents 5.4 MW capacity of the units put into operation by the end of the Token Launch) will be issued immediately following the end of the Token Launch. New batches of tokens will be issued in step with the construction of new units. Tokens will be distributed on the first come, first served basis.

**Summary**

To sum up, the purchase of access to a hosting capacity with a lower hosting rate allows you to significantly reduce the cost of your mining business, thereby increasing mining rewards, offers more flexibility and helps balance out the mining risks: hosting capacity can be rented out at any time, and rental income is much less affected by the cryptocurrency volatility. Additionally, Giga Watt facility has a 50-year lifecycle (compared to 2.5 years for miners, due to constant increase in mining difficulty) and is suitable for any Blockchain. If any significant changes occur in the mining world, Giga Watt capacities could alternatively be used to set up private Blockchains.

Expected lifespan of WTT tokens is 50 years. This term is based on the expected lifespan of the Giga Watt's facilities.

134834324.1

## Token Launch Platform

Token Launch is conducted through a groundbreaking Cryptonomos platform.

All payments for WTT tokens will be collected by Cryptonomos. Upon the completion of the Token Launch, on August 7, 2017, Cryptonomos will issue and distribute its initial batch of WTT tokens, with subsequent batch issues to follow upon the completion of new capacity construction. If a cap of 30,000,000 WTT tokens sold is reached before the scheduled end of the Token Launch, Cryptonomos at its own discretion may issue WTT tokens ahead of the specified date to provide access to the facilities built by that time.

## WTT Smart Contract

WTT is an Ethereum token. It complies with and extends ERC-20 - a de-facto standard and widely used token API. WTT Smart Contract guarantees:

**1. Transparency**

    **1.1. Balance.** The information on the number of tokens held by any user is public.

    **1.2. Transfers.** All information on transfers is public and can be traced back in time.

**2. Ownership**

    **2.1 Scope.** Only Ethereum users and contracts can be token holders.

    **2.2. Uniqueness.** Each token belongs to one user-owner. There are no shared tokens.

    **2.3. Right to transfer.** A token can be transferred to another user only by the direct command of its owner or by the command of the receiver directly authorized by the owner. No token transfer may be initiated by another user.

**3. Token Supply**

    **3.1. Exclusive issue.** Only one user, the contract owner, can issue tokens.

**4. Contract Management**

134834324.1

16

GWSEC00000018

**4.1 Replacement.** The contract owner can relinquish the ownership in favor of any other Ethereum user or contract.

**4.2 Blockade.** The contract owner can stop or resume token transfers between token holders at any time.

## 5. Miscellaneous

**5.1 Recovery.** Any call to the contract which results in an error does not change the users' tokens or Ether balance, except for the gas spent on the transaction.

**5.2 Limits.** Maximum allowed tokens in circulation and may be set and are limited to.

Smart contract does not guarantee the following ("Uncertainty Provisions"):

**1. User validity.** An account with positive token balance may or may not be a real Ethereum user or contract and therefore may not have a private key. Tokens transferred to such users will likely be lost.

**2. Ether supply.** The contract prohibits most, but not all means by which Ether could be sent to it by users who are not contract owners.

We engage independent auditors prominent in the industry, who review the smart contract code line by line, checking for any security, incentivization or other concerns regarding the attack surface.

## Payment Terms

WTT tokens will be available for purchase on pre-sale starting on May 19, 2017 and during the Token Launch from June 2, 2017 to July 31, 2017, unless a cap of 30,000,000 WTT tokens sold is reached earlier.

134834324.1

WTT can be acquired with BTC, ETH or fiat currencies via Cryptonomos platform. Transfers can be made from any BTC or ETH wallet[17]. For transfers of USD 1,000 and over a wire transfer option is available[18].

Funds are credited to the participants' Cryptonomos accounts and could be used to acquire tokens. Each account will have three wallets (USD/BTC/ETH). The minimum Token Launch entry threshold is 1 WTT (equals to 1-1.2 USD, depending on the day of acquisition). The minimum entry threshold for the pre-sale is 10,000 WTT tokens (equivalent of 10,000 USD).

Cryptonomos accounts will be accessible several days before the start of the Token Launch (web-based or mobile access). Users may be offered an option to sign up and make transfers to their Cryptonomos accounts, but they will not be able to acquire WTT tokens until the start of the Token Launch unless they purchase WTT Token on pre-sale through the sales team. Accounts will be protected from unauthorized access by a two-factor authentication system.

All funds collected through the pre-sale and Token Launch will be deposited in escrow. Original payments made in BTC and ETH will be converted to USD at the rate effective at the time when the rights to WTT tokens were reserved.

The funds will be released from escrow in step with the completion of facilities.

Once the Token Launch is closed, no further WTT tokens could be acquired. On August 7, 2017 or earlier, as described above[19], the first batch of tokens will be issued to participants[20]. As soon as the tokens are issued, they may be transferred to the owner's account on Giga Watt's web-site and used to host miners or to be rented out.

