# EXHIBIT 17

| | |
|---|---|
| **From:** | Mahon, Robert (SEA) |
| **Sent:** | Tuesday, May 16, 2017 9:53 AM |
| **To:** | Peterson, Richard (CHI) |
| **Subject:** | FW: Corporate structure of Giga Watt |
| **Attachments:** | GW structure-1.png |

**Robert Mahon** | Perkins Coie LLP
PARTNER
1201 Third Avenue Suite 4900
Seattle, WA 98101-3099
D. +1.206.359.6360
F. +1.206.359.7360
E. RMahon@perkinscoie.com

---

**From:** katrina@cryptonomos.com [mailto:katrina@cryptonomos.com]
**Sent:** Thursday, May 11, 2017 1:53 PM
**To:** Ness, Lowell D. (PAO); Mahon, Robert (SEA)
**Subject:** Corporate structure of Giga Watt

Gentlemen, we were advised by the accounting firm that we have too much exposure for tax and liability reasons.

Therefore, attached is the proposed structure for Giga Watt, Inc., a Washington corporation. Please let me know your thoughts.

Thank you,
Katrina

Sent from Mail for Windows 10

---



GigaWatt Pte. Ltd.
- sells tokens
- sells equipment

GW Management, LLC
- management entity

Giga Watt Hosting, LLLP
- hosting service

Giga Watt, Inc.
- owns IP
- leases the land

Mine Building, LLC
- builds facilities

Giga Pod 1 -100, LLC
- each entity owns of facility

100% owner

100% owner

100% owner

100% owner

99% limited partner

1% general partner

PC_004720

# EXHIBIT 18

3150 Porter Drive
Palo Alto, CA 94304-1212

+1.650.838.4300
+1.650.838.4350
perkinscoie.com

March 3, 2017

Lowell D. Ness
LNess@perkinscoie.com
D. (650) 838-4317
F. (650) 838-4517

VIA E-MAIL

Cryptonomos PTE. Ltd.
5002 Beach Road
#08-08 Golden Mile Complex
Singapore  199588
Attention:  Katarina Grant

**Re:** **Legal Representation**

Dear Katarina:

Thank you for selecting Perkins Coie LLP to represent Cryptonomos PTE. Ltd., a company formed under the laws of Singapore (the "Client", "you" or "your"), in connection with U.S. securities law, tax and regulatory advice.  This letter will also apply to any additional matters that we undertake at the Client's request, unless otherwise specified in a separate engagement letter addressing that matter.

**Fees/Costs/Billing**

As agreed, effective March 1, 2017, Cryptonomos will pay our firm a monthly fixed fee of $10,000 plus disbursements through February 28, 2018.  As provided in my email correspondence dated March 2, 2017, the monthly fixed fee will cover all day-to-day support, including counseling on securities regulations, corporate structure, tax laws as well as final document review with respect to digital currency style token sales.

The fixed fee will not cover costs and disbursement, one-time projects, such as patent and/or trademark applications, litigation (if any), or our support as you negotiate and codify substantive partnerships.

For those projects outside of the scope of the monthly retainer, we will utilize our current hourly billing rates and will provide fee estimates at the onset of each project, and keep Cryptonomos apprised of material deviations from such budgets (if any) as the projects unfold.

In addition, we will cooperatively revisit the monthly fixed fee during within six months of the inception of our engagement to ensure the current pricing structure is operating as anticipated relative to providing of legal services.  We believe that this arrangement will assist in providing Cryptonomos with a higher degree of predictability for this operational expense.

134650702.1

Cryptonomos PTE. Ltd.
March 3, 2017
Page 2

All other matters we handle on behalf of Cryptonomos will be subject to our standard terms of engagement as described below or otherwise agreed to in writing.

Aside from the fixed fee arrangement described above, the principal factors in determining our fees will be the time and effort devoted to the matter and the hourly rates of the lawyers and paralegals involved. I will have primary oversight for Perkins' representation of the Client, but we assign other firm lawyers and paralegals when necessary, beneficial or cost-effective and when desirable to meet the time constraints of the matter. The hourly billing rates of the persons whom we anticipate assigning to the Matter currently range from $350 to $1,150. These rates are adjusted at least annually, usually on January 1. Services performed after the effective date of the new rates will be charged at the new applicable rates. We try to issue invoices for our fees and disbursements on a monthly basis. These invoices include detail that most of our clients find sufficient, but please let me know at any time if more detailed information is needed on our invoices. Please also refer to the enclosed Information for Clients for specifics regarding fees, disbursements, billing, payment, and termination of our representation should payment not be made or other circumstances warrant.

---

**Conflicts of Interest**

Our representation of the Client does not include acting as counsel for any entity in which the Client holds equity or any subsidiary, affiliate, equityholder, employee, family member or other person (collectively, "Affiliates"), unless such additional representation is separately and clearly undertaken by us. If in the future we and the Client mutually agree to expand our representation of the Client to include any of the Client's Affiliates, it is agreed that the terms, conditions and consents contained herein will apply to such representation(s).

---

Perkins Coie represents many other companies, individuals and government agencies ("clients"). During the time we are representing the Client we may be asked to represent:

(1)     other present or future clients in transactions, litigation or other disputes directly adverse to the Client that are not substantially related to our representation of the Client;

(2)     parties who are considered directly adverse parties in matters we handle for the Client. Our work for these directly adverse parties would be in matters that are not substantially related to our work for the Client; and/or

134650702.1

WSGR-GW 007297

(3)  you in future transactions, litigation or other disputes directly adverse to other firm clients in matters not substantially related to our work for the other firm clients.

We request the Client's consent to allow Perkins to undertake such future representations without the need to obtain any further or separate approval from the Client, as long as those representations described in (1) and (2) above are not substantially related to work Perkins has done, or is doing, for the Client.  Your signature below constitutes the Client's consent to such representation(s).  We agree not to use any proprietary or other confidential nonpublic information concerning the Client acquired by us as a result of our representation of the Client in connection with any litigation or other matter in which we represent a party directly adverse to the Client.

Perkins Coie may need to consult with or secure consent from its other current or prospective clients who are or may become adverse to you in order to clear or address actual or potential conflicts of interest.  You agree and consent that to the extent it is reasonably necessary in such communications, Perkins Coie may disclose to each such current or prospective client the fact that Perkins Coie has or has had an attorney-client relationship with you.

During our representation of the Client, there may be issues that raise questions about our duties under the rules of professional conduct that apply to lawyers.  These might include, *e.g.,* conflict of interest issues, and could even include issues raised because of a dispute between us and a client over the handling of a matter.  Normally when such issues arise we would seek the advice of our Professional Standards Counsel, Loss Prevention partners or Professional Standards Conflicts Attorneys who are experts in such matters.  Consistent with the rulings of courts in many jurisdictions, we consider such consultations to be attorney-client privileged conversations between firm personnel and counsel for the firm.  However, there have been judicial decisions indicating that under some circumstances such conversations involve a conflict of interest between the client and Perkins Coie and that our consultation with Perkins Coie's counsel may not be privileged, unless we either withdraw from the representation of the client or obtain the client's consent to consult on a privileged basis with Perkins Coie's counsel.

We believe that it is in our clients' interests, as well as ours, that in the event legal ethics or professional responsibility issues arise during a representation, we receive expert analysis.  Accordingly, as part of our agreement concerning our representation of the Client, you agree that if we determine in our own discretion during the representation that it is appropriate to consult with our firm counsel (either Perkins Coie's internal counsel or, if we choose, outside counsel) we have your consent to do so on a privileged basis despite any alleged conflict of interest.  You further agree that our continuing to represent you at the time of such consultation shall not

134650702.1

WSGR-GW 007298

thereby waive or otherwise limit any attorney-client privilege that Perkins Coie has regarding the confidentiality of our communications with our own in-firm or outside counsel. The costs associated with such legal counsel for Perkins Coie will be paid solely by Perkins Coie and will not be charged to you in any way.

**Marketing Materials**

The Client agrees that, following public release of information regarding any acquisition, disposition, joint venture, financing, fundraising or other project, transaction, lawsuit or proceeding in which we are involved (a "Project"), we may place a tombstone-style advertisement in newspapers, publications or marketing materials (including our website), in each case at our own expense, which may include the Client's logo and a reference to our representation of the Client in the Project. Such announcements would not disclose dollar amounts or other information about the Client or the Project that the Client had not already publicly released or was otherwise publicly available. The Client further agrees that, subject to the preceding sentence, we may disclose the fact that the Client is a client of the firm, as well as our involvement in any Project, on our web site and marketing materials, provided we do not disclose any confidential information regarding our representation or the Project.

**Conclusion**

This letter, along with the enclosed Information for Clients, confirms the terms and conditions on which Perkins Coie LLP will provide legal services to the Client. Unless otherwise agreed in writing, the terms of this letter and the enclosed Information for Clients will also apply to any additional matters that we undertake at the Client's request. If this letter correctly sets forth our understanding, please sign and date a copy of this letter and promptly return it to me. If you have any questions about this letter or generally about our services or bills, please call me at any time. We look forward to working with you and thank you for placing your confidence in Perkins.

Sincerely,

Lowell D. Ness

Enclosure:     Information for Clients

134650702.1

Cryptonomos PTE. Ltd.
March 3, 2017
Page 5

ACCEPTED AND AGREED:

CRYPTONOMOS PTE. LTD.

By: _____
    DocuSigned by:
    738DD6D6D3234C6...
Nikolay Evdokimov
Chief Executive Officer

Date: марта 11, 2017 _____

134650702.1

WSGR-GW 007300

# Information for Clients

Perkins Coie LLP is pleased to serve you. The following information explains the terms that apply to our engagements (except to the extent that you have reached a different written understanding with us about particular terms) for legal services provided by Perkins Coie LLP. No changes or additions to these terms will be binding unless confirmed in writing sent by us or signed by us. We encourage you to discuss this information with our lawyers at the inception of a matter and whenever you have questions during the course of that matter. Section headings are for convenience of reference only and not intended to affect the interpretation of the provisions of such sections.

**Personnel.** We generally assign one lawyer primary responsibility for seeing that your requests for legal services are met, but additional lawyers, paralegals and technology professionals may assist in rendering the most appropriate and efficient legal services. We attempt to assign personnel to each matter based on the nature and scope of the issues raised by the matter and our lawyers' experience and expertise.

**Basis for Fees.** We charge for legal services rendered by our firm at applicable hourly rates. Each attorney, paralegal, and other timekeeper records time at assigned billing rates. Because hourly rates vary among personnel, each statement typically reflects a composite of several hourly rates. Those rates are reviewed periodically and change at least annually (usually on January 1) based on economic factors and the changing experience levels of our personnel. Services performed after the effective date of the new rates will be charged at the new rates.

**Disbursements and Other Charges.** In the course of performing legal services for you, various services may be provided by third parties. Examples include messenger and courier charges, filing and recording fees, foreign agent fees, court reporters and transcript costs, expert and other witness fees, discovery vendor costs, charges for outside consultants and research services, and travel expenses. You are responsible for these third-party charges, and we reserve the right to forward their invoices directly to you for payment. For administrative ease, however, we may advance payment to the third-party provider and include the charge on our invoice to you, with no markup for handling. We will retain and not allocate to clients relatively insignificant discounts we receive for prompt payment or volume usage. For patent, trademark and other matters that may involve significant third-party payments, you may be required to maintain a minimum balance in a trust account to fund such payments. You will be advised of any such requirements, and we will not be obligated to request or pay for third-party services not fully covered by such deposits.

We will also charge you for certain internal services we provide in connection with our legal services. As noted below, because we both invest in specialized equipment and commit to long-term contracts with computer research vendors (such as Westlaw) and other vendors, we achieve savings in exchange for guaranteed payment, usage or other obligations undertaken at our risk. This allows us to charge our clients for certain services at rates discounted below standard rates. However, the payments we receive from clients for these services may exceed our total payments to the vendors. This excess is used to partially offset the costs we incur for related equipment and personnel and the risks we assume in entering into these contracts.

We currently charge specific internal costs in the following manner:

    **1. Photocopying, Printing, and Facsimile.** In our U.S. offices, clients are charged ten cents per page for photocopying. These charges are higher in our non-U.S. offices. We do not charge for facsimiles sent or received.

    **2. Computer Research.** There is no extra charge to clients for our use of the firm's internal work product retrieval system. Clients are charged for computer-assisted research from outside services, other than many Westlaw Services, at the vendors' standard rates. For many services from Westlaw, our primary outside computer-research source, we are able to charge clients just 37% of Westlaw's standard rates as of 2016 because we committed to a long-term contract with monthly minimum payments. We may occasionally be able to pass along other discounted rates for computer-assisted research from outside sources when we can negotiate volume discounts.

134650702.1

WSGR-GW 007301

3. **Telecommunications.** We do not charge for local or long-distance calls or for any email communications. Credit card and cell phone calls necessitated by work on your matters are charged at our actual cost.

4. **Mail/Messengers.** In our larger offices, we may use firm messengers whenever appropriate to shorten delivery times and offer greater flexibility. Charges for such internal messengers are equal to or below rates charged by outside messengers for similar services. We do not charge for regular mail. Bulk mailings, packages, overnight deliveries, and special postal services are charged at our actual cost.

5. **Overtime.** Clients are charged for staff overtime, meals, and transportation only when (a) the client specifically requests after-hours effort or (b) the nature of the work necessitates overtime and such work could not have been done during normal work hours.

6. **Discovery Services and Database Hosting.** Certain matters, particularly large-scale litigation, may require certain discovery and ancillary support services such as data processing, data hosting and certain software solutions that you instruct us to use. In some instances we may be able to reduce costs by contracting with vendors, including discovery and data storage vendors on whose servers and other media your information may be stored, to purchase a quantity of service over time that is beyond the needs of a single client. Because these services require us to incur management and other overhead expenses, we may bill you at a reduced per-unit rate that does not fully reflect the quantity of discounts we ultimately obtain.

**Invoices and Payment.** We typically bill monthly, and payment is due upon receipt of the invoice. Payment of an invoice will reflect your agreement to the amount charged on that invoice, and you must bring any misbilling or other charge that you believe is inappropriate to our attention within 45 days of presentation of the invoice. To the fullest extent permitted by law, you agree that we have an attorneys' lien (including, without limitation, in the results of our services) to secure payment of the obligations owed us and that we may take steps to inform others of any attorneys' lien rights we might have. For accounts not paid within 30 days of the invoice date, we add a late payment charge of 1% per month (or such lower rate as required by applicable law) on unpaid balances from the invoice date. Unless otherwise agreed upon, we may apply payments first to our own attorneys' fees and costs of collection, second to our late charges, third to our invoiced fees, and finally to our invoiced disbursement charges. Our election not to exercise any rights or not to require punctual performance of each provision of this agreement will not be construed as a waiver or relinquishment of our rights. We do not and cannot guarantee the outcome of any matter or particular results, and payment of our fees and disbursements is not conditioned on any particular outcome. If we are required to bring an action or proceeding to collect fees or disbursements due us, we will also be entitled to recover certain fees and costs. These include, but are not limited to, our own outside attorneys' fees, expert witness fees, other costs of collection billed to us, and the value of legal services Perkins Coie's own attorneys perform in analyzing or prosecuting a collection action if such circumstances arise on your account. You consent to venue and jurisdiction wherever we have an office with attorneys who worked on your behalf. Also, if we are required to testify, produce documents, or respond to other requests in connection with litigation or other proceedings commenced by third parties that relate to our representation of you, you will pay us our reasonable fees and costs incurred in connection with such activities. For matters handled by our New York lawyers, the client may have a right to arbitrate fee disputes under Part 137 of the Rules of the Chief Administrator of the New York Supreme Court, Appellate Division.

**Insurance Coverage.** You may have insurance policies relating to a matter for which you engage us that might cover, among other things, reimbursement of attorneys' fees and costs. If coverage is potentially available, including coverage for our fees and costs, your appropriate insurance company must be notified as soon as possible. We can advise you on the availability of insurance coverage only if you expressly and timely request that we do so, we do not have a conflict of interest, and we agree to undertake such additional work. You would then need to furnish us copies of all relevant insurance policies and related documents. Regardless whether, when, and to what the extent insurance coverage might be available to reimburse all or a portion of our fees and costs, you nevertheless remain primarily obligated for amounts owed us, including any late charges that accrue during any delay in payment by others.

