# EXHIBIT 27

**So Ordered.**

**Dated: August 13th, 2020**



Frederick P. Corbit
Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WASHINGTON

In Re:                                  No. 18-03197-FPC11

GIGA WATT, INC.,                **ORDER REGARDING PRODUCTION OF DOCUMENTS RESPONSIVE TO RULE 2004 ORDER AND PLACING LIMITS ON THE USE OF CONFIDENTIAL INFORMATION IN SUCH DOCUMENTS**
                        Debtor.

THIS MATTER came on for hearing pursuant to Perkins Coie LLP's Motion for Further Direction and for Protective Order Regarding Ex Parte Order for Rule 2004 Examination, the Court having reviewed and considered the pleadings and papers filed in connection with such motion, the Court hereby rules as follows:

1.       For purposes of Rule of Professional Conduct 1.6(b)(6), Perkins is hereby directed to produce to the Trustee, in a reasonably prompt fashion, those non-privileged documents which are responsive to the Rule 2004 Order which this Court entered on July 6, 2020.

ORDER RE PRODUCTION OF DOCUMENTS
RESPONSIVE TO RULE 2004 ORDER, ETC. - 1

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

2.     Perkins has informed the Trustee and the Court that many of the documents which are responsive to the Rule 2004 Order contain financial or other sensitive information.  Accordingly, Perkins may designate as "Confidential" any document which it reasonably and in good faith believes to contain information involving business, financial, or personal information which should reasonably be protected from public disclosure or dissemination.  Such designations shall be made by stamping or otherwise affixing the label "Confidential" on such documents. This provision is without prejudice to the right of the Trustee to contest such designation.

3.     Unless otherwise ordered by the Court or agreed to in writing by Perkins and the Trustee, Confidential documents may be used only for purposes relating to this bankruptcy, and may be disclosed only to:

a.     any party in interest to this bankruptcy directly concerned with the issues then in dispute relating to such Confidential documents;

b.     the Court, court personnel, court reporters, and their staff;

c.     the counsel of record in this bankruptcy, as well as their staff to whom it is reasonably necessary to disclose the information for this litigation;

d.     experts and consultants to whom disclosure is reasonably necessary;

e.     any non-party vendor retained to assist any party in interest to this bankruptcy and their attorneys with litigation-related activities, such as processing, copying, imaging, and management of documents;

ORDER RE PRODUCTION OF DOCUMENTS
RESPONSIVE TO RULE 2004 ORDER, ETC. - 2

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

f.      during their depositions or in any hearing or pretrial proceeding, witnesses in the action to whom disclosure is reasonably necessary; and

g.      the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information contained in the document.

4.      Confidential documents, or information derived from Confidential documents, shall not be filed with the Court or included in pleadings, motions, declarations, etc., except when such information and documents and any portion(s) of such pleadings, motions, declarations, etc., that reference such material are accompanied by a motion to seal pursuant to LBR 9018-1, unless otherwise ordered by the Court.  Documents or information designated as Confidential may be provided to the Court *in camera* pending a decision on the motion to seal.  If the Court grants the motion to seal the material, the Confidential material shall be filed with the clerk in accordance with local rules.  If the motion to seal is denied, the material shall be filed with the clerk in the normal fashion.

5.      The parties shall meet and confer regarding the procedures for use of any materials designated as Confidential at trial or any hearing held in open court.  If the parties are unable to resolve a dispute related to the use of Confidential material in open court, (a) the party who seeks to protect such Confidential material bears the burden of requesting relief from the Court and (b) such relief shall be heard on an expedited basis of ten (10) days or less, subject to the Court's calendar.

ORDER RE PRODUCTION OF DOCUMENTS
RESPONSIVE TO RULE 2004 ORDER, ETC. - 3

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

6.      Any party may challenge a designation of confidentiality at any time. Any motion regarding Confidential designations or for a subsequent Protective Order must include a certification, in the motion or in a declaration or affidavit, that the movant has engaged in a good faith meet-and-confer conference with other affected parties in an effort to resolve the dispute without Court action.

7.      Within 60 days after the termination of this bankruptcy, including all appeals, each person possessing "Confidential" documents shall use reasonable efforts to destroy all Confidential material, including all copies, extracts, compilations, and summaries thereof.

8.      This Order is without prejudice to the right of the Trustee to request further documents and without prejudice to Perkins' right to object to any such further requests.

///END OF ORDER///

Presented by:

BYRNES KELLER CROMWELL LLP

By /s/ Bradley S. Keller
     Bradley S. Keller, WSBA #10665
By /s/ Ralph E. Cromwell, Jr.
     Ralph E. Cromwell, Jr., WSBA #11784
1000 Second Avenue, 38th Floor
Seattle, Washington  98104
206-622-2000
Fax:  206-622-2522
Email:  bkeller@byrneskeller.com
          rcromwell@byrneskeller.com
*Attorneys for Perkins Coie LLP*

ORDER RE PRODUCTION OF DOCUMENTS
RESPONSIVE TO RULE 2004 ORDER, ETC. - 4

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

<div style="text-align: right; color: #888;">1</div>

**CERTIFICATE OF SERVICE**

  I hereby certify that on this 12th day of August, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system.  The NEF for the foregoing specifically identifies recipients of electronic notice.

<div style="text-align: center;">
By /s/ Ralph E. Cromwell, Jr.
</div>

        Ralph E. Cromwell, Jr.
        *Attorneys for Plaintiffs*
        1000 Second Avenue, 38th Floor
        Seattle, Washington  98104
        206-622-2000
        Fax:  206-622-2522
        Email:  rcromwell@byrneskeller.com

ORDER RE PRODUCTION OF DOCUMENTS
RESPONSIVE TO RULE 2004 ORDER, ETC. - 5

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

# EXHIBIT 28



701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036

PHONE 206.883.2500
FAX 206.883.2699
**www.wsgr.com**

STEPHANIE L. JENSEN
sjensen@wsgr.com
Direct Dial: (206) 883-2556

August 2, 2018

**FOIA CONFIDENTIAL
TREATMENT REQUESTED**

*__Via Email (mathieb@sec.gov)__*

BeLinda I. Mathie
Senior Attorney, Division of Enforcement
U.S. Securities and Exchange Commission
175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604

**Re: In the Matter of Giga Watt, Inc. (MC-08502)**

Dear Ms. Mathie:

As you know, this firm represents Giga Watt, Inc. ("Giga Watt") in connection with the U.S. Securities and Exchange Commission's ("SEC") May 2, 2018 letter requesting a voluntary production of documents and information in the above-referenced matter. In this letter, we first provide written responses to certain Information and Documents to be Produced ("Requests") contained in your May 2, 2018 letter. Second, we write to follow up regarding certain information presented during our June 20, 2018 meeting. And finally, we provide responses to certain questions raised by the Staff during the June 20, 2018 meeting.

## I. RESPONSES TO REQUESTS

<u>**Request No. 1**</u>:

A description of the corporate structure and management of Giga Watt, including, without limitation, the date and place of establishment, organization, and, if applicable, incorporation or formation.

<u>Response to Request No. 1</u>:

Giga Watt is a closely held corporation formed under the laws of the state of Washington on December 15, 2016. Certain of Giga Watt's corporate documents have now been produced.

AUSTIN   BEIJING   BOSTON   BRUSSELS   HONG KONG   LOS ANGELES   NEW YORK   PALO ALTO
SAN DIEGO   SAN FRANCISCO   SEATTLE   SHANGHAI   WASHINGTON, DC   WILMINGTON, DE

GWTEE099978

U.S. Securities and Exchange Commission         **FOIA CONFIDENTIAL**
August 2, 2018                                                 **TREATMENT REQUESTED**
Page 2

Giga Watt is managed by the following directors and officers:

| Individual | Position |
|---|---|
| David M. Carlson | Chief Executive Officer, Director |
| Timur Usmanov | Chief Financial Officer, Secretary |
| Andrey Kuzenny | Chief Operation Officer |

Giga Watt's current share ownership is as follows:

| Shareholder | No. of shares |
|---|---|
| David M. Carlson | 1,000 |
| Silaren Limited | 3,020 |
| Leonid Markin | 1,660 |
| Andrey Kuzenny | 1,660 |
| Eduard Khaptakhaev | 1,660 |
| The Goldcoin Trust | 500 |

Giga Watt believes this responds in full to Request No. 1. If you seek additional information, please let us know.

**Request No. 2**:

A list of all officers, directors, principals, owners, shareholders, employees, and all others acting on behalf of Giga Watt, including each person's title/role.

Response to Request No. 2:

In addition to the information provided in Response to Request No. 1, the requested information is attached hereto as Addendum A.

**FOIA CONFIDENTIAL
TREATMENT REQUESTED**

Giga Watt believes this responds in full to Request No. 2.  If you seek additional information, please let us know.

**Request No. 3**:

A list of all domestic and foreign bank, brokerage, cryptocurrency, or other financial accounts held by or on behalf of or controlled by Giga Watt, including its owners, officers, employees and agents.

Response to Request No. 3:

Giga Watt currently holds the following accounts:

- Bank of America, Account No. 325104121544, Routing No. 122000661/121000358; and

- Washington Trust Bank, Account Nos. 1000622587, 1000624864, and 1000624930, Routing No. 125100089.

Giga Watt believes this responds in full to Request No. 3.  If you seek additional information, please let us know.

**Request No. 4**:

To the extent not covered by Request #3 above, a list of all cryptocurrency digital wallet addresses that were used to send assets to Giga Watt, including any virtual currency, or other token or coin, in connection with any digital token or coin, or any membership interest or asset, sold or contemplated to be sold by Giga Watt.

Response to Request No. 4:

No funds were paid to Giga Watt in cryptocurrency in connection with the token sale.  As we explained on June 20, 2018, Cryptonomos provided the platform for GigaWatt Pte. Ltd.'s ("GW Singapore") WTT token sale and was authorized by GW Singapore to collect the sales proceeds paid in cryptocurrency, convert it to fiat currency, and transfer it to the designated escrow account.

Conversely, Giga Watt received fiat currency either from GW Singapore directly, or from the escrow account at the direction of GW Singapore.

Giga Watt believes this responds in full to Request No. 4.  If you seek additional information, please let us know.

