Pamela M. Egan, WSBA No. 54736
POTOMAC LAW GROUP PLLC
1905 7th Ave. W.
Seattle, WA 98119
Telephone: (415) 297-0132
Email: pegan@potomaclaw.com
 *Attorneys for Mark D. Waldron, Chapter 7 Trustee*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| In re:<br><br>GIGA WATT, Inc., a Washington corporation,<br><br>    Debtor. | Case No. 18-03197 FPC 11<br><br>The Honorable Frederick P. Corbit<br><br>Chapter 7 |
| MARK D. WALDRON, as Chapter 7 Trustee,<br><br>    Plaintiff,<br><br>  vs.<br><br>PERKINS COIE LLP, a Washington limited liability partnership, LOWELL NESS, individual and California resident, and TIMUR USMANOV, individual and Russian citizen,<br><br>    Defendants. | Adv. Case No. 20-80031<br><br>**FIRST AMENDED COMPLAINT** |

   Mark D. Waldron, in his capacity as the duly appointed Chapter 7 Trustee, by and through his attorneys, the Potomac Law Group PLLC, for his First Amended Complaint against Perkins Coie LLP ("Perkins Coie") alleges as follows:

FIRST AMENDED COMPLAINT – Page 1

## SUBJECT MATTER JURISDICTION AND VENUE

1.　This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This action is related to the bankruptcy case.

2.　Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## PARTIES

3.　Plaintiff is the duly appointed Trustee in the above-captioned bankruptcy case of Giga Watt, Inc. ("Giga Watt"), which was filed on November 19, 2018 ("Petition Date")

4.　Defendant Perkins Coie LLP ("Perkins") is a limited liability partnership formed under the laws of Washington State. It maintains offices in Seattle, Palo Alto, and numerous other cities worldwide. Perkins is the 16th largest law firm in the United States. It was named one of the "Top Five Law Firms for Startups" in 2019 (Kruze) and won the Technology/Telecom Deal of the Year" by The Deal Awards in 2019.

5.　Defendant Lowell Ness ("Ness") resides in or around Palo Alto, California. He is a partner of Perkins in the firm's Corporate practice, regularly acting as either company counsel or investors' counsel in venture capital financings. Perkins' website adds that Ness is:

> a core member of the Blockchain Technology and Digital Currency industry group where he focuses part of his practice on assisting Blockchain, Bitcoin and other cryptocurrency clients raise money by maintaining relationships with key venture capital groups and other potential investors in the industry.

Ness earned a B.A. (*cum laude*) from the University of Pennsylvania in 1989. He earned a J.D. (*cum laude*) in 1994 from Georgetown University Law Center. He

FIRST AMENDED COMPLAINT – Page 2

speaks French and Russian. Ness and Perkins are referred to herein collectively as "Perkins."

6. Defendant Timur Usmanov ("Usmanov") is a Russian national who resides in Los Angeles, California. He was Giga Watt's Chief Financial Officer ("CFO") from on or about May 3, 2017 to on or about September 15, 2018.

## PRELIMINARY STATEMENT

7. The First Claim of Relief alleges that Perkins owed Giga Watt a fiduciary duty. The duty arises from two roles that it played as the Giga Watt Initial Coin Offering ("GW ICO") escrow holder and as Giga Watt' s attorneys. Perkins breached its fiduciary duty to Giga Watt by allowing a Singapore corporation, GigaWatt Pte. Ltd. ("GW Sg."), to control the WTT Token sales proceeds and by releasing those proceeds, for a total of $22.3 million, out of step with the completion of Giga Watt's cryptocurrency facilities. WTT Tokens are described below.

8. The Second Claim of Relief alleges that Perkins is also liable pursuant to RCW 11.98.085 as a trustee. Perkins breached the trust by treating the WTT Token sales proceeds as if they belonged to GW Sg. and by disbursing the WTT Token sales proceeds regardless of the completion of Giga Watt cryptocurrency mining facilities. Perkins is liable for the amount required to restore the value of the trust property to what it would have been had the breach not occurred. That amount is $22.3 million

9. The Third Claim of Relief alleges that Usmanov owed Giga Watt a fiduciary duty as its Chief Financial Officer. Usmanov breached this duty by

FIRST AMENDED COMPLAINT – Page 3

1   enabling, executing, and covering up (a) GW Sg.'s misappropriation of the $22.3

2   million that Perkins held in trust, (b) Cryptonomos Pte. Ltd.'s ("Cryptonomos")

3   misappropriation of Giga Watt's operating revenues in the estimated amount of $5

4   million, (c) the disappearance of approximately $1.2 million, and (d) the

5   fraudulent transfer of $180,000 to Andrey Kuzenny ("Kuzenny") pursuant to a

6   fraudulent scheme to obtain for him a U.S. work visa. Usmanov implemented

7   Kuzenny's plan to strip Giga Watt of all capital contributions and revenues and to

8   saddle it with liabilities.

9   **GENERAL ALLEGATIONS**

10   10. In January 2017, David Carlson ("Carlson"), Rob Taves ("Taves")

11   and Jeff Field ("Field") sold all or substantially all the assets of their company,

12   MegaBigPower, to Giga Watt for a purchase price of $3 million.

13   11. Giga Watt had only been incorporated in Washington the month

14   before in December 2016 by Nikolay Evdokimov ("Evdokimov"), a Russian

15   national. It never had signed bylaws or a signed shareholders agreement. There are

16   no minutes or record of a shareholders meeting by which directors could be

17   appointed. Relatedly, there are no minutes or record of a directors' meeting or

18   appointment by directors of officers. Instead, four Russian nationals ran Giga

19   Watt as if it were their non-corporate enterprise. These nationals are Evdokimov,

20   Kuzenny, Leonid Markin ("Markin"), and Eduard Khaptakhaev ("Khaptakhaev").

21   These four, whom Carlson called "the Russian partners" and Kuzenny called "the

22   Russian team," ran Giga Watt. At some point during the GW ICO, Evdokimov

23   was squeezed out. But the other three remained.

24

FIRST AMENDED COMPLAINT – Page 4

25

1     12.     MegaBigPower was the business name of Enterprise Focus, Inc., a

2 Washington corporation. It was a cryptocurrency mining operation located in

3 Moses Lake and East Wenatchee, Washington.

4     13.     Evdokimov signed the purchase and sale agreement on behalf of

5 Giga Watt. Carlson signed on behalf of MegaBigPower.

6     14.     In January 2017, Carlson became the Chief Executive Officer

7 ("CEO") of Giga Watt.

8     15.     On March 3, 2017 Perkins signed an engagement letter with

9 Cryptonomos, a Singapore corporation. Evdokimov signed this engagement letter

10 on Cryptonomos' behalf. The engagement letter provided that Perkins would

11 provide "final document review with respect to digital currency style token sales."

12 A copy of the foregoing engagement letter is attached hereto as **Exhibit A**.

13     16.     On March 13, 2017, Carlson wrote to Taves and Field that there

14 would be a delay in payment of the purchase price of the sale to Giga Watt,

15 writing, "Investor feedback on the token is very positive, ***but continue to wait for***

16 ***Perkins Coie*** to finish their opinion letter so that we can launch the PR

17 campaign[.]" (Emphasis added.)

18     17.     Upon information and belief, Perkins did not issue an opinion letter.

19 But it advised Giga Watt regarding "the PR campaign."

20     18.     By PR campaign, Carlson meant the GW ICO.

21     19.     A document entitled the Giga Watt Token Launch White Paper

22 ("White Paper"), attached hereto as **Exhibit B**, set forth the terms of the GW ICO.