Giga Watt account owners get their mining rewards and rental income in BTC, ETH, or LTC (rental income is calculated based on the current exchange rate of BTC, ETH, or LTC to USD). Funds can be moved from the token holder's account to any third party BTC/ETH/LTC wallet at any time.

---

[17] Cryptonomos does not charge any processing fees. Processing time and fees are determined by the payment processor. Token holders are responsible for paying all processing fees and financial charges imposed by the payment processor in connection with the payment.
[18] Please contact the support team for wire transfer instructions.
[19] See Section "Token Launch Platform" for details.
[20] Please see the Projected Timeline section for details of the token issue batches.

18

134834324.1

## Distribution and Rates

The Giga Watt facility layout is extremely flexible, which allows us to be flexible with the token sales.

There is no minimum amount: the first facilities have already been completed and the new units are currently being built. Consequently, the tokens can be issued for as low capacity as required. However, the total number of tokens available for sale as Giga Watt builds out additional capacities is capped at 30 million.

Each token represents 1 Watt's worth of the processing center's capacity. For every 100 tokens sold, 15 additional tokens will be issued and retained for the team, partners and advisors: 10 tokens to be distributed to team members, and 5 to be retained for distribution to partners and advisors at issuer's discretion. Consequently, for every 100 tokens sold, 115 Watts of processing center capacity is put into operation.

If the token sale is over-subscribed, meaning that there is more demand for WTT tokens than there is existing facility capacity, the capacity will be allocated to the WTT tokens in the order in which the WTT tokens were purchased. The over-subscribed proceeds will be placed into escrow until the requisite processing center capacity has been built out.[21]

WTT tokens retained for distribution to the team will be distributed only when no proceeds from over-subscribed tokens remain in escrow awaiting the completion of additional processing center capacity construction. WTT tokens retained for distribution to partners and advisors will be distributed on a case by case basis.

WTT initial rate depends on the day of acquisition:

| | |
|---|---|
| $1.00 | Weeks 1-2 |
| $1.05 | Weeks 3-4 |
| $1.10 | Weeks 5-6 |
| $1.15 | Weeks 7-8 |
| $1.20 | Week 9 |

---

[21] If the construction of the processing center capacity designed to accommodate additional WTT tokens is not completed in a reasonable amount of time, the relevant portion of these proceeds will be refunded to the WTT token purchasers. However, if Giga Watt discharged all its obligations in full, no refunds will be due to the WTT token purchasers.

134834324.1

19

GWSEC00000021

# Projected Timeline

The size of the Giga Watt facility depends on the amount of available funds. The Giga Watt project has sufficient commitments for land and electricity to build additional capacities to fulfil its obligations under this Token Launch.

**Projected Token Launch Timeline**

- May 19 – June 2, 2017: pre-sale

- June 2 – July 31, 2017: Token Launch book building

- August 7, 2017: First batch of tokens (5,400,000 WTT) issued to participants; if the cap is reached earlier, the first batch of WTT tokens may be issued ahead of the schedule to provide access to the facilities built by the time of the issue (at Cryptonomos' discretion).

*New batches of tokens will be issued in step with the construction of new facilities.*[22] *To ensure the advantage for the Token Launch participants, no listing will be placed on third party exchanges until all WTT tokens sold through the Token Launch are distributed.*

**Projected Construction Timeline**

3 units, 2.25 MW are available right now

- July 15, 2017: 1 Giga Pod completed, 0.75 MW

- August 1, 2017: 2 Giga Pods completed, 2.4MW

- August 15, 2017: Expansion of the unit, 0.9 MW

- September 1, 2017: 3 Giga Pods completed, 4.5 MW

- September 15, 2017: 9 Giga Pods completed, 15 MW

---

[22] Additional WTT tokens may be sold to the public in the future as the facility capacity is increased through build outs.

134834324.1

20-80031-FPC    Doc 115-2    Filed 09/26/22    Entered 09/26/22 19:23:41    Pg 74 of 92

GWSEC00000022

- October 1, 2017: 3 Giga Pods completed, 4.5 MW

- November 15, 2017: 3 Giga Pods completed, 4.2 MW

134834324.1

# Team

## Giga Watt Project Team

- Dave Carlson

  CEO, Giga Watt, Inc.

Software engineer and entrepreneur. 4 years as a CEO and founder of MegaBigPower, one of the largest single-operator mining facilities in the world.

- Adam West

  VP Business Development, Director, Operator-Partner Program, Giga Watt, Inc.

10 years' experience in business development, management and marketing. Over the past year focused on Blockchain technologies, with the emphasis on industrial mining projects.

- Kyle Sidles

  CTO, Giga Watt, Inc.

Database design, programming, network infrastructure and application deployment. Successfully built and launched over 200 diverse software projects in USA, India, and China. Builds and runs large-scale Blockchain data centers since 2013.

- Jeffrey Field

  Lead Engineer, Giga Watt, Inc.

4 years' experience designing the physical infrastructure for mining facilities, network layouts, and cooling plans while managing technical crews for all aspects of installation and maintenance at the MegaBigPower facilities.

- Brian Armstrong

  Operations Supervisor, Giga Watt, Inc.