**Advance Payments and Estimates.** We may require advance payments before working or continuing work on a matter. Of course, the amount of work we are called upon to perform may subsequently exceed our prior

WSGR-GW 007302

expectations. Regardless of whether you make an advance payment, you agree that any budget, estimate, or similar range for potential charges is nothing more than a forecast based on then-current assumptions, and any such forecast may be high or low due to changed or unforeseen circumstances. We reserve the right, as a condition of providing additional services, to require an increase in any advance payment.

**Legal Service Provider.** We provide strictly legal services to you in connection with this agreement. You are not relying on us for any services other than legal services, and we are specifically not providing any business, investment, insurance, or accounting advice or any investigation of the character or credit of persons with whom you may be dealing.

**Identity of Client.** You confirm that we are being engaged by you and not any of your subsidiaries, affiliates, equityholders, employees, members of your family, or other persons (collectively, "Affiliates"), unless we separately and explicitly undertake such representation. You also expressly confirm that, as our representation is limited to you and does not include acting as counsel for your Affiliates, we may represent other clients adverse to your Affiliates without disclosing those matters to you or obtaining your consent. If in the future we agreed to expand our representation of you to include one or more of your Affiliates, you, and Affiliate(s), agree that the terms, conditions and consents contained in our engagement letter with you will apply to such representation(s).

**Conflicts of Interest.** We have performed a search of our other clients to determine whether representing you might create a potential conflict of interest with any other clients. That check was done using your name and any other names you gave us. Please inform us immediately if you use other names or have affiliated companies that we should enter into our conflicts system.

**Cooperation/Reliance on Accurate Information.** To enable us to represent you effectively, you will cooperate fully with us in your matter(s). You and your agents will fully and accurately disclose to us all facts and documents that may be relevant to a matter we undertake or which we may otherwise request. This information will form the basis of our legal advice.

**Email Communication Disclaimer.** Many of our legal professionals receive hundreds of email messages per day (in addition to spam). Although email is an efficient method for many communications, it can also be delayed in transit or otherwise missed (e.g., blocked by our anti-spam software). If you have not received a response or acknowledgement of receipt of an email, please notify the intended recipient.

**Termination of Services.** We retain the right to cease performing legal services and to terminate our legal representation for any reason consistent with ethical rules, including conflicts of interest or your failure to pay our legal fees and expenses when due. Our representation in any matter will also cease on completion of our work on that matter unless you ask us to perform additional work that we agree to undertake. Performing additional services for you on the same or any other matter is subject to these terms and conditions, our mutual concurrence and clearance of conflicts, if any. We are unable to assure you that matters for other clients will not conflict us out of additional matters you might later ask us to undertake. On completion of a matter, we may close our files and, absent a specific written undertaking to do so, will not thereafter be obligated to docket milestones, make additional or continuation filings, pursue appeals, take other steps on your behalf on the matter, or monitor or advise you with respect to changes in the law or circumstances that might bear upon or adversely affect the completed matter. If you wish to have us return material from your files after the conclusion of a particular matter, we will provide you such material at your request and expense. Some of our practice groups consider our electronic records to be the official client file. Thus, requests for copies of client files may be provided in electronic form only. We will have no obligation to retain client files more than one year after the conclusion of a particular matter or our representation. Our representation of you will be deemed concluded at the time that we have rendered our final bill for services on the matter described in our engagement letter or any such additional matters that are clearly undertaken by us. Whether we will undertake any further matters and form an attorney-client relationship again will depend upon your request, our performance of a conflicts check and our expression to you of our willingness to accept any further matters.

**Alliances/Other Counsel.** Many of our clients also have international or other legal needs we cannot fulfill. This causes us from time to time to establish ongoing working relationships or strategic alliances with law firms in other jurisdictions. While our close relationships with our legal colleagues at these firms have helped us provide

-3-

20-80031-FPC     Doc 120-4     Filed 10/17/22     Entered 10/17/22 17:48:49     Pg 12 of 82

WSGR-GW 007303

coordinated representation for many of our clients, these firms (and other firms we may recommend to our clients) are separate from and independent of Perkins Coie. We do not share personnel or fees, do not have common operations beyond occasional joint seminars and presentations, and must check any other firm's conflicts of interest before that firm's lawyers may jointly represent any of our clients. Under rules in certain jurisdictions where we practice, we must advise you that you may consult independent counsel to advise you regarding these documents governing our relationship, and we encourage you to do so if you like. Also, you retain the right to consult with independent counsel at any time while we represent you. However, we are not responsible for any advice an independent counsel may give you, and such consultation will be entirely at your expense.

**Questions.** We endeavor to deliver legal services effectively and efficiently and to render accurate and understandable billings. Please direct any questions about services or billing practices to your client service lawyer. Questions regarding the billing or payment status of your account may also be directed to the Client Accounting Department in our Seattle office at 1-800-261-3143 (206-359-3143 in the Seattle area).

134650702.1

WSGR-GW 007304

# EXHIBIT 19

| From: | "Timur Usmanov" <tu@giga-watt.com> |
|---|---|
| **Sent:** | Tue, 12 Sep 2017 17:51:52 +0000 |
| **To:** | "Zeev Kirsh" <zeev@cryptonomos.com> |
| **Subject:** | Re: Intro |

I'll respond to her email today later on.

Let's have Martha gather all of the constitutional dox together and check if everything was filed properly. Maybe we'll also put her inn charge of drafting SHA. Then we'll take over the bundle from her and from that point forward you will be taking care of the corporate minutes, etc.

On Tue, Sep 12, 2017 at 10:03 AM, Zeev Kirsh <zeev@cryptonomos.com> wrote:
Martha is suggesting Perkins maintain the corporate minutes. she also suggests she can do more things for giga-watt. I can do those things. if i need help, it will be much less expensive than hiring perkins and their corporate paralegals which they bill at over 180$ an hour.

Martha suggests that she be on the phone call for the hashplex merger. I think that's a good idea. that is precisely where her expertise will be helpful.

if you prefer that perkins do this work , that is fine. If you want,

I can  maintain the corporate minutes.
I can do the following instead of perkins:

 **Perkins:** Prepare a shareholder action in which the director(s) are appointed (and other incorporator actions)
- **Perkins:** Prepare the organizational actions to be approved by a company's board of directors
- **Perkins**: Order governing documents from WA Secretary of State's Office and amend and restate articles of incorporation

If you prefer



---------- Forwarded message ----------
From: **Sandoval, Martha D. (Perkins Coie)** <MSandoval@perkinscoie.com>
Date: Tue, Sep 12, 2017 at 9:43 AM
Subject: RE: Intro
To: Timur Usmanov <tu@giga-watt.com>, Zeev Kirsh <zeev@cryptonomos.com>
Cc: Dave Carlson <dave@giga-watt.com>, Sinden Harum <sinden@giga-watt.com>,
"ek@cryptonomos.com" <ek@cryptonomos.com>, Leonid Markin <lm@cryptonomos.com>,
Andrey Kuzenny <ak@giga-watt.com>, "Seigle, Stephanie (Perkins Coie)"
<SSeigle@perkinscoie.com>

Apologies, I thought I had copied my secretary on the email re the conference call, so assumed that she was handling the scheduling. Here's where things stand:

- Articles of Incorporation

  - To ensure that we have a complete set of GigaWatt, Inc.'s articles, we are ordering a set of all documents filed with the Washington Secretary of State's office

    - We need to know the starting point in order to amend and restate

  - Currently 10,000 common shares are authorized

    - Does the company have a capitalization table that sets out the number of shares outstanding and who owns these shares?

    - IF an equity incentive program were to be established, how many shares would be set aside for this? It is common to start with 10% of all authorized shares (if VC funding is anticipated, this percentage could be higher)

    - There would be a 2-step process for increasing the number of authorized shares: (a) determine the number of authorized shares desired and (b) conduct a stock split so current shareholders' equity holdings remain constant

  - Bylaws and other Incorporation Steps

    - You passed along an action by the incorporator dated 12/16/16. In this action, the incorporator:

      - adopted the bylaws;

      - stated that the company would have 1 director; and

      - appointed Nikolay Evdokimov as the sole director

      - Of these 3 acts taken by the incorporator, the incorporator only has statutory authority to adopt the bylaws and set the number of directors.

    - Inconsistent with the 12/16/16 incorporator action, in the 1/1/2017 Minutes of the Special Meeting of the Board of Directors, Adam West is identified as (and acted as) the sole director. In this meeting, the following officers were appointed:

- CEO: David M. Carlson

- President: Nikolay Evdokimov

- CFO: Leonid Markin

- Secretary: Adam West

○ Steps to be taken are:

- **Client**: Provide the identity (identities) of the company's board of directors

- **Client:** Provide the identity of the company's officer [are those listed above correct?; are there other officers?]

- **Client:** Provide capitalization table (or breakdown of share ownership)

- **Client**: Provide input on desired number of authorized shares (post stock split)

- **Perkins:** Prepare a shareholder action in which the director(s) are appointed (and other incorporator actions)

- **Perkins:** Prepare the organizational actions to be approved by a company's board of directors

- **Perkins**: Order governing documents from WA Secretary of State's Office and amend and restate articles of incorporation

I would like to introduce all of you to Stephanie Seigle. Stephanie is the corporate paralegal on the GigaWatt team. Stephanie will be working closely with us to clean up (and establish) the corporate records. I believe the desire is for Perkins to maintain the corporate minute; please correct me if my understanding is incorrect.

On the last two points:

I do not know who would have the authority to communicate with the Singapore authorities to obtain company records. Most likely, it would be the incorporator or anyone listed as an officer of the entity. If no documentation can be found on GigaWatt Pte. Ltd., we can do some research ourselves to determine what options might be available for gathering this information.

Please let me know (a) who would be on the call to discuss the anticipated merger with HashPlex, Inc.; (b) days and times (this week and next) that would work on your end for a call

to discuss; and (c) anticipated timing of this transaction (so I can begin arranging for staffing needs).

Martha

**Martha Sandoval** | **Perkins Coie LLP**

PARTNER

PHONE: 206.359.6244

FAX: 206.359.7244

MSandoval@perkinscoie.com

**From:** Timur Usmanov [mailto:tu@giga-watt.com]
**Sent:** Monday, September 11, 2017 10:35 AM
**To:** Sandoval, Martha D. (SEA); Zeev Kirsh
**Cc:** Dave Carlson; Sinden Harum; ek@cryptonomos.com; Leonid Markin; Andrey Kuzenny
**Subject:** Re: Intro

Hi Martha,

I haven't heard back from you since we agreed to set up a call. I hope this message finds you well.

Please let me know where we are in the process of amending the company's Articles of Incorporation.

On Wed, Aug 23, 2017 at 11:02 AM, Timur Usmanov <tu@giga-watt.com> wrote:

Hi Martha,

Please find my comments below

Based on the incorporation documents provided for Giga Watt, Inc., the company was incorporated using the on-line application, which includes the very basic elements needed under the statute (neither a certificate of incorporation or existence would have been issued if the filing was faulty). Since the basic articles were filed, this means that the statutory defaults apply. These defaults do not conform with best (WA) corporate practices. For example, two statutory defaults that apply are (1) directors are elected by cumulative voting and (2) a shareholder has preemptive rights.

==I recommend that we amend and restate to reflect best practice AND also to increase the number of authorized shares. If the company expects to issue options or other equity incentives, we'll definitely need to increase the number of shares.

Totally agree with your point that we need to amend and restate the articles and increase the number of shares. Even if the company doesn't decide to implement any stock option plans, it doesn't hurt to have a larger authorized stock in case of a future equity financing.

I did not do an eyeball review of the corporate bylaws, but suspect that these also don't follow best corporate practices for a Washington corporation.

The copy of the bylaws provided are unsigned. Do you know if these were adopted and then signed by the corporate secretary? Generally, at the time of incorporation, there would be a shareholder action to appoint directors and then a directors resolution/consent to appoint officers, adopt the bylaws and take other organizational actions.

==Are executed copies of these documents available? If none of these exist in the company's record books, then we'll start from scratch.

I haven't seen executed copies either of the bylaws, but I've got a copy of some sort of a board resolution regarding the adoption of the company's bylaws and some other actions. Please take a look at the attached minutes. Kindly advise if those can be considered valid from legal perspective.

As for the Singapore entity, we would not have the authority to request this information from the registered agent unless and until we are introduced to the agent as company's counsel and the agent is authorized to send information to us.

==who at Giga Watt can make this introduction and authorization?

I'll try to find that out later on. Meanwhile, let's focus on our U.S. entities.

I have not heard of GW One LLC or about an anticipated merger with Hashplex, so definitely agree that I need to get up to speed on what's happening with the organization. Dates and times that I am currently available for a call follow (all are pacific):

- Thursday, August 24:
  - 8-9am or anytime between 12:30pm-6:30pm - **what about 12:30? Will your assistant share the dial-in?**

Thank you

On Tue, Aug 22, 2017 at 7:03 PM, Sandoval, Martha D. (Perkins Coie) <MSandoval@perkinscoie.com> wrote:

All,

Based on the incorporation documents provided for Giga Watt, Inc., the company was incorporated using the on-line application, which includes the very basic elements needed under the statute (neither a certificate of incorporation or existence would have been issued if the filing was faulty). Since the basic articles were filed, this means that the statutory defaults apply. These defaults do not conform with best (WA) corporate practices. For example, two statutory defaults that apply are (1) directors are elected by cumulative voting and (2) a shareholder has preemptive rights.

==I recommend that we amend and restate to reflect best practice AND also to increase the number of authorized shares. If the company expects to issue options or other equity incentives, we'll definitely need to increase the number of shares.

I did not do an eyeball review of the corporate bylaws, but suspect that these also don't follow best corporate practices for a Washington corporation.

The copy of the bylaws provided are unsigned. Do you know if these were adopted and then signed by the corporate secretary? Generally, at the time of incorporation, there would be a shareholder action to appoint directors and then a directors resolution/consent to appoint officers, adopt the bylaws and take other organizational actions.

==Are executed copies of these documents available? If none of these exist in the company's record books, then we'll start from scratch.

As for the Singapore entity, we would not have the authority to request this information from the registered agent unless and until we are introduced to the agent as company's counsel and the agent is authorized to send information to us.

==who at Giga Watt can make this introduction and authorization?

I have not heard of GW One LLC or about an anticipated merger with Hashplex, so definitely agree that I need to get up to speed on what's happening with the organization. Dates and times that I am currently available for a call follow (all are pacific):

- Thursday, August 24:
    - o 8-9am or anytime between 12:30pm-6:30pm

- Friday, August 25:
    - o Anytime between 8am-11:30am or 2:00-3:00pm

- Monday, August 28:
    - o Anytime between 9am-6:00pm

- Tuesday, August 29:
    - o Anytime between 8am-10am or 2:00-6:00pm

- Wednesday, August 30:
    - o Anytime between 8:30am-3:00pm

- Thursday, August 31:
    - o Anytime between 8am-11:00am or 1:00pm-4:00pm

- Friday, September 1:
    - o Anytime between 8am-10:00am or 12:00pm-4:00pm

Martha

**Martha Sandoval** | **Perkins Coie LLP**

Lighthouse 0413613

**PARTNER**

PHONE: <u>206.359.6244</u>

FAX: <u>206.359.7244</u>

<u>MSandoval@perkinscoie.com</u>

---

**From:** Timur Usmanov [mailto:<u>tu@giga-watt.com</u>]
**Sent:** Wednesday, August 09, 2017 2:35 PM
**To:** Dave Carlson
**Cc:** Sandoval, Martha D. (SEA); Sinden Harum; <u>ek@cryptonomos.com</u>; Leonid Markin; Andrey Kuzenny
**Subject:** Re: Intro

Dear all,

I totally agree with Dave. We would need to ask Perkins Coie to audit our structure and provide advice and assistance.

---

Martha didn't mention GW One LLC as a company that is also under our umbrella. Apparently, we would have to set up a call and talk through the entire group and bring Martha up to speed on our M&A plans. We definitely need a legal advice on the upcoming merger with Hashplex as there are few things I'm not clear about.

As for the constitutional dox requested by Martha - please find attached some of the documents on Giga Watt, Inc that I've got as of today. As you can see the Articles of Incorp doesn't contain articles per se, but only a title page.

In view of the above, I suggest that Perkins Coie also reach out to Washington Secretary of State to check with them whether or not the initial filing was complete. Same goes for our Singapore entities. Someone would probably need to request the full batch of documents via the registered agent.