U.S. Securities and Exchange Commission
August 2, 2018
Page 4

**Request No. 5**:

To the extent not covered by Requests #3 and #4 above, a list of all cryptocurrency digital wallet addresses that were used to send assets to a third party to be transmitted to Giga Watt, including any virtual currency, or other token or coin, in connection with any digital token or coin, or any membership interest or asset, sold or contemplated to be sold by Giga Watt.

Response to Request No. 5:

As explained above in Response to Request No. 4, Giga Watt did not sell the WTT tokens; they were sold through Cryptonomos' platform for the benefit of GW Singapore. However, the list of cryptocurrency digital wallet addresses used to purchase WTT is attached hereto as Addendum B.

Giga Watt believes this responds in full to Request No. 5. If you seek additional information, please let us know.

**Request No. 6**:

A description of Giga Watt's operations, including without limitation any actual or contemplated products and services to be provided by Giga Watt.

Response to Request No. 6:

The most comprehensive description of Giga Watt's operations is set forth in the White Paper, which was produced at production number range GWSEC00000003–GWSEC00000031 on June 1, 2018.

At the time of the pre-sale and throughout the ICO, there were two large warehouses in East Wenatchee and one in Moses Lake, with a total of approximately 3 MW of capacity. At present, total mining capacity (including temporary arrangements pending delivery of power to all constructed Giga Pods) is 22 MW, with 18 MW currently obligated by WTT holders.

Currently energized Giga Pods and other facilities, and the approximate dates they were energized, are set forth in the following chart.

| Energized Hosting Facilities | Approximate Dates Facilities Were Energized |
| --- | --- |
| Pre-existing Moses Lake facilities | Before pre-sale |
| Moses Lake Pods 1 and 2 | November 1, 2017 |

U.S. Securities and Exchange Commission
August 2, 2018
Page 5

| Pangborn Pod 1 and Building A | November 13, 2017 |
| Moses Lake Pod 3 | December 20, 2017 |
| Moses Lake Pods 4 and 5 | January 3, 2018 |
| Ephrata temporary facility | January 7, 2018 |
| George temporary facility | February 1, 2018 |
| Moses Lake Pod 6 | February 6, 2018 |
| Moses Lake Pod 7 | February 17, 2018 |
| Moses Lake Pod 8 | April 25, 2018 |

Per our call on June 13, 2018, you asked Giga Watt to broaden this request to include documents concerning the subject of the initial request. Giga Watt believes it has produced all non-privileged documents not containing foreign language that are responsive to this expanded request from the initial data set of 4,096 documents as described in my June 11, 2018 email. If you seek additional information, please let us know.

**Request No. 7**:

A description of the purpose and utility (both actual and intended) of the Giga Watt token, including the rights and privileges held or contemplated to be held by purchasers or holders of Giga Watt tokens.

Response to Request No. 7:

The most comprehensive description of the purpose and utility of WTT tokens is set forth in the White Paper, which was produced at production number range GWSEC00000003–GWSEC00000031 on June 1, 2018. A WTT token represents the right to use Giga Watt's mining facility capacity rent free for 50 years, and entitles token holders to receive 1 Watt worth of mining equipment power consumption. This allows prospective miners of any size to participate in mining at the low energy rates available in Wenatchee, Washington while allowing them to save on the costs of running individual mining operations.

Per our call on June 13, 2018, you asked Giga Watt to broaden this request to include documents concerning the subject of the initial request. Giga Watt believes it has produced all non-privileged documents not containing foreign language that are responsive to this expanded

U.S. Securities and Exchange Commission        **FOIA CONFIDENTIAL**
August 2, 2018                                  **TREATMENT REQUESTED**
Page 6

request from the initial data set of 4,096 documents as described in my June 11, 2018 email.  If you seek additional information, please let us know.

**Request No. 8**:

A list of all Persons that purchased any membership interest, token, or coin, offered by Giga Watt, including names and contact information (addresses, email addresses and telephone numbers).

Response to Request No. 8:

As explained above in Response to Request No. 4, Giga Watt did not sell the WTT tokens; they were sold through Cryptonomos' platform for the benefit of GW Singapore. However, the requested list is attached hereto as Addendum C.

Giga Watt believes this responds in full to Request No. 8.  If you seek additional information, please let us know.

**Request No. 9**:

Giga Watt's policies and procedures to verify the Accredited Investor status of purchasers of any Giga Watt token.  Include a description of any such procedures actually followed during Giga Watt's presale and Giga Watt Initial Coin Offering ("ICO"), or other sales or grants of Giga Watt tokens.

Response to Request No. 9:

As explained above in Response to Request No. 4, Giga Watt did not sell the WTT tokens.  Giga Watt believes that it was not required to verify the Accredited Investor status of purchasers of WTT tokens, and it does not have any policies for doing so.

Per our call on June 13, 2018, you asked Giga Watt to broaden this request to include documents concerning the subject of the initial request.  Giga Watt believes it has produced all non-privileged documents not containing foreign language that are responsive to this expanded request from the initial data set of 4,096 documents as described in my June 11, 2018 email.  If you seek additional information, please let us know.

**Request No. 10**:

Giga Watt's Know Your Customer ("KYC") policies and procedures.

Response to Request No. 10:

Giga Watt believes that it was not required to adopt KYC policies and procedures, and it has not adopted any such policies or procedures.

Giga Watt believes this responds in full to Request No. 10.  If you seek additional information, please let us know.

**Request No. 11**:

A list of platforms, exchanges and/or secondary markets for actual or intended trading of Giga Watt digital tokens or coins.

Response to Request No. 11:

WTT is listed on the YoBit, ForkDelta (formerly EtherDelta), and Idex exchanges.

Per our call on June 13, 2018, you asked Giga Watt to broaden this request to include documents concerning the subject of the initial request.  Giga Watt believes it has produced all non-privileged documents not containing foreign language that are responsive to this expanded request from the initial data set of 4,096 documents as described in my June 11, 2018 email.  If you seek additional information, please let us know.

**Request No. 12**:

A description of any analysis by Giga Watt (or on its behalf) to determine whether any ICO or token sale or grant is a securities offering within the meaning of the U.S. federal securities laws, or regarding the application of the securities laws to Giga Watt's actual or contemplated ICOs, token sales, or grants.

Response to Request No. 12:

Per our call on June 13, 2018, you asked Giga Watt to broaden this request to include documents concerning the subject of the initial request.  Giga Watt believes it has produced all non-privileged documents not containing foreign language that are responsive to this expanded request from the initial data set of 4,096 documents as described in my June 11, 2018 email.  If you seek additional information, please let us know.

**Request No. 13**:

All promotional and/or marketing materials presented or provided by Giga Watt to any actual or potential purchaser of any digital token or coin, any membership interest, or any asset

U.S. Securities and Exchange Commission
August 2, 2018
Page 8

sold or contemplated to be sold by Giga Watt, including without limitation any white paper, due diligence materials, sales presentation, script, proposal, summary, highlights or talking points, and any marketing Documents (including all pitch-books and pitch-decks), including all drafts or prior version, and any copies bearing notations or marks not found in the original.

    Response to Request No. 13:

    Per our call on June 13, 2018, you asked Giga Watt to broaden this request to include documents concerning the subject of the initial request. Giga Watt believes it has produced all non-privileged documents not containing foreign language that are responsive to this expanded request from the initial data set of 4,096 documents as described in my June 11, 2018 email. If you seek additional information, please let us know.

    **Request No. 14**:

    All public statements by Giga Watt concerning Giga Watt, including without limitation official statements, press releases, forum discussions, question and answers, and videos, issued by Giga Watt including but not limited to Documents sufficient to identify the date and medium of dissemination of any such statement.

    Response to Request No. 14:

    Giga Watt's counsel collected from publicly available internet sources public statements by Giga Watt concerning Giga Watt as available on platforms Giga Watt identified as having been utilized and through counsel's own search for news articles purporting to include public statements by Giga Watt. These documents were produced on the following dates at the following production number ranges.

- June 1, 2018—GWSEC00000032–GWSEC00016181;

- June 6, 2018—GWSEC00016182–GWSEC00020989; and

- June 29, 2018—GWSEC00021885–GWSEC00021926.

    Per our call on June 13, 2018, you asked Giga Watt to broaden this request to include documents concerning the subject of the initial request. Giga Watt believes it has produced all non-privileged documents not containing foreign language that are responsive to this expanded request from the initial data set of 4,096 documents as described in my June 11, 2018 email. If you seek additional information, please let us know.

**Request No. 15**:

A description of any referral programs, incentive programs or promotional programs related to the actual or potential purchase of any digital token or coin, any membership interest, or any asset sold or contemplated to be sold by Giga Watt.

Response to Request No. 15:

As explained above in Response to Request No. 4, Giga Watt did not sell the WTT tokens; they were sold through Cryptonomos' platform for the benefit of GW Singapore.

Through the Cryptonomos platform, GW Singapore offered a 5% bonus to WTT purchasers who successfully referred the token sale to another. Cryptonomos posted the details of the referral program at the following URL:

https://bitcointalk.org/index.php?topic=1914900.msg19103130#msg19103130

Cryptonomos also announced a "bounty" program open to persons willing and able to translate the White Paper and other announcements into any of twenty-five listed languages. Cryptonomos posted the details of the bounty program at the following URL:

https://medium.com/cryptonomos/giga-watt-bounty-program-fe0f0bd498a6

Per our call on June 13, 2018, you asked Giga Watt to broaden this request to include documents concerning the subject of the initial request. Giga Watt believes it has produced all non-privileged documents not containing foreign language that are responsive to this expanded request from the initial data set of 4,096 documents as described in my June 11, 2018 email. If you seek additional information, please let us know.

**Request No. 16**:

Identify any threatened, pending, and settled litigation or arbitration concerning Giga Watt.

Response to Request No. 16:

On December 28, 2017, plaintiff StormsMedia, LLC filed a putative securities class action against Giga Watt and GW Singapore under the caption *StormsMedia, LLC v. Giga Watt, Inc. et al.*, No. 2:17-cv-00438-SMJ (E.D. Wash.). The complaint alleged claims of an unregistered offering of securities under sections 5(a) and (c) of the Securities Act of 1933 and of rescission of contract. Plaintiff and Giga Watt negotiated a settlement, pursuant to which the court dismissed the action on January 19, 2018.