23 Daria Generalova, authored the White Paper.

24
FIRST AMENDED COMPLAINT – Page 5
25

20. The GW ICO was an investment scheme that leveraged the novelty of digital assets, cryptocurrency, and the blockchain to attract investors. It ran from approximately May 2017 to approximately August 2017. Pursuant to the GW ICO, Giga Watt sold WTT Tokens and GW Sg. sold miners, as described more fully below.

21. The White Paper styled Cryptonomos as an ersatz investment banker for the GW ICO, providing marketing services and logistical support in storing the WTT Tokens on the Ethereum blockchain.

22. Carlson did not want to register the GW ICO with the SEC, which he referred to as "the eye of SECron" in an allusion to the embodiment of evil in *The Lord of the Rings*.

23. He reasonably believed that Perkins was advising Giga Watt, through its engagement by Cryptonomos. At one point, he referred to their legal work as an effort to "productize" the WTT Token, by which he meant it would not be considered a security subject to the registration and other requirements of U.S. securities laws.

24. Cryptocurrency mining is power intensive and the GW ICO tied its sales pitch to power. One WTT Token entitled the holder to the net revenues generated by Giga Watt's use of one watt of power in its mining operation, assuming the WTT Token holder also purchased a miner running one watt of power. Thus, if Giga Watt's mining operation was using 10 megawatts of power and there were holders of 10 million WTT Tokens with miners using those 10 megawatts of power, then the WTT Token holders would be entitled to 100% of

FIRST AMENDED COMPLAINT – Page 6

1    Giga Watt's revenues, less a maintenance fee and the proportionate cost of
2    electricity. In the same vein, someone holding one million WTT Tokens and
3    owning miners using one million watts of power would be entitled to 10% of Giga
4    Watt's mining revenues less a maintenance fee and the proportionate cost of
5    electricity.

6         25.     Giga Watt pooled its miners and the revenues they earned. Thus, if
7    one miner did not earn any cryptocurrency, the miner would nonetheless be
8    credited with revenue if the pool as a whole had earned revenue. Revenues were
9    not tied to individual miners. Giga Watt built the facilities and maintained the
10    miners.

11         26.     For every 100 WTT Tokens sold, fifteen (15) were to be distributed
12    to the Giga Watt insiders.

13         27.     According to the White Paper, if Giga Watt failed to build out
14    cryptocurrency facilities within three months of the schedule set forth in the White
15    Paper, and sold more WTT Tokens than it could accommodate, then the
16    oversubscribed WTT Token holders would be entitled to a refund.

17         28.     The White Paper further provided, "All funds collected through the
18    pre-sale and Token Launch will be deposited in escrow. . . . The funds will be
19    released from escrow in step with the completion of facilities." **Exhibit B**, White
20    Paper at 18.

21         29.     The White Paper further provided:

22         . . . . If the completion of the capacities is delayed by more than 3
         months from the projected date, and, consequently, the relevant WTT
23         tokens are not issued, the escrow agent may issue a refund at the

24

FIRST AMENDED COMPLAINT – Page 7

25

request of the WTT token purchasers. The refund will be issued in the original form of payment at the exchange rate on the date of the refund.

**Exhibit B**, White Paper at 26-27.

30.     Further pursuant to the White Paper, Cryptonomos would collect the WTT Token sales proceeds on Giga Watt's behalf and release the WTT tokens upon Giga Watt's completion of the requisite facilities. GW Sg. was selling the miners. Miner sales proceeds were not placed in trust.

31.     The GW ICO was preceded by months of multi-channel marketing involving social media, conferences, interviews, videos, press releases, and one billboard.

32.     The Russians prominently featured the two American participants in their PR campaign, Carlson, and Perkins. Giga Watt produced to the SEC thousands of pages of social media posts and numerous videos about Carlson and Giga Watt. Further, Carlson spent a significant amount of his time otherwise networking and promoting Giga Watt. As set forth below, Carlson did not run Giga Watt, despite his title as Chief Executive Officer.

33.     Cryptonomos carried Perkin's name and Lowell Ness' photograph on its website with the caption, "Legal Consulting and Escrow. Internationally acclaimed law firm with vast experience in the field of blockchain and cryptocurrencies." The website stated under Ness' photograph and next to the picture of a safe:

> All funds raised through the WTT Token Launch are put in fiat escrow (funds received in cryptocurrencies are first converted into USD). Funds are released from escrow in batches ***only after the***

FIRST AMENDED COMPLAINT – Page 8

1    ***underlying capacities are built*** and relevant tokens are issued and distributed.

2    (Emphasis added.)

3        34.    In addition, the local government supported Giga Watt. The Chelan

4    Douglas Port Authority gave Giga Watt a lease for 13 acres of land in a business

5    park near the Pangborn Airport (the "Pangborn Site"). The terms were favorable.

6    For example, Giga Watt would pay less than $1,000 a month in rent for the six

7    months of the lease. This was intended to allow Giga Watt six months to get the

8    Pangborn Site up and running.

9        35.    Further, the Douglas County Public Utility District No. 1 gave Giga

10   Watt a 30-megawatt power contract at exceptionally low electrical rates, although

11   the rates were subject to change at any time, and Giga Watt had to pay for and

12   build a substation capable of handling 30 megawatts of power.

13       [*This First Amended Complaint continues on the next page.*]

FIRST AMENDED COMPLAINT – Page 9

1    36.    The Pangborn Site featured heavily in the GW ICO, but it was just a

2    Potemkin Village. In April 2018, Wilson Sonsini Goodrich & Rosati ("<u>Wilson

3    Sonsini</u>") sent the following picture to the SEC in an effort to show that the WTT

4    Token and miner proceeds had been used to build out a real project:



5

6

7

8

9

10

11

12

13

14

15

16

17    37.    As the picture shows, Giga Watt had erected buildings on the

18    Pangborn Site. But none of them were powered, except for one "show pod" which

19    only used .75 megawatts. Further, the "show pod" was not "tokenized," but

20    instead operated for the benefit of Red Team Investments, Inc., whose principal

21    was Trevin Vaughn.

22

23

24    FIRST AMENDED COMPLAINT – Page 10

25

38.     Despite the failure to develop the Pangborn Site, Carlson and the Russians succeeded in building approximately 10.8 MW of "tokenized" facilities in Moses Lake, Washington, albeit at less favorable lease and power rates.

39.     Giga Watt also ran a non-tokenized facility in East Wenatchee, Washington on Highline Drive known as the Highline or TNT Facility.

40.     In May 2017, shortly after the GW ICO had started, Katrina Grant, a/k/a Katrina Arden a/k/a Ekatarina Kovalyova ("Grant"), who is a Russian national with a California law license and who worked for Cryptonomos, GW Sg., and Giga Watt, asked Ness if Perkins would be willing to serve as the GW ICO escrow.

41.     Ness agreed saying that he would issue a "vanilla" engagement letter in order to get access to Perkins' IOLTA trust account, which would hold the WTT Token sales proceeds.

42.     Grant followed up with Ness, "Remember, GW Sg. is selling the tokens." However, the White Paper said that GW Sg. was selling the miners – not the WTT Tokens.

43.     GW Sg. was a paper façade. It was registered as a corporation in Singapore. Its first director, Sergey Pashentsev, was an auto mechanic living in rural Russia. Andrey Kuzenny authored emails pretending to be Pashentsev. GW Sg.'s second director, Marina Mikhaylyuta, may have lived in Moscow. Usmanov ghostwrote at least some of her letters. GW Sg. had no shareholders agreement. Kuzenny controlled GW Sg. After December 2017, GW Sg. had no stable, reliable banking relationship anywhere.