Service and maintenance of mining equipment, training new personnel, team supervision on assigned operational tasks, troubleshooting and repair of network systems. 8 years' experience in the U. S. Air Force as a security expert.

22

134834324.1

GWSEC00000024

- Sinden Harum

Executive Manager, Giga Watt, Inc.

Day to day operational responsibility for staff, office administration, payroll, human resources, bookkeeping, accounting, core programs, special programs.

- Michael Savuskan

CEO, GigaWatt Pte. Ltd.

24 years' experience in product, technology, and business development, marketing, planning, and sales management. Sales and profit growth, new business launches, and domestic and international marketplace assessments.

- Hayden Gill

VP of Sales, GigaWatt Pte. Ltd.

13 years' experience in investment, marketing, and alternative currencies. From 2010 focuses on bitcoin and blockchain technologies. Founder of successful projects in peer-to-peer payment services and alternative currencies.


## Cryptonomos Token Launch Team

- Nick Evdokimov, CEO

14 years' experience in developing high load online services. Founder of numerous Internet enterprises. 2 years in Blockchain development.

- Dmitry Khovratovich, Smart Contract Development

12 years' experience, with a focus on privacy and security of blockchain projects (Bitcoin, Ethereum), design and analysis of cryptographic schemes, and security software engineering. Security Researcher at the University of Luxembourg.

- Andrew Kuzenny, Head of IR

134834324.1

18 years' experience in investor relations, seeking and engaging partners, asset management. A recent Blockchain technologies enthusiast.

- Edward Khaptakhaev, Legal Counsel

12 years' experience in legal support of international and domestic companies engaged in energy generation, banking and IT/IP.

- Leonid Markin, Financial management

12 years' experience in finances and asset management. 5 years in finances in the high-tech engineering segment of the energy field. Fintech entrepreneur.

- Daria Generalova, Communications and PR

10 years in public communications. Diverse experience in marketing, from event management to marketing strategy development, with a focus on infrastructure companies. Joined blockchain industry last year.

- Anar Babaev, Digital Marketing

14 years in digital marketing. Internet entrepreneur focused on mastering and implementation of new technologies. Co-author of several books on digital advertising.

134834324.1

# Risk Factors

The acquisition of Tokens involves a high degree of risk, including but not limited to the risks described below. Before acquiring tokens, it is recommended that each participant carefully weighs all the information and risks detailed in this White Paper, and, specifically, the following risk factors.

## A. Dependence on computer infrastructure

Giga Watt's dependence on functioning software applications, computer hardware and the Internet implies that Giga Watt can offer no assurances that a system failure would not adversely affect the performance of your mining operations. Despite Giga Watt's implementation of all reasonable network security measures, its processing center servers are vulnerable to computer viruses, physical or electronic break-ins or other disruptions of a similar nature. Computer viruses, break-ins or other disruptions caused by third parties may result in interruption, delay or suspension of services.

## B. Smart contract limitations

Smart contract technology is still in its early stages of development, and its application is of experimental nature. This may carry significant operational, technological, regulatory, reputational and financial risks. Consequently, although the audit conducted by independent third party increases the level of security, reliability, and accuracy, this audit cannot serve as any form of warranty, including any expressed or implied warranty that the WTT Smart Contract is fit for purpose or that it contains no flaws, vulnerabilities or issues which could cause technical problems or the complete loss of WTT tokens.

## C. Regulatory risks

The Blockchain technology, including but not limited to the issue of tokens, may be a new concept in some jurisdictions, which may then apply existing regulations or introduce new regulations regarding Blockchain technology-based applications, and such regulations may conflict with the current WTT Smart Contract setup. This may result in substantial modifications of the WTT Smart Contract, including but not limited to its termination and the loss of WTT tokens.

## D. Price of Bitcoin

134834324.1

Giga Watt offers services to companies and individuals engaged in mining cryptocurrencies, primarily Bitcoin. Such operations are highly dependent on Bitcoin prices at local exchanges. Sharp and protracted decline in Bitcoin prices can affect the ability of Giga Watt's customers to fulfill their contractual obligations to pay rental fees to token holders whose tokens they rent.

**E. Rapid changes in technology may adversely affect mining business**

Cryptocurrency mining is a very dynamic and fast-paced business. To remain competitive, Giga Watt will use its best efforts to follow and promptly introduce the latest technologies at its facility. However, Giga Watt's failure to remain competitive despite its endeavors may pose the risk of declining benefits for the WTT token holders. Likewise, token holders are advised to monitor their own mining equipment performance and update it as needed. Alternatively, as their equipment performance weakens over time, they should consider renting their tokens out to other miners to avoid the decline in the mining rewards.

**F. Fluctuation in mining rewards.**

Mining cryptocurrencies is a risky business and many factors must be carefully considered prior to its commencement. Fluctuations of the BTC price, increase of the prices for mining equipment and electricity, growth of the mining difficulty rate, decrease in the block reward, and many other factors may affect mining rewards and result in losses.