As far as SHA is concerned - I believe this is still being drafted and discussed amongst the shareholders.

Thank you

On Tue, Aug 8, 2017 at 9:13 AM, Dave Carlson <dave@giga-watt.com> wrote:

Thanks for the clarity Martha.

Ed - we met with Perkins week before last and did a project orientation checkup with Martha.  I wasn't clear what Perkins had been involved with versus the guidance given by Katrina.

Its clear that at this point that the corp structure (Giga.sg and Giga.us) and their relationship were defined by Katrina with perhaps some input by Perkins, but not at their specific direction.

I think we need to determine if we are comfortable with our current arrangement, or do we want Perkins to dig into how we are doing business and what the entity structure consists of.  Further, we may need Perkins to evaluate whether the legal protection and tax/revenue strategies implied by this corp structure are effective and achieve our goals.

We've built a lot of business based on the structure Katrina defined, and perhaps you guys are familiar and comfortable with it - I'm asking you for your feedback on whether to engage Perkins to audit our structure and build us a robust plan going forward.  At this point I think its fair to say that Perkins knows *very little* about our business, with the exception of the two entities and a proposed third entity (Hosting).


Your thoughts?


Thanks!

Dave

On Mon, Aug 7, 2017 at 2:46 PM, Sandoval, Martha D. (Perkins Coie)
<MSandoval@perkinscoie.com> wrote:

Sinden and Dave,

It was a pleasure meeting the two of you the week before last. I followed up with my colleagues who have worked on Giga Watt / Cryptonomos matters prior to my involvement and can confirm that we were not involved in the incorporation of Giga Watt, Inc. or Pte. Ltd nor in organizational structure conversations/decisions. As I mentioned in our meeting, our involvement began with questions regarding separation of liability between the entities.

If the desire is for Perkins to take on the role of corporate counsel for the affiliated entities, we will need to have the charter documents for the entities, this includes:

- Giga Watt Pte. Ltd:

  o Articles of incorporation (or the Singapore equivalent)

  o Bylaws (or the Singapore equivalent)

  o Shareholders Agreement

  o Capitalization table

- Giga Watt, Inc.

  o Articles of incorporation

  o Bylaws

  o Shareholders Agreement

- Giga Watt Hosting, LLC

  o Executed LLC Agreement (we drafted this agreement, but I don't know if it was signed)

In addition, if the agreement between GW Inc and GW Hosting and the form of hosting services agreement have been drafted, please provide those as well. We can certainly comment on these; however, I am primarily asking so we have in our records in case questions come up in the future.

Cheers,

Martha

**Martha Sandoval** | *Perkins Coie LLP*

PARTNER

PHONE: 206.359.6244

FAX: 206.359.7244

MSandoval@perkinscoie.com

---

**From:** Sinden Harum [mailto:sinden@giga-watt.com]
**Sent:** Thursday, June 29, 2017 3:30 PM
**To:** katrina
**Cc:** Sandoval, Martha D. (SEA); Dave Carlson
**Subject:** Re: Intro

Hello All,

We are still trying to arrange for an in person meeting. We have no availability up to the July 4th holiday then Dave leaves for London until 7/19. We may need to schedule toward the end of July but will know more later today.

Best,

Sinden

On Jun 29, 2017, at 11:51 AM, katrina <katrina@cryptonomos.com> wrote:

Good Afternoon, everyone.

Martha, sounds good.

Sinden, could you please work with Martha and provide her with the requested info for Giga Watt, Inc. please.

Martha, you should already have the documents for Giga Watt Hosting, LLC I sent you earlier.

Sincerely,

Katrina

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------

From: "Sandoval, Martha D. (Perkins Coie)" <MSandoval@perkinscoie.com>

Date: 6/29/17 10:55 (GMT-08:00)

To: Katrina Grant <katrina@cryptonomos.com>, Dave Carlson <dave@giga-watt.com>, sinden@giga-watt.com

Subject: RE: Intro

All,

Since we have been unsuccessful in getting a meeting on our calendars, should we have this conversation via email?

If so, please provide details on the companies at issue – where and when formed, types of entities, a narrative of the desired separation/spinoff.


Martha


**Martha Sandoval** | Perkins Coie LLP

PARTNER

PHONE: 206.359.6244

FAX: 206.359.7244

MSandoval@perkinscoie.com


**From:** Katrina Grant [mailto:katrina@cryptonomos.com]
**Sent:** Wednesday, June 14, 2017 8:06 PM
**To:** Sandoval, Martha D. (SEA); Dave Carlson; sinden@giga-watt.com
**Subject:** Intro


Good Evening, all.

Martha, please meet Dave Carlson and Sinden Harum (copied). Could you please communicate with Dave and Sinden on how to separate two companies and assist them through the process.

I reviewed the documents and I think it should work. We can start the process of separating the companies now and add the BOD resolution later, since these are the internal documents of the company.

Sincerely,

Katrina

_____

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

--



Dave Carlson, CEO

Giga Watt, Inc.

[www.giga-watt.com](http://www.giga-watt.com)

--

Best,

Tim Usmanov

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

--

Best,


Tim Usmanov




--

Best,


Tim Usmanov

---

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.


--
Best,

Tim Usmanov

# EXHIBIT 20

**From:** Sandoval, Martha D. (SEA)
**Sent:** Friday, September 29, 2017 3:41 PM
**To:** Seigle, Stephanie (SEA)
**Subject:** RE: Intro

Thanks for letting me know, Stephanie, and sorry you had to deal with this. I haven't met Zeev or Timur, only David. The chart was sent to Bob from the inhouse attorney who set up these entities.

David told me it was outdated, but didn't have a current chart.

**Martha Sandoval** | **Perkins Coie LLP**
PARTNER
PHONE: 206.359.6244
FAX: 206.359.7244
MSandoval@perkinscoie.com

---

**From:** Seigle, Stephanie (SEA)
**Sent:** Thursday, September 28, 2017 2:35 PM
**To:** Sandoval, Martha D. (SEA)
**Subject:** FW: Intro

Martha,

I spoke to Zeev and he was very upset and combative, saying that he doesn't understand a thing we're doing and we're wasting our time and their money, and that he doesn't understand any of the actions you are telling them they need to take.

He was VERY concerned about where we got the org chart. He kept asking me to "look at the meta data" to find out where it came from. I see now (after looking through emails) that it was sent to Bob Mahon, but I don't know who actually created it.

I offered to set up a call with you, but he declined.

I just want to give you a heads up in case he or Timur contact you. I just don't understand his anger, as he was copied on your email to Timur on 9/13.

Give me a call if you'd like to discuss further.

Thanks,
Stephanie

**Stephanie Seigle** | **Perkins Coie LLP**
PARALEGAL
206.359.3833

---

**From:** Zeev Kirsh [mailto:zeev@cryptonomos.com]
**Sent:** Thursday, September 28, 2017 2:15 PM
**To:** Seigle, Stephanie (SEA)
**Subject:** Re: Intro

we had this. and have it.

On Thu, Sep 28, 2017 at 2:12 PM, Seigle, Stephanie (Perkins Coie) <SSeigle@perkinscoie.com> wrote:

Hi Zeev,

20-80031-FPC    Doc 120-4    Filed 10/17/22    Entered 10/17/22 17:48:49    Pg 31 of 82    PC_004721

# EXHIBIT 21

| | |
|---|---|
| **From:** | "Zeev Kirsh" <zeev@cryptonomos.com> |
| **Sent:** | Fri, 22 Sep 2017 21:07:28 +0000 |
| **To:** | "kyle@giga-watt.com" <kyle@giga-watt.com> |
| **Cc:** | "Timur Usmanov" <tu@giga-watt.com>; "Dave Carlson" <dave@giga-watt.com>; "Leonid Markin" <lm@cryptonomos.com>; "Andrey Kuzenny" <ak@cryptonomos.com> |
| **Subject:** | Re: contracting questions |

Dave leonid andrew ignore the email for now. I will organize all information with Kyle and Timur for now.

zeev


On Fri, Sep 22, 2017 at 2:01 PM, Zeev Kirsh <zeev@cryptonomos.com> wrote:
  Kyle,

  I dont' believe we've formally met, Timur explained to me that Gigawatt inc's relationship with Giga Watt singapore (GWSE) must be formalized and that you could help me do this. to do this, we need to know how gigawatt singapore's business depends on gigawatt inc's (INC) operations.

  obviously , in short , GWSE depends on INC for a whole lot. But i need a more specific spelled out set of promises/obligations which detail what it is that gigawatt inc and its employees do from top to bottom.

  this is made more complex by the fact that a bunch of coders in moscow or other parts of the world are working for gigawatt inc or for gigawatt singapore. i do not knwo who they 'belong' to.

  It may help to to know who is doing what work where. a list of employees and service providers would be a good start so we know who works for INC for certain and what their responsibilities are . of those responsibilities, we need to know what INC is obliged to provide for GWSE

  ultimately GWSE also has its own employees and workers that it pays to do things. INC cannot be obliged to provide those things for GWSE. those will be deemed GWSE's own reponsibilities.


  the formalized obligations of INC must be provided in return for some compensation or funding of some time. A legal relationship that is a contract must be bidirectional.

  We must get together a list of money and funding amounts that GWSE has provided , and will commit to providing in the future to gigawatt inc.

the relationship between the two companies will be defined as a two way relationship of funding (and other things?) in return for obligations. in this manner, anyone looking to invest or purchase an interest in GWSE , or INC, will have a better understanding of what they are investing in. and the investment will be more attractive.

This will probably be the start of a long set of emails because this is a very complex situation and it will take some time to sort this out. We may eventually require a statement of shareholder interests in both companies to make both companies more attractive for investment and funding from outside sources.

How do you think we should get started? Please feel free to reach out to me on telegram @zeevkirsh or call
212 586 7517

Zeev Kirsh

kyle , it was good speaking with you the other day.
tim , i would like your input. i don't think you are aware of gigawatt hosting llc . perhaps you can speak to andrey about this.

I am working on the agreements between gigawatt inc and singapore.

I have a question i just want to double check. for some reasons, someone created giga watt hosting llc. this entity is owned/governed by giga watt inc.

i think hosting llc was created with the idea in mind that giga watt inc could escape liability for hosting agreements. this is not the case for a wholly owned subsidiary so i really don't know why it exists other than sloppy thinking by lawyers involved previously.

I am going to exclude gigawatt hosting llc from any of the agreements whatsover and pretend it does not exist. gigawatt inc will be the only entity involved in the sla and it will be responsible for hosting of hardware as far as the agreement goes.

I believe sinden harum was involved with this, but he/she has not been resonding to a single email so I have just stopped ccing them.

let me know what you think.
Zeev


On Fri, Sep 22, 2017 at 2:01 PM, Zeev Kirsh <zeev@cryptonomos.com> wrote:
    Kyle,

    I dont' believe we've formally met, Timur explained to me that Gigawatt inc's relationship with Giga Watt singapore  (GWSE) must be formalized and that you could help me do this.
    to do this, we need to know how gigawatt singapore's  business depends on gigawatt inc's (INC) operations.

    obviously , in short , GWSE depends on INC for a whole lot. But i need a more specific spelled out set of promises/obligations which detail what it is that gigawatt inc and its employees do from top to bottom.

    this is made more complex by the fact that a bunch of coders in moscow or other parts of the world are working for gigawatt inc or for gigawatt singapore. i do not knwo who they 'belong'

to.

It may help to to know who is doing what work where. a list of employees and service providers would be a good start so we know who works for INC for certain and what their responsibilities are . of those responsibilities, we need to know what INC is obliged to provide for GWSE

ultimately GWSE also has its own employees and workers that it pays to do things. INC cannot be obliged to provide those things for GWSE. those will be deemed  GWSE's own reponsibilties.

the formalized obligations of INC must be provided in return for some compensation or funding of some time.  A legal relationship that is a contract must be bidirectional.

We must get together a list of money and funding amounts that GWSE has provided , and will commit to providing in the future to gigawatt inc.

the relationship between the two companies will be defined as a two way relationship of funding (and other things?) in return for obligations. in this manner, anyone looking to invest or purchase an interest in  GWSE , or INC, will have a better understanding of what they are investing in. and the investment will be more attractive.

This will probably be the start of a long set of emails because this is a very complex situation and it will take some time to sort this out. We may eventually require a statement of shareholder interests in both companies to make both companies more attractive for investment and funding from outside sources.

How do you think we should get started? Please feel free to reach out to me on telegram @zeevkirsh or call
212 586 7517

Zeev Kirsh

# EXHIBIT 22

| | |
|---|---|
| **From:** | "Zeev Kirsh" <zeev@cryptonomos.com> |
| **Sent:** | Mon, 16 Oct 2017 21:35:13 +0000 |
| **To:** | "Andrey Kuzenny" <ak@cryptonomos.com>; "Leonid Markin" <lm@cryptonomos.com>; "Ed Khaptahaev" <ek@cryptonomos.com>; "Dave Carlson" <dave@giga-watt.com> |
| **Subject:** | Re: Shareholder Agreement |
| **Attachments:** | Giga Watt Sha 26072017 10_20_17.docx |

To The Shareholders,

I'm attaching the Shareholder Agreement that should be agreed upon and signed in person or digitally at some point soon.

I have updated the document schedule to name the officers at the bottom of the document. I am not proposing any changes but if this will reflect current internal practice I put Timur into the CFO position , I took Nikolay Evdokimov out. and I moved Leonid from Chief Financial Officer to President. If this is no good,I only offered it as an idea. You can put in more officers or create officer positions as you like for everyone/anyone who wants one. Open the Agreement , Let me know and I can fill it in.

Also note that Daria Generalova and The Goldcoin trust were allocated 100 and 500 shares but this document was never signed. Daria is no longer with the company. Their shares are 1% and 5% respectively out of total 10,000 shares  issued. 1500 shares are not allocated.  I don't know what hard agreements there are with Daria or Goldcoin, or if any even exist with them, but they were never signed. If there is no actual agreement with them, it is possible you may effectively reclaim 1% and/or 5% of the the shares by delisting them from the shareholder schedule agreement.

Also, It is not my business , and you do not need to tell me but just to remind you all that Dave asked and you may want to respond to him personally regarding share ownership before everyone signs. "I assume Faraversum is Nick and Silaren is Leo, Ed & Andrey?"


SEE BELOW.

Schedule C
Initial APPOINTMENT OF OFFICERS OF THE CORPORATION

**(a)      Approval of the Corporation's President;                     Leonid Markin?**

**(b)      Approval of the Corporation's CEO;                          Dave Carlson**

Lighthouse 0488643

**(c)     Approval of the Corporation's Chief Financial Officer     Timur Usmanov?**

**(d)     Approval of the Corporation's Secretary;     Adam West**


On Thu, Oct 5, 2017 at 3:46 PM, Zeev Kirsh <zeev@cryptonomos.com> wrote:
    Dear Shareholders,

    I spoke with Ed today. The Shareholder Agreement sent to me by Andrey. The most important thing to understand is that there are 8500 out of 10,000 shares currently owned by all shareholders and 5 authorized seats on the board. The majority of all 5 seats can control the voting process according to the shareholder agreement. While corporate laws do provide protection to 'minority shareholders' in the case of disputes, the essential agreement between you is that Silaren limited, through the ownership of a majority of the current outstanding shares, will have control over the board of directors because it has the ability to vote for 3 of 5 board seats.

    1500 shares are issued but not distributed yet. Here are the distributions below.

LIST OF FOUNDERS


| Founders | Number and Class of Shares |
|---|---|
| Faraversum Corporation Limited | 2,920 |
| Silaren Limited | 4,980 |
| David M. Carlson | 1000 |


SCHEDULE "A-2"

LIST OF OTHER SHAREHOLDERS . **Please Note that Daria no longer works with GigaWatt Inc.**


| Other Shareholders | Number and Class of Shares |
|---|---|
| The Goldcoin Trust dated 01/01/2017 | 500 |
| Daria Generalova | 100 |

    The board is comprised as below:

Lighthouse 0488644

1 Director shall be appointed by Founder 1    Faraversum Corporation

1 Directors shall be appointed by Founder 2; Silaren Limited

1 Director shall be appointed by Founder 3;    Dave Carlson


This is the most important aspect of the agreement,  above any and all other aspects of the existing shareholder agreement.

If this is satisfactory, the agreement is ready for signature whenever you should be ready.