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

U.S. Securities and Exchange Commission
August 2, 2018
Page 10

**FOIA CONFIDENTIAL
TREATMENT REQUESTED**

On March 19, 2018, plaintiff Mark Moss filed a securities action against Giga Watt and GW Singapore under the caption *Moss v. Giga Watt, Inc. et al.*, No. 2:18-cv-00100-SMJ (E.D. Wash.). The complaint alleges individual claims of an unregistered offering of securities under the Securities Act of 1933 and the Washington Securities Act and a claim for rescission of contract. By stipulation of the parties, on July 3, 2018, the court consolidated this case with an action titled *Balestra v. Giga Watt, Inc., et al.*, described below.

On March 20, 2018, plaintiff Raymond Balestra filed a putative securities class action against Giga Watt, GW Singapore, Cryptonomos, and Giga Watt CEO Dave Carlson under the caption *Balestra v. Giga Watt, Inc., et al.*, No. 2:18-cv-00103-SMJ (E.D. Wash.). The complaint alleges a claim of an unregistered offering of securities against all defendants under section 12(a)(1) and a control person claim against Dave Carlson under section 15(a) of the Securities Act of 1933 on behalf of a putative class of plaintiffs who purchased Giga Watt tokens during the Giga Watt ICO. On June 28, 2018, the court appointed Alex McVicker as lead plaintiff. By stipulation of the parties, on July 3, 2018, the court consolidated this case with the action titled *Moss v. Giga Watt, Inc. et al.* described above.

The above does not include any actions brought in small claims court by unsatisfied customers, or threats of litigation communicated by customers to support staff without the involvement of an attorney.

Giga Watt believes this responds in full to Request No. 16. If you seek additional information, please let us know.

**Request No. 17**:

All compensation Agreements between Giga Watt and any of its officers, directors, principals, owners, shareholders, employees, agents, general partners, or limited partners.

Response to Request No. 17:

Giga Watt has produced the employment agreements between Giga Watt, Inc. and David M. Carlson, and between Giga Watt, Inc. and Andrey Kuzenny.

To the best of our current knowledge, we believe these are the only formal compensation agreements entered into by Giga Watt. If additional compensation agreements are located, they will be provided to you.

Subject to the above caveat, Giga Watt believes this responds in full to Request No. 17. If you seek additional information, please let us know.

**FOIA CONFIDENTIAL
TREATMENT REQUESTED**

**Request No. 18**:

Documents sufficient to show the amount, whether in fiat currency or cryptocurrency, raised in connection with the Giga Watt pre-sale and ICO.

Response to Request No. 18:

As explained above in Response to Request No. 4, Giga Watt did not conduct the pre-sale or ICO; these efforts were undertaken by Cryptonomos on behalf of GW Singapore. Total amounts raised during the pre-sale were 833.12983404 BTC, 3762.71675434 ETH, and $635,219.00 USD. Total amounts raised during the ICO were 3588.16195179405588140091 BTC, 21008.02428223565228806956 ETH, and $4,996,559.06 USD.

As discussed above, all cryptocurrency received in connection with the sale of WTT was converted to fiat and placed in escrow with Perkins Coie LLP.

The total revenue received as a result of the WTT token sale was $22,515,678.06, out of which $849,920.75 has been refunded to customers, leaving **$21,665,757.31**.

Giga Watt believes this responds in full to Request No. 18. If you seek additional information, please let us know.

**Request No. 19**:

Documents sufficient to identify any escrow Agreement or arrangement Concerning the proceeds of the Giga Watt pre-sale and ICO.

Response to Request No. 19:

As explained during our June 20, 2018 meeting, Perkins Coie LLP extended the use of its IOLTA account to GW Singapore to keep proceeds received from the WTT Token sale in escrow until WTT tokens were distributed to purchasers in step with construction of the respective hosting capacity. Perkins Coie LLP released the funds in accordance with the completion of construction of the Giga Pods and distribution of the WTT tokens in batches.

Per our call on June 13, 2018, you asked Giga Watt to broaden this request to include documents concerning the subject of the initial request. Giga Watt believes it has produced all non-privileged documents not containing foreign language that are responsive to this expanded request from the initial data set of 4,096 documents as described in my June 11, 2018 email. If you seek additional information, please let us know.

**FOIA CONFIDENTIAL
TREATMENT REQUESTED**

**Request No. 20**:

Documents sufficient to show the use of the proceeds of the Giga Watt pre-sale and ICO.

Response to Request No. 20:

As stated in our July 13, 2018 email, all funds raised through the ICO were ultimately spent on construction.

Per our call on June 13, 2018, you asked Giga Watt to broaden this request to include documents concerning the subject of the initial request. Giga Watt believes it has produced all non-privileged documents not containing foreign language that are responsive to this expanded request from the initial data set of 4,096 documents as described in my June 11, 2018 email. If you seek additional information, please let us know.

**Request No. 21**:

Documents sufficient to show the actual and planned issuance of Giga Watt tokens, including the number of tokens and dates of issuance.

Response to Request No. 21:

The details of the planned issuance of WTT are included in the White Paper, produced at production number range GWSEC00000003–GWSEC00000031 on June 1, 2018. A total of 2,813,004 WTT were sold during the pre-sale. A net total of 20,154,783 WTT were sold during the ICO, comprised of the following:

2,813,004 (pre-sale) + 18,184,256 (ICO) – 842,477 (refunded) = 20,154,783 WTT

The number of tokens sold at each price point is as follows:

| Price | Tokens |
|---|---|
| $1.20 | 1,758,570 WTT |
| $1.15 | 3,293,194 WTT |
| $1.10 | 3,162,769 WTT |
| $1.05 | 3,652,050 WTT |
| $1.00 | 9,130,677 WTT |
| **TOTAL** | **20,997,260 WTT** |

U.S. Securities and Exchange Commission

August 2, 2018

Page 13

The batches of tokens were issued as follows:

| Batch | WTT Issued | Date Issued |
|---|---|---|
| 1 | 5,045,779 | August 7, 2017 |
| 2 | 900,000 | August 15, 2017 |
| 3 | 4,500,000 | September 22, 2017 |
| 4 | 7,730,093 | December 25, 2017 |
| 5 | 4,090,869 | February 28, 2018 |
| 6 | 911,259 | February 28, 2018 |
| **TOTAL** | **23,178,000 WTT** | |

Per our call on June 13, 2018, you asked Giga Watt to broaden this request to include documents concerning the subject of the initial request. Giga Watt believes it has produced all non-privileged documents not containing foreign language that are responsive to this expanded request from the initial data set of 4,096 documents as described in my June 11, 2018 email. If you seek additional information, please let us know.

**Request No. 22**:

Communications between Giga Watt and any of its affiliates, including but not limited to Cryptonomos and GigaWatt, Concerning the Giga Watt pre-sale and ICO.

Response to Request No. 22:

Giga Watt believes it has produced all non-privileged documents not containing foreign language that are responsive to this request from the initial data set of 4,096 documents as described in my June 11, 2018 email. If you seek additional information, please let us know.

\*       \*       \*

In summary, Giga Watt believes it has responded in full to Request Nos. 1–5, 8, 10, and 16–18 through the information contained in this letter, and has produced all non-privileged documents not containing foreign language that are responsive to Request Nos. 6, 7, 9, 11–15, and 19–22 from the initial data set of 4,096 documents as described in my June 11, 2018 email.

## II.    INFORMATION PRESENTED VERBALLY DURING JUNE 20, 2018 MEETING

To the extent not previously provided above, what follows relates to the information we presented during the June 20, 2018 meeting.

During the June 20, 2018 meeting, we stated that Anton Orlov is acting Chief Operations Officer ("COO") of Giga Watt, Inc.  This was incorrect.  Mr. Orlov is acting COO of GW Singapore, not Giga Watt, Inc.  Additionally, please note that Mr. Orlov's salary is not paid by GW Singapore, but rather by Credio Financial.

We also need to correct the statement that Giga Watt, Inc. is owned by Mr. Carlson (10%) and his partners, Mr. Markin, Mr. Kuzenny, and Mr. Khaptakhaev (30% each).  As set forth in Response to Request No. 1 above, while Mr. Carlson owns 1,000 shares (~10.5%) and Messrs. Markin, Kuzenny, and Khaptakhaev each own 1,660 shares (~17.5%), respectively, there are also two additional shareholders: Silaren Limited owns 3,020 shares (~31.8%) and The Goldcoin Trust owns 500 shares (~5.3%).

Additionally, during the June 20, 2018 meeting, we inadvertently provided inaccurate figures for the amounts of ETH and USD collected during the WTT pre-sale and ICO.  We stated that 833.12983404 ETH were raised during the pre-sale, which was the precise amount of BTC raised during the pre-sale.  We also stated that $692,897.00 USD was raised during the pre-sale and $5,094,227.55 USD was raised during the ICO.  As accurately stated in response to Request No. 18 above, the pre-sale raised 833.12983404 BTC, 3762.71675434 ETH, and $635,219.00 USD, and the ICO raised 3588.1619517940558140091 BTC, 21008.02428223565228806956 ETH, and $4,996,559.06 USD.  Please note that the figures we provided on June 20, 2018 for both the total amount of ETH raised during the entire ICO (21008.02428223565228806956) and the total amount of revenue raised as a result of the WTT token sale ($21,665,757.31) were accurate.

During the June 20, 2018 meeting, we noted that the marketing and promotion of WTT during the pre-sale and ICO was handled primarily by Cryptonomos and included the White Paper, websites, Bitcointalk, Telegram, Whatsapp, Slack, Twitter, Facebook, and Instagram. The specific URLs are provided below.