FIRST AMENDED COMPLAINT – Page 11

1    44.    On or about May 12, 2017, Perkins and GW Sg. signed the "vanilla"
2    engagement letter providing that Perkins would give GW Sg. "general corporate
3    advice." However, Perkins did not provide "general corporate advice" to GW Sg.
4    It provided general corporate advice to Giga Watt, as set forth below. A copy of
5    the foregoing engagement letter is attached hereto as **Exhibit C**.

6    45.    Shortly afterward, Grant sent an email to Ness' assistant asking if
7    they should write down the terms regarding Perkins' holding of the WTT Token
8    sales proceeds. Ness did not respond, at least not in writing, and thus chose not to
9    put any terms in writing separate from the White Paper.

10    46.    Further, pursuant to the engagement letter with Cryptonomos,
11    Perkins was responsible for "final review" of the White Paper. Therefore, Ness
12    knew the terms by which he would be holding the WTT Token sales proceeds.

13    47.    After May 12, 2017, Perkins IOLTA trust account began receiving
14    hundreds of small-dollar payments relating to the GW ICO.

15    48.    Just as the GW ICO started, Andrey Kuzenny, Leonid Markin, and
16    Eduard Khaptakhaev installed Usmanov at Giga Watt as its Chief Financial
17    Officer ("CFO"). From May 2017 until November or December 2017 when Giga
18    Watt began paying his salary, Usmanov received his compensation in the form of
19    wire transfers to his bank account in Latvia and cash payments. Kuzenny and
20    Cryptonomos made these payments. He has not reported them to the United States
21    Internal Revenue Service.

22
23
24    FIRST AMENDED COMPLAINT – Page 12
25

1     49.    In June 2017, less than a month after the GW ICO began, Ness wrote

2 to Arden:

3 > My escrow guys are asking how long this is going to go on.
> Normally, we do closing escrows as an accommodation for clients

4 > that take a week or two for a transaction to close and involve 10 or 20
> wires to manage. This one has gone way beyond the norm for us. Are

5 > we close to the closing when no more wires will come in? If not, let's
> see what other escrow providers can handle this. We are not set up to

6 > manage long term escrow accounts.

7     50.    Arden responded, in pertinent part:

8 > We have the date for the end of sales set on July 31, unless we reach
> the cap of 30,000,000 [WTT Tokens] sold earlier. This date was

9 > indicated on every single document you reviewed prior to agreeing to
> provide the escrow services to Giga Watt. We have publicly

10 > announced that Perkins Coie performs the escrow for the sale of
> tokens. It is listed on the web-site, in publications and reports made

11 > on WTT by independent media. ***Switching this service to another
> company now would be detrimental for the entire token launch***

12 > ***process and would jeopardize not just the future sales but also
> existing purchases once the buyers learn that Perkins Coie no***

13 > ***longer escrows their funds.*** I do understand your concern and I feel
> sorry that it causes your firm a great deal of inconvenience; however,

14 > due to the extend [sic] of possible damage, switching the escrow at
> this point does not seem to be a solution. Let's figure something out

15 > to make the process easier for you, instead.

16     51.    Ness replied, "Understood. Don't want to cause trouble. Just looking

17 for a way to explain this novel stuff internally. Let's hope you get to the cap first!"

18     52.    By "novel stuff," Ness was referring to the fact that the GW ICO, like

19 all initial coin offerings, used the blockchain to record the interests, called WTT

20 Tokens, that Giga Watt was selling. Ownership and transfers of the WTT Tokens

21 were stored on the Ethereum blockchain, which is a ledger that is located on the

22 cloud. Because they are stored on a blockchain, tokens are considered "digital

23 assets."

24 FIRST AMENDED COMPLAINT – Page 13

25

53.     In July 2017, Arden wrote to Ness:

Giga Watt [is] trying to get a loan to build the additional facilities secured by the funds in the escrow so it can build more and ahead of construction schedule. The lender wants to make sure that he would get paid from the escrow. If we ask PC to keep certain balance (we are talking about $3,000,000) and make payment at Giga's request to a specific third party, you should be able to do so, right? The loan would be for three months but Giga is planning to repay it in one month.

54.     Ness did not ask whether she meant Giga Watt or GW Sg. He had more pressing concerns, responding:

I'm getting a ton of push back internally for "abusing" our closing escrow. They definitely aren't going to let me do something really unusual like paying a third party. I know we set this up at the last minute, but we're just using our standard client closing account that normally gets 10 or 11 wires into it and pays out to our client a week or two later.

55.     On July 25, 2017, the SEC issued its *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* in which it explained its analysis that blockchain digital asset tokens were securities subject to the U.S. securities laws.

56.     On July 27, 2017, Carlson met with a corporate attorney at Perkins, Martha Sandoval ("Sandoval"), seeking advice regarding Giga Watt and its relationship with GW Sg. By this point, GW Sg. had already usurped the WTT Token sales proceeds, substituting itself as the seller at the last minute, contrary to the White Paper terms.

57.     In preparation for that meeting, Michael Olmstead ("Olmstead"), Giga Watt's accountant, wrote to Sandoval that they needed advice regarding the treatment of Giga Watt's revenues "both internally and for tax purposes."

FIRST AMENDED COMPLAINT – Page 14

58.     This meeting upset Usmanov. He wrote multiple drafts of a letter to Carlson for Leonid Markin's signature. Markin is a Russian national who worked with Kuzenny. On July 28, 2017, Leonid Markin, sent an email to Carlson telling him to accept Usmanov's authority and "change [his] attitude." After this point, Usmanov took over the relationship with Perkins.

59.     The GW ICO ended on or about July 31, 2017. Kuzenny told the SEC that they had sold approximately 22 million WTT Tokens for approximately $22 million. However, as of July 31, 2017, Perkins was only holding $8,621,218.58 in WTT Token sales proceeds.

60.     On August 1, 2017, GW Sg. deposited $1.95 million into the Perkins IOLTA trust account. This deposit contradicted the White Paper which stated that Cryptonomos – not GW Sg. – would collect the WTT Token sales proceeds and place them in the escrow. Further, Giga Watt – not GW Sg. – should have been selling the WTT Tokens. GW Sg. was only selling the miners.

61.     On August 4, 2017, Circle Internet Finance, Ltd. ("Circle") made two deposits into Perkins' IOLTA Trust account, one in the amount of $5 million and another in the amount of $6,598,900.

62.     Circle's records do not show the source of these funds.

63.     Only three days later, on August 7, 2017, Mikhaylyuta asked Perkins to release to GW Sg. $5.4 million, writing, "Now that we've launched the first batch of tokens[,] I would like to ask you to release the equivalent amount of USD 5 400 000."

FIRST AMENDED COMPLAINT – Page 15

64.    That same day, August 7, 2017, Sandoval wrote to Olmstead, Giga Watt's sole in-house accountant, that Perkins had not worked on Giga Watt's incorporation, and that before the July 2017 meeting, she had not been familiar with Giga Watt. It was not listed in Perkins' database as a client.

65.    The same day, August 7, 2017, Usmanov sent an email to Ness with the subject line, "need your advice." The body of the email stated:

> Hi Lowell [Ness], My name is Tim, I'm the CFO at Giga Watt, Inc. ***Katrina referred to you as a main contact person who I could speak with on all our legal matters.*** Several days ago we received an email supposedly sent by the U.S. Secret Service, asking us to share some sensitive information. Please find below a copy of this email.