**G. Fluctuation in token benefits and rental income.**

The WTT token is intended to provide a valuable benefit of access to a low-cost hosting solution for cryptocurrency miners by giving them the ability to use Giga Watt's facilities. Although token holders can rent their tokens to other people through the internal Giga Watt platform and receive income from rent, the primary purpose of the token is to allow token holders to achieve savings by cutting costs of their mining operations. Market changes, a drop in hosting prices, changes in the local cost of electricity at WTT's facility and other factors may reduce the value of the WTT tokens and drive down the rental prices of tokens.

**H. Construction delay.**

Construction timeline specified in this White Paper is based on the reasonable estimates but is not guaranteed. This timeline may change, and the construction may be delayed because

134834324.1

of many factors, including those beyond Giga Watt's control, such as the actions of third parties (contractors, suppliers, etc.). If the completion of the capacities is delayed by more than 3 months from the projected date, and, consequently, the relevant WTT tokens are not issued, the escrow agent may issue a refund at the request of the WTT token purchasers. The refund will be issued in the original form of payment at the exchange rate on the date of the refund.

**I. Change in electricity rate.**

The effective electricity rate provided in this document is based on a current cost of electricity available under the existing contracts with the Public Utility District of Washington State. The electricity rate is not guaranteed and may change from time to time. Any change in electricity rates will cause a direct change in the value of the WTT tokens and the ongoing cost of hosting your mining equipment.

**J. Irregular electricity consumption.**

If during the testing of the equipment sent to Giga Watt for hosting such equipment demonstrates a greater use of electric power than the number of WTT tokens purchased or rented to accommodate it, the equipment owner will be charged a regular Giga Watt's hosting rate (7.5-9.75 cents per kWh, depending on the number of hosted miners) for any amount of power consumed by the equipment in excess of the number of tokens available to host it.

**K. Change of electricity consumption.**

From time to time, the equipment's power consumption may fluctuate for various reasons including but not limited to seasonal temperature changes. If and when the equipment's power consumption exceeds the number of WTT tokens purchased or rented by its owner for its hosting, the owner will be charged a regular Giga Watt's hosting rate (7.5-9.75 cents per kWh, depending on the number of the hosted miners) for any amount of power consumed by the equipment in excess of the number of tokens available to host it.

**L. Change in maintenance cost.**

The maintenance cost specified in this document is based on the current labor costs and the hours required to run the company's operations and maintain the projected number of facilities and the clients' equipment. Over time, the cost of maintenance may change for

134834324.1

various reasons, including but not limited to the eventual minimum wage increase by the Washington State or Federal government. Any change in maintenance cost will cause a direct change in the value of the WTT tokens and the ongoing cost of hosting your mining equipment.

**M. Sales and other taxes.**

Token holders and purchasers of mining equipment may be required to pay sales tax (collected at sale) and other taxes associated with the transactions contemplated herein, whether in the United States or in their home countries. It will be a sole responsibility of the token holders and purchasers of the mining equipment to comply with the tax laws of the United States and other jurisdictions and pay all relevant taxes.

**N. Force Majeure.**

Giga Watt's performance may be interrupted, suspended or delayed due to force majeure circumstances. For the purposes of this White Paper, force majeure shall mean extraordinary events and circumstances which could not be prevented by Giga Watt and shall include: acts of nature, wars, armed conflicts, mass civil disorders, industrial actions, epidemics, lockouts, slowdowns, prolonged shortage or other failures of energy supplies or communication service, acts of municipal, state or federal governmental agencies, other circumstances beyond Giga Watt's control, which were not in existence at the time of Token Launch. If such circumstances occur prior to issuance of WTT tokens and Giga Watt is unable to issue WTT tokens within 6 months from the projected date, the escrow agent may issue a refund at the request of the WTT token purchasers. The refund will be issued in the original form of payment at the exchange rate on the date of the refund.

**O. Compliance with U.S. laws and regulations.**

Because the hosting facilities are located in the United States, WTT token holders who wish to use their tokens to host their equipment at the facilities would be required to comply with the U.S. laws and regulations and may need to verify their identities and provide proof of address (for individuals), or verify their registration, good standing, list of ultimate beneficial owners, and address (for legal entities) prior to using their WTT tokens and setting up their equipment at Giga Watt's facilities, or at any time thereafter upon Giga Watt's request. Token holders who fail to comply with such verification request, or who are determined to be

134834324.1

restricted from dealing with the U.S. entities or operating in the U.S., or who are otherwise ineligible under the US law to host their equipment with Giga Watt would be refused hosting or WTT token rental services, with no refund issued by Giga Watt for the purchased tokens. Such token holders may retain their tokens or may, at their discretion, choose to sell them to eligible customers. Token purchasers are solely responsible for learning about the US laws and legal restrictions applicable to residents of certain countries and individuals involved in certain activities.

**P. Disclosure of information.**

Personal information received from WTT token holders, WTT token renters, and owners of the equipment submitted for hosting, the information about the number of tokens or miners serviced by Giga Watt, rewards earned on the pool, the wallet addresses used, and any other relevant information may be disclosed to law enforcement, government officials, and other third parties when Giga Watt is required to disclose such information by law, subpoena, or court order. Giga Watt shall at no time be held responsible for such information disclosure.