If you have any other questions or concerns please let me know. Thank you.

Zeev Kirsh


--
https://www.linkedin.com/in/zeev-kirsh-2900607/
212 586 7517
@zeevkirsh telegram
@zevkirsh twitter/steemit

Lighthouse 0488645

**SHAREHOLDER AGREEMENT for**

**GIGA WATT INC.**

**THIS SHAREHOLDERS AGREEMENT** is made as of the ____ day of _____, ___ between

Faraversum Corporation Limited, a corporation registered and existing under the laws of England and Wales having a company number 09286372 with its registered address at: Suite 1 5 Percy Street, Fitzrovia, London, W1T 1DG ("*Founder 1*");

Silaren Limited, a business company registered and existing under the laws of British Virgin Islands having a registration number 1745954 with its registered address at: Trident Trust Company (BVI), Trident Chambers, P.O. Box 146, Road Town, Tortola, British Virgin Islands ("*Founder 2*");

Mr. David M. Carlson ("*Founder 3*");

(Founder 1, Founder 2 and Founder 3 are hereinafter referred collectively as "**Founders**" and, separately, "**Founder**", each Founder' shareholding is listed on Schedule "A-1" annexed hereto); and

The Goldcoin Trust dated 01/01/2017, ("*Other Shareholder 1*")

Daria Generalova, ("*Other Shareholder 2*");

(Other Shareholder 1 and "Other Shareholder 2" are hereinafter collectively referred as "**Other Shareholders**" and, separately – "**Other Shareholder**", each Other Shareholder is listed on Schedule "A-2" annexed hereto); and

Giga Watt Inc., a corporation incorporated under the laws of Washington State, United States of America, located at 1 Campbell Pkwy, East Wenatchee, WA 98802 (the "Corporation");

and any person who becomes a party hereto by executing an acknowledgement in the form annexed hereto as Schedule "B".

**RECITALS:**

**WHEREAS** the Corporation is engaged in Business (as defined hereinafter);

**WHEREAS** the parties hereto, other than the Corporation, together own, directly or indirectly, 95% of the issued and outstanding shares in the capital of the Corporation as of the date hereof;

**AND WHEREAS** the parties hereto wish to record their agreement as to the manner in which the Corporation's affairs are to be conducted and to agree upon the terms on which the

-1-

Lighthouse 0488646

securities of the Corporation, now or hereafter outstanding and held by them, will be held, transferred and voted;

**NOW, THEREFORE,** pursuant to R.C.W. § 23B.07.320 and each new shareholder's subscription for, or purchase of, shares of stock in the Corporation, and in consideration of the covenants and conditions set forth below, the parties agree as follows**:**

## ARTICLE 1
## DEFINITIONS AND PRINCIPLES OF INTERPRETATION

### 1.1    Definitions

Whenever used in this Agreement, the following words and terms have the meanings set out below:

(a)    "Affiliate" (i) in the case of an entity, any Person who, through one or more intermediaries, directly or indirectly controls, is controlled by, or is under common control with, any specified Person, or (ii) in the case of an individual, such individual's spouse, children (whether adopted or stepchildren), grandchildren, or parents, or a trust, family limited partnership, or family limited liability company organized primarily for the benefit of any of them..

(b)    "Agreement" means this Shareholders Agreement and all attached schedules and all instruments supplemental to or in amendment or confirmation of this Agreement;

(c)    "arm's length" has the meaning that it has for purposes of Washington Business Corporation Act (as amended);

(d)    "Bankrupt" or "Bankruptcy" means the filing of a voluntary or involuntary petition with respect to a Person under the Federal Bankruptcy Code, any successor federal legislation, or any comparable state law (if such proceeding is not terminated within thirty (30) days of filing), or the making of an assignment of all or substantially all of one's assets for the benefit of creditors.

(e)    "Board" means the board of directors of the Corporation, as the same may be constituted from time to time in accordance with this Agreement;

(f)    "Business" means crypto-currency mining services (including but not limited to equipment sales, maintenance and repair, construction and maintenance of data hosting facilities);

(g)    "Business Day" means any day except Saturday, Sunday or any statutory holiday in the United States;

20-80031-FPC    Doc 120-4    Filed 10/17/22    Entered 10/17/22 17:48:49    Pg 42 of 82
Lighthouse 0488647

(h)     "Business Plan" means is an annual business plan for the Corporation and the Corporation Subsidiaries;

(i)     "Common Shares" means the Common Shares in the capital of the Corporation;

(j)     "Competitor" means any business which is, at the relevant time, engaged in the design, development, marketing, sale or licensing of any products or services that are in form and function competitive with the Business or any of the products and services that are marketed and sold or licensed by the Corporation or any product or service that is known by a Shareholder to be under development by the Corporation;

(k)     "Control" means: (a) with respect to any corporation, the ownership, beneficially and legally, of voting securities in the capital of such corporation, to which are attached more than fifty percent (50%) of the votes that may be cast to elect the directors of such corporation and such votes are sufficient (if exercised) to elect a majority of the directors; and (b) with respect to a partnership, trust, syndicate or other entity, actual power or authority to manage and direct the affairs of, or ownership of more than fifty percent (50%) of the beneficial interest in such entity;

(l)     "Change of Control" shall occur if a person who has Control of a body corporate ceases to do so or if another person acquires Control of it;

(m)     "Dissolves" or "Dissolution" means, in respect of a corporation, partnership, or trust, an involuntary dissolution that is not reversed within sixty (60) days.

(n)     "Encumbrance" means any pledge, charge, lien, mortgage, debenture, hypothecation, security interest, pre-emption right, option or any other encumbrance or third party right or claim of any kind or any agreement to create any of the above;

(o)     "Fair Value" means the value of any Shares or, as the case may be, the value per Share, in each case as calculated in accordance with the principles set out in Schedule C as agreed between the Parties or as determined in accordance Clause 6.9 and Clause 6.10;

(p)     "Family Members" means, in respect of an individual, any parent, spouse, child, spouse of a child, grandchild and/or sibling;

(q)     "Founders" means collectively Founder 1, Founder 2 and Founder 3 and "Founder" means any one of them;

(r)     "Group Companies" means the Corporation and any Corporation Subsidiary, and "Group Company" means any one of them;

(s)     "Initial Public Offering" means the sale by either the Corporation or any of its Subsidiaries of its capital stock pursuant to a registration statement under the Securities Act (other than a registration statement relating solely to an employee

-3-

Lighthouse 0488648

benefit plan or transactions covered by Rule 145 or Regulation A of the Securities Act);

(t)    "Major Transaction" means either single loan or a series of loans with the total value exceeding US$50,000 or a pledge or any other type of Encumbrance or a series thereof with total value exceeding US$50,000;

(u)    "Majority" means shareholders holding more than fifty percent (50%) of the outstanding Common Shares not including Permitted Additional Securities;

(v)    "Non-Record Shareholder" means a spouse who is not the Shareholder of Record, as described in Clause 9.10 of this Agreement;

(w)    "Ordinary Course of Business" means the Corporation's ordinary course of business consistent with past custom and practice (including with respect to quantity, quality and frequency);

(x)    "Parties" means, collectively, the Shareholders, the Founders, and the Corporation and any other Person that becomes a party to this Agreement, and "Party" means any one of them;

(y)    "Permitted Additional Securities" means up to [*number of shares in stock option pool*] Common Shares issued or issuable pursuant to the Stock Plan (including all Common Shares issuable on the exercise of options granted under the Stock Plan or proposed for grant under the Stock Plan to the date hereof, and options to purchase such Common Shares) (subject to appropriate adjustment for any share dividends, share splits, recapitalizations, combinations or the like affecting the Common Shares) or such greater number of Common Shares as approved by the Board and a Majority;

(z)    "Permitted Encumbrances" means any Encumbrances incurred in connection with (a) Shareholder Loans, or (b) the provision of Development Finance by third party lenders;

(aa)    "Permitted Transferee" means any Person to whom Shares are transferred pursuant to Clause 6.4;

(bb)    "Person" includes any individual, sole proprietorship, partnership, unincorporated association, unincorporated syndicate, unincorporated organization, trust, body corporate, and a natural Person in his capacity as trustee, executor, administrator, or other legal representative;

(cc)    "Reserved Matters" has the meaning ascribed to it in Clause 4.3 below;

(dd)    "Shareholder Group" means, in relation to a Shareholder, that Shareholder and its Affiliates and includes all such Shareholder's Group Permitted Transferees;

Lighthouse 0488649

(ee)  "<u>Shareholder Loan</u>" means any loan made by a Shareholder or any of its Affiliates to any Group Company whether before or after the date of this Agreement;

(ff)  "<u>Shareholder Proportion</u>" means, in relation to a Shareholder, the proportion which the number of Shares held by it, together with Shares held by members of its Shareholder Group, bears to the total number of Shares held by the Shareholders (and their Shareholder Groups) in issue from time to time

(gg)  "<u>Shareholders</u>" means the Founders and Other Shareholders, together with such other Persons as may become Parties to this Agreement as a shareholder of the Corporation, collectively, and "<u>Shareholder</u>" means any one of such Persons individually;

(hh)  "<u>Shares</u>" means the Common Shares;

(ii)  "<u>Stock Plan</u>" means the Corporation's stock option plan to be implemented with approval of the Majority and as it may be amended from time to time, providing for the issuance of Common Shares to eligible employees, consultants, directors, vendors and any other parties approved by the Majority;

(jj)  "<u>Subsidiary</u>" means a Person that is controlled directly or indirectly by another Person; and

(kk)  "<u>Transfer</u>" means any disposition, transfer, sale, exchange, assignment, gift, bequest, disposition, mortgage, hypothecation, charge, pledge, encumbrance, grant of security interest, or any arrangement by which possession, legal title or beneficial ownership passes, directly or indirectly, from one person or entity to another, or to the same person or entity in a different capacity, whether or not voluntary and whether or not for value, and includes any agreement to effect the foregoing.

## 1.2    <u>Certain Rules of Interpretation</u>

In this Agreement:

(a)  **Consent -** Whenever a provision of this Agreement requires an approval or consent and such approval or consent is not delivered within the applicable time limit, then, unless otherwise specified, the Party whose consent or approval is required is conclusively deemed to have withheld its approval or consent.

(b)  **Governing Law -** This Agreement shall be governed by and construed in accordance with the laws of Washington State, United States of America, without regard to the province's conflict of law provisions, and each of the Parties irrevocably agrees to submit to the exclusive jurisdiction of the courts of such province for and in connection with any proceedings relating to this Agreement.

(c)  **Headings -** Headings of articles and sections are inserted for convenience of reference only and do not affect the construction or interpretation of this Agreement.

20-80031-FPC    Doc 120-4    Filed 10/17/22    Entered 10/17/22 17:48:49    Pg 45 of 82
Lighthouse 0488650

(d)      **Including -** Where the word "including" or the word "includes" is used in this Agreement, it means "including (or includes) without limitation".

(e)      **Number and Gender –** Unless the context otherwise requires, words importing the singular include the plural and vice versa and words importing gender include all genders.

(f)      **Severability –** If any provision of this Agreement is adjudged invalid or unenforceable, the other provisions of this Agreement will remain in full force and effect..

(g)      **Time –** Time is of the essence in the performance of the Parties' respective obligations.

(h)      **Time Periods -** Unless otherwise specified, time periods within or following which any payment is to be made or act is to be done are calculated by excluding the day on which the period commences and including the day on which the period ends and by extending the period to the following Business Day if the last day of the period is not a Business Day.

(i)      **Currency -** Unless otherwise indicated all dollar amounts referred to in this Agreement, including the symbol "$", refer to lawful money of the United States.

## ARTICLE 2
## PURPOSE AND SCOPE

### 2.1      Compliance with Agreement

Each Shareholder agrees to vote and act as a shareholder of the Corporation to fulfil the provisions of this Agreement and in all other respects to comply with, and use all reasonable efforts to cause the Corporation to comply with, this Agreement, and to the extent, if any, permitted by law, shall cause its respective nominee(s) as directors of the Corporation to act in accordance with this Agreement.  The Shareholders further undertake that they will use their influence as Shareholders to cause such meetings of the Corporation to be held, resolutions passed, by-laws enacted, agreements and other documents signed and acts or things performed or done as may be necessary or desirable to ensure that the provisions of this Agreement are implemented and given full force and effect.

### 2.2      Compliance by Corporation

The Corporation undertakes to carry out and be bound by the provisions of this Agreement to the full extent that it has the capacity and power at law to do so.

### 2.3      Conflict with By-laws

In the event of any conflict between the provisions of this Agreement and the provisions of the by-laws of the Corporation, the provisions of this Agreement shall prevail, and the

-6-

Lighthouse 0488651

Shareholders shall vote to amend the by-laws of the Corporation so as to ensure conformity with the terms of this Agreement.

### ARTICLE 3
### FINANCIAL PARTICIPATION IN THE CORPORATION

**3.1**     **Equity Participation**

Each of the Shareholders represents and warrants to each other and to the Corporation that:

(a)     such Shareholder at the date hereof (or, if such Shareholder becomes a Party following the date of this Agreement, at the date such Shareholder acquired its Shares), owns beneficially and of record the number of Shares set forth opposite such Shareholder's name on Schedule "A-1" or Schedule "A-2" attached hereto, as applicable (as such schedules may be amended from time to time to reflect changes in shareholdings);

(b)     the Shares held by such Shareholder are held beneficially and of record by such Shareholder, such Shares are not subject to any mortgage, lien, charge, pledge, encumbrance, security interest or adverse claim and no Person has any rights to become a holder or possessor of any of the Shares or of the certificates representing the same, if applicable;

(c)     if the Shareholder is an individual, that such Shareholder has the capacity to enter into and give full effect to this Agreement;

(d)     if the Shareholder is a corporation, that it is duly incorporated and validly existing under the laws of its jurisdiction of incorporation and that it has the corporate power and capacity to own its assets and to enter into and perform its obligations under this Agreement;

(e)     if the Shareholder is a trust, partnership or joint venture, that it is duly constituted under the laws that govern it and that it has the power to own its assets and to enter into and perform its obligations under this Agreement;

(f)     this Agreement has been duly authorized by such Shareholder and duly executed and delivered by such Shareholder and constitutes a valid and binding obligation enforceable in accordance with its terms, subject to the usual exceptions as to bankruptcy and the availability of equitable remedies;

(g)     that the execution, delivery and performance of this Agreement does not and shall not contravene the provisions of its articles, by-laws, constitutional documents or other organizational documents or the documents by which such Shareholder was created or established or the provisions of any indenture, agreement or other instrument to which such Shareholder is a party or by which such Shareholder may be bound; and

-7-

Lighthouse 0488652

(h)     that, subject to the terms of this Agreement, all of the foregoing representations and warranties (other than the representation and warranty in paragraph (a)) shall continue to be true and correct during the continuance of this Agreement.

## ARTICLE 4
## MANAGEMENT OF THE CORPORATION

### 4.1     Board of Directors

The Corporation shall have a Board consisting of up to 5 directors (each - "**Director**"), of which:

1 Director shall be appointed by Founder 1

3 Directors shall be appointed by Founder 2;

1 Director shall be appointed by Founder 3;

Each Shareholder shall vote its Shares at any meeting at which directors are to be elected, or execute any written resolutions of the shareholders at the request of the Corporation, to elect the directors nominated in accordance with this Agreement.

### 4.2     Removal and Replacement of Nominees

Any Shareholder (or group of Shareholders) entitled to nominate and elect a director may remove any such director by notice to such director, the other Shareholders and the Corporation. Any vacancy occurring on the Board by reason of the death, disqualification, inability to act, resignation or removal of any director may be filled only by a further nominee of the Shareholder or Shareholders whose nominee was so affected so as to maintain a Board consisting of the nominees specified in Clause 4.1.