Promotion:
- https://bitcointalk.org/index.php?topic=1914900.0
- https://wtt.cryptonomos.com/

**Wilson Sonsini Goodrich & Rosati**
PROFESSIONAL CORPORATION

Official Links for Token Buyers:
- Token Launch Website: https://cryptonomos.com/wtt/
- Twitter: https://twitter.com/WTTtoken
- Facebook: https://www.facebook.com/cryptonomos
- Telegram chat: https://t.me/wtt_token
- Instagram: https://www.instagram.com/cryptonomos
- Medium: https://medium.com/cryptonomos

Official Links for Giga Watt's Clients:
- Giga Watt Website: https://giga-watt.com/
- Facebook: https://www.facebook.com/gigawattcom
- Instagram: https://instagram.com/gigawatt_mining
- Twitter: https://twitter.com/gigawatt_mining
- Slack (support): https://slack.giga-watt.com/
- Blog: https://medium.com/gigawatt

Finally, you asked who provided legal advice regarding the pre-sale and ICO. As we stated on June 20, 2018, representation was provided by three firms: Blockchain Law Group PC (Katrina (Grant) Arden); Perkins Coie LLP (J. Dax Hansen and Lowell Ness); and Clyde & Co. Clasis Singapore Pte. Ltd. (Kai Young Tan).

## III.    RESPONSES TO QUESTIONS RAISED DURING JUNE 20, 2018 MEETING

During the June 20, 2018 meeting, we showed you three publicly available YouTube videos to help you picture Giga Watt's operations. You requested the date each such video was released. Below, we list the URL, name, duration, and date of release of each of these three videos.

1. https://youtu.be/_VYksAS2N1k
   Intro to Giga Pod
   6:17
   June 13, 2017

2. https://youtu.be/Tlhk3FwJaEc
   Giga Pod up close
   9:23
   July 21, 2017

**FOIA CONFIDENTIAL
TREATMENT REQUESTED**

3. https://youtu.be/qpE2FqlgKG4
   Giga Watt's super high density racks
   2:09
   July 24, 2017

You also asked whether the facility shown in the first two videos above was Pod 1. We confirmed that it is.

You asked where the White Paper discloses that GW Singapore is the entity conducting the WTT token sale. The White Paper does not directly identify the entity issuing the WTT tokens. However, Page 12 of the White Paper explains that "[u]nder the existing partnership arrangements between Giga Watt and its Partner [previously defined as GW Singapore], the Partner is offered access to Giga Watt's facility at an unprecedentedly low hosting rate . . . . Now, through the tokenization process, this low hosting rate can be passed to all token holders." This language discloses the fact that GW Singapore is the entity that has negotiated for the low hosting rate, and is passing that low hosting rate along through tokenization to WTT token holders.

Regarding the escrow account, you asked who at Perkins Coie was responsible for withdrawals. Perkins Coie Partner Lowell Ness approved the release of funds from the IOLTA account, while Trust Accountant Billy Gajdos administered the funds transfers.

With respect to conversion, Cryptonomos converted cryptocurrency to fiat currency in batches throughout and immediately after the token sale through Circle Internet Financial Ltd., as set forth in the following table:

| Date | Fiat Amount |
|---|---|
| July 7 ,2017 | $780,000 |
| July 18, 2017 | $826,020 |
| July 21, 2017 | $1,287,500 |
| July 24, 2017 | $2,575,000 |
| July 28, 2017 | $95,000 |
| August 4, 2017 | $6,598,900 |
| August 4, 2017 | $5,000,000 |

U.S. Securities and Exchange Commission            **FOIA CONFIDENTIAL**
August 2, 2018                                           **TREATMENT REQUESTED**
Page 17

Finally, you asked us to provide an estimate of documents remaining to be reviewed. To date, with the exception of 360 documents containing foreign language, we have completed the review of the documents returned from our initial search. We sent the final production of non-foreign language documents on Wednesday, August 1, 2018, and anticipate providing you with logs of documents withheld or redacted on the grounds of privilege or privacy by August 15, 2018.

We believe this answers each of the questions you posed during the June 20, 2018 interview. We are in the process of preparing responses to the inquiries you sent on July 30, 2018. If you believe any other questions remain outstanding, or you believe additional document searches and review need to be conducted, please let us know.

\*　　　\*　　　\*

Please note that, through this letter and addendums, Giga Watt does not intend to produce privileged documents, provide privileged information, or waive any applicable privilege or work product protection. Any inadvertent production or provision of such information is protected by Rule 502 of the Federal Rules of Evidence. On behalf of Giga Watt, we request that the SEC provide confidential and nonpublic treatment, pursuant to the Freedom of Information Act ("FOIA"), to this letter, the enclosed documents and all information contained therein. *See* 5 U.S.C. § 552(b); 18 U.S.C. § 1905; 17 C.F.R. § 200.80(b); 17 C.F.R. § 200.83; Letter to FOIA Officer (attached).

If you have any questions concerning this production, please feel free to contact me at (206) 883-2556.

Sincerely,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

*Stephanie L. Jensen*

Stephanie L. Jensen

Enclosures

cc:    FOIA Officer (without enclosures)

# EXHIBIT 29



COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS





NAEGELI
*Expect Excellence*

**DEPOSITION AND TRIAL**



CELEBRATING **35** YEARS IN BUSINESS

**(800) 528-3335**
**NAEGELIUSA.COM**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF WASHINGTON**

In Re:                          Case No. 18-03197 FPC 11
GIGA WATT, INC., a Washington
corporation,

     Debtor.

_____

MARK D. WALDRON, as Chapter 7
Adv.Pro. No. 20-80031-FPC Trustee,

     Plaintiff,

vs.

PERKINS COIE, LLP, a Washington
limited partnership, LOWELL NESS,
an individual and California
resident, GIGA WATT PTE. LTD., a
Singapore corporation, and ANDREY
KUZENNY, an individual and citizen
of the Russian Federation,

     Defendants,

- and -

THE GIGA WATT PROJECT, a partnership,

     Nominal
Defendant.

     **REMOTE DEPOSITION BY VIDEOCONFERENCE OF**

     **TIMUR USMANOV**

     **TAKEN ON**
     **MONDAY, MARCH 7, 2022**
     **11:10 A.M.**

     **WASHINGTON**

1  you.

2       Q.    Did you have any discussions regarding the escrow

3  held by Perkins?

4       A.    To get all of the information, I asked to be

5  informed, where we expecting the money from.  It was a

6  serious decision for me to make regarding changing jobs, and

7  I wanted to be sure that this is a stable -- financially

8  stable company.  I knew that they were a start-up company,

9  and I wanted to be sure that my work will not end in two

10 months.

11      Q.    And how does that factor in with the escrow?

12      A.    Because the -- I was -- it was explained to me

13 that Wenatchee company in the USA is a very prospective,

14 potentially successful company.  It has a future because it

15 deals in cryptocurrency.

16            (In English) Not only -- not only the crypto, but

17 blockchain.  It can grow out many projects, based on

18 blockchain technology.  You can do rigging.  You can provide

19 services for -- for entertainment industry, for healthcare.

20      Q.    Mr. Usmanov, how does that relate to the escrow?

21      A.    Singapore had to finance the creation or

22 construction of the Giga- -- Giga Watt Wenatchee.

23      Q.    When Giga Watt Singapore deposited money into Giga

24 Watt Wenatchee's bank accounts, what transparency did you

25 have into the source of that money?

1    A.    I was told that the money was from escrow,

2    released from escrow account.

3    Q.    **That was money paid by Giga Watt Singapore.  And**

4    **what about money that was paid to you by Cryptonomos -- paid**

5    **to --**

6    A.    They had a special separate project they were

7    engaged in, and it had nothing to do with the Giga Watt

8    Wenatchee.

9    Q.    **I'm not sure what -- what you mean.  I was just**

10    **asking about the source of the money that Cryptonomos**

11    **deposited into Giga Watt Wenatchee's bank account.**

12    A.    (Answer given in Russian but not interpreted to

13    English.)

14    Q.    **When Cryptonomos paid money to you -- when**

15    **Cryptonomos paid money to Giga Watt --**

16            **THE COURT REPORTER:**  Excuse me.

17            **MR. CROMWELL:**  Hey, guys.  The court reporter

18    can't follow this.

19            **THE COURT REPORTER:**  Yeah, excuse me --

20            **MR. CROMWELL:**  Why don't you start it -- start

21    again, Pam.

22            **THE COURT REPORTER:**  Yeah, and the previous

23    question (sic), I don't think it was translated.  I didn't

24    get a translation for it, the answer.  I can repeat the

25    question.

1          **MR. CROMWELL:**  Why don't you do that.

2          **THE INTERPRETER:**  Because I don't remember what

3    question you're talking about.

4          **THE COURT REPORTER:**  Yes.

5          **THE INTERPRETER:**  I'm sorry.

6          **(Question read back as requested.)**

7      A.    I don't know, but I know that they had their own

8    project with -- that had to do with -- they had their own

9    project.  I was not involved in that and didn't participate

10   in it.

11   **BY MS. EGAN:**

12     **Q.    When you were told that money coming in to Giga**

13   **Watt Wenatchee from Giga Watt Singapore was from the escrow,**

14   **were you aware of the -- the terms of the escrow at all?**

15         **THE INTERPRETER:**  I'm sorry.  What's the question?

16         **MS. EGAN:**  I'll rephrase it.  I'll rephrase it.

17   **BY MS. EGAN:**

18     **Q.    Did you -- did you know what the terms of the**

19   **escrow were?**

20     A.    It was explained to me in -- in general, briefly,

21   that one dollar was equal to one watt of energy.

22         (In English) Or we can put it differently. Watt --

23   watt of energy was represented by one dollar in escrow.

24     **Q.    Okay.  And did -- was it a requirement that before**

25   **a dollar was released from escrow, there would actually be a**

1 **watt of power available for that dollar's worth of a token?**

2      A.   There should be corresponding or a required

3 facility bill for that, and it had to be connected to the

4 source of the energy, and there should be an agreement

5 signed.  And I don't know all of the details of it.

6      **Q.   Was it within your sphere of responsibility to**

7 **make sure that each dollar released from the escrow was**

8 **backed by a watt of power?**

9      A.   (In English) No.  Because Giga Watt Wenatchee had

10 nothing to do with the release of or sale of these tokens or

11 escrow.  It wasn't part of that agreement.