(Emphasis added.) Ness promptly directed Usmanov to Jean-Jacques Cabou ("Cabou"), Ness' partner, who responded:

> I share your skepticism but it also bears some indicia of legitimacy to me. I'd be happy to return the call if you'd like; otherwise there's no harm in returning the call and saying you are trying to confirm the legitimacy of the request before consulting with counsel about providing any information. Don't give anything up yet; see what the guy says

66.    Usmanov responded:

> Agree with you. Would be great if you gave them a call on our behalf. Your voice will sound more persuasive. At least you will find the right questions to ask.

67.    On August 8, 2017, Perkins made the first premature escrow release in the amount of $5.4 million. No new construction had been completed. This payment violated the White Paper terms.

68.    That same day, August 8, 2017, at 8:19 a.m., Ronan McGee of the USSS wrote to Ness:

FIRST AMENDED COMPLAINT – Page 16

Good morning Lowell,

The U.S. Secret Service has an ongoing investigation in which a suspect's phone received a confirmation code from Cryptonomos. We believe the confirmation code to be related to the mining operations of the Cryptonomos / Giga Watt venture. We are interested in obtaining any and all information Cryptonomos / Giga Watt maintains on file for this specific phone number, particularly any bitcoin addresses.

We have attempted to contacted [sic] Cryptonomos directly multiple times, but they have thus far failed to respond to our inquiries. ***Our understanding is that you are the legal representative of Giga Watt***.

As a result, could you please provide the appropriate Grand Jury subpoena contact information (e.g. physical address to include on the subpoena, email to which subpoena can be served, etc) for Cryptonomos / Giga Watt so that we may subpoena the information in question?

(Emphasis added.) (Punctuation in the original.)

69.     Less than an hour later, on August 8, 2017, Cabou responded:

Ronan and Team,

It was a pleasure to speak with Ronan briefly just now regarding this email that was directed to my partner, Lowell Ness, who is also copied here. As I explained to Ronan, ***our firm represents Giga Watt*** and I can accept service of a subpoena by email on its behalf. Please just send that to me.

We understand that the USSS and state authorities have reason to believe Giga Watt may hold certain records relevant to your investigation. Once we get the subpoena, we will work with the client to determine what if any responsive records we have and to produce them to you in a timely and convenient way.

Please let me know if you have any questions.

We look forward to working with you.

(Emphasis added.).

FIRST AMENDED COMPLAINT – Page 17

70. Cabou forwarded the email to Ness and Usmanov adding the following:

Lowell and Tim,

I spoke just now with Ronan McGee, an intelligence analyst for the USSS. He confirmed this was a legit request and will be sending a subpoena from the US District Court in Kentucky for the records they want. I have asked that the subpoena be directed to me, as you can see below. McGee confirmed that GW is just a holder of information here, not a target or subject of the investigation.

So the play here is for us to be cooperative as long as possible, see what they want, and then get it to them if we have it. One thing I'd like to do is to review whatever agreement(s) or terms we would have with the individual in question to ensure that we have no self-imposed obligation to notify them of the subpoena.

Obviously[,] I'd be happy to talk about any of this at your convenience.

71. Thus, on the day that Perkins made the first premature escrow release, Perkins represented Giga Watt "on all legal matters," confirmed to the USSS that Perkins represented Giga Watt, and provided legal advice to Giga Watt.

72. In August 2017, Kuzenny was seeking an investment from a Russian who used the moniker, Al Mafia. On August 9, 2017, the day after Perkins made the first premature escrow release to GW Sg., "Al Mafia" wrote to Perkins' accounting department asking for the "general ledger regarding the GigaWatt Pte. Ltd. escrow."

73. That same day, August 9, 2017, Kuzenny wrote to Al Mafia, "***Our lawyers*** are in a panic at your letter that you addressed. Honestly. You know how they relate to the word mafia here in America (( Let me better send you dox from them." (Emphasis added.) (Punctuation and parentheses in original.)

FIRST AMENDED COMPLAINT – Page 18

74.     On August 9, 2017, Carlson followed up with Sandoval regarding their July meeting, referring to the issues they discussed as the "project orientation checkup." In this email he wrote that Perkins should scrutinize Giga Watt and GW Sg.'s relationship, analyze whether it makes sense, and familiarize itself with Giga Watt's business. Addressing Sandoval and Khaptakhaev, he wrote:

> Thanks for the clarity[,] Martha.
>
> Ed - we met with Perkins week before last and did a project orientation checkup with Martha. I wasn't clear what Perkins had been involved with versus the guidance given by Katrina [Grant].
>
> Its clear that at this point that the corp[.] structure (Giga.sg and Giga.us) and their relationship were [sic] defined by Katrina with perhaps some input by Perkins, but not at their specific direction.
>
> I think we need to determine if we are comfortable with our current arrangement, or do we want Perkins to dig into how we are doing business and what the entity structure consists of. Further, we may need Perkins to evaluate whether the legal protection and tax/revenue strategies implied by this corp structure are effective and achieve our goals.
>
> We've built a lot of business based on the structure Katrina defined, and perhaps you guys are familiar and comfortable with it - I'm asking you for your feedback on whether to engage Perkins to audit our structure and build us a robust plan going forward. At this point I think its [sic] fair to say that Perkins knows *very little* about our business, with the exception of the two entities and a proposed third entity (Hosting).
>
> Your thoughts? Thanks! Dave

75.     Carlson copied Markin, Kuzenny, and Usmanov on the foregoing email.

76.     On August 9, 2017, Usmanov wrote to Sandoval:

> I totally agree with Dave. We would need to ask Perkins Coie to audit our structure and provide advice and assistance.

FIRST AMENDED COMPLAINT – Page 19

Martha didn't mention GW One LLC as a company that is also under our umbrella. Apparently, we would have to set up a call and talk through the entire group and bring Martha up to speed on our M&A plans. We definitely need a legal advice on the upcoming merger with Hashplex as there are few things I'm not clear about.

As for the constitutional dox requested by Martha - please find attached some of the documents on Giga Watt, Inc that I've got as of today. As you can see the Articles of Incorp doesn't contain articles per se, but only a title page. In view of the above, I suggest that Perkins Coie also reach out to Washington Secretary of State to check with them whether or not the initial filing was complete. Same goes for our Singapore entities. Someone would probably need to request the full batch of documents via the registered agent. As far as SHA [Shareholder Agreement] is concerned - I believe this is still being drafted and discussed amongst the shareholders.

77.     On or about August 11, 2017, Kuzenny received unwelcome news. GW Sg.'s bank, the Overseas Chinese Banking Corporation ("OCBC") asked him to explain the $1.95 million that GW Sg. had deposited into the Perkins IOLTA Trust Account and about which Perkins had asked no questions. As alleged earlier, GW Sg. had no business selling the WTT Tokens in the first place.

78.     On or about the same day, OCBC also asked Kuzenny to explain the $5.4 million that Perkins had transferred to GW Sg. from the Perkins IOLTA trust account. As alleged earlier, this transfer violated the terms of the GW ICO because it was made before Giga Watt had finished the requisite construction.

79.     Unable to tell the truth without risking losing the account, Kuzenny and Usmanov dissembled, stating falsely that the $1.95 million transfer was akin to an "inter-company transfer" between GW Sg. and Perkins, and that the $5.4 million transfer was for "completed construction." They also said that the funds were for a "pre-sale," although this was unsubstantiated and irrelevant.