**Q. Value of WTT Token.**

Once purchased, the value of WTT Token may significantly fluctuate due to various reasons. Giga Watt does not guarantee any specific value of the WTT Token over any specific period of time. Giga Watt shall not be held responsible for any change in the value of WTT Token.

Assumptions with respect to the foregoing involve, among other things, judgments about the future economic, competitive and market conditions and business decisions, most of which are beyond the control of the Giga Watt project team and therefore difficult or impossible to accurately predict. Although the Giga Watt team believes that its assumptions underlying its forward-looking statements are reasonable, any of these may prove to be inaccurate. As a result, the Giga Watt team can offer no assurances that the forward-looking statements contained in this White Paper will prove to be accurate. In light of the significant uncertainties inherent in the forward-looking statements contained herein, the inclusion of such information may not be interpreted as a warranty on the part of Giga Watt or any other entity that the objectives and plans of the Giga Watt project will be successfully achieved.

Please note that the Giga Watt project may be subject to other risks not foreseen by its management at this time.

134834324.1

# EXHIBIT C

**PERKINS**COIE

3150 Porter Drive
Palo Alto, CA 94304-1212

+1.650.838.4300
+1.650.838.4350
PerkinsCoie.com

**Lowell D. Ness**
LNess@perkinscoie.com
D. +650.838.4317
F. +650.838.4517

May 12, 2017

**VIA E-MAIL**

Marina Mykhaylyuta
GigaWatt Pte. Ltd.
5005 Beach Road, #08-08
Golden Mile Complex
Singapore 199588

**Re:      Legal Representation**

Dear Marina:

We are delighted that GigaWatt Pte. Ltd.  ("GigaWatt Pte. Ltd. ," "you" or "your") has selected
Perkins Coie LLP as legal counsel.  This letter describes the scope and terms of our engagement.
Although this letter addresses the formalities of our engagement, we want you to know how
honored we are that you have placed your trust in us.

Perkins Coie will represent you in connection with general corporate matters.  This letter will
also apply to any additional matters that we undertake at GigaWatt Pte. Ltd. 's request, unless
otherwise specified in a separate engagement letter addressing that matter.

Unless other arrangements are made, the principal factors in determining our fees will be the
time and effort devoted to the matter and the hourly rates of the lawyers and paralegals involved.
I will have primary oversight for Perkins Coie's representation of GigaWatt Pte. Ltd. , but we
assign other firm lawyers and paralegals when necessary, beneficial or cost-effective and when
desirable to meet the time constraints of the matter.  The hourly billing rates of the persons
whom we anticipates assigning to the Matter currently range from $350 to $1,150.  These rates
are adjusted at least annually, usually on January 1.  Services performed after the effective date
of the new rates will be charged at the new applicable rates.  We normally issue invoices for our
fees and disbursements on a monthly basis.  These invoices include detail that most of our clients
find sufficient, but please let me know at any time if more detailed information is needed on our
invoices.  Please also refer to the enclosed Information for Clients for specifics regarding fees,
disbursements, billing, payment, and termination of our representation should payment not be
made or other circumstances warrant.

Our representation of GigaWatt Pte. Ltd. does not include acting as counsel for any entity in which GigaWatt Pte. Ltd. holds equity or any subsidiary, affiliate, equity-holder, employee, family member or other person (collectively, "Affiliates"), unless such additional representation is separately and clearly undertaken by us. If in the future we and GigaWatt Pte. Ltd. mutually agree to expand our representation of GigaWatt Pte. Ltd. to include any of GigaWatt Pte. Ltd. 's Affiliates, it is agreed that the terms, conditions and consents contained herein will apply to such representation(s).

Perkins Coie represents many other companies, individuals and government agencies ("clients"). During the time we are representing GigaWatt Pte. Ltd. we may be asked to represent:

(1)     other present or future clients in transactions, litigation or other disputes directly adverse to GigaWatt Pte. Ltd. that are not substantially related to our representation of GigaWatt Pte. Ltd. ; and/or

(2)     parties who are considered directly adverse parties in matters we handle for GigaWatt Pte. Ltd. . Our work for these directly adverse parties would be in matters that are not substantially related to our work for GigaWatt Pte. Ltd. .

We request GigaWatt Pte. Ltd. 's consent to allow Perkins Coie to undertake such future representations without the need to obtain any further or separate approval from GigaWatt Pte. Ltd. , as long as those representations described in (1) and (2) above are not substantially related to work Perkins Coie has done, or is doing, for GigaWatt Pte. Ltd. . Your signature below constitutes GigaWatt Pte. Ltd. 's consent to such representation(s). We agree not to use any proprietary or other confidential nonpublic information concerning GigaWatt Pte. Ltd. acquired by us as a result of our representation of GigaWatt Pte. Ltd. in connection with any litigation or other matter in which we represent a party directly adverse to GigaWatt Pte. Ltd. .