### 4.3     Matters Requiring Prior Majority Approval ("Reserved Matters")

None of the following shall be carried out and effected by the Corporation without the prior written approval of the Majority:

(a)     any amendment to the Articles of Incorporation or by-laws of the Corporation;

(b)     any changes in the number of directors of the Corporation;

(c)     any corporate restructuring, amalgamation or merger of the Corporation with any other body corporate; or

(d)     acquisition or disposal of any assets of the Corporation or its subsidiary in a transaction or a series of transactions with the total value exceeding US$100,000 outside the Ordinary Course of Business;

-8-

Lighthouse 0488653

(e)     entering into a transaction or a series of transactions with related parties unless performed in the Ordinary Course of Business;

(f)     issuance of any additional Shares, other securities, granting of any option or right of subscription, registration of any new Shareholders;

(g)     any Major Transaction unless performed in the Ordinary Course of Business;

(h)     approval of the Stock Plan;

(i)     institution or settling or compromising any material legal proceedings with value in excess of US$50,000;

(j)     approval of the Business Plan;

(k)     any resolution on winding up of the Corporation or any application for the appointment of a receiver or an administrator of the Corporation's assets;

(l)     forming any company or participating in or terminating any participation in, any partnership, joint venture or Subsidiary;

(m)     any declaration of a dividend or any other distribution;

(n)     any change to the Corporation's auditors or accountants after the date of this Agreement.

**4.4     <u>Matters Requiring Prior Board Approval</u>**

None of the following shall be carried out and effected by the Corporation without the prior written approval of the majority of the Board:

(a)     Approval of the Corporation's President;

(b)     Approval of the Corporation's CEO;

(c)     Approval of the Corporation's Chief Financial Officer

(d)     Approval of the Corporation's Secretary;

(e)     Approval of the Corporation's internal auditor.

**4.5     <u>Insurance</u>**

Upon and in the event of a determination by the Board to purchase such insurance, the Corporation shall purchase and maintain insurance on behalf of any agent of the Corporation against any liability asserted against or incurred by the agent in such capacity or arising out of the agent's status as such whether or not the Corporation would have the power to indemnify the agent against that liability.

20-80031-FPC     Doc 120-4     Filed 10/17/22     Entered 10/17/22 17:48:49     Pg 49 of 82
Lighthouse 0488654

## ARTICLE 5
## COVENANTS OF THE CORPORATION

### 5.1    Information Rights

The Corporation shall prepare and deliver to each of the Founders:

(a)    as soon as available after the end of each financial year, unaudited financial statements of the Corporation, including consolidated balance sheets of the Corporation and its subsidiaries, if any, as at the end of such financial year, and consolidated statements of income, retained earnings and changes in cash flow of the Corporation and its subsidiaries, if any, for such year, setting forth in each case in comparative form the corresponding figures for the previous financial year, all prepared in accordance with generally accepted accounting principles in the United States;

(b)    as soon as available after the end of each quarter, a report prepared by the management of the Corporation regarding such quarter's financial results and operations;

(c)    prior to the commencement of each financial year, the Business Plan with an operating and capital expenditure budget of the Corporation (the "Annual Budget") as approved by the Board;

(d)    such other financial and business information as any Shareholder may reasonably request from the Corporation from time to time.

### 5.2    Other Covenants

Without limiting any other covenants and provisions hereof, and except to the extent the following covenants and provisions of this Clause 5.2 are waived in any instance by the holders of Majority, the Corporation covenants and agrees that it shall perform and observe the following covenants and provisions, and shall cause each of its subsidiaries, if and when such subsidiary exists, to perform and observe such covenants and provisions.

(a)    Financings.

The Corporation shall inform the Board of any negotiations, offers or contracts relating to possible financings of any nature for the Corporation, whether initiated by the Corporation or any other Person, except for (A) arrangements with trade creditors, and (B) utilization by the Corporation of commercial lending arrangements with financial institutions.

(b)    Proprietary Information and Inventions Agreements.

The Corporation shall obtain a duly executed agreement relating to proprietary information and assignment of inventions on terms and conditions acceptable to the Board, from each current and future technical or senior managerial employee, contractor and consultant of the Corporation.

-10-

(c)     Confidentiality and Non-Compete Agreements.

The Corporation shall ensure that all key employees of the Corporation enter into appropriate employment contracts containing appropriate confidentiality, non-compete and non-solicit covenants that are acceptable to the Board.

The Founders and Other Shareholders hereby undertake to procure that the Corporation's key officers, namely President, CEO, CFO, CMO, COO, and CTO shall not directly or indirectly compete with the Business of the Corporation and its successors and assigns during the period of validity of this Agreement and for [one year] following termination this Agreement and notwithstanding the cause or reason for termination.

## ARTICLE 6
## DEALING WITH SHARES

**6.1     Restrictions on Transfer of Shares**

(a)     No Shareholder shall Transfer any Shares to any Person, except as specifically permitted or required by this Agreement and only in accordance with the terms of this Agreement.  The Corporation shall not be required: (A.) to Transfer on its books any Shares, nor (B.) to treat as the owner of the Shares, or otherwise to accord voting or dividend rights to, any transferee to whom the Shares have been Transferred in contravention of this Agreement.

(b)     Every Transfer of Shares held by a Shareholder is subject to the conditions that:

(i)      the proposed transferee, if not already bound by the terms of this Agreement, first agrees, in writing, to become a party to and be bound by the terms of this Agreement by signing an acknowledgment substantially in the form annexed hereto as Schedule "B";

(ii)     the Transfer is approved in accordance with the by-laws;  provided, that, any Transfer referred to in Clause 6.1(a) or that is otherwise a permitted Transfer pursuant to this Agreement shall be deemed to be consented to by the Shareholders for the purposes of any restrictions on Transfer in the by-laws; and

(iii)    the Shareholder shall have provided the Corporation with written assurances, in form and substance satisfactory to the Corporation, that: (A.) the proposed Transfer is exempt from the registration and prospectus requirements of all applicable securities laws, and (B.) all appropriate action necessary for compliance with applicable securities laws and regulatory policies in connection with such proposed Transfer have been taken.

(c)     The Corporation shall refuse to issue any new Shares to any Person who is not a Party hereto, and the issuance of Shares to any such Person shall not be approved by the Board, unless either (a) such Person has agreed to become a Party hereto and bound by all the provisions hereof by signing an acknowledgment substantially in

20-80031-FPC     Doc 120-4     Filed 10/17/22     Entered 10/17/22 17:48:49     Pg 51 of 82
Lighthouse 0488656

the form annexed hereto as <u>Schedule "B"</u>; or (b) such Person is subject to a Share Restriction Agreement. All future grantees of options to purchase Shares or securities of the Corporation convertible into Shares shall be required, as a condition to the exercise or conversion of any such options or convertible securities, either (a) to enter into an appropriate written contractual obligation to become a Party to and bound by this Agreement; or (b) to become a party to a Share Restriction Agreement.

**6.2**     <u>**Endorsement on Certificates**</u>

In addition to such legends as may be required by applicable securities laws, share certificates of the Corporation shall bear the following language either as an endorsement or on the face of such share certificate:

> "**THE SECURITIES EVIDENCED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS OF A SHAREHOLDERS' AGREEMENT DATED [●], 2017, AS AMENDED, A COPY OF WHICH IS ON FILE AT THE CORPORATION'S PRINCIPAL PLACE OF BUSINESS."**

**6.3**     <u>**Pre-Emptive Rights In Case of Issuance of Additional Securities**</u>

(a)     Subject to paragraphs (b) and (c), if any shares or other securities of the Corporation, or options, rights, warrants or other instruments to purchase shares, or securities convertible into or exchangeable directly or indirectly for shares (including any newly created class or series) (collectively referred to in this Clause as "**Additional Securities**"), are to be issued, the Corporation shall first offer such Additional Securities to the Shareholders by notice given to them of the Corporation's intention to issue Additional Securities and the number and purchase price of such Additional Securities to be so issued. Each of the Shareholders may purchase its Pro Rata Share (as such term is defined below) of the Additional Securities so offered. Each Shareholder's "**Pro Rata Share**" of the Additional Securities shall be equal to the total number of Additional Securities so offered, multiplied by the quotient of X/Y, where X is equal to the number of Common Shares that the Shareholder holds, and Y is equal to the aggregate number of Common Shares held by all of the Shareholders. Each Founder shall have five (5) Business Days from the date such notice is given to give a notice to the Corporation of such Shareholder's intention to purchase all or any of the Additional Securities to which it is entitled. If no such notice is given by a Shareholder within such five (5) Business Day period, such Shareholder shall be deemed to have rejected the offer to purchase such Additional Securities. The transaction of purchase and sale by the Corporation to the Shareholders shall be completed on the date specified by the Board. Any Additional Securities not taken up by the Shareholders may be issued within ninety (90) days of such Additional Securities having been first offered to the Shareholders, at not less than the price and on terms no more favorable than the terms offered to the Shareholders, to such Person as the Majority

20-80031-FPC    Doc 120-4    Filed 10/17/22    Entered 10/17/22 17:48:49    Pg 52 of 82

Lighthouse 0488657

determines, provided that such Person agrees to be bound by, and become a party to, this Agreement in accordance with Clause 6.1(c) above.

(b)     The Corporation may issue Additional Securities without complying with the provisions of sub-clause (a) of this Clause 6.3:

   (i)     if such Additional Securities are:

      (A)     Permitted Additional Securities; or

      (B)     Common Shares or rights to purchase Common Shares issued for consideration other than cash pursuant to a merger, amalgamation, consolidation, or acquisition of a business or any assets or properties or technology, or similar business combination, in any case approved in good faith by the Board; or

   (ii)     if the application of this Clause 6.3 is waived in writing by a Majority.

(c)     The pre-emptive rights of Shareholders to purchase Additional Securities, described in this Clause 6.3, will terminate immediately prior to a Sale Transaction (as defined in Clause 6.7 (a) (i) of this Agreement; or

## 6.4     Permitted Transfers

Each Shareholder may, after giving notice to the Corporation, transfer all or any part of the Shares beneficially owned by it to any Affiliate of such Shareholder provided, that, each transferee agrees to be bound by, and become a party to, this Agreement in accordance with Clause 6.1(c) above and.

## 6.5     Shareholders' Right Of First Refusal On The Transfer Of Shares

(a)     Subject to Clause 6.4 (*Permitted Transfers*), a Shareholder (the "**Selling Party**"), together with members of its Shareholder Group that hold Shares, may transfer any or all Shares held by it and by members of its Shareholder Group to any bona fide third party purchaser making a bona fide offer for such Shares not in collusion with the Selling Party (not being a Permitted Transfer, a Transfer Event) (a "**Third Party Purchaser**"), provided that the Selling Party shall first comply with the terms of this Clause 6.5 and Clause 6.6 (*Co-Sale Rights*).

(b)     Before entering into any agreement with a Third Party Purchaser, the Selling Party shall serve an offer in writing (the "**Offer Notice**") on each other Shareholder (as applicable, the "**Non-Selling Parties**") identifying:

   i.     the total number of Shares proposed to be sold (the "**Offer Shares**");

   ii.     any proposed Third Party Purchaser which has already expressed an interest in acquiring the Offer Shares;

Lighthouse 0488658

<blockquote>

iii.          the transfer price (which shall be payable in cash only) (the "**Offer Price**");

iv.          any other material terms and conditions (the "**Offer Terms**");

v.          an offer to each Non-Selling Party to sell all (but not some only) of the Offer Shares with full title guarantee, free from all Encumbrances (save for Permitted Encumbrances) and together with all rights attaching to them to such Non-Selling Party or (if more than one Non-Selling Party accepts the offer) to such Non-Selling Parties pro rata to their Shareholder Proportions, which is open for acceptance for at least twenty (20) Business Days (the "**Offer Period**"); and

vi.          any Co-Sale Right that will apply to the proposed transfer.

</blockquote>

(c)     An Offer Notice may not be withdrawn after it has been given by the Selling Party to the Non-Selling Parties.

(d)     Before the expiry of the Offer Period, each Non-Selling Party may either:

i.     give Notice to the Selling Party confirming its decision not to exercise its right to purchase the Offer Shares (its "**Right of First Refusal**") or, if applicable, its Co-Sale Right; or

ii.     if it wishes to exercise its Right of First Refusal, give Notice (the "**Purchase Notice**") to the Selling Party which shall:

<blockquote>

(A)     confirm that the Non-Selling Party wishes to exercise its Right of First Refusal in respect of all but not some only of the Offer Shares; and

(B)     fix a date and time for completion of the purchase of the Offer Shares which shall be no later than ten (10) Business Days after the date of the Purchase Notice; or

</blockquote>

iii.     if it wishes to exercise its Co-Sale Right (if applicable), give Notice to the Selling Party to that effect in accordance with Clause 6.6 (*Co-Sale Rights*), whereupon the terms of that Clause shall apply.

20-80031-FPC   Doc 120-4   Filed 10/17/22   Entered 10/17/22 17:48:49   Pg 54 of 82

Lighthouse 0488659

(e)     If each Non-Selling Party elects not to exercise its Right of First Refusal or fails to give a Purchase Notice, the Selling Party shall (subject to complying with the provisions of Clause 6.6 (*Co-Sale Rights*)) be free within a period of one hundred and twenty (120) Business Days following the expiry of the Offer Period to transfer or procure the transfer of all of the Offer Shares to a Third Party Purchaser named in the Offer Notice at a price not less than the Offer Price and on the Offer Terms, provided that the Third Party Purchaser first executes two original counterparts of a Deed Poll of Adherence agreeing to be bound by the terms of this Agreement, and delivers one (1) original counterpart of such Deed Poll of Adherence to the Company.

(f)     If only one Non-Selling Party gives a Purchase Notice in accordance with Clause 6.5 (d) all Offer Shares shall be sold and transferred by the Selling Party to such Non-Selling Party at the Offer Price and on the Offer Terms. If more than one Non-Selling Party accepts the offer, the number of Offer Shares to be sold and transferred to each accepting Non-Selling Party shall be pro rata to the Shareholder Proportions of the respective Non-Selling Parties as at the close of business on the Business Day immediately prior to the date of the Offer Notice.

(g)     The sale and purchase of the Offer Shares shall take place in accordance with Clause 6.1 (*Restriction on Transfer of Shares*).

(h)     If the Non-Selling Party fails to complete the purchase of the Offer Shares and Offer Funding Instruments within the period specified in Clause 6.5(d)(ii)(B) (other than as a result of a failure by the Selling Party in relation to such completion or if a sale and purchase of Shares under this Agreement is subject to prior third party consents or regulatory approvals under applicable laws or regulations), the Selling Party shall be entitled to transfer or procure the transfer of the Offer Shares and Offer Funding Instruments to a Third Party Purchaser in accordance with Clause 6.5(e).

(i)     The Selling Party shall be entitled to disclose the terms of this Clause 6.5 and of Clause 6.6 (*Co-Sale Rights*), if applicable, to any Third Party Purchaser. If the Third Party Purchaser is required to execute a Deed Poll of Adherence, the Selling Party shall be entitled to disclose this Agreement in its entirety.

(j)     The implementation of an Offer Notice procedure under this Clause 6.5 and the completion of any resulting sale and purchase of Shares shall be without prejudice to any rights, remedies or claims that any Shareholder or members of its Shareholder Group or the Corporation may have against the other Shareholder(s) or members of its respective Shareholder Group under Clause 9.9 (*Termination*).

6.6     **Co-Sale Rights**

(a)     If any Shareholder (the "**Selling Party**") receives from a third party (the "**Third Party**"), acting as principal and dealing at arm's length with the Selling Party, a bona fide written offer (the "**Third Party Offer**"), prior to the acceptance of the

-15-

Lighthouse 0488660

Third Party Offer, the Selling Party shall notify all other Shareholders (the "**Remaining Shareholders**") of such proposed sale and the terms of such proposed sale and the Selling Party shall obtain from the Third Party a bona fide offer addressed to each of the Remaining Shareholders, on terms and conditions at least as favorable as those contained in the Third Party Offer, to purchase from each Remaining Shareholder (the "**Co-Sale Offer**") the Shares which the Remaining Shareholder holds.

(b)     If the Third Party has specified a limited number of Shares that it is willing to purchase in the aggregate, then each Shareholder has the right to sell to the Third Party up to that number of Shares (calculated on an as-converted basis) that is in the same proportion to the number of Shares being purchased by the Third Party pursuant to the Third Party Offer, as the number of Shares then owned by such Shareholder is of the total number of Shares held by the Selling Party and the Remaining Shareholders (in each case, calculated on an as-converted basis). If any Remaining Shareholder does not elect to sell the full number of Shares that it is entitled to sell, the Selling Party is entitled to sell additional Shares to make up the aggregate number of Shares being so purchased.