12      **Q.   Well, then, how would it work if this --**

13 **hypothetically -- if a dollar came from the escrow before a**

14 **watt of power was available, would that be consistent with**

15 **the terms of the escrow or inconsistent with the terms of**

16 **the escrow, as far as you knew?**

17      A.   I don't say hypo- -- I cannot say anything

18 hypothetically.  I -- I just know when the money was

19 released from escrow, then Wenatchee would receive the

20 information or command or indication that -- that they can

21 connect to the source of energy.

22      **Q.   Did you --**

23      A.   So there was a special person who had this

24 assignment, and David was the one -- Carlson -- because he

25 was a local.  He knew people.  He had connections. So he was

```
 1                        CERTIFICATE

 2

 3        I, Aleina Puente, do hereby certify that I reported

 4    all proceedings adduced in the foregoing matter and that

 5    the foregoing transcript pages constitutes a full, true

 6    and accurate record of said proceedings to the best of my

 7    ability.

 8

 9        I further certify that I am neither related

10    to counsel or any party to the proceedings nor have any

11    interest in the outcome of the proceedings.

12

13        IN WITNESS HEREOF, I have hereunto set my hand this

14    21st day of March, 2022.

15

16

17

18    _____

19                 Aleina Puente

20                 WA CCR #423

21

22

23

24

25
```

# EXHIBIT 30

No. 22-35104

---

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

In re:  GIGA WATT, INC., a Washington corporation,

*Debtor.*

---

MARK D. WALDRON, Chapter 7 Trustee,

*Appellee,*

v.

PERKINS COIE LLP, a Washington limited liability partnership, and
LOWELL NESS, individual and California resident,

*Appellants,* and

GIGA WATT PTE., LTD., a Singapore corporation, and ANDREW
KUZENNY, a citizen of the Russian Federation,

*Defendants.*

---

APPEAL FROM UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON
No. 2:21-cv-00159-SAB; Honorable Stanley A. Bastian

---

### APPELLANTS' REPLY BRIEF

---

| | | |
|---|---|---|
| Bradley S. Keller, | John Munding, | Michael B. King, |
| WSBA No. 10665 | WSBA No. 21734 | WSBA No. 14405 |
| Ralph E. Cromwell, Jr., | MUNDING, P.S. | Jason W. Anderson, |
| WSBA No. 11784 | 9425 N. Nevada St. Suite 212 | WSBA No. 30512 |
| Jofrey M. McWilliam, | Spokane, Washington  99218 | CARNEY BADLEY |
| WSBA No. 28441 | Telephone:  (509)-624-6464 | SPELLMAN, P.S. |
| BYRNES KELLER | | 701 Fifth Avenue, Suite 3600 |
| CROMWELL LLP | | Seattle, Washington  98104 |
| 1000 Second Ave., Ste. 3800 | | Telephone: (206) 622-8020 |
| Seattle, Washington  98104 | | |
| Telephone: (206) 622-2000 | | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................... ii

I.     SUMMARY OF REPLY ARGUMENT ........................................1

II.    REPLY ARGUMENT ...............................................................4

    A.    The Trustee Cannot Ignore, Much Less Disavow, the Allegations of His Complaint...............................................................4

    B.    Arbitration Should Have Been Compelled Under Principles of Estoppel Because the Trustee's Claims Are Inextricably Intertwined With the WTT Token Purchase Agreements Which Contain the Arbitration Clause. . ........................................................7

    C.    Arbitration Should Have Been Compelled Under Principles of Agency.....................................................................11

    D.    Federal Common Law Applies to the Issue of Arbitrability.....................12

    E.    All of the Elements of the New York Convention Are Met. ...................17

    F.    The Specifics of Scott Glasscock's Claim in the Main Bankruptcy Proceeding Are Irrelevant.............................................21

III.    CONCLUSION.......................................................................21

CERTIFICATE OF COMPLIANCE...............................................23

i

# TABLE OF AUTHORITIES

Page(s)

<u>**CASES**</u>

*American Title Insurance Co. v. Lacelaw Corp.*,
   861 F.2d 224 (9th Cir. 1988) ............................................................... 7

*Amisil Holdings, Ltd. v. Clarion Capital Management*,
   622 F. Supp. 2d 825 (N.D. Cal. 2007) ............................................... 12

*Casa del Caffe Vergnano S.P.A. v. ItalFlavors, LLC*,
   816 F.3d 1208 (9th Cir. 2016) ................................................. 13, 14, 15

*Certain Underwriters at Lloyd's London v. Argonaut Insurance Co.*,
   500 F.3d 571 (7th Cir. 2007) ............................................................. 15

*Chelsea Family Pharmacy PLLC v. Medco Health Solutions, Inc.*,
   567 F.3d 1191 (10th Cir. 2009) ........................................................... 5

*David Terry Investments, LLC-PRC v. Headwaters Development Group Ltd. Liab.
   Co.*, 463 P.3d 117 (Wash. Ct. App. 2020) .......................................... 15

*Doe v. Princess Cruise Lines, Ltd.*,
   657 F.3d 1204 (11th Cir. 2011) ........................................................... 5

*GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA,
   LLC*, 140 S. Ct. 1637 (2020) ............................................................. 13

*Hakopian v. Mukasey*,
   551 F.3d 843 (9th Cir. 2008) ............................................................... 7

*InterGen N.V. v. Grina*,
   344 F.3d 134 (1st Cir. 2003) ............................................................. 15

*Lechner v. Halling*,
   216 P.2d 179 (Wash. 1950) ............................................................... 19

*Letizia v. Prudential Bache Securities, Inc.*,
   802 F.2d 1185 (9th Cir. 1986) ..................................................... 12, 14

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
   473 U.S. 614 (1985) ............................................................................ 5

*Padilla Ayala v. Teledyne Defense Electronics*,
   533 F. Supp. 3d 920 (C.D. Cal. 2021) .............................................. 20

*PowerAgent, Inc. v. Electronic Data Systems Corp.*,
   358 F.3d 1187 (9th Cir. 2004) ............................................................. 6

*PowerAgent, Inc. v. United States District Court for the Northern District of
   California*, 210 F.3d 385, 2000 WL 32073 (9th Cir. 2000) ................. 6

*Radach v. Prior*,
   297 P.2d 605 (Wash. 1956) ............................................................... 19

ii

*Rogers v. Royal Caribbean Cruise Line*,
 547 F.3d 1148 (9th Cir. 2008) .................................................................. 20
*Satomi Owners Ass'n v. Satomi, LLC*,
 225 P.3d 213 (Wash. 2009) ...................................................................... 16
*Setty v. Shrinivas Sugandhalaya LLP*,
 3 F.4th 1166 (9th Cir. 2021) .............................................................. Passim
*Simula, Inc., v. Autoliv, Inc.*,
 175 F.3d 716 (9th Cir. 1999) ...................................................................... 5
*Smith/Enron Cogeneration Ltd. v. Smith Cogeneration International, Inc.*,
 198 F.3d 88 (2d Cir. 1999) ....................................................................... 15
*Townsend v. Quadrant Corp.*,
 268 P.3d 917 (Wash. 2012) ...................................................................... 16
*Woodall v. Avalon Care Center-Federal Way, LLC*,
 231 P.3d 1252 (Wash. Ct. App. 2010) ..................................................... 16

## STATUTES

9 U.S.C. § 202 .......................................................................................... 20

## OTHER AUTHORITIES

Restatement (Third) of Trusts ¶¶ 2, 10 (2003) ....................................... 18

## I.    SUMMARY OF REPLY ARGUMENT

The Trustee's answering brief does not meaningfully address Perkins' entitlement to arbitration under either estoppel or agency theories.  In its Opening Brief, Perkins carefully explained that the Trustee's claims are intertwined with the performance and alleged breach of WTT Token Purchase Agreements ("TPAs") which contain arbitration clauses.  Indeed, it is hard to imagine how a claim could be more "intertwined with" a contract containing an arbitration clause than the claim actually plead by the Trustee: that the escrow provisions at issue were incorporated into the TPAs, that Perkins' failure to properly perform the escrow put the debtor in breach of the TPAs, and that the result was liability to the debtor under the TPAs, which the Trustee now seeks to recover from Perkins as damages.  The Trustee does not really argue otherwise and does not address the argument in the context of his Complaint.

Instead, to avoid arbitration, the Trustee ignores his own allegations and, contrary to his Complaint, now argues that any escrow agreement was entirely separate from the TPAs, that this separate escrow agreement did not contain its own arbitration provision, and thus that any breach of the "escrow" was independent from and not "intertwined with" the TPAs and the arbitration provisions they contain.  But there are no such allegations in the Trustee's Complaint.  Perkins' entitlement to arbitration turns on the allegations of the Complaint, not some new theory devised

1

to defeat arbitration. The Trustee may not defeat arbitration by simply ignoring the allegations of his own Complaint and asserting contrary positions that are not plead. *See* Opening Br. at 27, 47-49. Perkins repeatedly asserted in its briefing to the courts below that the Trustee was "bound" by his Complaint. 2-ER-40-41, 44-45, 243-245. Nonetheless, the Bankruptcy and District Courts erroneously ignored the Trustee's Complaint, acceding to the same incorrect argument that the Trustee makes to this Court.

Moreover, even if one were to accept, for purposes of argument, the Trustee's new theory that the only escrow provision at issue was in an agreement separate from the TPAs—the Trustee fails to explain how this would alter the arbitrability analysis. The question is not whether the "escrow" is somehow distinct from the TPAs, but whether the Trustee's *claims* are intertwined with the TPAs, which require arbitration. The Trustee's *claims* indisputably are intertwined with the TPAs. A core proposition of the Trustee's claims is that Perkins, as escrow agent, was duty-bound to monitor and enforce required performance under the TPAs and that, when Perkins released token purchase proceeds before completion of required performance under the TPAs, the result was to put GW Wenatchee (the debtor) into breach of the TPAs, causing liability, which the Trustee seeks to recover from Perkins. Thus, the Trustee's claim is not simply that Perkins breached a separate escrow undertaking and that is the end of the matter; rather, the Trustee's claim is

2

that Perkins' breach of that supposed separate escrow caused a breach of the TPAs for which GW Wenatchee allegedly is liable, and which the Trustee now seeks to recover from Perkins. As such, the Trustee's claims clearly depend upon the terms, performance, and alleged breach, of the TPAs. Accordingly, Perkins is entitled to avail itself of the arbitration provision in the TPAs.