FIRST AMENDED COMPLAINT – Page 20

1      80.    On August 14, 2017, Usmanov followed up with Cabou, regarding

2   the grand jury subpoena. He included a message that the USSS had sent to

3   Nikolay Evdokimov on August 7, 2017. As alleged above, Evdokimov had signed

4   Giga Watt's incorporation papers. However, sometime in 2017, he parted ways

5   with Giga Watt and conducted a different unregistered securities offering which

6   resulted in a default judgment against him by the SEC for more than $16 million.

7      81.    In the foregoing email, dated August 14, 2017, Usmanov asked

8   Cabou:

9      Could you provide some more information of what you are
       discussing with them? Would you also share that subpoena with us,
10     please? Any steps from our end required?

11     82.    Cabou responded:

12     Tim, Thanks for your note. To be clear, I have an open line of
       communication with the USSS but I have NOT shared or discussed
13     any substance at all with them. I have simply said we want to assist
       and will accept service of a subpoena to me by email.
14
       They have confirmed they are still obtaining the subpoena and will be
15     in further touch.

16     Nothing to do for now at all. Best J

17     83.    On August 15, 2017, Mikhaylyuta asked to withdraw $900,000 from

18   Perkins' IOLTA trust account, "We ve [sic] released the second batch of tokens[.]

19   I would like to ask you to release the equivalent amount of USD 900 000 nine

20   hundred thousand in favor of GIGAWATT PTE LTD [GW Sg.]." (All caps in

21   original.)

22     84.    On August 17, 2017, Cabou forwarded the grand jury subpoena to

23   Usmanov with Ness copied, "Attached is the subpoena I just received. We need to

24
   FIRST AMENDED COMPLAINT – Page 21
25

1  have a call to discuss next steps. When can you and/or your team have that call

2  with me." The subpoena was addressed to Cryptonomos/Giga Watt.

3      85.    Usmanov responded, "I'm ready to talk whenever you are." Shortly

4  thereafter, Cabou wrote to Usmanov with a copy to Ness:

5      Tim, Good to speak with you just now. As we discussed, you and
   your team will conduct a diligent search for all records responsive to
6      the subpoena and will get any such records to me for review. Once
   that's done, we will work with you to complete the waiver and
7      declaration forms and we will get those to the USSS for you.

8      Look forward to hearing from you[.]

9      86.    On August 18, 2017, Usmanov described to Perkins the steps that the

10 Romanian suspect had taken on Cryptonomos' website.

11     87.    On August 19, 2017, Perkins released $900,000 to GW Sg. No

12 construction had been completed.

13     88.    On August 22, 2017, Usmanov wrote to Cabou again, "Hi J, Here is

14 the name that this guy used when creating a profile on the website. Popescu

15 Bogdan Stefan[.]"

16     89.    On August 22, 2017, Sandoval wrote to Usmanov that Giga Watt

17 lacked signed bylaws and that she needed more information regarding "the

18 Singapore entity." Usmanov responded, "I'll try to find that out later on [re the

19 Singapore entity]. Meanwhile, ***let's focus on our U.S. entities***." (Emphasis

20 added.) He thus drew attention away from the Singapore paper façade.

21     90.    Over the next few days, Cabou nagged, cajoled, and guided Usmanov

22 through the steps necessary to comply with the USSS subpoena. For example, on

23

24 FIRST AMENDED COMPLAINT – Page 22

25

September 4, 2017, Cabou wrote to Usmanov and Giga Watt's Chief Operating Officer, Anton Orlov ("Orlov"), with a copy to Ness:

> Guys,
>
> This is urgent and frustrating. I have gotten no response to the below.
>
> Our deadline to provide documents is September 7. I MUST, WITHOUT EXCEPTION, have all documents to be produced by tomorrow. So far, I have only one file to produce. That clearly isn't enough, as explained below.
>
> I also need the waiver and certification attached completed and returned to me tomorrow. We are under court order here. We cannot miss this deadline. Please let me know what is happening.

91.    Orlov is a Russian national. He did not receive his salary from Giga Watt. Carlson told Wilson Sonsini that he "was on loan" from another company.

92.    On September 5, 2017, Usmanov asked Cabou to confirm that what he and Orlov had cobbled together "is enough." Cabou responded, "Yes. Thank you. I will look forward to getting the waiver and certification."

93.    On September 5, 2017, Usmanov wrote to Carlson regarding the USSS subpoena, "You, as the CEO, just need ot [sic] sign the waiver and the certification." That same day, September 5, 2017, Zeev Kirsh ("Kirsh"), a New York-licensed lawyer who advised Giga Watt, Gw. Sg., and Cryptonomos, wrote to Usmanov with a copy to Carlson regarding the waiver and certification for the grand jury subpoena responses, "i filled out the form stuff on pages 5 and 7. Dave, all you need ot [sic] do isput [sic] down 2 signatures one at the bottom of each page. This needs to be sent out within 2 days by Perkins." Carlson signed the waiver and certification as the CEO of Giga Watt.

FIRST AMENDED COMPLAINT – Page 23

94.     On September 5, 2017, Olmstead, the sole accountant at Giga Watt, learned that Giga Watt no longer had control of or even access to Giga Watt's cryptocurrency revenue wallets. A wall had been erected between Giga Watt and its revenues. Cryptonomos controlled Giga Watt's revenues from this point forward. According to Usmanov's emails, Olesia Egozina, the Chief Product Officer of Cryptonomos, controlled information regarding the wallet. Although Giga Watt reported approximately $1 million in revenue in its 2017 federal tax return, that number was provided to Usmanov by Cryptonomos and by his own admission, Usmanov did not verify the number.

95.     On September 12, 2017, Sandoval wrote to Usmanov regarding Giga Watt's formation documents:

o Bylaws and other Incorporation Steps

   ☐ You passed along an action by the incorporator dated 12/16/16.

In this action, the incorporator:

        • adopted the bylaws;

        • stated that the company would have 1 director; and

        • appointed Nikolay Evdokimov as the sole director •

Of these 3 acts taken by the incorporator, the incorporator only has statutory authority to adopt the bylaws and set the number of directors.

   ☐ Inconsistent with the 12/16/16 incorporator action, in the 1/1/2017 Minutes of the Special Meeting of the Board of Directors, Adam West is identified as (and acted as) the sole director.

In this meeting, the following officers were appointed:

FIRST AMENDED COMPLAINT – Page 24

• CEO: David M. Carlson

• President: Nikolay Evdokimov

• CFO: Leonid Markin

• Secretary: Adam West

o Steps to be taken are

• Client: Provide the identity (identities) of the company's board of directors

 • Client: Provide the identity of the company's officer (are those listed above, correct?; are there other officers?)

• Client: Provide capitalization table (or breakdown of share ownership)

• Client: Provide input on desired number of authorized shares (post stock split)

• Perkins: Prepare a shareholder action in which the director(s) are appointed (and other incorporator actions)

• Perkins: Prepare the organizational actions to be approved by a company's board of directors

• Perkins: Order governing documents from WA Secretary of State's Office and amend and restate articles of incorporation

96.     By "client," Sandoval meant Giga Watt.

97.     On a similar topic, on September 22, 2017, Kirsh wrote to Carlson, "you are very right, we have serious problems in gW inc, gw singapore and even in Cryptonomos. all these companies need shareholder agreements." (Punctuation and typographical errors in original.)

98.     Carlson wrote back to Kirsh:

Not surprising honestly.