Perkins Coie may need to consult with or secure consent from its other current or prospective clients who are or may become adverse to you in order to clear or address actual or potential conflicts of interest. You agree and consent that to the extent it is reasonably necessary in such communications, Perkins Coie may disclose to each such current or prospective client the fact that Perkins Coie has or has had an attorney-client relationship with you.

During our representation of GigaWatt Pte. Ltd. , there may be issues that raise questions about our duties under the rules of professional conduct that apply to lawyers. These might include, e.g., conflict of interest issues, and could even include issues raised because of a dispute between us and a client over the handling of a matter. Normally when such issues arise we would seek the advice of our Professional Standards Counsel, Loss Prevention partners or Professional Standards Conflicts Attorneys who are experts in such matters. Consistent with the rulings of courts in many jurisdictions, we consider such consultations to be attorney-client privileged

conversations between firm personnel and counsel for the firm. However, there have been judicial decisions indicating that under some circumstances such conversations involve a conflict of interest between the client and Perkins Coie and that our consultation with Perkins Coie's counsel may not be privileged, unless we either withdraw from the representation of the client or obtain the client's consent to consult on a privileged basis with Perkins Coie's counsel.

We believe that it is in our clients' interests, as well as ours, that in the event legal ethics or professional responsibility issues arise during a representation, we receive expert analysis. Accordingly, as part of our agreement concerning our representation of GigaWatt Pte. Ltd. , you agree that if we determine in our own discretion during the representation that it is appropriate to consult with our firm counsel (either Perkins Coie's internal counsel or, if we choose, outside counsel) we have your consent to do so on a privileged basis despite any alleged conflict of interest. You further agree that our continuing to represent you at the time of such consultation shall not thereby waive or otherwise limit any attorney-client privilege that Perkins Coie has regarding the confidentiality of our communications with our own in-firm or outside counsel. The costs associated with such legal counsel for Perkins Coie will be paid solely by Perkins Coie and will not be charged to you in any way.

This letter, along with the enclosed Information for Clients, confirms the terms and conditions under which Perkins Coie LLP will provide legal services to GigaWatt Pte. Ltd. . Unless otherwise agreed in writing, the terms of this letter and the enclosed Information for Clients will also apply to any additional matters that we undertake at GigaWatt Pte. Ltd. 's request. If you agree that this letter correctly describes the terms of our engagement, please sign and date a copy of this letter and return it to me. Should you have any questions about this letter, our services or fees, or if you have any other concerns, please call me at any time. We look forward to working with you and are gratified by your confidence in Perkins Coie.

Sincerely,

Lowell D. Ness

LDN/au

Enclosure:    Information for Clients

Marina Mykhaylyuta
May 12, 2017
Page 4

ACCEPTED AND AGREED:

GIGAWATT PTE. LTD.

DocuSigned by:

By: *Marina Mykhaylyuta*
Print Name: Marina Mykhaylyuta
Its: Director
Date: мая 16, 2017

# Information for Clients

Perkins Coie LLP is pleased to serve you. The following information explains the terms that apply to our engagements (except to the extent that you have reached a different written understanding with us about particular terms) for legal services provided by Perkins Coie LLP. No changes or additions to these terms will be binding unless confirmed in writing sent by us or signed by us. We encourage you to discuss this information with our lawyers at the inception of a matter and whenever you have questions during the course of that matter. Section headings are for convenience of reference only and not intended to affect the interpretation of the provisions of such sections.

**Personnel.** We generally assign one lawyer primary responsibility for seeing that your requests for legal services are met, but additional lawyers, paralegals and technology professionals may assist in rendering the most appropriate and efficient legal services. We attempt to assign personnel to each matter based on the nature and scope of the issues raised by the matter and our lawyers' experience and expertise.

**Basis for Fees.** We charge for legal services rendered by our firm at applicable hourly rates. Each attorney, paralegal, and other timekeeper records time at assigned billing rates. Because hourly rates vary among personnel, each statement typically reflects a composite of several hourly rates. Those rates are reviewed periodically and change at least annually (usually on January 1) based on economic factors and the changing experience levels of our personnel. Services performed after the effective date of the new rates will be charged at the new rates.

**Disbursements and Other Charges.** In the course of performing legal services for you, various services may be provided by third parties. Examples include messenger and courier charges, filing and recording fees, foreign agent fees, court reporters and transcript costs, expert and other witness fees, discovery vendor costs, charges for outside consultants and research services, and travel expenses. You are responsible for these third-party charges, and we reserve the right to forward their invoices directly to you for payment. For administrative ease, however, we may advance payment to the third-party provider and include the charge on our invoice to you, with no markup for handling. We will retain and not allocate to clients relatively insignificant discounts we receive for prompt payment or volume usage. For patent, trademark and other matters that may involve significant third-party payments, you may be required to maintain a minimum balance in a trust account to fund such payments. You will be advised of any such requirements, and we will not be obligated to request or pay for third-party services not fully covered by such deposits.