(c)     The Selling Party shall deliver the Co-Sale Offer to the Remaining Shareholders, together with a copy of the Third Party Offer. The Co-Sale Offer shall be irrevocable and shall be open for acceptance by the Remaining Shareholders for thirty (30) days after the delivery thereof to the last of the Remaining Shareholders. If, within such thirty (30) day period, a Remaining Shareholder does not provide the Selling Party with notice of such Remaining Shareholder's intent to accept or reject the Co-Sale Offer, such Remaining Shareholder shall be deemed to have rejected the Co-Sale Offer.

(d)     The price per share for any Shares in respect of which a co-sale right under this Clause 6.6 is exercised will be the price stated in the Third Party Offer.

(e)     This Clause 6.6 shall not apply if the Majority exercises the drag-along rights provided in Clause 6.7 with respect to the Third Party Offer.

**6.7     Drag Along Rights**

(a)     If:

(i)     a third party offer is made to the Corporation and/or one or more of the Shareholders that provides for: (A.) any merger, amalgamation, reorganization, consolidation or other transaction involving the Corporation and any other corporation or other entity or person in which the persons who were the shareholders of the Corporation immediately prior to such merger, amalgamation, reorganization, consolidation or other transaction own less than fifty percent (50%) of the outstanding voting shares of the surviving or continuing entity after such merger, amalgamation, reorganization, consolidation or other transaction; (B.) the sale, exchange or transfer by the

-16-

Lighthouse 0488661

Corporation's shareholders, in a single transaction or series of related transactions, of all of the voting shares of the Corporation (other than those held by the Person making the third party offer); or (C.) the sale, lease, license, abandonment, transfer or other disposition of all or substantially all the assets of the Corporation or the exclusive license of all or substantially all of the Corporation's material intellectual property and technology (any transaction referred to in (A.), (B.) or (C.) above being hereinafter referred to as a "**Sale Transaction**"); and

(ii)     the Sale Transaction has been irrevocably accepted, or otherwise approved, by a Majority,

then, upon being notified by the Corporation or such third party offeror of the names of the Shareholders who have irrevocably accepted or otherwise approved such offer and the number of Shares in respect of which they have irrevocably accepted, or otherwise approved, the Sale Transaction, each Shareholder: (I.) shall, if the Sale Transaction involves a sale or other tender of Shares, sell all of the Shares held by such Shareholder to the third party offeror pursuant to the terms of the Sale Transaction in accordance with the offer upon the terms and at the price contained in the offer; (II.) shall vote in favor of (for the purposes of any approval acquired by the by-laws, this Agreement or otherwise), and otherwise act, to approve the Sale Transaction and any continuance, reorganization or recapitalization or any other change to the by-laws that is necessary or desirable to facilitate the Sale Transaction, as applicable; and (III.) shall provide such reasonable representations, warranties, indemnities, covenants, escrow agreements and other agreements as may be required by the third party offeror pursuant to such Sale Transaction. To the extent permitted by law, each Shareholder hereby expressly waives any right to dissent or appraisal under applicable laws with respect to the transactions or approvals referred to in clause (II.) above.

(b)     Notwithstanding the foregoing, no Shareholder (nor their respective Permitted Transferees) is required to comply with the terms of this Clause 6.7 if:

(i)     the liability of such Shareholder under the purchase agreement for the Sale Transaction (including, without limitation, liability for a breach of representation or warranty or for a claim under an indemnity) exceeds with respect to such Shareholder the lesser of such Shareholder's (A.) pro rata share of any claim; and (B.) the purchase price payable to such Shareholder;

(ii)     the portion of the aggregate proceeds of the sale allocated to the Shareholder is less than the portion of the assets of the Corporation would be distributed to such Shareholder upon a liquidation of the Corporation; or

(iii)     the terms of the Drag-Along Offer, other than price, that are applicable to the Shareholder are, on the whole, less favorable to the Shareholder as the terms applicable to the Shareholders that accept or approve the offer pursuant to Clause 6.7(a)(ii).

Lighthouse 0488662

## 6.8    Transfer Events

(a)    The provisions of this Clause 6.8 shall apply when a Transfer Event occurs at any time.

(b)    It is a "**Transfer Event**" in relation to any Shareholder if:

(i)    that Shareholder or a Shareholder which is a member of its Shareholder Group or any holding company or parent undertaking of that Shareholder or any such other Shareholder undergoes a Change of Control (a "**Control Transfer Event**");

(ii)   such Shareholder purports to effect a Disposal of any Shares in breach of this Agreement as determined by a final and non-appealable arbitral award in accordance with Clause 9.13;

(iii)  a Group Transferee ceases to be an Affiliate of the relevant Shareholder without first transferring its Shares back to a continuing Affiliate of the relevant Shareholder;

(iv)   an order is made by a court of competent jurisdiction or resolution passed for the winding up of a Relevant Entity or a petition is presented or meeting convened for the purposes of winding up a Relevant Entity otherwise than in the course of a reconstruction or amalgamation which the other Shareholder(s) (or the Shareholder which is not its Affiliate, as appropriate) has previously approved in writing, or any voluntary arrangement or composition proposed or made with the creditors of a Relevant Entity; or

**(v)**   a liquidator, administrator, administrative receiver or any other receiver or manager is appointed in respect of a Relevant Entity or any of its assets or any steps have been taken to initiate any such appointment.

For the purpose of this Clause 6.8 (b), "**Relevant Entity**" means, in relation to a Shareholder, that Shareholder, any member of its Shareholder Group which is a Shareholder and any holding company or parent undertaking of that Shareholder or any such member of its Shareholder Group.

(c)    If a Transfer Event occurs in relation to a Shareholder and/or any of its Group Transferee(s) (the "**Defaulting Shareholder**") that Shareholder shall give Notice of such event (a "Notice of Transfer Event") to the other Shareholders (the "**Non-Defaulting Shareholders**") as soon as possible. If the Defaulting Shareholder fails to serve a Notice of Transfer Event on the Non-Defaulting Shareholders, it shall be deemed to have done so on the date on which any of the Non-Defaulting Shareholders becomes aware of the Transfer Event (and any Non-Defaulting Shareholder shall notify the other Non-Defaulting Shareholders as soon as reasonably practicable after it becomes so aware).

-18-

Lighthouse 0488663

(d)     As soon as practicable after service, or deemed service, of a Notice of Transfer Event, Defaulting Shareholder and Non-Defaulting Shareholders shall procure appointment of the Valuer for the purpose of the determination of the Fair Value per Share in accordance with Clauses 6.9 and 6.10.

## 6.9    <u>Valuer</u>

(a)     The Shareholders shall together appoint one of the Big Four companies (PWC, E&Y, Deloitte or KPMG) as an independent appraiser to act as Valuer and to decide on matters relating to a determination on Fair Value.

(b)     The Valuer shall prepare a determination in writing and give notice in writing (including a copy) of the determination to the Shareholders within twenty (20) Business Days of its appointment, and such determination shall be final.

(c)     The following provisions shall apply in relation to the Valuer appointed pursuant to this Clause 6.9:

(i)     If a Valuer becomes unwilling or incapable of acting, or does not deliver the relevant determination within the time required by this Clause then either of the Shareholders may discharge such Valuer and this Clause shall apply in relation to the appointment of a replacement Valuer and to that Valuer once appointed.

(ii)    Each Valuer shall act as expert and not as arbitrator. All actions under this Clause 6.9 shall be conducted, and each Valuer's determination shall be written, in the English language.

(iii)   The Shareholders shall be entitled to make submissions to the Valuer, including oral submissions, and shall provide (or procure that others, including the Corporation, provide) the Valuer with such assistance, facilities and documents as that Valuer reasonably requires for the purpose of reaching a decision, subject to that Valuer providing such undertakings as to confidentiality as the Shareholders may reasonably require.

(iv)    The Shareholders shall each with reasonable promptness provide (and procure that others, including the Corporation, provide) the other with all information and access to all documentation and personnel as it may reasonably require in order to make a submission under this Clause.

(v)     If any difficulty arises in applying the principles referred to and set out in Clause 6.10 (Fair Value) and Schedule C (Valuation Methodology), the Valuer shall resolve that difficulty in such manner as it shall in its absolute discretion think fit.

(vi)    To the extent not provided for by this Clause, the Valuer may in its reasonable discretion determine such other procedures to assist with the conduct of the determination as it considers just or appropriate.

-19-

Lighthouse 0488664

(vii)    The Valuer's written determination on the matters referred to it shall be final and binding on the Parties for the purpose of calculating the Fair Value in accordance with this Clause 6.9 in the absence of manifest error or fraud.

(viii)    The Valuer's reasonable fees and any costs properly incurred in relation to the determination (including any fees and costs of any advisers appointed by the Valuer) shall be borne by the Shareholders equally.

## 6.10    <u>Fair Value</u>

The Fair Value per Share or of the Shares whose Fair Value is to be determined (as the case may be, the "**Relevant Share(s)**") shall be determined (i) using the fair market value of the Corporation calculated in accordance with paragraphs (b) to (f) and paragraphs (h) and (i) below and with the principles set out in Schedule C (Valuation Methodology) (the "**Corporation Value**") and (ii) on the basis set out in paragraphs (a) and (g) below:

(a)    the value of the Relevant Shares is that proportion of the Corporation Value that the Relevant Shares bear to the total number of Shares (with no premium or discount for the size of the Defaulting Shareholder's shareholding or the rights or restrictions applying to the Relevant Shares under this Agreement or the Articles or for the unquoted status of the Relevant Shares);

(b)    the sale is on an arm's length basis between a willing buyer and a willing seller on the open market of the whole of the issued share capital of the Corporation;

(c)    there are no legal or regulatory issues and no third party consents or approvals required in order to effect the sale;

(d)    if Fair Value is being calculated because of the occurrence of a Transfer Event, the sale is taking place on the date that the Transfer Event occurred, taking into account the impact of the relevant Transfer Event on the Corporation and the Corporation Subsidiaries, but (without prejudice to any other rights that a party have in relation to any such breach) Fair Value should otherwise be determined without applying any discount for any breach of this Agreement;

(e)    if the Corporation is then carrying on its Business as a going concern, on the assumption that it shall continue to do so;

(f)    the Shares are capable of transfer without restrictions and will be sold free from all Encumbrances and together with all rights and privileges attaching to them;

(g)    no additional or reduced value is attached to any contractual rights provided for in this Agreement with regard to the Shares;

(h)    the application in all other respects of principles and practice consistent with those customarily applied in the previous audited accounts of the Corporation; and

(i)    to take account of any other factors that the Valuer reasonably believes should be taken into account.

20-80031-FPC    Doc 120-4    Filed 10/17/22    Entered 10/17/22 17:48:49    Pg 60 of 82
Lighthouse 0488665

## 6.11 Call Option Following Transfer Event

(a)    The provisions of this Clause 6.11 shall apply when: a Transfer Event occurs at any time in relation to any Shareholder or a member of their respective Shareholder Groups.

(b)    Within ten (10) days of agreement or determination of the Fair Value per Share in accordance with Clause 6.10, Shareholders holding together more than 45% of Shares shall be entitled to serve a Notice (a "**Default Call Notice**") on the Defaulting Shareholder requiring the Defaulting Shareholder to sell to them such portion of Shares held by the Defaulting Shareholder and its Shareholder Group as is pro rata to such Non-Defaulting Shareholders' Shareholder Proportions  (as the case may be, the "**Default Call Shares**") at the Fair Value per Share.

(c)    A Default Call Notice shall also require the Defaulting Shareholder to sell to the relevant Non-Defaulting Shareholders such portion of those Shareholder Loans owed to the Defaulting Shareholder as is pro rata to such Non-Defaulting Shareholders' Shareholder Proportions (as the case may be, the "**Default Call Funding Instruments**") for a consideration equal to the total principal amount outstanding pursuant to such Shareholder Loans plus any interest accrued on such amount which remains unpaid at the date of the assignment; and

(d)    A Default Call Notice shall fix a date and time for completion of the purchase of the Default Call Shares (and, if applicable, the Default Call Funding Instruments) which shall be within twenty (20) Business Days of the service of the Default Call Notice and shall take place in accordance with Article 7. If a Non-Defaulting Shareholder desires to purchase a number of Default Call Shares (and, if applicable, the Default Call Funding Instruments) in excess of the proportion to which it is entitled, it shall in its Default Call Notice state how many excess Default Call Shares (and, if applicable, the Default Call Funding Instruments) it wishes to purchase and any Default Call Shares (and, if applicable, the Default Call Funding Instruments) not taken up by the other Non-Defaulting Shareholders shall be used for satisfying the request for excess Default Call Shares (and, if applicable, the Default Call Funding Instruments) pro rata to the Shareholder Proportions of any Non-Defaulting Shareholder(s) making such request.

(e)    With effect from the date of service or deemed service of a Notice of Transfer Event:

(i)    the Defaulting Shareholder shall not be entitled to attend and vote at general meetings of the Company or to exercise any rights under this Agreement to give approval in relation to any actions or decisions by the Corporation or in relation to access to information; and

Lighthouse 0488666

(ii) any Director appointed by the Defaulting Shareholder shall automatically vacate office.

(f) Nothing in this Clause 6.11 shall affect any rights, remedies or claims which any Non-Defaulting Shareholder or members of its Shareholder Group or the Company may have against a Defaulting Shareholder or members of its Shareholder Group, including to claim damages, or other compensation or, where appropriate, to seek the remedy of injunction, specific performance or similar court order to enforce the obligations of the Defaulting Shareholder or of members of its Shareholder Group, or otherwise under Clause 9.9 (*Termination*).

## ARTICLE 7
## ARRANGEMENTS REGARDING DISPOSITIONS

### 7.1 Closing

The following provisions apply to any Transfer of Shares between Shareholders or between Shareholders and the Corporation pursuant to this Agreement, or by a Shareholder who wishes or is required to sell Shares pursuant to Clauses 6.5 or 6.6 of this Agreement:

(a) The Transfer shall be completed at the Corporation's registered office on the date specified for closing. At such time, the transferor(s) shall Transfer to the transferee(s) good title to the Shares being transferred free and clear of all liens, charges and encumbrances and deliver to the transferee(s) certificates and other documents of title evidencing ownership of the Shares being transferred, duly endorsed in blank for transfer by the holders of record. In addition, if the transferor is disposing of all or substantially all of its Shares, the transferor(s) shall deliver to the Corporation all records, accounts and other documents in its possession belonging to the Corporation and the resignations and releases of its nominees on the Board, all such resignations to be effective no later than the time of delivery. The transferee(s) shall deliver to the transferor(s) full payment of the purchase price (subject to any escrow or holdback requirement) payable for the Shares being transferred.

(b) If, at the time of closing, a transferor fails to complete the subject transaction of purchase and sale, the transferee (or, in the case of a Sale Transaction, the Corporation or any other Shareholder) shall have the right, if not in default under this Agreement, without prejudice to any other rights that it may have, upon payment by the transferee the agreed purchase price payable to the transferor at the time of closing to the credit of the transferor (or, in the case of a Sale Transaction in which the consideration consists of cash, securities or other assets, or any combination, with a third party escrow agent), to execute and deliver, on behalf of and in the name of the transferor, such deeds, transfers, share certificates, resignations or other documents that may be necessary to complete the subject transaction and the transferor hereby irrevocably appoints the transferee its attorney in that behalf. Such appointment and power of attorney, being coupled with an interest, shall not be revoked by the insolvency or bankruptcy of the transferor and

20-80031-FPC    Doc 120-4    Filed 10/17/22    Entered 10/17/22 17:48:49    Pg 62 of 82
Lighthouse 0488667

the transferor hereby ratifies and confirms and agrees to ratify and confirm all that the transferee may lawfully do or cause to be done by virtue of such appointment and power.

## 7.2     Completion of Drag-Along Offers

If a Sale Transaction contemplates a purchase of Shares and, at the time proposed for the closing of the Sale Transaction, a Shareholder does not complete the transactions for any reason, the party making the third party offer has the right to deposit that agreed portion of the consideration for such Shareholder's Shares to be paid at closing either, in the case of consideration consisting of cash, to the credit of such Shareholder in the main branch of the Corporation's bank, or, in the case of consideration consisting of cash, securities or other assets, or any combination, with a third party escrow agent. If the purchase price is so deposited, then from and after the date of deposit, even if certificates or instruments evidencing the Shares are not delivered to the third party making the third party offer:

(a)     the purchase is deemed to have been fully completed (subject to any obligation in the transaction documents to make payments of portions of the purchase price after the closing date), and the records of the Corporation may be amended accordingly;

(b)     all interest in the Shares is conclusively deemed to have been transferred and assigned to and to have become vested in the third party; and

(c)     all interest of such Shareholder and of any other Person (other than the third party) having an interest in such Shares ceases.