In addition to ignoring his own allegations, the Trustee devotes considerable space to arguing facts and issues of marginal, if any, relevance. For example, the Trustee's brief discusses facts that go to the purported merits of the Trustee's claim rather than arbitrability. Likewise, the parties' briefing to, and the Bankruptcy and District Courts' decisions regarding, Perkins' right, in the alternative, to trial by jury is not before this Court. While Perkins disagrees with most of the Trustee's assertions in these regards, Perkins does not address those issues here as they are not material to arbitrability.

This Reply addresses the following issues raised by the Trustee's arguments: (a) the Trustee is not free to ignore, much less assert a position contrary to, the allegations of his Complaint; (b) under the allegations of the Trustee's Complaint, the Trustee's claims are inextricably intertwined with the TPAs and, therefore, arbitration should have been compelled; (c) arbitration is likewise required under principles of agency; (d) federal common law, not the law of Washington or Singapore, applies to the issue of arbitrability, although the same "intertwined with"

3

test applies and the same result obtains under Washington and federal law; (e) all of the elements of the New York Convention are met; and (f) the specifics of Scott Glasscock's claim in the main bankruptcy proceeding are irrelevant to arbitrability.

In sum, arbitration should have been compelled because the Trustee's claims are inextricably intertwined with the terms, performance, and alleged breach of the TPAs—contracts that contain a written arbitration clause.

## II.    REPLY ARGUMENT

### A.    The Trustee Cannot Ignore, Much Less Disavow, the Allegations of His Complaint.

It is undisputed that Perkins never entered into any written escrow agreement with any party, and that a written escrow agreement detailing the terms of escrow does not exist.  The Bankruptcy Court so found.  1-ER-27, 29 (Findings of Fact Nos. 6, 9, 13); 2-ER-129.   A key predicate of the Trustee's claim against Perkins, therefore, is that escrow terms were incorporated by reference into the TPAs from the so-called "White Paper," which then became binding on Perkins when it agreed to hold purchase proceeds in its IOLTA account on behalf of its client, GW Singapore.   *See* 3-ER-389-404 ¶¶ 10, 18, 26, 28, 42, 48; 3-ER-413:18-22; 4-ER-543:13-19; 4-ER-560:18-22.  *See also* Opening Br. at 13.  That the terms of escrow were allegedly incorporated by reference into the TPAs is likewise the predicate of the Trustee's claim that, when Perkins failed to properly perform the terms of escrow, Perkins' conduct thereby put the debtor into breach of the TPAs, causing

4

liability on the part of the debtor under the TPAs to token purchasers—liability for which the Trustee seeks recovery from Perkins. 3-ER-395-97 ¶¶ 26, 27, 28, 31, 32.

To avoid arbitration, however, the Trustee argues a position directly contrary to the allegations of his Complaint: that he is not seeking to enforce the TPAs but is instead seeking to enforce an unwritten escrow agreement separate and distinct from, and therefore not intertwined with, the TPAs. *See* 1-ER-27 ¶ 5; Appellee's Br. at 11-12. But, and as Perkins repeatedly pointed out to the Courts below, Perkins' right to arbitration is determined by the allegations of the Trustee's Complaint, which are binding and cannot be ignored. 2-ER-40-41, 44-45, 243-245.

Specifically, in determining arbitrability federal courts "examine the factual allegations raised" in the complaint and whether those allegations "touch matters" encompassed within the scope of an agreement to arbitrate. *See, e.g., Simula, Inc., v. Autoliv, Inc.,* 175 F.3d 716, 721 (9th Cir. 1999). *See also*, *e.g., Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 624 n.13 (1985) (arbitrability determined based on allegations underlying the claims); *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1220 n.13 (11th Cir. 2011) (observing that courts measure the language of the arbitration provision against "the factual allegations in the complaint match[ed] up with the causes of the action asserted"); *Chelsea Fam. Pharmacy PLLC v. Medco Health Sols., Inc.*, 567 F.3d 1191, 1194 (10th Cir. 2009)

5

(stating that it is necessary to look at the substance of the factual allegations in the complaint to determine arbitrability, not legal labels).

Because a complaint's allegations bear directly on arbitrability, this Court has held that where the allegations require arbitration, and where arbitration has been ordered, a plaintiff may not amend the complaint to circumvent a previously issued order compelling arbitration, as this would allow every order compelling arbitration to become, "merely provisional." *PowerAgent, Inc. v. Elec. Data Sys. Corp.*, 358 F.3d 1187, 1190 (9th Cir. 2004) (citing *PowerAgent, Inc. v. U.S. Dist. Ct. for the N. Dist. of Cal.*, 210 F.3d 385, 2000 WL 32073 at *2 (9th Cir. 2000) (unpublished)).

That arbitrability is determined based on the complaint is true not only where the court is analyzing whether the claims fall within the scope of an arbitration clause, but also where the court is determining whether to compel arbitration under estoppel principles. *See Setty v. Shrinivas Sugandhalaya LLP,* 3 F.4th 1166, 1169 (9th Cir. 2021) (concluding that "the allegations here do not implicate the agreement that contained the arbitration clause—a prerequisite for compelling arbitration under the equitable estoppel framework").

Thus, and as set forth in Perkins' Opening Brief, the allegations of the Trustee's Complaint cannot be ignored, much less disavowed, but are binding upon the Trustee, and the courts below, when analyzing whether arbitration must be

6

compelled. *See* Opening Br. at 27, 49 (discussing *Hakopian v. Mukasey*, 551 F.3d 843, 846 (9th Cir. 2008) (holding that "[a]llegations in a complaint are considered judicial admissions" and constitute undisputed facts) and *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) (holding that factual assertions in pleadings "are considered judicial admissions conclusively binding on the party who made them" including "before the trial court" and "on appeal")).

**B.     Arbitration Should Have Been Compelled Under Estoppel Principles Because the Trustee's Claims Are Inextricably Intertwined With the WTT Token Purchase Agreements, Which Contain the Arbitration Clause.**

Turning to the allegations of the Trustee's Complaint, his claims are clearly intertwined with the terms, conditions, and performance of the TPAs, which contain broad arbitration provisions. *See* Opening Br. at 11-16, 23-25, 34-37 (citing to the Complaint). To reiterate, the Trustee's Complaint alleges that the TPAs incorporate escrow terms from the White Paper:

> According to the White Paper, which describes the Giga Watt Project in detail, and whose provisions were *incorporated by reference* into the token purchase agreements, all token sale proceeds would be held in escrow until Giga Watt met certain milestones in constructing the new facilities.

3-ER-392 ¶18 (emphasis added). *See also* 3-ER-389-404 ¶¶ 10, 26, 28, 42, 48.

Because the escrow terms were incorporated into the TPAs, the Trustee's Complaint specifically alleges that Perkins' alleged breach of its duties as escrow agent put the debtor (GW Wenatchee) into breach of the TPAs:

7

Perkins Coie's breach of fiduciary duty immediately put Giga Watt in breach of the token purchase agreements which *incorporated the terms of the White Paper*, including, in particular, the Escrow requirements.

3-ER-395 ¶ 26. *See also* 3-ER-395-97 ¶¶ 27, 28, 31, 32.

Moreover, contrary to his current characterization of the escrow as being a separate, unrelated agreement between only GW Singapore and Perkins, the Trustee's Complaint alleges that the token purchasers also became party to the escrow arrangement when they entered into the TPAs:

Tokens were purchased through a "module" on Giga Watt's website which Cryptonomos created and controlled. Using "Smart Contracts," GW Singapore and the token holders entered into the WTT Token Sales Agreements *which incorporated by reference the terms of the White Paper, including its escrow terms*.

3-ER-404 ¶ 48 (emphasis added); *see also* 3-ER-389-401 ¶¶ 10, 18, 26, 42.

Finally, the Trustee's Complaint alleges that a result of the debtor being put into breach of the TPAs is that it became liable for the escrowed funds prematurely released by Perkins:

Therefore, when Perkins violated the Escrow and disbursed Escrow funds before capacity was built out, Giga Watt immediately became liable . . . .

3-ER-412 ¶ 72 (redacted); 4-ER-559 ¶ 72 (under seal). *See also* 3-ER-391-92 ¶ 17, 395-97 ¶¶ 26, 27, 28, 31, 32.

These allegations could not be more clear or specific. The Trustee claims that Perkins agreed to act as an escrow agent under an escrow provision that was

8

incorporated into the TPAs, and that when Perkins failed to properly perform its duties, the result was to put the debtor in breach of the TPAs, causing it to become liable under the TPAs to token purchasers for prematurely released token purchase proceeds. Perkins' entitlement to arbitration is determined based on these allegations.

Although these allegations and their effect were discussed at length in Perkins' Opening Brief, the Trustee makes no meaningful attempt to explain why the claims based on those allegations are not intertwined with the TPAs. *See* Opening Br. at 11-16, 23-25, 34-42. Instead, ignoring his own allegations, the Trustee argues that there is no arbitration provision in what he now asserts was a separate escrow agreement, such that a breach of the escrow has nothing to do with the TPAs. Appellee's Br. at 15-17.

In addition, the Trustee fails to explain how treating the escrow as a standalone agreement would alter the analysis or the outcome on whether arbitration should have been compelled. It would not. The issue is not whether the escrow is somehow a separate, standalone agreement, but whether the Trustee's claims are "intertwined with" the TPAs containing the arbitration clause. The Trustee's claims indisputably are inextricably intertwined with the TPAs even assuming a separate escrow agreement between only Perkins and GW Singapore.

In this regard, a core tenet of the Trustee's claims is that the TPAs required construction of sufficient capacity before the purchase of corresponding tokens could close and token purchase proceeds could be released to the seller, GW Singapore. 3-ER-392-99 ¶¶ 18, 21, 23, 38; 3-ER-400-01 ¶ 42; 3-ER-404 ¶ 48; 3-ER 412 ¶ 71. Accordingly, the Trustee claims that, as escrow agent, Perkins was required to monitor and confirm completion of the performance required under the TPAs before it could release the proceeds of sale it was holding. *See id*; 4-ER-559 ¶ 71; 4-ER-560-61 ¶ 79. Thus, establishing the terms and conditions of the TPAs, and the precise performance that was required before a purchase could close and proceeds could be released under the TPAs, is fundamental to the Trustee's claims.