FIRST AMENDED COMPLAINT – Page 25

> In any case I don't see why we can't execute a shareholders agreement to at least nail it down legally. It's a lot to ask for us to continue operating as if it is in place, when technically it's never been executed.
>
> We can amend later if needs be...
>
> Cheers, and thanks for the copy of the bylaws. I'll get them to the PUD.

There were never signed bylaws and they never nailed down the shareholders agreement.

99.    On September 22, 2017, Mikhaylyuta (or Kuzenny using her name) asked Perkins to release $1.2 million from the escrow. On September 25, 2017, Perkins complied. As of September 25, 2017, no new construction had been finished.

100.    On September 26, 2017, Cabou continued to advise Giga Watt with respect to the grand jury subpoena, "This has been taken care of. Please do not contact USSS further. They will let us know if they have questions."

101.    On October 6, 2017, Usmanov wrote to Sandoval:

> Sorry for the delay. Our colleagues has [sic] been traaveling [sic] a lot lately, so it was hard to get all together.
>
> Regarding GW Management, LLC, Giga Pod 1-100, LLC, and Mine Building, LLC - actually
>
> I've never heard these entities were duly established. Let me ask you where you heard of them .
>
> Anyways, like I mentioned earlier in our previous correspondences, let's focus first on Giga Watt, Inc. as this is our main operating vehicle.

102.    On November 7, 2017, Perkins released $3.3 million to GW Sg. from its IOLTA trust account. No new construction had been completed. The OCBC

FIRST AMENDED COMPLAINT – Page 26

asked GW Sg. to explain this payment. Usmanov and Kuzenny used the exact same language as before stating that the funds were proceeds from the GW ICO "pre-sale," a statement that was both unsubstantiated and irrelevant. OCBC was asking about the source of these funds. If Usmanov and Kuzenny had told the truth, they would have had to admit that the funds were withdrawn contrary to the terms of the GW ICO White Paper.

103.   On December 4, 2017, GW Sg. lost its OCBC banking privileges.

104.   On December 5, 2017, Usmanov wrote to AA1 Solutions, "Most probably we will have to release some funds from escrow later this week. So we'd definitely need a USD [U.S. dollar denominated] account ***to land the money***." (Emphasis added.)

105.   After OCBC terminated GW Sg.'s banking privileges, Kuzenny began directing Perkins to deliver the escrow releases to Giga Watt. However, Giga Watt was having its own banking problems. From August 2017 to January 2018, Wells Fargo, Numerica Credit Union, and Umpqua Bank each informed Giga Watt that it was no longer welcome. Giga Watt bounced from bank to bank.

106.   Perkins played along with this financial hopscotch, transferring money to Numerica Credit Union, then to Umpqua Bank, and then to Bank of America, no questions asked.

107.   On December 18, 2017, Usmanov drafted what would become the text of an email request to Perkins, ostensibly from Mikhaylyuta, to release $2 million from the escrow to Giga Watt.

FIRST AMENDED COMPLAINT – Page 27

108. On December 19, 2017, Perkins transferred $2 million from the escrow to Giga Watt. Giga Watt had built 2 megawatts of new cryptocurrency mining capacity. However, Giga Watt was more than three months behind the construction schedule set forth in the White Paper and, therefore, by its terms, WTT Token holders, other than those who had received the 2 megawatts of cryptocurrency capacity, were entitled to refunds. The prior $10.8 million should not have been released.

109. On December 22, 2017, Usmanov ghost wrote another escrow release request to Perkins, this time requesting that $4.5 million be sent to Giga Watt.

110. Perkins transferred the $4.5 million to Giga Watt on December 26, 2017. GW Sg. treated this transfer to Giga Watt and all escrow transfers to Giga Watt as a loan. By this date, Giga Watt had built 4.5 megawatts of new cryptocurrency mining capacity. However, the WTT Token holders remained oversubscribed and the escrow had already been improperly and severely depleted.

111. In late December 2017, Stormsmedia LLC, a WTT Token and miner purchaser, sued Giga Watt, GW Sg., and others under section 12 of the U.S. Securities Act of 1933, seeking rescission and restitution of its WTT Token and miner purchases on behalf of all WTT Token and Miner investors. Stormsmedia alleged that Giga Watt had not completed construction.

112. Perkins received actual notice of the Stormsmedia complaint and the allegation that Giga Watt was behind in its construction schedule by more than

FIRST AMENDED COMPLAINT – Page 28

1 three months and that there were oversubscribed WTT Token holders entitled to
2 refunds from the IOLTA trust account.

3      113.   In January 2018, Giga Watt settled the Stormsmedia lawsuit by
4 paying Stormsmedia LLC $953,319.55 out of funds that Perkins transferred to
5 Giga Watt from its IOLTA trust account on instructions from Usmanov, Kuzenny,
6 and/or Mikhaylyuta. GW Sg. treated that transfer as a loan.

7      114.   The Stormsmedia settlement released both Giga Watt and GW Sg.
8 from claims brought by Stormsmedia. No settlement class had been certified.

9      115.   In February 2018, Perkins made the last two escrow releases,
10 notwithstanding its knowledge of Stormsmedia's allegations that construction was
11 delayed. Giga Watt had completed sufficient new cryptocurrency facilities to
12 service some additional WTT Tokens. However, the WTT Token holders
13 remained significantly oversubscribed. To service all the sold WTT Tokens, Giga
14 Watt would have had to be running approximately 22 megawatts of power.
15 Instead, it was only running approximately 11 megawatts of power for WTT
16 Tokens.

17      116.   A summary of the Escrow withdrawals follows:

| Date | Amount | Paid To |
|---|---|---|
| 8/8/2017 | ($5,400,000.00) | GW Sg. |
| 8/19/2017 | ($900,000.00) | GW Sg. |
| 9/25/2017 | ($1,200,000.00) | GW Sg. |
| 11/7/2017 | ($3,300,000.00) | GW Sg. |

FIRST AMENDED COMPLAINT – Page 29

| Date | Amount | Paid To |
|---|---|---|
| 12/19/2017 | ($2,000,000.00) | Giga Watt |
| 12/26/2017 | ($4,500,000.00) | Giga Watt |
| 2/9/2018 | ($1,148,057.58) | Giga Watt |
| 2/22/2018 | ($3,217,700.00) | Giga Watt |
| | ($21,665,757.58) | |

117.   As the foregoing shows, from August 2017 to November 2017, GW Sg. received $10,800,000 ("Released Escrow Proceeds") from Perkins IOLTA trust account.

118.   During this same August to November period, GW Sg. paid to Giga Watt $9,050,000, which it treated as loans to Giga Watt. GW Sg. commingled the Released Escrow Proceeds with other funds before transferring any funds to Giga Watt.

119.   GW Sg. had other funds to commingle. From June 2017 to December 2017, GW Sg. received $14,309,605.00 ("Circle Proceeds") from Circle, which exchanged cryptocurrency for U.S. dollars, among other things. GW Sg. also received revenues from the sale of miners. The Circle Proceeds alone were

*[This First Amended Complaint continues on the next page.]*

FIRST AMENDED COMPLAINT – Page 30

sufficient to cover all payments by GW Sg. to Giga Watt without recourse to the

WTT Token sales proceeds:



120.    GW Sg. began directing payments to Giga Watt after GW Sg. lost

independent access to a bank. GW Sg. was unbankable. During the period,

December 2017 to February 2018, as set forth above, Perkins transferred to Giga

Watt from the IOLTA trust account, the aggregate sum of $10,865,757.31. If GW

Sg. had not previously depleted the escrow, these payments would have been

made in step with construction.