We will also charge you for certain internal services we provide in connection with our legal services. As noted below, because we both invest in specialized equipment and commit to long-term contracts with computer research vendors (such as Westlaw) and other vendors, we achieve savings in exchange for guaranteed payment, usage or other obligations undertaken at our risk. This allows us to charge our clients for certain services at rates discounted below standard rates. However, the payments we receive from clients for these services may exceed our total payments to the vendors. This excess is used to partially offset the costs we incur for related equipment and personnel and the risks we assume in entering into these contracts.

We currently charge specific internal costs in the following manner:

      **1.   Photocopying, Printing, and Facsimile.** In our U.S. offices, clients are charged ten cents per page for photocopying. These charges are higher in our non-U.S. offices. We do not charge for facsimiles sent or received.

      **2.   Computer Research.** There is no extra charge to clients for our use of the firm's internal work product retrieval system. Clients are charged for computer-assisted research from outside services, other than many Westlaw Services, at the vendors' standard rates. For many services from Westlaw, our primary outside computer-research source, we are able to charge clients just 37% of Westlaw's standard rates as of 2016 because we committed to a long-term contract with monthly minimum payments. We may occasionally be able to pass along other discounted rates for computer-assisted research from outside sources when we can negotiate volume discounts.

**3. Telecommunications.** We do not charge for local or long-distance calls or for any email communications. Credit card and cell phone calls necessitated by work on your matters are charged at our actual cost.

**4. Mail/Messengers.** In our larger offices, we may use firm messengers whenever appropriate to shorten delivery times and offer greater flexibility. Charges for such internal messengers are equal to or below rates charged by outside messengers for similar services. We do not charge for regular mail. Bulk mailings, packages, overnight deliveries, and special postal services are charged at our actual cost.

**5. Overtime.** Clients are charged for staff overtime, meals, and transportation only when (a) the client specifically requests after-hours effort or (b) the nature of the work necessitates overtime and such work could not have been done during normal work hours.

**6. Discovery Services and Database Hosting.** Certain matters, particularly large-scale litigation, may require certain discovery and ancillary support services such as data processing, data hosting and certain software solutions that you instruct us to use. In some instances we may be able to reduce costs by contracting with vendors, including discovery and data storage vendors on whose servers and other media your information may be stored, to purchase a quantity of service over time that is beyond the needs of a single client. Because these services require us to incur management and other overhead expenses, we may bill you at a reduced per-unit rate that does not fully reflect the quantity of discounts we ultimately obtain.

**Invoices and Payment.** We typically bill monthly, and payment is due upon receipt of the invoice. Payment of an invoice will reflect your agreement to the amount charged on that invoice, and you must bring any misbilling or other charge that you believe is inappropriate to our attention within 45 days of presentation of the invoice. To the fullest extent permitted by law, you agree that we have an attorneys' lien (including, without limitation, in the results of our services) to secure payment of the obligations owed us and that we may take steps to inform others of any attorneys' lien rights we might have. For accounts not paid within 30 days of the invoice date, we add a late payment charge of 1% per month (or such lower rate as required by applicable law) on unpaid balances from the invoice date. Unless otherwise agreed upon, we may apply payments first to our own attorneys' fees and costs of collection, second to our late charges, third to our invoiced fees, and finally to our invoiced disbursement charges. Our election not to exercise any rights or not to require punctual performance of each provision of this agreement will not be construed as a waiver or relinquishment of our rights. We do not and cannot guarantee the outcome of any matter or particular results, and payment of our fees and disbursements is not conditioned on any particular outcome. If we are required to bring an action or proceeding to collect fees or disbursements due us, we will also be entitled to recover certain fees and costs. These include, but are not limited to, our own outside attorneys' fees, expert witness fees, other costs of collection billed to us, and the value of legal services Perkins Coie's own attorneys perform in analyzing or prosecuting a collection action if such circumstances arise on your account. You consent to venue and jurisdiction wherever we have an office with attorneys who worked on your behalf. Also, if we are required to testify, produce documents, or respond to other requests in connection with litigation or other proceedings commenced by third parties that relate to our representation of you, you will pay us our reasonable fees and costs incurred in connection with such activities. For matters handled by our New York lawyers, the client may have a right to arbitrate fee disputes under Part 137 of the Rules of the Chief Administrator of the New York Supreme Court, Appellate Division.

**E-billing Set-Up.** We understand that our clients often use e-billing services. In many instances, those e-billing services electronically send our clients' Outside Counsel Guidelines as part of the procedure to set up the account. Acceptance of Outside Counsel Guidelines by our finance/billing personnel through e-billing services set-up is to facilitate invoicing. To the extent that there may be provisions within those guidelines that conflict with this engagement letter or the Information for Clients attachment, this engagement letter and attachment will control unless we otherwise mutually agree in writing.