## 7.3     Repayment of Debt

(a)     In the event that at the time of the sale of any Shares under any provision of this Agreement, the seller thereof is indebted to the Corporation or any Affiliate thereof, the seller shall assign and set over to the Corporation or such Affiliate and shall direct the purchaser to pay to the Corporation or such Affiliate, if requested by the Corporation to do so, the purchase price of such Shares to the extent required to discharge the seller's indebtedness to the Corporation or such Affiliate.

(b)     In the event that at the time of the sale of any Shares under any provision of this Agreement, the Corporation or any Affiliate thereof is indebted to the seller, the Corporation or such Affiliate shall pay all such indebtedness to the seller (unless it otherwise agrees in writing) at the time of closing herein provided for.

-23-

Lighthouse 0488668

**ARTICLE 8**
**CONFIDENTIALITY**

**8.1     Confidentiality**

No Party shall, at any time or under any circumstances, without the consent of the Corporation, directly or indirectly communicate or disclose to any Person (other than the other Parties and its or their employees, agents, advisors and representatives) or make use of any confidential knowledge or information howsoever acquired by such Party relating to or concerning the customers, products, technology, trade secrets, systems or operations, or other confidential information regarding the property, business and affairs of the Corporation (collectively, "Information"), except for:

(a)     Information that becomes generally known in the industry to which the business of the Corporation is related other than through a breach of this Agreement;

(b)     Information that is lawfully obtained from a third party without breach of this Agreement by the Party;

(c)     Information that is reasonably required to be disclosed by a Party to protect its interests in connection with any proposed Transfer of Shares that is pursuant or subject to this Agreement; or

(d)     Information that is required to be disclosed by law or by the applicable regulations or policies of any regulatory agency of competent jurisdiction or any stock exchange, provided that the Party gives the Corporation prompt written notice of the compelled disclosure and cooperates with the Corporation, at the Corporation's expense, in seeking a protective order or any other protections available to limit the disclosure of the Information.

If a Shareholder ceases to be a shareholder of the Corporation, the Shareholder shall use all reasonable efforts to ensure that all Information and all copies thereof are either destroyed or returned to the Corporation if the Corporation so requests, and shall not, directly or indirectly, use for the Shareholder's own purposes, any Information discovered or acquired by the Shareholder or the Shareholder's advisors.  The Party's obligations in this Article 8 shall be in addition to and not in derogation of any other obligation of confidentiality owed to the Corporation by the Founders or other Shareholders who are employees of or consultants to the Corporation.

**ARTICLE 9**
**GENERAL**

**9.1     Application of this Agreement**

The terms of this Agreement shall apply to any Shares that may hereafter be issued by the Corporation and to any shares or other securities:

(a)     resulting from the conversion, reclassification, redesignation, subdivision, consolidation or other change to the Shares; or

-24-

Lighthouse 0488669

(b)     of the Corporation or any successor body corporate that may be received by the Shareholders on a merger, amalgamation, arrangement or other reorganization of or including the Corporation;

and prior to any action referred to in (a) or (b) above being taken the Parties shall give due consideration to any changes that may be required to this Agreement in order to give effect to the intent of this Clause 9.1.

## 9.2     Aggregation of Shares

All of the Shares of each class held or acquired by each Shareholder and/or any Permitted Transferee of such Shareholder pursuant to Clause 6.4(a) of this Agreement shall be aggregated together for the purposes of determining the availability of any rights of such Shareholder under this Agreement.

## 9.3     Undertaking

The Parties undertake to sign and complete all such deeds, documents, resolutions, minutes and other instruments and to do all such acts as are necessary to give full effect to the terms, conditions and restrictions contemplated by this Agreement and to make them binding on the Parties as well as on third parties who are not privy to the terms hereof.

## 9.4     Notices

All notices to be given by one party to any others pursuant to this Agreement must be delivered in person, by facsimile, or deposited in the United States mail, postage prepaid, by certified or registered mail, return receipt requested and addressed as specified beneath each party's signature below or, if none, to the last known address on file with the Company or its transfer agent. Notices are deemed given and delivered (a) upon receipt, if hand delivered or sent by facsimile or (b) three (3) days after being properly mailed. Any party, by written notice to the others, may alter the address or facsimile telephone number for receipt by it and its agents of written notices hereunder.

## 9.5     Amendment

(a)     No amendment, supplement or modification of this Agreement and, unless otherwise specified, no waiver, consent or approval by any Party, is binding unless approved in writing by the Majority. Notwithstanding the above:

(i)     any amendment of this Agreement that treats some Shares of a particular class in a manner that is not similar to the remaining Shares of such class is ineffective without the written consent of all Shareholders whose Shares of such class are not treated in a similar matter to the remaining Shares.; and

(ii)     the Parties agree that the Corporation is entitled to, and the Corporation shall, make such amendments to Schedule "A-1" and Schedule "A-2" from time to time as may be necessary to reflect permitted changes in the Shareholders and their shareholdings.

-25-

Lighthouse 0488670

**9.6    Execution and Delivery**

This Agreement contains the entire understanding of the parties relating to the subject matter hereof and supersedes any prior agreements, written or oral, with respect to the same subject matter.

**9.7    Benefit of the Agreement**

This Agreement enures to the benefit of and is binding upon the respective heirs, executors, administrators, successors and permitted assigns of the Parties.

**9.8    Assignment**

Except as expressly provided in this Agreement, none of the Parties to this Agreement may assign its rights, benefits, remedies and obligations under this Agreement without the prior written consent of the  Majority.

**9.9    Termination**

This Agreement terminates upon the first to occur of:

(a)     the date this Agreement is terminated by the written approval of: those Shareholders owning in the aggregate at least sixty seven percent (67%) of all Shares then outstanding;

(b)     the time that one Person becomes the beneficial owner of all of the Shares;

(c)     The Dissolution of the Corporation, except that if the Corporation is administratively Dissolved, not until the lapse of the statutory period during which the Corporation may be reinstated;

(d)     The Corporation's Bankruptcy;

(e)     The moment in time immediately preceding the Corporation's Initial Public Offering; or

(f)     the date of a Sale Transaction unless otherwise agreed in writing by a Majority;

except that the provisions of Articles 8 and  9 continue upon a termination of this Agreement.

**9.10   Interest of Spouse.**

    (a)    Signature of Spouse. By signing below, a Shareholder's spouse represents that this Agreement has been fully explained to his or her satisfaction and acknowledges that, pursuant to its terms, his or her present or future interest in the Shares may be sold without his or her consent as provided herein. Each undersigned spouse is aware of the desirability of having independent legal counsel review the Agreement. To the extent that the Shares or any other asset of or interest in the Corporation now are or hereafter become the community property of any marital community, each spouse not shown as the shareholder in the stock records of the Corporation (the "**Non-Record Shareholder**") hereby grants to the spouse shown as the Shareholder in the stock records of the Corporation (the "**Record Shareholder**") an irrevocable power-of-attorney to act on the behalf of the Non-Record Shareholder with respect to the ownership of such Shares, asset, or interest, the management of the Corporation, and any future amendment or modification of this Agreement. The Non-Record Shareholder grants to his or her spouse who is the Record Shareholder management authority over the Non-Record Shareholder's community interest, if any, in the Shares and the assets of the Corporation, and agrees that the other parties to this Agreement will and may rely upon this irrevocable grant of management authority. This grant of a power-of-attorney and management authority with respect to community property is coupled with an interest and, therefore, is irrevocable.

    (b)    Covenant to Secure Spousal Consent. Each married Shareholder covenants that he or she will use reasonable, good faith efforts to obtain the consent set forth in Clause 5.1 from his or her spouse.

**9.11   Specific Performance.**

It would be impossible to measure in money the damages that would accrue to the parties hereto or their successors by reason of any party's failure to perform any of the obligations under this Agreement. For this reason, among others, the Shareholders and Corporation would be irreparably damaged in the event that this Agreement is not specifically enforced. If any Shareholder or the Company breaches this Agreement, including but not limited to, as a result of failing to give any notice, make any offer, sell Shares, obtain any written consent, execute and deliver any document, instrument, certificate, or agreement, or if any Shareholder fails to accurately disclose the terms and conditions of any bona fide offer or the identity of the Third Party Purchaser pursuant to Clause 6.5 (a) hereof, then, in any such event, any of the aggrieved Shareholders or the Corporation may institute and maintain a proceeding to compel the specific performance of this Agreement. Such remedy is cumulative, nonexclusive, and in addition to any other remedy at law or in equity that the Shareholders or the Corporation may have. Any person (including the Corporation) against whom such action or proceeding is brought hereby waives any claim or defense that such party or such successor of a party has an adequate remedy at law, and such person shall not urge at any such action or proceeding the claim or defense that such remedy at law exists.

**9.12   Entire Agreement**

20-80031-FPC    Doc 120-4    Filed 10/17/22    Entered 10/17/22 17:48:49    Pg 67 of 82
Lighthouse 0488672

This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and supersedes and replaces in its entirety all previous agreements, term sheets and understandings relating to the matters referred to in this Agreement.

**9.13    Governing law and dispute resolution**

This Agreement shall be interpreted, construed, and enforced in accordance with the internal laws of the State of Washington without reference to principles of conflict of laws.

All disputes arising out of or in connection with the present contract shall be submitted to the International Court of Arbitration of the International Chamber of Commerce and shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by three arbitrators appointed in accordance with the said Rules. The seat of the arbitration shall be San Francisco, USA. The language of the arbitration shall be English.

**9.14    Litigation Expenses.** In any controversy, claim, or dispute arising out of or relating to this Agreement, the method and manner of performance thereof, or the breach thereof, the prevailing party is entitled to and shall be awarded, in addition to any other relief, a reasonable sum as litigation expenses. If neither party wholly prevails, the party that substantially prevails will be awarded a reasonable sum as litigation expenses. This provision applies to any controversy, claim, or dispute which is the subject of judicial, arbitration, administrative, or bankruptcy proceedings, including appeals therefrom.

**9.15    Counterparts; Faxed Signatures.** This Agreement may be executed in one or more counterparts, each of which shall be an original and all of which together shall constitute one and the same instrument. Signatures transmitted by facsimile are fully binding and effective for all purposes.

**9.16    Further Acts.** Each Party and its successors and assigns agrees to perform any further acts and to execute and deliver any documents, instruments, certificates, and agreements that may be reasonably necessary to carry out the provisions of this Agreement.

**[The remainder of this page is intentionally left blank.]**

IN WITNESS OF WHICH the Parties have duly executed this Agreement.

**Giga Watt Inc.**

By: _____
      Name:
      Title:

SIGNED, SEALED AND DELIVERED   )
in the presence of:   )
     )
_____   ) _____
Witness   )   **[name of FOUNDER1]**

SIGNED, SEALED AND DELIVERED   )
in the presence of:   )
     )
_____   ) _____
Witness   )   **[name of FOUNDER2]**

SIGNED, SEALED AND DELIVERED   )
in the presence of:   )
     )
_____   ) _____
Witness   )   **[name of FOUNDER3]**

SIGNED, SEALED AND DELIVERED   )
in the presence of:   )
     )
_____   ) _____
Witness   )   **[name of OTHER SHAREHOLDER 1]**

SIGNED, SEALED AND DELIVERED   )
in the presence of:   )
     )
_____   ) _____
Witness   )   **[name of OTHER SHAREHOLDER 2]**

20-80031-FPC   Doc 120-4   Filed 10/17/22   Entered 10/17/22 17:48:49   Pg 69 of 82

Lighthouse 0488674

**SCHEDULE "A-1" 10,000 shares issued 8500 Shares Allocated 1500 Unallocated**

**LIST OF FOUNDERS**

| Founders | Number and Class of Shares |
|---|---|
| Faraversum Corporation Limited | 2,920 |
| Silaren Limited | 4,980 |
| David M. Carlson | 1000 |

**SCHEDULE "A-2"**

**LIST OF OTHER SHAREHOLDERS**

| Other Shareholders | Number and Class of Shares |
|---|---|
| The Goldcoin Trust dated 01/01/2017 | 500 |
| Daria Generalova | 100 |

Lighthouse 0488675

## SCHEDULE "B"

## FORM OF ACKNOWLEDGEMENT

To:    The parties to the Shareholders Agreement made as of *10/23/2017* between Giga Watt Inc. (the "<u>Corporation</u>") and all of the shareholders of the Corporation, as the same may be amended from time to time (the "<u>Agreement</u>")

       The undersigned, _____, having purchased certain shares of the Corporation [previously held by                          ], in consideration of the approval by the Board and/or the shareholders of the Corporation of the transfer [or issuance] of such shares to the undersigned and other good and valuable consideration (receipt of which is hereby acknowledged) hereby agrees to be a party to and bound by all of the provisions of the Agreement as if the undersigned were an original party thereto. Capitalized terms not otherwise defined herein shall have the respective meanings set forth in the Agreement.

       DATED at _____, this_____day of _____ , 20___ .

SIGNED, SEALED AND DELIVERED )
in the presence of                              )
                              ) _____
                              )

_____

OR

                                   •

                          Per: _____

20-80031-FPC    Doc 120-4    Filed 10/17/22    Entered 10/17/22 17:48:49    Pg 71 of 82
Lighthouse 0488676

**SCHEDULE C**
**INITIAL APPOINTMENT OF OFFICERS OF THE CORPORATION**

(a)   Approval of the Corporation's President;                            Leonid Markin

(b)   Approval of the Corporation's CEO;                                   Dave Carlson

(c)   Approval of the Corporation's Chief Financial Officer        Timur Usmanov

(d)   Approval of the Corporation's Secretary;                           Adam West

20-80031-FPC    Doc 120-4    Filed 10/17/22    Entered 10/17/22 17:48:49    Pg 72 of 82
Lighthouse 0488677

**SCHEDULE D**
**VALUATION METHODOLOGY [TBD]**

The fair market value of the Corporation shall be the average of valuations based on income approach, including discounted cash flow ("DCF") analysis, market approach and cost approach.

Lighthouse 0488678

# EXHIBIT 23

**PERKINSCOIE**

3150 Porter Drive
Palo Alto, CA 94304-1212

+1.650.838.4300
+1.650.838.4350
PerkinsCoie.com

**Lowell D. Ness**
LNess@perkinscoie.com
D.  +650.838.4317
F.  +650.838.4517

May 12, 2017

**VIA E-MAIL**

Marina Mykhaylyuta
GigaWatt Pte. Ltd.
5005 Beach Road, #08-08
Golden Mile Complex
Singapore 199588

**Re:      Legal Representation**

Dear Marina:

We are delighted that GigaWatt Pte. Ltd.  ("GigaWatt Pte. Ltd. ," "you" or "your") has selected
Perkins Coie LLP as legal counsel.  This letter describes the scope and terms of our engagement.
Although this letter addresses the formalities of our engagement, we want you to know how
honored we are that you have placed your trust in us.

Perkins Coie will represent you in connection with general corporate matters.  This letter will
also apply to any additional matters that we undertake at GigaWatt Pte. Ltd. 's request, unless
otherwise specified in a separate engagement letter addressing that matter.

Unless other arrangements are made, the principal factors in determining our fees will be the
time and effort devoted to the matter and the hourly rates of the lawyers and paralegals involved.
I will have primary oversight for Perkins Coie's representation of GigaWatt Pte. Ltd. , but we
assign other firm lawyers and paralegals when necessary, beneficial or cost-effective and when
desirable to meet the time constraints of the matter.  The hourly billing rates of the persons
whom we anticipates assigning to the Matter currently range from $350 to $1,150.  These rates
are adjusted at least annually, usually on January 1.  Services performed after the effective date
of the new rates will be charged at the new applicable rates.  We normally issue invoices for our
fees and disbursements on a monthly basis.  These invoices include detail that most of our clients
find sufficient, but please let me know at any time if more detailed information is needed on our
invoices.  Please also refer to the enclosed Information for Clients for specifics regarding fees,
disbursements, billing, payment, and termination of our representation should payment not be
made or other circumstances warrant.