Another core proposition of the Trustee's claims is that Perkins failed to verify the status of performance under the TPAs, 4-ER-540-41, 559-60 ¶¶ 21, 23, 71, 79, that the performance required under the TPAs had not been completed, *id.,* and that Perkins' release of certain proceeds of sale was therefore "premature" under the TPAs, causing a breach of the TPAs. 3-ER-395-97 ¶¶ 26, 27, 28, 32. The Trustee claims that, as a result, Perkins' conduct as the escrow agent put the debtor, GW Wenatchee, into breach of the TPAs. Thus, performance and breach under the TPAs, and whether Perkins' release of token purchase proceeds was "premature" and caused the debtor to be in breach of the TPAs, are necessary elements of the Trustee's claim.

10

Finally, the Trustee claims Perkins' conduct injured the debtor in that the debtor became liable to the token purchasers for breach of the TPAs in the amount of the token purchase proceeds that Perkins allegedly prematurely released. 3-ER-395-97 ¶¶ 26, 27, 28, 32. Thus, the damage claimed by the Trustee is the consideration paid by the token purchasers under the TPAs that was allegedly prematurely released, and for which the debtor is purportedly liable to the token purchasers—liability for breach of the TPAs that the debtor now seeks to recover from Perkins.

Thus, even if the "escrow" were somehow a separate, standalone agreement, the Trustee's claims are still dependent on and closely intertwined with the terms, performance, and breach of, and the purported liability to token purchasers under the TPAs, which contain the arbitration provisions. The Trustee offers no argument to the contrary. It was error for the Bankruptcy and District Courts to disregard the Trustee's own allegations and reach conclusions directly contrary to those allegations—an error that the Trustee, in its briefing to this Court, continues to propagate without explanation or authority.

## C. Arbitration Should Have Been Compelled Under Principles of Agency.

Perkins also argued in its Opening Brief that arbitration should also have been compelled under agency principles. In response, the Trustee offers no argument or authority to the contrary. To briefly reiterate, to the extent Perkins acted as an

11

escrow agent, it necessarily did so as an agent to the principal parties to the TPAs. *See* Opening Br. at 38-39, 43-44 (discussing facts and authorities). Indeed, if Perkins' performance as escrow was not as an agent of the parties under the TPAs, then Perkins' conduct could not have caused a breach of, nor resulted in the debtor's liability under the TPAs, as alleged by the Trustee. Where the claims and alleged wrongdoing relate to performance under or intertwined with a contract containing an arbitration clause, the agent is entitled to compel arbitration even though it is not a signatory to the agreement. *See, e.g., Letizia v. Prudential Bache Secs., Inc.*, 802 F.2d 1185, 1188 (9th Cir. 1986) (holding that non-signatory agents of securities broker were entitled to enforce arbitration agreement arising from their alleged wrongdoing in performing under brokerage account contract); *Amisil Holdings, Ltd. v. Clarion Cap. Mgmt.,* 622 F. Supp. 2d 825, 840-41 (N.D. Cal. 2007) (holding that non-signatories, as agents of signatory, may enforce agreement to arbitrate where alleged wrongful conduct of non-signatories relates to performance of agreement and claims are "intertwined" with agreement). The Trustee does not address these principles and does not explain why arbitration should not be compelled under them.

## D.   Federal Common Law Applies to the Issue of Arbitrability.

The Trustee asserts that the law of Washington, or in the alternative the law of Singapore, applies to determine whether arbitration should have been compelled. Each argument is addressed in turn.

As an initial matter, both federal authorities and Washington authorities were argued to Courts below.  *See* 2-ER-41, 36-37, 139, 244; 3-ER-349-50.  Moreover, Washington applies the same test as federal common law ("intertwined with") to compelling arbitration by estoppel. *See id*.; *see also infra.*  Therefore, the Trustee's argument regarding Washington law is a distinction without a difference.  Nevertheless, federal law and not the law of Washington appears to apply here under this Court's decision in *Setty.  See* 3 F.4th at 1168 (applying federal law to determination of arbitration by estoppel under the New York Convention). *See also, e.g., Casa del Caffe Vergnano S.P.A. v. ItalFlavors, LLC,* 816 F.3d 1208, 1211 (9th Cir. 2016) (applying federal common law under section 2 of FAA, which implements the New York Convention).

At the time Perkins moved the Bankruptcy Court to compel arbitration, *Setty* had not yet been decided.  Meanwhile, the United States Supreme Court left open the question of which body of domestic law would apply to determine arbitrability under the New York Convention.  *See GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1648 (2020) (remanding without deciding the "body of law" that applied to determine enforcement of arbitration by estoppel under the New York Convention).  As such, Perkins briefed both Washington and federal authorities to the Bankruptcy and District Courts below.  *See* 2-ER-41, 36-37, 139, 244; 3-ER-349-50.

13

After the Bankruptcy Court denied Perkins' Motion to Compel Arbitration, this Court's decision in *Setty* was issued. *Setty* holds that, in cases involving the New York Convention, in determining the arbitrability of federal claims by or against non-signatories to an arbitration agreement, this Court applies "'federal substantive law', for which we look to 'ordinary contract and agency principles.'" 3 F.4th at 1168 (quoting *Letizia*, 802 F.2d at 1187). *See also, e.g., Casa del Caffe*, 816 F.3d at 1211 (concluding that because the case "arises under Chapter 2 of the Federal Arbitration Act [implementing the New York Convention], the issue of whether the Commercial Contract constituted a binding agreement is governed by federal common law").

The Trustee's argument that arbitrability should be determined under Washington law in this case appears to rely on this Court's statement, in *Setty*, that federal common law applies to determine the arbitrability of "federal claims" against non-signatories. *See* 3 F.4th at 1168. However, whether a plaintiff asserts federal or state law claims does not appear to be the dispositive factor in determining whether federal or state law applies to arbitrability under the New York Convention. Rather, the need for uniformity of law under the New York Convention appears to be the primary factor requiring the application of federal law. This is consistent with *Setty*, which observes that the New York Convention and its implementing legislation "emphasize the need for uniformity in the application of international

14

arbitration agreements." *Setty*, 3 F.4th at 1168 (quoting *Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*, 500 F.3d 571, 580-81 (7th Cir. 2007) for the proposition that "uniformity of law is of *paramount* importance" "in the context of the New York Convention"). *See also, e.g., Certain Underwriters*, 500 F.3d at 579 (rejecting application of state law and applying federal common law to contract interpretation under the New York Convention); *InterGen N.V. v. Grina*, 344 F.3d 134, 143–44 (1st Cir. 2003) (applying federal common law because "varying state standards in cases falling within the Convention's ambit would be in tension with the elemental purpose of chapter 2" of the FAA); *Smith/Enron Cogeneration Ltd. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 96 (2d Cir. 1999) (concluding that there are compelling reasons to apply federal common law under the New York Convention). *See also, e.g., Casa del Caffe*, 816 F.3d at 1211 (federal common law applies to cases that arise under chapter 2 of the FAA (which implements the New York Convention)).

However, even if Washington law applied, it was argued to the Courts below and the result would be the same. Like federal common law, Washington law requires arbitration of claims against non-signatories where the claims are "intertwined with" the contract that contains the arbitration clause. *See David Terry Invs., LLC-PRC v. Headwaters Dev. Grp. Ltd. Liab. Co.*, 463 P.3d 117, 124 (Wash. Ct. App. 2020) (applying estoppel and observing that under an estoppel analysis

15

courts look in particular at "whether the claims that the non-signatory sought to arbitrate were intimately founded in and intertwined with the underlying contract obligations").[1]  Indeed, Washington law essentially follows federal law regarding equitable estoppel and other common law grounds on which to enforce arbitration clauses.  *See, e.g., Townsend v. Quadrant Corp.*, 268 P.3d 917, 922 (Wash. 2012) (citing Ninth Circuit authorities for the proposition that an arbitration clause may be enforced under the doctrine of equitable estoppel); *Satomi Owners Ass'n v. Satomi, LLC*, 225 P.3d 213, 230 n.22 (Wash. 2009) (same); *Woodall v. Avalon Care Ctr.-Fed. Way, LLC*, 231 P.3d 1252, 1254 (Wash. Ct. App. 2010) (same).

The Trustee's alternate argument that Singapore law applies was not made below.  Moreover, application of Singapore law is foreclosed by *Setty*.  The Trustee's argument that Singapore law applies is apparently based on the choice-of-law clause in the TPAs, which selects the law of Singapore to govern the contract.  *See* 3-ER-292 ¶14.  In *Setty,* however, this Court held that whether a non-signatory may enforce an arbitration agreement "is a 'threshold issue' for which we do not look to the agreement itself."  3 F.4th at 1168.  In so holding, the Court expressly rejected

---

[1] It bears reiterating that the Trustee alleges that the rights and liabilities of GW Singapore and the debtor, GW Wenatchee, are one and the same, and that the debtor may enforce, and is liable under, any agreement that GW Singapore entered into as a partner of the "Giga Watt Project."  *E.g.*, 3-ER-392:17-19; Opening Br. at 15, 23, 32-33.  Thus, the Trustee asserts the rights and liabilities of a signatory to the TPAs (GW Singapore) against a non-signatory (Perkins).

16

the same argument made by the Trustee here—that the choice-of-law clause in the contract containing the arbitration clause should apply to determine arbitrability under the New York Convention. *See id.*

While the Trustee's legal analysis as to the applicability of Singapore law is incorrect, the Trustee's position that the choice-of-law clause in the TPAs applies to determine arbitrability appears to be a tacit admission that his claims are "intertwined with" the TPAs, which also contain the arbitration clause. *See* 3-ER-292-93 ¶¶ 14, 15.