FIRST AMENDED COMPLAINT – Page 31

121. The chart below compares the disbursements to Giga Watt in relation to Giga Watt's power capacity at the time of the transfer:



122. Further, Giga Watt did not retain all the proceeds that Perkins distributed directly to Giga Watt as set forth below:

| When | Escrow Transfers to Giga Watt | GW Bank Withdrawals (Not Ordinary) | Giga Watt Bank | Bank Records' Transfer Description |
|---|---|---|---|---|
| 12/19/2017 | $ 2,000,000.00 | | Numerica Credit Union | Incoming Wire |
| 12/26/2017 | $ 4,500,000.00 | | Umpqua Bank | Incoming Wire |
| 12/26/2017 | | $ (294,000.00) | Umpqua Bank | INTL Wire Xfer Debit Business Singtrade Kr Pte Ltd Overseas-Chinese Banking Corp Payment Under Gw Sgt |
| 1/8/2018 | | $ (3,450,340.00) | Umpqua Bank | OTC [Over the Counter] Withdrawal |
| 1/17/2018 | | $ (953,320.00) | Bank of America | BNF:SILVER MILLER FBO STORMSME SETTLEMENT AGREEMENT DD 01.15.20 |

FIRST AMENDED COMPLAINT – Page 32

| When | Escrow Transfers to Giga Watt | GW Bank Withdrawals (Not Ordinary) | Giga Watt Bank | Bank Records' Transfer Description |
|---|---|---|---|---|
| 1/19/2018 | | $ (47,250.00) | Bank of America | BNF:GIGWATT PTE. LTD BNF BK:E UROSTANDARD BK 60 LOAN AGREEMENT |
| 2/9/2018 | $ 1,148,057.58 | | Bank of America | Incoming Wire |
| 2/22/2018 | $ 3,217,699.73 | | Bank of America | Incoming Wire |
| | $10,865,757.31 | $ (4,744,910.00) | | |
| | | $ 2,258,078.00 | Bank of America & Washington Trust Bank | Deposits partially reimbursing the $3,450,340 withdrawal. |
| | $ (2,486,832.00) | $ (2,486,832.00) | | |
| | $ 8,378,925.31 | | | |

123.    The foregoing also shows that $3,450,340 was withdrawn in an over-the-counter transaction from Umpqua Bank. Umpqua, like Wells Fargo and Numerica Credit Union, had closed Giga Watt's account for suspicious activity. Only $2,258,078 was deposited into Bank of America and Giga Watt's other account at Washington Trust Bank, leaving a missing amount of $1,192,262.

[*This First Amended Complaint continues on the next page.*]

FIRST AMENDED COMPLAINT – Page 33

1    124.   The money flows between Perkins and the Giga Watt entities are

2    illustrated as follows:



13    125.   The foregoing also illustrates how Giga Watt's revenues were re-

14   directed to Cryptonomos. Cryptonomos paid some funds to Giga Watt, but only as

15   loans.

16    126.   After the Stormsmedia settlement, the lawyer for Stormsmedia

17   approached Perkins on behalf of another WTT Token holder, Mark Moss, asking

18   that any WTT Tokens sales proceeds remaining in Perkins IOLTA Trust account

19   be frozen. At the time, there should have been approximately $10.8 million in the

20   Escrow. Perkins informed him that it was no longer holding any WTT Token sales

21   proceeds in its IOLTA trust account.

22    127.   Shortly thereafter, on March 19, 2018, the lawyer filed a securities

23   action against Giga Watt and GW Sg. under the caption, *Moss v. Giga Watt, Inc.,*

24   FIRST AMENDED COMPLAINT – Page 34

25

*et al.*, No. 2:18-cv-0010-SMJ (E.D. Wash.). The complaint alleged individual claims of an unregistered offering of securities under the Securities Act of 1933 and the Washington Securities Act and a claim for rescission of the token purchases. In his complaint, Moss alleged:

> Moreover, contrary to the terms of the GIGA WATT White Paper – which stated that all invested cryptocurrency would be held in escrow and would only "be released from escrow in step with the completion of facilities" – Defendants have represented to Plaintiff that, ***without regard to GIGA WATT's failure to have completed its facilities***, virtually all of the cryptocurrency raised from investors in the ICO has been liquidated into U.S. Dollars and has been transferred from the escrow account to an operating account; and Plaintiff reasonably believes the funds raised have been dissipated, or will be dissipated, before all ICO investors receive their Giga Watt tokens/mining equipment or any opportunity to receive a return on their investments.

Moss Complaint, pp. 32-33, ¶ 105. (Emphasis added.)

128.   On March 20, 2018, a separately represented token purchaser named Raymond Balestra filed an action against Giga Watt, GW Sg., Cryptonomos, and Carlson, under the caption *Balestra v. Giga Watt, Inc., et al.*, No. 2:18-cv-00103-SMJ (E.D. Wash.). The complaint alleges a claim of unregistered offering of securities against all defendants under section 12(a)(1) and a control person claim against Carlson under section 15(a) of the Securities Act of 1933 on behalf of a putative class of plaintiffs who purchased tokens during the GW ICO.

129.   In his complaint, *Balestra, inter alia*, sought a preliminary injunction enjoining any further disbursement of WTT Token sales proceeds, although by then Perkins had already released all the WTT Token sales proceeds. (Balestra Complaint, pp. 21-22.) By stipulation of the parties, on July 3, 2018, the Court

FIRST AMENDED COMPLAINT – Page 35

consolidated this case with the action titled *Moss v. Giga Watt, Inc., et al.* described above, and a new named plaintiff appeared, Alex McVicker.

130. On or about April 19, 2018, the SEC commenced a formal investigation of the GW ICO. On the advice of Kirsh, Giga Watt retained Wilson Sonsini.

131. That same month Usmanov and Carlson decided to "destroy" the Giga Watt-MegaBigPower purchase and sale agreement, pursuant to which Giga Watt had promised to pay MegaBigPower $3 million for all or substantially all its assets, and replace it with what Carlson called a "note" for $1 million.

132. In the above-captioned bankruptcy case, Carlson used this "note" to pretend that he had only sold some of MegaBigPower's assets to Giga Watt and that he had retained ownership of the TNT Facility. In fact, though, in August 2018, GW Sg. had paid Carlson $2 million of the $3 million purchase price in cryptocurrency. GW Sg. then treated the $2 million payment as a loan to Giga Watt.

133. Usmanov said that destroying the purchase and sale agreement would help Carlson save on his taxes. Carlson said, "that would be excellent." It is not known whether Carlson reported the $2 million to the IRS or otherwise used Usmanov's ruse to save on his taxes.

134. During the SEC investigation, Carlson informed Wilson Sonsini that he did not have access to any information regarding the WTT token sale proceeds, including the Perkins IOLTA trust account. Cryptonomos had that information.

FIRST AMENDED COMPLAINT – Page 36

1  Thus, Kuzenny produced the information regarding the escrow and token sale
2  proceeds.

3      135.   Kuzenny falsely misrepresented to Wilson Sonsini and the SEC that
4  all WTT Token sales proceeds had been released from the Perkins IOLTA trust
5  account in step with construction. He also pretended that GW Sg. had enjoyed the
6  right to the WTT Token sales proceeds in the first place.

7      136.   In July 2018, Usmanov told Carlson that Kuzenny was embezzling
8  funds from WTT token holders who stored their share of Giga Watt's revenues in
9  wallets controlled by Cryptonomos. When Carlson confronted Kuzenny, Kuzenny
10 did not deny the embezzlement. Instead, he asked for more time to replenish the
11 funds, writing, "Please don't break the balls."