**Insurance Coverage.** You may have insurance policies relating to a matter for which you engage us that might cover, among other things, reimbursement of attorneys' fees and costs. If coverage is potentially available, including coverage for our fees and costs, your appropriate insurance company must be notified as soon as possible. We can advise you on the availability of insurance coverage only if you expressly and timely request that we do so, we do

not have a conflict of interest, and we agree to undertake such additional work. You would then need to furnish us copies of all relevant insurance policies and related documents. Regardless whether, when, and to what the extent insurance coverage might be available to reimburse all or a portion of our fees and costs, you nevertheless remain primarily obligated for amounts owed us, including any late charges that accrue during any delay in payment by others.

**Advance Payments and Estimates.** We may require advance payments before working or continuing work on a matter. Of course, the amount of work we are called upon to perform may subsequently exceed our prior expectations. Regardless of whether you make an advance payment, you agree that any budget, estimate, or similar range for potential charges is nothing more than a forecast based on then-current assumptions, and any such forecast may be high or low due to changed or unforeseen circumstances. We reserve the right, as a condition of providing additional services, to require an increase in any advance payment.

**Legal Service Provider.** We provide strictly legal services to you in connection with this agreement. You are not relying on us for any services other than legal services, and we are specifically not providing any business, investment, insurance, or accounting advice or any investigation of the character or credit of persons with whom you may be dealing.

**Identity of Client.** You confirm that we are being engaged by you and not any of your subsidiaries, affiliates, equityholders, employees, members of your family, or other persons (collectively, "Affiliates"), unless we separately and explicitly undertake such representation. You also expressly confirm that, as our representation is limited to you and does not include acting as counsel for your Affiliates, we may represent other clients adverse to your Affiliates without disclosing those matters to you or obtaining your consent. If in the future we agreed to expand our representation of you to include one or more of your Affiliates, you, and Affiliate(s), agree that the terms, conditions and consents contained in our engagement letter with you will apply to such representation(s).

**Conflicts of Interest.** We have performed a search of our other clients to determine whether representing you might create a potential conflict of interest with any other clients. That check was done using your name and any other names you gave us. Please inform us immediately if you use other names or have affiliated companies that we should enter into our conflicts system.

**Cooperation/Reliance on Accurate Information.** To enable us to represent you effectively, you will cooperate fully with us in your matter(s). You and your agents will fully and accurately disclose to us all facts and documents that may be relevant to a matter we undertake or which we may otherwise request. This information will form the basis of our legal advice.

**Email Communication Disclaimer.** Many of our legal professionals receive hundreds of email messages per day (in addition to spam). Although email is an efficient method for many communications, it can also be delayed in transit or otherwise missed (e.g., blocked by our anti-spam software). If you have not received a response or acknowledgement of receipt of an email, please notify the intended recipient.

**Termination of Services.** We retain the right to cease performing legal services and to terminate our legal representation for any reason consistent with ethical rules, including conflicts of interest or your failure to pay our legal fees and expenses when due. Our representation in any matter will also cease on completion of our work on that matter unless you ask us to perform additional work that we agree to undertake. Performing additional services for you on the same or any other matter is subject to these terms and conditions, our mutual concurrence and clearance of conflicts, if any. We are unable to assure you that matters for other clients will not conflict us out of additional matters you might later ask us to undertake. On completion of a matter, we may close our files and, absent a specific written undertaking to do so, will not thereafter be obligated to docket milestones, make additional or continuation filings, pursue appeals, take other steps on your behalf on the matter, or monitor or advise you with respect to changes in the law or circumstances that might bear upon or adversely affect the completed matter. If you wish to have us return material from your files after the conclusion of a particular matter, we will provide you such material at your request and expense. Some of our practice groups consider our electronic records to be the official client file. Thus, requests for copies of client files may be provided in electronic form only. We will have no

obligation to retain client files more than one year after the conclusion of a particular matter or our representation. Our representation of you will be deemed concluded at the time that we have rendered our final bill for services on the matter described in our engagement letter or any such additional matters that are clearly undertaken by us. Whether we will undertake any further matters and form an attorney-client relationship again will depend upon your request, our performance of a conflicts check and our expression to you of our willingness to accept any further matters.

**Alliances/Other Counsel.** Many of our clients also have international or other legal needs we cannot fulfill. This causes us from time to time to establish ongoing working relationships or strategic alliances with law firms in other jurisdictions. While our close relationships with our legal colleagues at these firms have helped us provide coordinated representation for many of our clients, these firms (and other firms we may recommend to our clients) are separate from and independent of Perkins Coie. We do not share personnel or fees, do not have common operations beyond occasional joint seminars and presentations, and must check any other firm's conflicts of interest before that firm's lawyers may jointly represent any of our clients. Under rules in certain jurisdictions where we practice, we must advise you that you may consult independent counsel to advise you regarding these documents governing our relationship, and we encourage you to do so if you like. Also, you retain the right to consult with independent counsel at any time while we represent you. However, we are not responsible for any advice an independent counsel may give you, and such consultation will be entirely at your expense.

**Questions.** We endeavor to deliver legal services effectively and efficiently and to render accurate and understandable billings. Please direct any questions about services or billing practices to your client service lawyer. Questions regarding the billing or payment status of your account may also be directed to the Client Accounting Department in our Seattle office at 1-800-261-3143 (206-359-3143 in the Seattle area).