KA000034

Our representation of GigaWatt Pte. Ltd. does not include acting as counsel for any entity in which GigaWatt Pte. Ltd. holds equity or any subsidiary, affiliate, equity-holder, employee, family member or other person (collectively, "Affiliates"), unless such additional representation is separately and clearly undertaken by us. If in the future we and GigaWatt Pte. Ltd. mutually agree to expand our representation of GigaWatt Pte. Ltd. to include any of GigaWatt Pte. Ltd. 's Affiliates, it is agreed that the terms, conditions and consents contained herein will apply to such representation(s).

Perkins Coie represents many other companies, individuals and government agencies ("clients"). During the time we are representing GigaWatt Pte. Ltd. we may be asked to represent:

(1)    other present or future clients in transactions, litigation or other disputes directly adverse to GigaWatt Pte. Ltd. that are not substantially related to our representation of GigaWatt Pte. Ltd. ; and/or

(2)    parties who are considered directly adverse parties in matters we handle for GigaWatt Pte. Ltd. . Our work for these directly adverse parties would be in matters that are not substantially related to our work for GigaWatt Pte. Ltd. .

We request GigaWatt Pte. Ltd. 's consent to allow Perkins Coie to undertake such future representations without the need to obtain any further or separate approval from GigaWatt Pte. Ltd. , as long as those representations described in (1) and (2) above are not substantially related to work Perkins Coie has done, or is doing, for GigaWatt Pte. Ltd. . Your signature below constitutes GigaWatt Pte. Ltd. 's consent to such representation(s). We agree not to use any proprietary or other confidential nonpublic information concerning GigaWatt Pte. Ltd. acquired by us as a result of our representation of GigaWatt Pte. Ltd. in connection with any litigation or other matter in which we represent a party directly adverse to GigaWatt Pte. Ltd. .

Perkins Coie may need to consult with or secure consent from its other current or prospective clients who are or may become adverse to you in order to clear or address actual or potential conflicts of interest. You agree and consent that to the extent it is reasonably necessary in such communications, Perkins Coie may disclose to each such current or prospective client the fact that Perkins Coie has or has had an attorney-client relationship with you.

During our representation of GigaWatt Pte. Ltd. , there may be issues that raise questions about our duties under the rules of professional conduct that apply to lawyers. These might include, e.g., conflict of interest issues, and could even include issues raised because of a dispute between us and a client over the handling of a matter. Normally when such issues arise we would seek the advice of our Professional Standards Counsel, Loss Prevention partners or Professional Standards Conflicts Attorneys who are experts in such matters. Consistent with the rulings of courts in many jurisdictions, we consider such consultations to be attorney-client privileged

conversations between firm personnel and counsel for the firm. However, there have been judicial decisions indicating that under some circumstances such conversations involve a conflict of interest between the client and Perkins Coie and that our consultation with Perkins Coie's counsel may not be privileged, unless we either withdraw from the representation of the client or obtain the client's consent to consult on a privileged basis with Perkins Coie's counsel.

We believe that it is in our clients' interests, as well as ours, that in the event legal ethics or professional responsibility issues arise during a representation, we receive expert analysis. Accordingly, as part of our agreement concerning our representation of GigaWatt Pte. Ltd. , you agree that if we determine in our own discretion during the representation that it is appropriate to consult with our firm counsel (either Perkins Coie's internal counsel or, if we choose, outside counsel) we have your consent to do so on a privileged basis despite any alleged conflict of interest. You further agree that our continuing to represent you at the time of such consultation shall not thereby waive or otherwise limit any attorney-client privilege that Perkins Coie has regarding the confidentiality of our communications with our own in-firm or outside counsel. The costs associated with such legal counsel for Perkins Coie will be paid solely by Perkins Coie and will not be charged to you in any way.

This letter, along with the enclosed Information for Clients, confirms the terms and conditions under which Perkins Coie LLP will provide legal services to GigaWatt Pte. Ltd. . Unless otherwise agreed in writing, the terms of this letter and the enclosed Information for Clients will also apply to any additional matters that we undertake at GigaWatt Pte. Ltd. 's request. If you agree that this letter correctly describes the terms of our engagement, please sign and date a copy of this letter and return it to me. Should you have any questions about this letter, our services or fees, or if you have any other concerns, please call me at any time. We look forward to working with you and are gratified by your confidence in Perkins Coie.

Sincerely,

Lowell D. Ness

LDN/au

Enclosure:    Information for Clients

KA000036

Marina Mykhaylyuta
May 12, 2017
Page 4


ACCEPTED AND AGREED:

GIGAWATT PTE. LTD.

By: *Marina Mykhaylyuta*
Print: 931D08755F32474 ........ ylyuta
Its: Director
Date: мая 16, 2017

KA000037

# Information for Clients

Perkins Coie LLP is pleased to serve you. The following information explains the terms that apply to our engagements (except to the extent that you have reached a different written understanding with us about particular terms) for legal services provided by Perkins Coie LLP. No changes or additions to these terms will be binding unless confirmed in writing sent by us or signed by us. We encourage you to discuss this information with our lawyers at the inception of a matter and whenever you have questions during the course of that matter. Section headings are for convenience of reference only and not intended to affect the interpretation of the provisions of such sections.

**Personnel.** We generally assign one lawyer primary responsibility for seeing that your requests for legal services are met, but additional lawyers, paralegals and technology professionals may assist in rendering the most appropriate and efficient legal services. We attempt to assign personnel to each matter based on the nature and scope of the issues raised by the matter and our lawyers' experience and expertise.

**Basis for Fees.** We charge for legal services rendered by our firm at applicable hourly rates. Each attorney, paralegal, and other timekeeper records time at assigned billing rates. Because hourly rates vary among personnel, each statement typically reflects a composite of several hourly rates. Those rates are reviewed periodically and change at least annually (usually on January 1) based on economic factors and the changing experience levels of our personnel. Services performed after the effective date of the new rates will be charged at the new rates.

**Disbursements and Other Charges.** In the course of performing legal services for you, various services may be provided by third parties. Examples include messenger and courier charges, filing and recording fees, foreign agent fees, court reporters and transcript costs, expert and other witness fees, discovery vendor costs, charges for outside consultants and research services, and travel expenses. You are responsible for these third-party charges, and we reserve the right to forward their invoices directly to you for payment. For administrative ease, however, we may advance payment to the third-party provider and include the charge on our invoice to you, with no markup for handling. We will retain and not allocate to clients relatively insignificant discounts we receive for prompt payment or volume usage. For patent, trademark and other matters that may involve significant third-party payments, you may be required to maintain a minimum balance in a trust account to fund such payments. You will be advised of any such requirements, and we will not be obligated to request or pay for third-party services not fully covered by such deposits.

We will also charge you for certain internal services we provide in connection with our legal services. As noted below, because we both invest in specialized equipment and commit to long-term contracts with computer research vendors (such as Westlaw) and other vendors, we achieve savings in exchange for guaranteed payment, usage or other obligations undertaken at our risk. This allows us to charge our clients for certain services at rates discounted below standard rates. However, the payments we receive from clients for these services may exceed our total payments to the vendors. This excess is used to partially offset the costs we incur for related equipment and personnel and the risks we assume in entering into these contracts.

We currently charge specific internal costs in the following manner:

     **1. Photocopying, Printing, and Facsimile.** In our U.S. offices, clients are charged ten cents per page for photocopying. These charges are higher in our non-U.S. offices. We do not charge for facsimiles sent or received.

     **2. Computer Research.** There is no extra charge to clients for our use of the firm's internal work product retrieval system. Clients are charged for computer-assisted research from outside services, other than many Westlaw Services, at the vendors' standard rates. For many services from Westlaw, our primary outside computer-research source, we are able to charge clients just 37% of Westlaw's standard rates as of 2016 because we committed to a long-term contract with monthly minimum payments. We may occasionally be able to pass along other discounted rates for computer-assisted research from outside sources when we can negotiate volume discounts.

KA000038

**3. Telecommunications.** We do not charge for local or long-distance calls or for any email communications. Credit card and cell phone calls necessitated by work on your matters are charged at our actual cost.

   **4. Mail/Messengers.** In our larger offices, we may use firm messengers whenever appropriate to shorten delivery times and offer greater flexibility. Charges for such internal messengers are equal to or below rates charged by outside messengers for similar services. We do not charge for regular mail. Bulk mailings, packages, overnight deliveries, and special postal services are charged at our actual cost.

   **5. Overtime.** Clients are charged for staff overtime, meals, and transportation only when (a) the client specifically requests after-hours effort or (b) the nature of the work necessitates overtime and such work could not have been done during normal work hours.

   **6. Discovery Services and Database Hosting.** Certain matters, particularly large-scale litigation, may require certain discovery and ancillary support services such as data processing, data hosting and certain software solutions that you instruct us to use. In some instances we may be able to reduce costs by contracting with vendors, including discovery and data storage vendors on whose servers and other media your information may be stored, to purchase a quantity of service over time that is beyond the needs of a single client. Because these services require us to incur management and other overhead expenses, we may bill you at a reduced per-unit rate that does not fully reflect the quantity of discounts we ultimately obtain.

**Invoices and Payment.** We typically bill monthly, and payment is due upon receipt of the invoice. Payment of an invoice will reflect your agreement to the amount charged on that invoice, and you must bring any misbilling or other charge that you believe is inappropriate to our attention within 45 days of presentation of the invoice. To the fullest extent permitted by law, you agree that we have an attorneys' lien (including, without limitation, in the results of our services) to secure payment of the obligations owed us and that we may take steps to inform others of any attorneys' lien rights we might have. For accounts not paid within 30 days of the invoice date, we add a late payment charge of 1% per month (or such lower rate as required by applicable law) on unpaid balances from the invoice date. Unless otherwise agreed upon, we may apply payments first to our own attorneys' fees and costs of collection, second to our late charges, third to our invoiced fees, and finally to our invoiced disbursement charges. Our election not to exercise any rights or not to require punctual performance of each provision of this agreement will not be construed as a waiver or relinquishment of our rights. We do not and cannot guarantee the outcome of any matter or particular results, and payment of our fees and disbursements is not conditioned on any particular outcome. If we are required to bring an action or proceeding to collect fees or disbursements due us, we will also be entitled to recover certain fees and costs. These include, but are not limited to, our own outside attorneys' fees, expert witness fees, other costs of collection billed to us, and the value of legal services Perkins Coie's own attorneys perform in analyzing or prosecuting a collection action if such circumstances arise on your account. You consent to venue and jurisdiction wherever we have an office with attorneys who worked on your behalf. Also, if we are required to testify, produce documents, or respond to other requests in connection with litigation or other proceedings commenced by third parties that relate to our representation of you, you will pay us our reasonable fees and costs incurred in connection with such activities. For matters handled by our New York lawyers, the client may have a right to arbitrate fee disputes under Part 137 of the Rules of the Chief Administrator of the New York Supreme Court, Appellate Division.

**E-billing Set-Up.** We understand that our clients often use e-billing services. In many instances, those e-billing services electronically send our clients' Outside Counsel Guidelines as part of the procedure to set up the account. Acceptance of Outside Counsel Guidelines by our finance/billing personnel through e-billing services set-up is to facilitate invoicing. To the extent that there may be provisions within those guidelines that conflict with this engagement letter or the Information for Clients attachment, this engagement letter and attachment will control unless we otherwise mutually agree in writing.

**Insurance Coverage.** You may have insurance policies relating to a matter for which you engage us that might cover, among other things, reimbursement of attorneys' fees and costs. If coverage is potentially available, including coverage for our fees and costs, your appropriate insurance company must be notified as soon as possible. We can advise you on the availability of insurance coverage only if you expressly and timely request that we do so, we do

KA000039

not have a conflict of interest, and we agree to undertake such additional work. You would then need to furnish us copies of all relevant insurance policies and related documents. Regardless whether, when, and to what the extent insurance coverage might be available to reimburse all or a portion of our fees and costs, you nevertheless remain primarily obligated for amounts owed us, including any late charges that accrue during any delay in payment by others.

**Advance Payments and Estimates.** We may require advance payments before working or continuing work on a matter. Of course, the amount of work we are called upon to perform may subsequently exceed our prior expectations. Regardless of whether you make an advance payment, you agree that any budget, estimate, or similar range for potential charges is nothing more than a forecast based on then-current assumptions, and any such forecast may be high or low due to changed or unforeseen circumstances. We reserve the right, as a condition of providing additional services, to require an increase in any advance payment.

**Legal Service Provider.** We provide strictly legal services to you in connection with this agreement. You are not relying on us for any services other than legal services, and we are specifically not providing any business, investment, insurance, or accounting advice or any investigation of the character or credit of persons with whom you may be dealing.

**Identity of Client.** You confirm that we are being engaged by you and not any of your subsidiaries, affiliates, equityholders, employees, members of your family, or other persons (collectively, "Affiliates"), unless we separately and explicitly undertake such representation. You also expressly confirm that, as our representation is limited to you and does not include acting as counsel for your Affiliates, we may represent other clients adverse to your Affiliates without disclosing those matters to you or obtaining your consent. If in the future we agreed to expand our representation of you to include one or more of your Affiliates, you, and Affiliate(s), agree that the terms, conditions and consents contained in our engagement letter with you will apply to such representation(s).

**Conflicts of Interest.** We have performed a search of our other clients to determine whether representing you might create a potential conflict of interest with any other clients. That check was done using your name and any other names you gave us. Please inform us immediately if you use other names or have affiliated companies that we should enter into our conflicts system.

**Cooperation/Reliance on Accurate Information.** To enable us to represent you effectively, you will cooperate fully with us in your matter(s). You and your agents will fully and accurately disclose to us all facts and documents that may be relevant to a matter we undertake or which we may otherwise request. This information will form the basis of our legal advice.

**Email Communication Disclaimer.** Many of our legal professionals receive hundreds of email messages per day (in addition to spam). Although email is an efficient method for many communications, it can also be delayed in transit or otherwise missed (e.g., blocked by our anti-spam software). If you have not received a response or acknowledgement of receipt of an email, please notify the intended recipient.

**Termination of Services.** We retain the right to cease performing legal services and to terminate our legal representation for any reason consistent with ethical rules, including conflicts of interest or your failure to pay our legal fees and expenses when due. Our representation in any matter will also cease on completion of our work on that matter unless you ask us to perform additional work that we agree to undertake. Performing additional services for you on the same or any other matter is subject to these terms and conditions, our mutual concurrence and clearance of conflicts, if any. We are unable to assure you that matters for other clients will not conflict us out of additional matters you might later ask us to undertake. On completion of a matter, we may close our files and, absent a specific written undertaking to do so, will not thereafter be obligated to docket milestones, make additional or continuation filings, pursue appeals, take other steps on your behalf on the matter, or monitor or advise you with respect to changes in the law or circumstances that might bear upon or adversely affect the completed matter. If you wish to have us return material from your files after the conclusion of a particular matter, we will provide you such material at your request and expense. Some of our practice groups consider our electronic records to be the official client file. Thus, requests for copies of client files may be provided in electronic form only. We will have no

KA000040

obligation to retain client files more than one year after the conclusion of a particular matter or our representation. Our representation of you will be deemed concluded at the time that we have rendered our final bill for services on the matter described in our engagement letter or any such additional matters that are clearly undertaken by us. Whether we will undertake any further matters and form an attorney-client relationship again will depend upon your request, our performance of a conflicts check and our expression to you of our willingness to accept any further matters.

**Alliances/Other Counsel.** Many of our clients also have international or other legal needs we cannot fulfill. This causes us from time to time to establish ongoing working relationships or strategic alliances with law firms in other jurisdictions. While our close relationships with our legal colleagues at these firms have helped us provide coordinated representation for many of our clients, these firms (and other firms we may recommend to our clients) are separate from and independent of Perkins Coie. We do not share personnel or fees, do not have common operations beyond occasional joint seminars and presentations, and must check any other firm's conflicts of interest before that firm's lawyers may jointly represent any of our clients. Under rules in certain jurisdictions where we practice, we must advise you that you may consult independent counsel to advise you regarding these documents governing our relationship, and we encourage you to do so if you like. Also, you retain the right to consult with independent counsel at any time while we represent you. However, we are not responsible for any advice an independent counsel may give you, and such consultation will be entirely at your expense.

**Questions.** We endeavor to deliver legal services effectively and efficiently and to render accurate and understandable billings. Please direct any questions about services or billing practices to your client service lawyer. Questions regarding the billing or payment status of your account may also be directed to the Client Accounting Department in our Seattle office at 1-800-261-3143 (206-359-3143 in the Seattle area).

KA000041