## E.    All Elements of the New York Convention Are Met.

As set forth in Perkins' Opening Brief (and Perkins' briefing to the underlying Courts), all of the elements of the New York Convention are met. *See* Opening Br. at 18-19; 3-ER 345-52. The only element the Trustee challenges is whether the transaction is "commercial" in nature. In arguing that it is not, the Trustee focuses exclusively on the fiduciary nature of an escrow agent's obligations. From this, the Trustee claims that an escrow is a "trust" and that a trust cannot be commercial in nature. The Trustee cites no authority for this proposition, and his own allegations foreclose the argument.

As an initial matter, it is hard to imagine how the underlying transaction can be characterized as anything other than commercial. GW Singapore set out to sell $30 million of tokens via the internet to thousands of people all over the world. It

<p style="text-align:center">17</p>

touted the tokens as a means to access low electrical rates in Eastern Washington to facilitate cryptomining. The White Paper, used to market the tokens, contained detailed projections about the economics of cryptomining and the savings that could be achieved by purchasing tokens. How can a sale of millions of dollars of tokens to people who hope to profit from cryptomining not be a commercial transaction?

Moreover, the Trustee's unsupported "trust" argument stretches the nature of an escrow too far. That agency relationships create fiduciary obligations does not mean agency relationships are trusts and an agent a trustee. The distinguishing characteristic of a trust is that the trustee takes ownership of and title to trust property—title that is granted by a trustor to the trustee for the benefit of another (the beneficiary). *See, e.g.,* Restatement (Third) of Trusts ¶¶ 2, 10 (2003). In addition, implicit in the Trustee's argument, which is unsupported by citation to authority, is that "trusts" can never be commercial in nature. However, some trust relationships certainly may be commercial in nature (an example might be ownership "in trust" of property by a lender to secure a loan). On the other hand, a personal or family trust would ordinarily not be intended to facilitate a commercial transaction. It is this personal or family type trust to which the Trustee apparently likens the escrow in this case. The Trustee provides no basis in fact or law to support this argument.

18

First, unlike a personal or family trust, an escrow generally facilitates a commercial transaction. Under the facts as alleged by the Trustee, that is certainly the case here. Moreover, while an escrow agent may owe fiduciary duties to its principals, unlike a trustee, an escrow agent does not take ownership of and title to trust property granted by one (the trustor) for the benefit of another (the beneficiary). Rather, a deposit into escrow is nothing more than a "conditional delivery" by one principal party to the other principal party to a (commercial) transaction, which the escrow agent holds and transfers to the other principal party to the transaction when the conditions of the transaction are met. *Lechner v. Halling*, 216 P.2d 179, 185 (Wash. 1950). The escrow is merely an agent of the principal parties to the transaction and, as their agent, facilitates the performance of the transaction. *See, e.g., Radach v. Prior*, 297 P.2d 605, 608 (Wash. 1956). Again, as alleged by the Trustee, that was the case here. Perkins' alleged role as escrow for the parties to the TPAs was to facilitate the completion and closing of the transaction. Perkins allegedly took a "conditional delivery" of consideration (purchase proceeds) from the buyers and delivered them to the seller.

The notion, therefore, that a non-commercial "trust" was formed is without support in the facts or the law. Indeed, if such a trust had been formed, the Trustee would have no claim because Perkins' alleged premature release of purchase proceeds would not have caused a breach of the TPAs (which are not trust

19

documents), and the debtor, as the purported beneficiary of the trust, would have no liability to the token purchasers for a breach of trust by the alleged trustee (Perkins). The Trustee's argument, once again, shows his willingness to stray far afield from the facts of the case and the allegations of his Complaint.

More to the point, under the New York Convention, it is the commercial nature of the contract that contains the arbitration clause that must be considered; and in determining whether that contract evidences a transaction "involving commerce," the term "commerce" is construed broadly to encompass the full reach of Congress's Commerce Clause powers. *See* 9 U.S.C. § 202; *Rogers v. Royal Caribbean Cruise Line*, 547 F.3d 1148, 1154 (9th Cir. 2008) (discussing "evidencing a transaction" and "involving commerce" under the New York Convention as implemented in section 2 of the FAA); *Padilla Ayala v. Teledyne Def. Elecs.*, 533 F. Supp. 3d 920, 925–26 (C.D. Cal. 2021) (same).

As discussed above, the transaction here easily meets the definition. Indeed, under the allegations of the Trustee's own Complaint, the alleged escrow was the mechanism by which the token purchase transactions were facilitated and closed. Thus, whether characterized as an "escrow" or as a "trust," the transaction was indisputably commercial in nature within the meaning of the New York Convention and Perkins' alleged role was to facilitate that transaction.

**F.    The Specifics of Scott Glasscock's Claim in the Main Bankruptcy Proceeding Are Irrelevant.**

Finally, the Trustee argues the specifics of Scott Glasscock's creditor's claim in the main bankruptcy proceeding.  However, the specifics of that claim are irrelevant to arbitrability.  Scott Glasscock's WTT Token Purchase Agreement is in the record as evidence of the terms of the TPAs generally.  Indeed, the Trustee himself admittedly asserts and relies on the Glasscock WTT Token Purchase Agreement as evidencing the terms of token purchase, including that the terms of escrow were allegedly incorporated by reference into the TPAs.  *See* Opening Br. at 12-13; Appellee's Br. at 12; 2-ER-81, 129-30, 262.  But the specifics of Mr. Glascock's creditor's claim in the main bankruptcy have no bearing on arbitrability, and the Trustee provides no explanation of how they would.

### III.    CONCLUSION

Because the Trustee purports to have and asserts the rights of a signatory to the TPAs, because neither the Trustee nor the Bankruptcy and District Courts may ignore the allegations in the Trustee's Complaint, and because the Trustee's claims are necessarily and inextricably intertwined with the terms, performance, and breach of the TPAs, arbitration was required by the terms of the TPAs, and should have been (and should be) compelled.  The Bankruptcy and District Courts erred when they concluded otherwise.  For these reasons, the decisions of the Courts below should be reversed with instructions to compel arbitration.

21

Respectfully submitted this 26th day of August 2022.

BYRNES KELLER CROMWELL LLP

By /s/ *Bradley S. Keller*
Bradley S. Keller, WSBA #10665
By /s/ *Ralph E. Cromwell, Jr.*
Ralph E. Cromwell, Jr., WSBA #11784
By /s/ *Jofrey M. McWilliam*
Jofrey M. McWilliam, WSBA #28441

MUNDING, P.S.

By /s/ *John Munding*
John Munding, WSBA #21734

CARNEY BADLEY SPELLMAN, P.S.

By /s/ *Michael B. King*
Michael B. King, WSBA # 14405
Jason W. Anderson, WSBA # 30512

*Attorneys for Perkins Coie LLP and Lowell Ness*

22

## CERTIFICATE OF COMPLIANCE

Under Federal Rules of Appellate Procedure 29(d) and 32(a)(7)(C), I certify that this brief is proportionately spaced with one-inch margins on all four corners with a total of 5,132 words.

Respectfully submitted this 26th day of August, 2022.

BYRNES KELLER CROMWELL LLP

By /s/ *Bradley S. Keller*
Bradley S. Keller, WSBA #10665
By /s/ *Ralph E. Cromwell, Jr.*
Ralph E. Cromwell, Jr., WSBA #11784
By /s/ *Jofrey M. McWilliam*
Jofrey M. McWilliam, WSBA #28441

MUNDING, P.S.

By /s/ *John Munding*
John Munding, WSBA #21734

CARNEY BADLEY SPELLMAN, P.S.

By /s/ *Michael B. King*
Michael B. King, WSBA # 14405
Jason W. Anderson, WSBA # 30512

*Attorneys for Perkins Coie LLP and Lowell Ness*

23

## CERTIFICATE OF SERVICE

I hereby certify that I caused to be electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 26, 2022.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

>Pamela Egan
>Potomac Law Group
>1905 7th Avenue West
>Seattle, WA 98119-2815
>pegan@potomaclaw.com

Respectfully submitted this 26th day of August, 2022.

BYRNES KELLER CROMWELL LLP

By /s/ *Bradley S. Keller*
Bradley S. Keller, WSBA #10665
By /s/ *Ralph E. Cromwell, Jr.*
Ralph E. Cromwell, Jr., WSBA #11784
By /s/ *Jofrey M. McWilliam*
Jofrey M. McWilliam, WSBA #28441

MUNDING, P.S.

By /s/ *John Munding*
John Munding, WSBA #21734

CARNEY BADLEY SPELLMAN, P.S.

By /s/ *Michael B. King*
Michael B. King, WSBA # 14405
Jason W. Anderson, WSBA # 30512

*Attorneys for Perkins Coie LLP and Lowell Ness*

24

# EXHIBIT 31

Forgive me, but that's pretty weird stuff right there.

**Pamela M. Egan** | Partner | Potomac Law Group, PLLC
**Tel: (415) 297-0132 | Fax: (202) 318-7707**
pegan@potomaclaw.com | www.potomaclaw.com



*This e-mail and any attachments may contain information that is private, confidential, and/or privileged. If you are not the intended recipient, please notify us immediately and destroy all copies of this message and any attachments.*

**From:** Ralph Cromwell <rcromwell@byrneskeller.com>
**Sent:** Friday, September 16, 2022 9:29 AM
**To:** Pamela M. Egan <pegan@potomaclaw.com>
**Subject:** RE: GW/PC

⚠ **EXTERNAL**

I should give this more thought, but I think our position would be that our right to arbitration stands or falls based on the pleading in effect at the time we demanded arbitration. I doubt we would agree to anything that is inconsistent this position.

**From:** Pamela M. Egan <pegan@potomaclaw.com>
**Sent:** Friday, September 16, 2022 8:17 AM
**To:** Ralph Cromwell <rcromwell@byrneskeller.com>
**Subject:** GW/PC

Would you agree to remand, I obtain order amending, you renew your arbitration argument based on the amended pleading and we go from there.

Get Outlook for iOS

# EXHIBIT 32

| | |
|---|---|
| **From:** | Pamela M. Egan |
| **To:** | Ralph Cromwell |
| **Subject:** | GW/PC |
| **Date:** | Wednesday, September 28, 2022 9:23:29 AM |

Hi Ralph, I'm still thinking this through. But I think we should agree to remand the appeal and you can renew your motion to compel arbitration based on the newly discovered facts.

Get Outlook for iOS