12     137.   In August 2018 Carlson resigned. His last paycheck was in
13 September 2018.

14     138.   In October 2018, Raphael Sofair commenced a RICO action against
15 Giga Watt, GW Sg., and Carlson for claims arising from GW Sg.'s sale of miners
16 after the GW ICO ended. According to the allegations, after the GW ICO ended,
17 GW Sg. sold miners without regard to Giga Watt's capacity to run them. When
18 Giga Watt informed these miner purchasers that their miners would be deployed
19 after WTT Token holders' miners were deployed, they sued. Sofair's attorney is
20 currently also representing Jun Dam in litigation pending in the U.S. District
21 Court, E.D. Washington against Perkins, Case No. 20-264.

22
23
24 FIRST AMENDED COMPLAINT – Page 37
25

## FIRST CLAIM FOR RELIEF
### *(Breach of Fiduciary Duty – Perkins)*

139.   Plaintiff incorporates all prior allegations by reference as if set forth fully herein.

140.   Perkins owed Giga Watt a fiduciary duty as the trustee of the GW ICO escrow.

141.   Perkins also owed Giga Watt a fiduciary duty as its attorney.

142.   Perkins provided legal advice to Giga Watt as described herein and Grant, Carlson, and Usmanov reasonably believed that Perkins was Giga Watt's attorney.

143.   Ness knew the White Paper's terms when he agreed to hold the WTT Token sales proceeds.

144.   Perkins failed to act strictly in accordance with the provisions of the White Paper and failed to disburse the WTT Token sales proceeds with scrupulous honesty, skill, and diligence.

145.   Perkins breached its fiduciary duty by:

    a. Allowing GW Sg. to control and direct disbursements of the WTT Token sales proceeds from Perkins IOLTA trust account; and

    b. Disbursing funds from its IOLTA trust account contrary to the White Paper's terms.

146.   Each of these payments violated the escrow terms.

147.   Perkins conduct deprived Giga Watt of its right to control the WTT Token sales proceeds disbursements.

FIRST AMENDED COMPLAINT – Page 38

148.   It deprived Giga Watt of the ability to pay refunds after falling behind in its construction schedule. The plaintiffs in the consolidated McVicker class action have filed a proof of claim for rescission and $30 million in restitution. Giga Watt was left with no funds in the IOLTA trust account to pay any restitution. With knowledge of the allegations that construction had not been completed, Perkins emptied its IOLTA trust account of WTT Token sales proceeds.

149.   Perkins' dissipation of the WTT Token sales proceeds kept Giga Watt out of the capital markets, prevented it from attracting new investors or lenders, destroyed Giga Watt's relationship with WTT Token and miner owners who had invested in Giga Watt and led to this bankruptcy case.

150.   Based on the foregoing, Perkins is jointly and severally liable with the other Defendants to Giga Watt for not less than $22.3 million plus interest, and lost profits.

### SECOND CLAIM FOR RELIEF
*(Breach of Trust – RCW 11.98.085 – Perkins)*

151.   Plaintiff incorporates all prior allegations by reference as if set forth fully herein.

152.   Perkins held the WTT Token sales proceeds in trust for the benefit of Giga Watt.

153.   Perkins breached the trust by treating the WTT Token sales proceeds as if they belonged to GW Sg. and by disbursing the WTT Token sales proceeds without regard to the completion of Giga Watt's cryptocurrency mining facilities.

FIRST AMENDED COMPLAINT – Page 39

154. Perkins is liable for the amount required to restore the value of the trust property to what it would have been had the breach not occurred. That amount is $22.3 million.

## THIRD CLAIM FOR RELIEF
*(Breach of Fiduciary Duty – Usmanov)*

155. Plaintiff incorporates all prior allegations by reference as if set forth fully herein.

156. As the Chief Financial Officer of Giga Watt from May 2017 to September 2018, Usmanov was an officer with discretionary authority.

157. Usmanov failed to exercise his duties under that authority: (a) in good faith, (b) in a manner that Usmanov reasonably believed to be in the best interests of Giga Watt and (c) with the care an ordinarily prudent person in a like position would exercise under similar circumstances.

158. Furthermore, Usmanov's conduct constitutes a reckless, willful, and knowing breach of fiduciary duty amounting to fraud or defalcation.

159. Usmanov breached his fiduciary duty to Giga Watt by:

    a. Enabling Cryptonomos to strip Giga Watt of all its revenues starting in September 2017 until September 2018 when he left Giga Watt in the estimated amount of $5 million;

    b. Helping Kuzenny to misappropriate funds from the WTT Token sales proceeds;

    c. Helping Kuzenny to cover up GW Sg.'s misappropriation of the WTT Token sales proceeds;

FIRST AMENDED COMPLAINT – Page 40

1        d. Allowing approximately $1.2 million to vanish from Giga Watt's

2             bank accounts through an over-the-counter withdrawal from

3             Umpqua Bank; and

4        e. Causing Giga Watt to pay a $180,000 annual salary to Kuzenny

5             although Kuzenny had "no actual duties" and was being called the

6             Chief Operating Officer only so that he could obtain a work visa

7             under false pretenses.

8      160. Usmanov's conduct caused damages to Giga Watt in an amount not

9 less than $28 million.

10     161. The Trustee did not discover and could not reasonably have

11 discovered the facts of Usmanov's conduct until the summer of 2022 when the

12 Trustee obtained more than 220 gigabytes of documents relating to Giga Watt.

13     162. Usmanov's boss, Kuzenny, obstructed the Trustee's investigation of

14 Giga Watt's affairs. In fact, he told the Court in advance that the "Russian team"

15 would not cooperate with any trustee who was appointed. He falsely told the

16 Court that he had provided the Trustee access to Giga Watt's books and records,

17 and he falsely accused the Trustee of stealing or losing post-petition revenues. In

18 fact, the Trustee had no access to the books and records and no access to post-

19 petition revenues generated before his appointment.

20     163. Perkins also hindered and delayed the Trustee's discovery of the facts

21 underlying the claim against Usmanov. In response to the Trustee's queries,

22 Perkins mischaracterized its relationship with Giga Watt, stating falsely that it had

23

24 FIRST AMENDED COMPLAINT – Page 41

25

not represented Giga Watt. And it withheld correspondence in its possession that would have shown Usmanov's significant role in Giga Watt's affairs.

164.   Carlson also hindered and delayed the Trustee's investigation by misrepresenting which assets even belonged to Giga Watt. Further, he claimed to have no Giga Watt records and no knowledge of how to obtain them.

165.   GW Sg. has vanished.

166.   Cryptonomos has vanished.

167.   Kuzenny has vanished.

168.   Markin has claimed that he has no records and has vanished.

169.   Grant has cooperated but has no access to Giga Watt's records, including emails.

## PRAYER

Wherefore, the Plaintiff respectfully requests that the Court:

1.      Enter judgment in Plaintiff's favor and against the Defendants for joint and several liability in an amount to be proved at trial, plus prejudgment and post-judgment interest, costs, and attorneys' fees; and

2.      Grant such other and further relief as the Court deems necessary and just.

Dated: November 23, 2022          POTOMAC LAW GROUP PLLC

By:      _____s/ Pamela M. Egan_____
Pamela M. Egan (WSBA No. 54736)
*Attorneys for Mark D. Waldron, Chapter 7*
*Trustee, Plaintiff*

FIRST AMENDED COMPLAINT – Page 42